## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

ERIC EALY and DARRELL JAMES,

        Plaintiffs,                     CASE NO.: 4:24-cv-00029-RH-MAF

v.                                 JURY TRIAL DEMANDED

WEBBER INFRASTRUCTURE
MANAGEMENT, INC. F/K/A
FERROVIAL SERVICES
INFRASTRUCTURE, INC.,

        Defendant.
_____/

## AMENDED COMPLAINT

Plaintiffs, ERIC EALY ("Mr. Ealy") and DARRELL JAMES ("Mr. James") (hereinafter referred to collectively as "Plaintiffs"), by and through their undersigned counsel, hereby complain of Defendant, WEBBER INFRASTRUCTURE MANAGEMENT, INC., F/K/A FERROVIAL SERVICES INFRASTRUCTURE, INC. ("Defendant" and/or "WIM"), and allege as follows:

## INTRODUCTION

1. This case involves two black men who were unlawfully discriminated against and retaliated against by their employer on the basis of their race and color.

2. Plaintiffs seek monetary relief to redress the Defendant's unlawful employment practices in violation of 42 U.S.C. § 1981 *et seq*. ("Section 1981") and

1

the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes *et seq.* ("FCRA"). Additionally, this action seeks to redress Defendant's deprivation of Plaintiffs' personal dignity and their right to pursue equal employment opportunities.

## PARTIES

3.    Plaintiff, ERIC EALY ("Mr. Ealy") is an individual Black man, a resident of Madison, Florida, over the age of eighteen years, and otherwise *sui juris*.

4.    Plaintiff, DARRELL JAMES ("Mr. James"), is an individual Black man, a resident of Madison, Florida, over the age of eighteen years, and otherwise *sui juris*.

5.    Defendant, WEBBER INFRASTRUCTURE MANAGEMENT, INC., F/K/A FERROVIAL SERVICES INFRASTRUCTURE, INC. (hereinafter referred to as "Defendant" or "WIM"), is a Virginia for-profit corporation with its principal place of business located at 10415 Morado Circle, Bldg. 2, Suite 200, Austin, Texas 78759.

6.    At all times material hereto, Plaintiffs were employed at Defendant WIM's office located at 1311 W. Base Street, Madison, FL 32340 (the "Madison location") during their respective periods of employment.

7.    The exact number of employees of Defendant is unknown, but upon information and belief, there are well more than the statutory minimum under the FCRA.

2

8.     Defendant is an "employer" within the meaning of Fla. Stat. 760.02(7).

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

10.     Venue is proper under 28 U.S.C. § 1391 because the events giving rise to this action were committed within the jurisdiction of the United States District Court for the Northern District of Florida. This action is authorized and instituted pursuant to 42 U.S.C. § 1981.

## ADMINISTRATIVE PREREQUISITES

11.     Mr. Ealy has complied with all statutory prerequisites in order to file this action.

12.     On or about November 8, 2022, Mr. Ealy timely filed a Charge of Discrimination (Charge No. 511-2023-00427) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

13.     Eric Ealy is timely commencing this action more than 180 days since the filing of his charge of discrimination.

## FACTUAL ALLEGATIONS

### Plaintiff Ealy's Employment with Defendant

14.     In or around March 16, 2022, Defendant hired Mr. Ealy as a Maintenance Technician.

15.     At all times material, Mr. Ealy was considered a satisfactory employee and had a record of positive performance.

16.     As a Maintenance Technician, Mr. Ealy was responsible for a plethora of tasks in order to maintain hundreds of miles of state roadways. Mr. Ealy's role of Maintenance Technician involved Mr. Ealy to complete tasks, including but not limited to: 1) operating a tractor and skid machine, 2) mowing and weeding extensive tracts of land in the community, 3) clearing roadkill, trees, and trash off of the highways, and 4) performing maintenance of traffic.

17.     At all times material, Russ Flowers ("Mr. Flowers") was an individual non-black male, who was employed by Defendant as Project Manager. Mr. Flowers asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, promote, suspend and/or discipline Plaintiffs.

18.     At all times material, Stephen Bearden ("Mr. Bearden") was an individual non-black male, who was employed by Defendant as Project Superintendent. Mr. Bearden asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, promote, suspend and/or discipline Plaintiffs.

19.     At all times material, Warren Garcia ("Mr. Garcia") was an individual non-black male, who was employed by Defendant as Project Foreman. Mr. Garcia

asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, promote, suspend and/or discipline Plaintiffs.

20.     Plaintiffs' supervisors included but were not limited to Mr. Flowers, Mr. Bearden, and Mr. Garcia.

21.     From the onset of Mr. Ealy's employment, Defendant assigned him to work alongside fellow technician, "Bo" Roebuck [FIRST NAME UNKNOWN] ("Mr. Roebuck").

22.     From the onset of Mr. Ealy's employment, Mr. Roebuck subjected Plaintiff to discrimination on the basis of his race and color.

23.     By means of example, on or around the very first day of Mr. Ealy's employment, Mr. Roebuck told him, "Do you have a problem with me speaking about race? Because I don't see anything wrong with it." Mr. Ealy responded, "I don't want to play a role in that activity, I do not want to talk about race." Mr. Roebuck chuckled before replying, "I had a problem with a Black guy from my last job too."

24.     Mr. Ealy was unsure why Mr. Roebuck was telling him this but decided to keep his head down and limit his interactions with Mr. Roebuck.

25.     Later that day, Mr. Roebuck walked up to Mr. Ealy and said, "Eric, I've never seen a black man own a boat. Do you know why? Because he wouldn't be able to afford it. It's a White tradition." Mr. Roebuck continued, "sometimes when I go

fishing, I'll catch mudfish and give it to the black people because mudfish are at the bottom of the food chain and eat trash."

26.     Mr. Ealy was shocked and disgusted by Mr. Roebuck's discriminatory conduct, but he knew his job would be in jeopardy if he opposed the racist conduct.

27.     This was just the beginning of Mr. Roebuck's racist conduct.

28.     Mr. Roebuck started calling Mr. Ealy "boy", a disparaging racial slur historically directed towards black men to imply a subservient status.

29.     Roebuck's discriminatory conduct only grew worse over time. Soon thereafter, Mr. Roebuck began calling Mr. Ealy a *nigger*. By means of example, Mr. Roebuck started conversations with Mr. Ealy by asking "what's up my *nigger*?"

30.     Mr. Ealy told Mr. Roebuck to stop saying that egregious and offensive word, but Mr. Roebuck ignored him.

31.     On one occasion, while Mr. Ealy and Mr. Roebuck were on a job assignment, Mr. Roebuck shouted at Mr. Ealy, "I don't see a *nigger* outworking me!"

32.     Mr. Ealy explained to Mr. Roebuck that he felt uncomfortable and dehumanized when Mr. Roebuck called him a *nigger*.

33.     Again, while working a job assignment, Mr. Roebuck attempted to compete with Mr. Ealy and exclaimed, "I didn't realize we hired *niggers* here!"

34.     Mr. Ealy repeatedly asked Mr. Roebuck to stop using such a disgraceful and offensive word, but the racist conduct persisted.

35.     Mr. Roebuck eventually became comfortable saying the word *nigger* regularly in the workplace despite Mr. Ealy's repeated protests.

36.     Mr. Roebuck continued berating Mr. Ealy with racist remarks, calling him a "dumb *nigger*," and telling him that "*Blacks* want everything easy in life, that's what's wrong with you guys… I'm glad Trump won."

37.     These degrading and insulting comments continued much to Mr. Roebuck's pleasure. Mr. Roebuck even insisted on telling Mr. Ealy a joke: "What do you call a black man after you hang him? I'll tell you, a hung *nigger*!"

38.     Mr. Roebuck's onslaught of racist and conduct persisted for months, telling Plaintiffs that "*blacks* don't listen… *blacks* are always killing *blacks*… *blacks* don't like to work."

39.     Mr. Roebuck continued berating Mr. Ealy with racist remarks, greeting him by saying, "what's up *boy*," calling him a "dumb *nigger*," and telling him that "*Blacks* want everything easy in life, that's what's wrong with *you guys*… I'm glad Trump won."

### Plaintiff James' Employment with Defendant

40.     On or around May 2, 2022, Defendant hired Darryl James ("Mr. James"), an individual Black male, as a Maintenance Technician.

7

41.     At all times material, Mr. James was considered a satisfactory employee and had a record of positive performance.

42.     Mr. James had the same job duties and responsibilities as Mr. Ealy because Defendant employed both as Maintenance Technicians.

43.     Mr. James was also supervised by Mr. Flowers, Mr. Bearden, and Mr. Garcia.

44.     Defendant required Mr. James to work alongside Mr. Roebuck and Mr. Ealy.

45.     Mr. Roebuck subjected Mr. James to similar racially discriminatory conduct Mr. Ealy experienced, which Mr. James and Mr. Ealy were often subjected to simultaneously.

46.     By means of example, Mr. Roebuck made racially discriminatory remarks to Mr. James, including calling Mr. James "*boy*," "*nigger*," and "dumb *nigger*."

47.     Mr. Roebuck similarly told Mr. James that "*blacks* don't listen… *blacks* are always killing *blacks*… *blacks* don't like to work… *blacks* want everything easy in life… I'm glad Trump won."

48.     Further, Mr. Roebuck also told Mr. James "what do you call a black man after you hang him? I'll tell you, a hung *nigger*!"

49.     Mr. James was disgusted by the vile and offensive language targeted towards him. Mr. James was devastated and could not believe that Defendant allowed Mr. Roebuck to treat him like this.

50.     Mr. James told Mr. Roebuck that his behavior was unacceptable, and that Mr. Roebuck needed to treat Plaintiffs with more respect.

51.     Yet, Mr. Roebuck's unlawful and discriminatory comments persisted for the duration of his employment.

52.     Plaintiffs were humiliated and appalled by the discriminatory conduct but felt as if they had no choice but to continue enduring the harassment in order to ensure continued employment with Defendant.

### Defendant's Unlawful Retaliation Against Plaintiffs

53.     Plaintiffs had suffered enough at the hands of Mr. Roebuck and reported Roebuck's conduct to Mr. Garcia, their immediate supervisor. Plaintiffs recounted Roebuck's harassing conduct to Mr. Garcia, including Roebuck's repeated use of racial slurs and discriminatory comments.

54.     Plaintiffs hoped their complaint to Mr. Garcia would put an end to the discriminatory conduct in the workplace, but in fact, it only made the issue worse.

55.     Mr. Garcia did not take any effective measures in halting Mr. Roebuck's discriminatory behavior. Instead, Mr. Garcia encouraged Mr. Roebuck's

behavior by his inaction, ultimately failing to reprimand or punish Mr. Roebuck whatsoever.

56. Mr. Garcia even participated in the racially discriminatory conduct, calling each Plaintiff "*boy*" on several occasions following the incident and allowed Mr. Roebuck to work in the air-conditioned office while assigning Plaintiffs outdoor work in the field.

57. Plaintiffs collectively complained about Mr. Roebuck's racist conduct to Mr. Garcia two more times in or around May 2022 and June 2022. Mr. Garcia continued to disregard these complaints and took no further measures to ensure Defendant would offer a workplace free from racism or discrimination.

58. Not only did Mr. Garcia fail to notify any Human Resources officers or supervisors about Plaintiffs' complaints and reports, but Mr. Garcia explicitly told Plaintiffs, "I do not believe you."

59. Still to this point in time, neither Plaintiff was written up for poor performance or behavioral issues.

60. Mr. Garcia began to retaliate against Plaintiffs following their reports and complaints about unlawful racist conduct.

61. Mr. Garcia's retaliatory conduct included but was not limited to (1) making Plaintiffs eat lunch outside in the heat while Mr. Roebuck was allowed to eat lunch in the air-conditioned truck; (2) improperly disciplining Plaintiffs for

failing to wear a seatbelt although Plaintiffs were wearing a seatbelt, and additionally failed to discipline Mr. Roebuck for not wearing a seatbelt; (3) assigning unfavorable tasks to Plaintiffs such as cleaning up trash and roadkill off the highways and outdoor field work, neither task was assigned to non-black coworkers; (4) assigning favorable tasks to Mr. Roebuck such as operating the air-conditioned tractor or performing office work indoors, and (5) unreasonably subjecting Plaintiffs' work to harsher scrutiny and discipline than their non-black coworkers.

62.    Plaintiffs' hopes of working in a discrimination-free space were crushed and Mr. Roebuck's racist onslaught persisted throughout the duration of Plaintiffs' employment.

63.    In or around early June 2022, Defendant gave Plaintiffs no choice but to go over Mr. Garcia's head and report the racial slurs and racist comments made by Mr. Roebuck and Mr. Garcia to Mr. Bearden.

64.    Plaintiffs demanded that the racial slurs and racist comments stop once and for all, making this complaint the fourth complaint of discrimination to Defendant. Plaintiffs explained that they have continuously been mistreated despite never missing a day of work and always trying their best to successfully fulfill all job duties.

65.    Mr. Bearden asked Plaintiffs if they liked their job, and Plaintiffs responded by informing Mr. Bearden that they loved their job and had taken several

courses and earned maintenance of traffic certificates to continue working for Defendant. Plaintiffs could not risk losing any financial security and tried their best to maintain stable employment.

66.     Mr. Bearden told Plaintiffs that he would speak to Mr. Roebuck and Mr. Garcia.

67.     The following day, Plaintiffs arrived to work and began unloading the truck to prepare for the day.

68.     Mr. Garcia seemed particularly frustrated and started giving Plaintiffs orders while addressing each of them as "boy."

69.     Mr. Ealy opposed Mr. Garcia's racist conduct, making it clear that he would no longer tolerate racist conduct of any kind.

70.     As tensions heightened, Mr. James went to Mr. Bearden to intervene. As a result, Mr. Bearden sent Plaintiffs home.

71.     Plaintiffs asked why they were being sent home, and Mr. Bearden responded that he was following procedure instructed by Mr. Flowers.

72.     Plaintiffs pleaded with Mr. Bearden and stated that they had not done anything wrong and in fact, had been repeatedly mistreated.

73.     Mr. Bearden ignored Plaintiffs' pleas and sent them home for the day.

74.     On or around June 14, 2022, Plaintiffs were suspended without pay.

75.    On or around June 16, 2022, Mr. Flowers called Mr. Ealy, explaining that Plaintiffs were suspended because of the interaction with Mr. Garcia on the day they were sent home. Mr. Flowers provided an additional reason for Plaintiffs' suspension, that Plaintiffs refused to eat the food at the maintenance of traffic training program in Jacksonville the week prior.

76.    Mr. Ealy tried telling Mr. Flowers about the months of unlawful discriminatory treatment he endured while working for Defendant, but Mr. Flowers did not listen.

77.    Plaintiffs regretted reporting the unlawful racist conduct to any of their supervisors because Defendant immediately began the process of terminating Plaintiffs following their reports.

78.    On or around June 27, 2022, Stacy Wessel ("Ms. Wessel"), an individual female employed as Human Resources for Defendant, contacted Plaintiffs following their suspension. Plaintiffs again reported the ongoing racial slurs and comments they had been subjected to, as well as their complaints to several different supervisors.

79.    Rather than taking meaningful corrective actions regarding Plaintiffs' complaints, on or about June 27, 2022, Defendant unlawfully terminated Plaintiffs.

80.    None of Plaintiffs' coworkers or supervisors were terminated, including Mr. Garcia or Mr. Roebuck.

81.    The above-described conduct are just some examples of the discriminatory conduct and retaliation to which Defendant subjected Plaintiffs.

82.    Defendant unlawfully discriminated against Plaintiffs on the basis of their race and color and retaliated against Plaintiffs for opposing Defendant's unlawful employment practices.

83.    Defendant violated Section 1981 and the FCRA by subjecting Plaintiffs to a hostile work environment, disparate treatment, and retaliation.

84.    At all relevant times, Defendant's employees were acting as agents of Defendant in their discriminatory, retaliatory, and unlawful treatment of Plaintiffs.

85.    At all relevant times, Defendant acted with deliberate indifference to the discriminatory treatment, hostile work environment, and retaliation complained of herein.

86.    As a result of Defendant's actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

87.    As a result of the act and conduct complained herein, Plaintiffs have suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

14

88.     Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against Defendant.

89.     Defendant is either directly or vicariously responsible for the unlawful facts and conduct complained herein.

**CAUSES OF ACTION**
**COUNT I**
**42 U.S.C. § 1981**
**RACE AND COLOR DISCRIMINATION**
**(Plaintiff Ealy against Defendant)**

90.     Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

91.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

92.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

93.     Mr. Ealy is a black individual, and he is therefore a protected class member.

94.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

95.     Defendant subjected Mr. Ealy to discriminatory treatment on the basis of his race and skin color.

96.     Defendant's discriminatory treatment included, but was not limited to, denying Mr. Ealy the same employment privileges afforded to his non-Black co-workers; denying Mr. Ealy the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; assigning Mr. Ealy unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and outdoor field work; falsely accusing Mr. Ealy of driving without a seatbelt; suspending Mr. Ealy without pay; and unlawfully terminating Mr. Ealy.

97.     Defendant targeted Mr. Ealy because he is black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Ealy was forced to endure.

98.     The discriminatory actions of Defendant against Mr. Ealy, as described and set forth above, constitute an adverse employment action for purposes of Section

1981. In subjecting Mr. Ealy to adverse employment actions, Defendant intentionally discriminated against Mr. Ealy with respect to the compensation, terms, conditions, or privileges of his employment.

99. As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

100. Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

101. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ealy's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

102. Defendant's conduct deprived Mr. Ealy of his statutory rights guaranteed under Section 1981.

103. Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.


[THIS SPACE INTENTIONALLY LEFT BLANK]

## COUNT II
## 42 U.S.C. § 1981
## HOSTILE WORK ENVIRONMENT
### (Plaintiff Ealy against Defendant)

104. Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

105. Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

106. Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

107. Mr. Ealy is a black individual, and he is therefore a protected class member.

108. The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

18

109.   Defendant's severe and pervasive conduct included, but was not limited to, subjecting Mr. Ealy to the daily use of racial slurs including *nigger*, dumb *nigger*, hung *nigger*, and boy; denying Mr. Ealy the same employment privileges afforded to his non-Black co-workers; denying Mr. Ealy the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; assigning Mr. Ealy unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and outdoor field work; and falsely accusing Mr. Ealy of driving without a seatbelt.

110.   Defendant targeted Mr. Ealy because he is black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Ealy was forced to endure.

111.   Defendant's discriminatory conduct toward Mr. Ealy negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Ealy feel isolated, humiliated, embarrassed, and ashamed.

112.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

113.   Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

114.   Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

115.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ealy's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

116.   Defendant's conduct deprived Mr. Ealy of his statutory rights guaranteed under Section 1981.

117.   Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.

<u>**COUNT III**</u>
**42 U.S.C. § 1981**
**RETALIATION**
**(Plaintiff Ealy against Defendant)**

118.   Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

119.   Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

120.   Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

121.   The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

122.   Defendant retaliated against Mr. Ealy for reporting discrimination on the basis of his race and skin color in violation of Section 1981.

123.   Mr. Ealy engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

124.   Mr. Ealy was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

125.   Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

126.   Mr. Ealy first engaged in protected activity by reporting Mr. Roebuck's unlawful discriminatory behavior and comments to his supervisor, Mr. Garcia. Mr. Garcia, in return, started to assign Mr. Ealy to less favorable outdoor field work,

21

deny Mr. Ealy access to air conditioning during lunch, and denied Mr. Ealy breaks. Mr. Garcia additionally started to call Mr. Ealy "boy" on several occasions.

127.   Mr. Ealy further engaged in protected activity by reporting both Mr. Roebuck's and Mr. Garcia's racist and unlawful activity to Mr. Bearden. Within a short period of time following the report, Mr. Bearden sent Mr. Ealy home and suspended Mr. Ealy's employment.

128.   Shortly thereafter, Mr. Ealy engaged in protected activity by reporting Mr. Roebuck's and Mr. Garcia's racist unlawful activity to Mr. Flowers, who extended Mr. Ealy's suspension as a result of Mr. Ealy engaging in a protected activity.

129.   Ultimately, Mr. Ealy again reported Mr. Roebuck's and Mr. Garcia's unlawful racist conduct to Ms. Wessel, who terminated Mr. Ealy's employment as a result of Mr. Ealy engaging in a protected activity.

130.   There is a causal connection between Mr. Ealy's reports of unlawful discrimination and Defendant terminating Mr. Ealy's employment.

131.   In response to Mr. Ealy opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ealy.

132.   Defendant retaliated against Mr. Ealy by engaging in conduct, including but not limited to, assigning Mr. Ealy less favorable tasks such as cleaning

trash and roadkill off the highway and outdoor field work; refusing Mr. Ealy access to air conditioning during breaks; reducing the amount of breaks given to Mr. Ealy; calling Mr. Ealy "boy;" falsely accusing Mr. Ealy of failing to wear his seatbelt; suspending Mr. Ealy without pay; and unlawfully terminating Mr. Ealy.

133.  Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ealy because of his protected activities.

134.  Any reasonable employee in Mr. Ealy's position would be dissuaded from reporting racism if they knew that they would be subjected to the kind of treatment that Mr. Ealy was forced to endure.

135.  Defendant's alleged bases for its adverse employment actions against Mr. Ealy are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

136.  As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

137.  Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

138.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ealy's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

139.   Defendant's conduct deprived Mr. Ealy of his statutory rights guaranteed under Section 1981.

140.   Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.

## CAUSES OF ACTION
## COUNT IV
### 42 U.S.C. § 1981
### RACE AND COLOR DISCRIMINATION
### (Plaintiff James against Defendant)

141.   Mr. James reincorporates the factual allegations in Paragraphs 14 through 89.

142.   Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

143.   Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of

24

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

144.   Mr. James is a black individual, and he is therefore a protected class member.

145.   The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

146.   Defendant subjected Mr. James to discriminatory treatment on the basis of his race and skin color.

147.   Defendant's discriminatory treatment included, but was not limited to, denying Mr. James the same employment privileges afforded to his non-Black co-workers; denying Mr. James the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; assigning Mr. James unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and outdoor field work; suspending Mr. James without pay; and unlawfully terminating Mr. James.

148.   Defendant targeted Mr. James because he is black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. James was forced to endure.

149.   The discriminatory actions of Defendant against Mr. James, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. James to adverse employment actions, Defendant intentionally discriminated against Mr. James with respect to the compensation, terms, conditions, or privileges of his employment.

150.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. James has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. James has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

151.   Mr. James accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

152.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. James' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

153.   Defendant's conduct deprived Mr. James of his statutory rights guaranteed under Section 1981.

154.   Mr. James further requests that his attorney's fees and costs be awarded as permitted by law.

### COUNT V
### 42 U.S.C. § 1981
### HOSTILE WORK ENVIRONMENT
### (Plaintiff James against Defendant)

155.   Mr. James reincorporates the factual allegations in Paragraphs 14 through 89.

156.   Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

157.   Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

158.   Mr. James is a black individual, and he is therefore a protected class member.

159.   The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe

that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

160.    Defendant's severe and pervasive conduct included, but was not limited to, subjecting Mr. James to the daily use of racial slurs including *nigger*, dumb *nigger*, hung *nigger*, and boy; denying Mr. James the same employment privileges afforded to his non-Black co-workers; denying Mr. James the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; and assigning Mr. James unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and outdoor field work.

161.    Defendant targeted Mr. James because he is black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. James was forced to endure.

162.    Defendant's discriminatory conduct toward Mr. James negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. James feel isolated, humiliated, embarrassed, and ashamed.

163.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. James has suffered and will

continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

164.   Mr. James has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

165.   Mr. James accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

166.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. James' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

167.   Defendant's conduct deprived Mr. James of his statutory rights guaranteed under Section 1981.

168.   Mr. James further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT VI
### 42 U.S.C. § 1981
### RETALIATION
### (Plaintiff James against Defendant)

169.   Mr. James reincorporates the factual allegations in Paragraphs 14 through 89.

170.   Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory

to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

171.   Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

172.   The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

173.   Defendant retaliated against Mr. James for reporting discrimination on the basis of his race and skin color in violation of Section 1981.

174.   Mr. James engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

175.   Mr. James was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

176.   Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

177.   Mr. James first engaged in protected activity by reporting Mr. Roebuck's unlawful discriminatory behavior and comments to his supervisor, Mr. Garcia. Mr. Garcia, in return, started to assign Mr. James to less favorable outdoor field work, deny Mr. James access to air conditioning during lunch, and denied Mr. James breaks. Mr. Garcia additionally started to call Mr. James "boy" on several occasions.

178.   Mr. James further engaged in protected activity by reporting both Mr. Roebuck's and Mr. Garcia's racist and unlawful activity to Mr. Bearden. Within a short period of time following the report, Mr. Bearden sent Mr. James home and suspended Mr. James's employment.

179.   Shortly thereafter, Mr. James engaged in protected activity by reporting Mr. Roebuck's and Mr. Garcia's racist unlawful activity to Mr. Flowers, who extended Mr. James's suspension as a result of Mr. James engaging in a protected activity.

180.   Ultimately, Mr. James again reported Mr. Roebuck's and Mr. Garcia's unlawful racist conduct to Ms. Wessel, who terminated Mr. James's employment as a result of Mr. James engaging in a protected activity.

181.   There is a causal connection between Mr. James's reports of unlawful discrimination and Defendant terminating Mr. James's employment.

182.   In response to Mr. James opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. James.

183.   Defendant retaliated against Mr. Ealy by engaging in conduct, including but not limited to, assigning Mr. James less favorable tasks such as cleaning trash and roadkill off the highway and outdoor field work; refusing Mr. James access to air conditioning during breaks; reducing the amount of breaks given to Mr. James; calling Mr. James "boy;" suspending Mr. James without pay; and unlawfully terminating Mr. James.

184.   Defendant took the above-mentioned materially adverse actions, among others, against Mr. James because of his protected activities.

185.   Any reasonable employee in Mr. James' position would be dissuaded from reporting racism if they knew that they would be subjected to the kind of treatment that Mr. James was forced to endure.

186.   Defendant's alleged bases for its adverse employment actions against Mr. James are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

187.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. James has suffered and will continue to suffer financial and economic damages in the form of lost wages (front

and back pay) and lost benefits. Mr. James has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

188.   Mr. James accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

189.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. James's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

190.   Defendant's conduct deprived Mr. James of his statutory rights guaranteed under Section 1981.

191.   Mr. James further requests that his attorney's fees and costs be awarded as permitted by law.

<u>**COUNT VII**</u>
**§ 760.10(1), Fla. Stat.**
**RACE AND COLOR DISCRIMINATION**
**(Plaintiff Ealy against Defendant)**

192.   Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

193.   The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and color. § 760.10(1)(a), Fla. Stat.

194.   Mr. Ealy is a black individual, and he is therefore a protected class member.

195.   The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

196.   Defendant subjected Mr. Ealy to discriminatory treatment on the basis of his race and skin color.

197.   Defendant's discriminatory treatment included, but was not limited to, denying Mr. Ealy the same employment privileges afforded to his non-Black co-workers; denying Mr. Ealy the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; assigning Mr. Ealy unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and operating weed eaters; falsely accusing Mr. Ealy of driving without a seatbelt; suspending Mr. Ealy without pay; and unlawfully terminating Mr. Ealy.

198.   Defendant targeted Mr. Ealy because he is black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Ealy was forced to endure.

199.   The discriminatory actions of Defendant against Mr. Ealy, as described and set forth above, constitute an adverse employment action for purposes of the

FCRA. In subjecting Mr. Ealy to adverse employment actions, Defendant intentionally discriminated against Mr. Ealy with respect to the compensation, terms, conditions, or privileges of his employment.

200. As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

201. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ealy's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

202. The conduct of Defendant deprived Mr. Ealy of his statutory rights guaranteed under the FCRA.

203. Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.


[THIS SPACE INTENTIONALLY LEFT BLANK]

## COUNT VIII
### § 760.10(1), Fla. Stat.
### HOSTILE WORK ENVIRONMENT
### (Plaintiff Ealy against Defendant)

204. Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

205. The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and skin color. § 760.10(1), Fla. Stat.

206. Mr. Ealy is a black individual, and he is therefore a protected class member.

207. The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

208. Defendant's severe and pervasive conduct included, but was not limited to, subjecting Mr. Ealy to the daily use of racial slurs including *nigger*, dumb *nigger*, hung *nigger*, and boy; denying Mr. Ealy the same employment privileges afforded to his non-Black co-workers; denying Mr. Ealy the use of facilities and benefits afforded to non-black coworkers, such as denying access to air-conditioned trucks during lunch and reducing the number of breaks during work shifts; assigning Mr.

Ealy unfavorable tasks that non-black coworkers were not required to complete, such as cleaning up trash and roadkill off the highways and operating weed eaters; and falsely accusing Mr. Ealy of driving without a seatbelt.

209.   Defendant targeted Mr. Ealy because he is black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Ealy was forced to endure.

210.   Defendant's discriminatory conduct toward Mr. Ealy negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Ealy feel isolated, humiliated, embarrassed, and ashamed.

211.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

212.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Ealy's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

213.   The conduct of Defendant deprived Mr. Ealy of his statutory rights guaranteed under the FCRA.

214.   Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT IX**
**§ 760.10(7), Fla. Stat.**
**RETALIATION**
**(Plaintiff Ealy against Defendant)**

215.   Mr. Ealy reincorporates the factual allegations in Paragraphs 14 through 89.

216.   The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

217.   The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

218.   Mr. Ealy engaged in a protected activity when he opposed Defendant's unlawful discriminatory conduct on the basis of his race and color.

219.   Mr. Ealy engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

220.   Mr. Ealy was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

221. Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

222. Mr. Ealy first engaged in protected activity by reporting Mr. Roebuck's unlawful discriminatory behavior and comments to his supervisor, Mr. Garcia. Mr. Garcia, in return, started to assign Mr. Ealy less favorable work, deny Mr. Ealy access to air conditioning during lunch, and denied Mr. Ealy breaks. Mr. Garcia additionally called Mr. Ealy "boy" on several occasions.

223. Mr. Ealy further engaged in protected activity by reporting both Mr. Roebuck's and Mr. Garcia's racist and unlawful activity to Mr. Bearden. Within a short period of time following the report, Mr. Bearden sent Mr. Ealy home and suspended Mr. Ealy's employment.

224. Shortly thereafter, Mr. Ealy engaged in protected activity by reporting Mr. Roebuck's and Mr. Garcia's racist unlawful activity to Mr. Flowers, who extended Mr. Ealy's suspension as a result of Mr. Ealy engaging in a protected activity.

225. Ultimately, Mr. Ealy again reported Mr. Roebuck's and Mr. Garcia's unlawful racist conduct to Ms. Wessel, who terminated Mr. Ealy's employment as a result of Mr. Ealy engaging in a protected activity.

226.   There is a causal connection between Mr. Ealy's reports of unlawful discrimination and Defendant terminating Mr. Ealy's employment.

227.   In response to Mr. Ealy opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ealy.

228.   Defendant retaliated against Mr. Ealy by engaging in conduct, including but not limited to, assigning Mr. Ealy less favorable tasks such as cleaning trash and roadkill off the highway; refusing Mr. Ealy access to air conditioning during breaks; reducing the amount of given to Mr. Ealy; calling Mr. Ealy "boy;" falsely accusing Mr. Ealy of failing to wear his seatbelt; suspending Mr. Ealy without pay; and unlawfully terminating Mr. Ealy.

229.   Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ealy because of his protected activities.

230.   Any reasonable employee in Mr. Ealy's position would be dissuaded from reporting racism if they knew that they would be subjected to the kind of treatment that Mr. Ealy was forced to endure.

231.   Defendant's alleged bases for its adverse employment actions against Mr. Ealy are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

232.   As a direct and proximate result of Defendant's retaliatory conduct in violation of the FCRA, Mr. Ealy has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ealy has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Ealy accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

233.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Ealy's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

234.   The conduct of Defendant deprived Mr. Ealy of his statutory rights guaranteed under the FCRA.

235.   Mr. Ealy further requests that his attorney's fees and costs be awarded as permitted by law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request this Court enter judgment against the Defendant for all damages suffered by the Plaintiffs, including emotional distress damages, punitive damages, liquidated damages, statutory damages,

interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of Defendant's conduct in violation of Section 1981 and the FCRA.

Dated: Miami, Florida      **DEREK SMITH LAW GROUP, PLLC**
April 15, 2024            *Counsel for Plaintiffs*

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Danielb@dereksmithlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on April 15, 2024, on all counsel of record on the service list below via CM/ECF.

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.

## <u>SERVICE LIST</u>

**FISHER & PHILLIPS, LLP**

Kenneth A. Knox
Florida Bar No.: 829455
Email: kknox@fisherphillips.com
Fisher & Phillips LLP
201 East Last Olas Boulevard, Suite 1700
Fort Lauderdale, Florida, 33301
Telephone: (954) 525-4800
Facsimile: (954) 525-8739

*Attorneys for Defendant*