## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| **ERIC EALY and DARRELL JAMES,** | |
| **Plaintiffs,** | **DISTRICT JUDGE R. HINKLE** |
| **v.** | **CIVIL ACTION NO. 4:24-CV-00029** |
| **WEBBER INFRASTRUCTURE MANAGEMENT, INC. F/K/A FERROVIAL SERVICES INFRASTRUCTURE, INC.,** | |
| **Defendant.** | |

## DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

The defendant, Webber Infrastructure Management, Inc. f/k/a Ferrovial Services Infrastructure, Inc. (the "defendant" or "Ferrovial"), hereby files this Partial Motion for Summary Judgment and Incorporated Memorandum of Law. As grounds for this motion, the defendant will show that neither plaintiff has any evidence supporting his claim(s) for race and color discrimination (Am. Comp. [ECF. No. 22], Counts I, IV and VII). Because there is no genuine dispute as to any material fact in connection with whether each plaintiff can establish a *prima facie* case of discrimination and was terminated for a legitimate, non-discriminatory reason, the defendant is entitled to judgment as a matter of law.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Defendant

Ferrovial provides road maintenance services, such as repairing guardrails, litter control, landscaping, bridge repairs, and tunnel monitoring and maintenance throughout the United States. (Ex. 1, Declaration of Stephen Bearden ¶ 2). One of the defendant's offices is located in Madison, Florida. (Ex. 2, Bearden Dep. 11:8-10.) To perform the referenced services at jobsites near Madison, Ferrovial stores a tractor, two "gators," one Kawasaki mule, two zero-turn mowers, and one skid-steer. (Ex. 1, Declaration of Stephen Bearden ¶ 3.) Only the tractor and skid-steer are air-conditioned. (*Id.*) At the start of each day, employees use Company vehicles to transport themselves and most equipment from the office to jobsites in Madison and surrounding area roadways up to 30 miles away. (*Id.*)

The Madison office is a small operation; it employed seven individuals during the relevant period of March 2022 - June 2022. (Ex. 3.) Russ Flowers is the Project Manager and Stephen Bearden is the Project Superintendent, positions they held during the plaintiffs' employment. (Ex. 2, Bearden Dep. 27:23-25; Ex. 1, Declaration of Stephen Bearden ¶ 2.) Foreman Juan Garcia started working for the defendant on or around December 3, 2019, and during the relevant period was responsible for directing the work of three maintenance technicians. (Ex. 1, Declaration of Stephen Bearden ¶ 5, Ex. 3) Because of the scope of the work done

by the Madison office – it is responsible for maintaining hundreds of miles of state roadways – and the small number of technicians, Mr. Garcia was a working foreman. (*Id.*) Even Mr. Bearden sometimes does work typically performed by maintenance technicians, such as field work and trash collection. (Ex. 2, Bearden Dep. 28:1-7.) Shauna Stoddard is the office's Project Administrator. (Ex. 3.) The plaintiffs were employed as maintenance technicians, along with Allen "Bo" Roebuck. (*Id.*) Mr. Roebuck started working for the defendant on or around July 22, 2021. (*Id.*)

**B.    The Relevant Policies**

The defendant is committed to a policy of equal employment opportunity and strict compliance with the laws prohibiting any type of discrimination in employment. (Ex. 4.) All job-related decisions are made without regard to an individual's race, color, or any other protected status. (*Id.*) Further, the defendant has zero tolerance for unlawful discrimination, and has a policy that encourages employees to report to management any concerns they might have regarding possible unlawful discrimination. (Ex. 5.) To ensure that all Company policies are enforced, the defendant has a Human Resources Department. (Ex. 2, Bearden Dep. 59:7-22.) Stacy Wessel is the defendant's Director of Human Resources, Business Partnerships. (Ex. 6, Declaration of Stacy Wessel ¶ 2.) Part of the geographic area she is responsible for includes Florida and Georgia. (*Id.*)

**C.    The Plaintiffs' Employment**

Mr. Bearden hired Eric Ealy (individually "Ealy") and Darrell James (individually "James"). (Ex. 7, Ealy Dep. 16:18-25, 17:1-9, 19:9-12, 44:5-7; Ex. 8, James Dep. 11:8-24; Ex. 1, Declaration of Stephen Bearden ¶ 4.) Ealy began working as a Maintenance Technician on March 22, 2022. (Ex. 7, Ealy Dep. 25:22-25.) The defendant's Employee Handbook and Code of Business Conduct contain the aforementioned policies regarding equal employment opportunity and anti-discrimination. (Ex. 4 - 5.) Ealy acknowledged that he received and read a copy of the defendant's Employee Handbook and Code of Business Conduct. (Ex. 9 - 10.)

When Ealy was hired, he understood that Mr. Bearden – not Mr. Garcia – had authority to make decisions relating to his employment, including his pay, suspension, and termination. (Ex. 7, Ealy Dep. 44-12:25, 45:1-16.) Around the time Ealy started working for the defendant, he was provided a company truck. (Ex. 7, Ealy Dep. 64-13:16.) Ealy would drive this vehicle from his home to the Madison office at the start of the day, from the Madison office to jobsites during the day, and from jobsites to the Madison office and/or his home at the end of the day. (Ex. 7, Ealy Dep. 64-17:22, 65:6-22.) At the defendant's jobsites, Ealy primarily worked in the open, operating a "gator" or the Kawasaki mule. (Ex. 7, Ealy Dep. 131:3-13.) However, the "gators" and Kawasaki mule each have tops which protect occupants from the direct rays of the sun. (Ex. 1, Declaration of Stephen Bearden ¶ 3.)

Moreover, Ealy was permitted to sit in his air-conditioned Company truck during breaks and lunch. (Ex. 1, Declaration of Stephen Bearden ¶ 6.) Ealy claims that he did more work in the sun than his non-black co-workers, but admits that none of the defendant's employees ever told him that he was assigned more work in the open sun because he was black. (Ex. 7, Ealy Dep. 131:3-17.) Ealy also admitted that he did not know if any work was assigned to maintenance technicians based on an employee's time and experience with the Company. (Ex. 7, Ealy Dep. 132:13-17.)

From the beginning of his employment, Ealy was a disruptive employee, especially to Mr. Garcia personally. (Ex. 11.) For instance, Ealy frequently questioned Mr. Garcia's instructions about the work he was assigned, and sometimes would call Mr. Bearden to ask for his work assignment even after Mr. Garcia had already advised him on the day's tasks. (Ex. 2, Bearden Dep. 87:2-25; 88:1-7; Ex. 11) Ealy occasionally also responded to Mr. Garcia's instructions by swearing at him. (Ex. 11.) According to Ealy, Mr. Garcia was "hot-headed," and allegedly would become "outrageous" when Ealy had questions or made comments. (Ex. 7, Ealy Dep. 55:2-13.) After James was hired, Ealy's disruptive behavior became even more pronounced as described below. (Ex. 1, Declaration of Stephen Bearden ¶ 7.)

On or around May 10, 2022, James began working as a Maintenance Technician. (Ex. 8, James Dep. 24:8-25, 25:1-19.) James also acknowledged that he received and reviewed a copy of the defendant's Employee Handbook and Code of

Business Conduct on or around the date he started working. (Ex. 12 - 13.) As with Ealy, Mr. Bearden – not Mr. Garcia – had authority to make decisions affecting the material terms of James' employment. (Ex. 1, Declaration of Stephen Bearden ¶ 4.) During James' first two weeks on the job, he, Ealy, and Mr. Roebuck participated in a tractor driving training conducted by Mr. Bearden. (Ex. 2, Bearden Dep. 85:5-18.) Maintenance technicians are trained to use the tractor because it is the largest and most sophisticated piece of equipment they are asked to operate. (Ex. 1, Declaration of Stephen Bearden ¶ 3.)  At the conclusion of the training, Mr. Bearden determined that James was the best driver of the three. (Ex. 2, Bearden Dep. 85:5-18.) Therefore, he offered James the first opportunity to operate the tractor at jobsites going forward. (Ex. 2, Bearden Dep. 85:5-18.) However, James rejected the offer, informing Mr. Bearden that he preferred to be outside instead of confined in the tractor. (Ex. 2, Bearden Dep. 85:7-25.) Thereafter, James began performing assignments at jobsites with Ealy. (Ex. 8, James Dep. 112:3-25.) No employee ever told James that he was being assigned work in the open because he was black. (Ex. 8, James Dep. 113:15-25, 114:1-9.) James also admits that he did not know why he was assigned more work in the open than his non-black co-workers. (Ex. 8, James Dep. 113:2-14.)

While James typically did not openly challenge Mr. Garcia's authority in the loud, verbal manner Ealy did, he was disruptive in his own way. (Ex. 11.) James would contact Mr. Bearden with Ealy to ask about the day's assignment after

receiving instructions from Mr. Garcia. (Ex. 2, Bearden Dep. 87:2-25, 88:1-7; Ex. 1, Declaration of Stephen Bearden ¶ 8.) Moreover, James frequently gave Mr. Garcia an attitude after being assigned work, and on one occasion, refused Mr. Garcia's instructions regarding overtime work when it was necessary to complete a job. (Ex. 2, Bearden Dep. 100:9-25, 101:1-17; Ex. 11, Ex. 14.) Like Ealy, James claimed he had issues with Mr. Garcia because of Mr. Garcia's attitude and the way he spoke to him. (Ex. 8, James Dep. 49:1-14.) Specifically, according to James, when Mr. Garcia assigned work, he would give orders or make demands instead of asking politely. (Ex. 8, James Dep. 49:18-25.)

After James was hired, Ealy's obnoxious and inappropriate behavior toward Mr. Garcia became more blatant. (Ex. 1, Declaration of Stephen Bearden ¶ 7.) For his part, Mr. Garcia discussed Ealy's conduct with Mr. Bearden and expressed his frustration with the way Ealy treated him. (Ex. 2, Bearden Dep. 103:23-25, 104:1-7; Ex. 11, 14.) When this first occurred, Mr. Bearden questioned whether he had on his hands a supervisor who did not communicate well or an employee who was intentionally "challenging" his immediate supervisor. (Ex. 2, Bearden Dep. 88:17-25, 89:1-21; 90:11-21; Ex. 1, Declaration of Stephen Bearden ¶ 8.) Over time, however, Mr. Bearden realized that the problem was Ealy, not Mr. Garcia. (Ex. 14.)

Ealy's behavior problems were not confined to his interactions with Mr. Garcia. (Ex. 14 - 16.) He also was rude and obnoxious to Mr. Bearden and Mr.

Roebuck on occasion. (*Id.*) On May 5, 2022, Ealy was aggressive to Mr. Bearden when he was completing a progressive discipline notice to Ealy for violating the defendant's policy regarding seatbelt use. (Ex. 2, Bearden Dep. 110:24-25, 111:1-7; Ex. 14-15.) In addition, in early June 2022, the defendant sent Ealy and James to a Maintenance of Traffic ("MOT") training course conducted in Jacksonville, Florida. (Ex. 14 - 15.) Mr. Bearden told Ealy to drive a Company truck to the training, but Ealy objected, stating that he was not going to the training without his family, and demanded that Mr. Bearden provide him with gift cards. (*Id.*) While attending the training, Ealy repeatedly called Mr. Bearden demanding more money. (*Id.*)

On June 13, 2022, the road crew spent the day picking up trash from a roadway. (Ex. 1, Declaration of Stephen Bearden ¶ 9.) They bagged up what they collected, loaded it onto a truck, and returned to the Madison office. (*Id.*) That next morning, Mr. Garcia directed Ealy and James to unload the bags of trash into a dumpster at the office. (Ex. 11.) James interrupted him and asked Mr. Garcia how much trash he personally had picked up the day before. (*Id.*) James then said that he and Ealy worked harder than Mr. Garcia and Mr. Roebuck, and Ealy added, "fuck you. I ain't doing it. I ain't no fucking boy." (*Id.*) At that point, Mr. Garcia walked away to find Mr. Bearden. (*Id.*) As Mr. Garcia was speaking to Mr. Bearden, Ealy and James approached Garcia from behind. (*Id.*) As Ealy and James approached Mr. Garcia, Ealy yelled, "I ain't no fucking boy." (*Id.*; Ex. 15 - 16.) Mr. Bearden

observed that Ealy had balled up his fists as if he were going to hit Mr. Garcia, and he pulled out his phone to record the events. (Ex. 2, Bearden Dep. 129:24-25, 130:1-10; Ex. 14, 15.) Neither Ealy nor James made contact with Mr. Garcia, but Ealy again yelled at Mr. Garcia (Ex. 17.) As Ealy was yelling at Mr. Garcia, James was off to one side; he did not say much but appeared to agree with the narrative Ealy described. (*Id.*) Mr. Bearden subsequently told Ealy and James to go home for the rest of the day. (Ex. 14, 15.)

Mr. Bearden contacted Mr. Flowers and informed him of these events. (*Id.*) Later that same day, June 14, 2022, Mr. Flowers contacted Ms. Wessel for assistance in connection with the incident. (Ex. 18.) Ms. Wessel immediately began an investigation into the events of June 14, 2022, which included interviews of employees in the Madison office. (*Id.*) After Ms. Wessel started speaking to employees, the scope of her investigation became more focused on Ealy's misconduct. (Ex. 6, Declaration of Stacy Wessel ¶¶ 4-5.) Everyone with whom she spoke corroborated what Mr. Garcia and Mr. Bearden told her about Ealy's disruptive, inappropriate behavior, with two exceptions: Ealy and James. (Ex. 18.) While on suspension, James did not answer his phone when Ms. Wessel called him; nor did he respond to her voicemail messages. (Ex. 6, Declaration of Stacy Wessel ¶¶ 6, 7, 9.) Ealy, on the other hand, replied to most every question she asked by saying, "I am not going to agree or admit to anything." (Ex. 18.) When Ms. Wessel

completed her investigation, she recommended to Marilyn King, the defendant's Vice President of Human Resources, that Ealy's employment be terminated for misconduct and insubordination at work. (Ex. 19.) Ms. King agreed with her recommendation, and Ealy was terminated effective June 27, 2022. (Ex. 20.)

Operating under the assumption that James was suspended and under investigation, Mr. Bearden notified James on June 17, 2022, that he should not come to work. (Ex. 2, Bearden Dep. 168:11-23.) However, between June 14, 2022, and June 27, 2022, Ms. Wessel left James three voicemails that he did not return. (Ex. 6, Declaration of Stacy Wessel ¶¶ 6, 7.) In the voicemails, Ms. Wessel said: "Hello, this is Stacy Wessel, Director of HR for Ferrovial Services/Webber, I am calling to discuss an important matter with you. It is important that you return my call as soon as possible. Thank you." (*Id.*) Moreover, James says he was present and listened to a June 27, 2022 call on speaker phone between Ealy and Ms. Wessel about Ealy's job status. (Ex. 8, James Dep. 185:11-25, 186:1-20.) According to James, Ms. Wessel knew the call was on speaker and at one point, he responded to something Ealy addressed by saying: "[Y]es, ma'am, that's right. That's what happened." (Ex. 8, James Dep. 194:1-3.) However, James testified that he did not ask about his own job status during the call. (Ex. 8, James Dep. 193:21-25, 194:1-15.) He also did not subsequently attempt to contact Ms. Wessel and never returned to work. (Ex. 6, Declaration of Stacy Wessel ¶ 9.) The defendant administratively separated James

from employment on June 27, 2022, for job abandonment in violation of Company policy. (Ex. 21.)

## II.  MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### A.  Standard

Summary judgment is appropriate if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine which facts are material, a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no genuine issue of material fact," meaning a fact that "might affect the outcome of the case under the governing law." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009), quoting *Liberty Lobby*, 477 U.S. at 247–48. Therefore, "the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243.

## B.    Argument and Law

The plaintiffs' Amended Complaint alleges race and color discrimination. Ealy raises his claims under 42 U.S.C. §1981 and the Florida Civil Rights Act ("FCRA"). James proceeds only under 42 U.S.C. §1981.[1]

A plaintiff may prove a claim of intentional discrimination through direct or circumstantial evidence. *E.g.*, *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008)). Direct evidence is evidence that would "conclusively show that an employee was discriminated against, without any inference or presumption." *Bradley v. Pfizer, Inc.*, 440 F. App'x 805, 807 (11th Cir. 2011). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.*

In the absence of direct evidence, a circumstantial case of discrimination is analyzed using the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first prove that (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to do the job, and (4) the defendant treated

---

[1] Claims of race discrimination under § 1981 are analyzed in the same manner as those brought under Title VII. *Moghadam v. Morris*, 87 F. Supp.2d 1255, 1261 (N.D. Fla. 2000) (Title VII and 42 USC §1981); *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (Title VII and FCRA).

similarly situated employees outside his protected class more favorably. *See Cooper v. Jefferson Cty. Coroner and Med. Exam'r Off.*, 861 F. App'x 753, 756 (11th Cir. 2021); *see also Nealy v. SunTrust Bank*, No. 21-11358, 2021 WL 5112819 at *2 (11th Cir. Nov. 3, 2021). If an employee fails to produce comparator evidence, he may still prove his claim by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

If a plaintiff can establish a *prima facie* case, the burden of production – but not persuasion – shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (at all times, the employee bears the burden of persuasion). If the defendant does so, the plaintiff must prove the reason is merely a pretext for unlawful conduct. *Id.*

Here, neither plaintiff can succeed under a direct evidence analysis because each lacks evidence that would "conclusively show that [he] was discriminated against . . . ." *Bradley*, 440 F. App'x at 807. Specifically, neither Ealy nor James has presented any evidence demonstrating that the defendant's adverse employment decision was based on discriminatory animus, much less any that amounts to direct evidence of discrimination. *Id.* Each plaintiff's case based on circumstantial evidence is addressed below.

### i.   Summary Judgment is Proper on Ealy's Claims for Discrimination Based on Race and Color (Count I and Count VII)

#### 1.   Ealy Cannot Establish a *Prima Facie* Case of Race and Color Discrimination

In support of his race discrimination claim, Ealy claims that he was assigned unfavorable tasks that his non-black co-workers were not required to complete, such as cleaning up trash and roadkill off the highways and outdoor field work. (Am. Comp. [ECF. No. 22] at ¶¶ 96, 197; Ex. 7, Ealy Dep. 131:3-13.) He also alleges that his non-black co-workers had access to air conditioning during breaks, but he did not. (*Id.*) Ealy further alleges that he was unlawfully terminated after being suspended without pay. (*Id.*)

Ealy's claim is analyzed under the *McDonnell Douglas* burden-shifting framework. There is no dispute that Ealy is black, his termination was an adverse employment action, and he could perform the essential functions of his job. As explained by the Eleventh Circuit, valid comparators must be similarly situated "in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1227 (11th Cir. 2019). This means that a comparator will have engaged in the same basic conduct, will have been subject to the same policies, will work under the same supervisor, and will share similar employment or disciplinary history. *Id*. During the period Ealy was employed with the defendant, Mr. Roebuck was the only non-black Maintenance Technician. Therefore, Mr. Roebuck is the only possible comparator.

There is no evidence that Mr. Roebuck was treated better than Ealy was in a similar situation and not terminated. Ealy was provided a Company truck that he drove from his home to the Madison office at the start of the day, and from the office to jobsites during the day. (Ex. 7, Ealy Dep. 55:17-22.) This vehicle was air-conditioned, and nobody prevented him from using it at lunch or during breaks throughout the day. Further, Mr. Roebuck was only assigned more work than Ealy in air-conditioning after James rejected Mr. Bearden's offer to drive the tractor. During training, Mr. Bearden observed that Mr. Roebuck was the second-best driver and, therefore, asked if he wanted this responsibility after James rejected it. Nevertheless, all road crew employees – including Mr. Bearden – are at times responsible for the unfavorable tasks Ealy claims he was assigned, such as operating weed eaters, outdoor field work, and picking up trash. Moreover, Mr. Garcia and Mr. Roebuck began working for the defendant before Ealy, and, therefore, Ealy was assigned certain tasks because he was new and inexperienced relative to Mr. Garcia and Mr. Roebuck.

On June 14, 2022, Mr. Bearden and Mr. Roebuck observed Ealy approaching Mr. Garcia with balled up fists, as if he were going to make physical contact with him. Although Ealy did not touch Mr. Garcia, he yelled "I ain't no fucking boy" multiple times and complained about how much trash he allegedly picked up the prior day compared to the amount that he believed Mr. Garcia had picked up. Ealy

was sent home and Mr. Bearden described the events to Mr. Flowers, who contacted the defendant's Human Resources Department to open an investigation into the events of June 14, 2022. The investigation revealed multiple instances prior to June 14, 2022, of Ealy cursing, yelling, and arguing with Mr. Garcia during his employment. Human Resources also learned that Ealy once aggressively spoke to Ms. Stoddard about his hours and pay and, on another occasion, was overheard lecturing Mr. Roebuck about how Mr. Roebuck did not do any work or work nearly as hard as Ealy.

Human Resources determined that Ealy's behavior on June 14, 2022, inappropriate communications with co-workers, and repeated cursing and yelling at Mr. Garcia amounted to misconduct and insubordination in violation of Company policies. Unlike Ealy, Mr. Roebuck was never accused of misconduct or insubordination during his employment with the defendant. Accordingly, race was not a factor in the defendant's decision to terminate Ealy. Because Ealy cannot state a *prime facie* case of race discrimination or otherwise create an inference of discrimination, summary judgment is proper. *See, e.g., Camara v. Brinker Int'l,* 161 F. App'x. 893, 896-97 (11th Cir. 2006) (holding summary judgment was proper where plaintiff failed to establish *prima facie* case of discrimination absent evidence of similarly situated employee who was treated less severely).

2.    The Defendant Has Articulated Legitimate, Nondiscriminatory Reasons for Ealy's Termination and Ealy Cannot Establish Pretext

Even if Ealy were able to establish a *prima facie* case of discrimination, which he cannot, the defendant nonetheless is entitled to summary judgment because it has articulated legitimate, nondiscriminatory reasons for terminating Ealy – his misconduct and insubordination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (explaining that after a plaintiff makes a *prima facie* case, burden shifts to employer to proffer a legitimate reason for the adverse action). "The employer's burden [here] . . . is 'exceedingly light' and merely requires that [it] proffer a legitimate nondiscriminatory reason." *Bradley*, 440 F. App'x 805 at 807 (11th Cir. 2011) (citations omitted). Once the employer offers such a reason, the burden shifts back to Ealy to prove the proffered reason is mere pretext for illegal discrimination. *Menefee v. Sanders Lead Co.*, 786 F. App'x 963, 966 (11th Cir. 2019). To do so, "[the] plaintiff must disprove all legitimate nondiscriminatory reasons proffered by the employer." *Bradley*, 440 F. App'x at 807. Even proof of discriminatory animus is not enough to prove pretext unless the plaintiff also proves that the legitimate reason is false. *See id.* Instead, the plaintiff must "show *both* that the employer's explanation was false, and that discrimination was the real reason for his decision." *Margolis v. Pub. Health Tr. of Miami-Dade Cty.*, 89 F. Supp. 3d 1343, 1351 (S.D. Fla. 2015).

Ealy has no evidence that any of the defendant's reasons are false or offered to cover up discriminatory animus. *Bradley*, 440 F. App'x at 807-08. While Ealy may believe he should not have been terminated, those beliefs are immaterial to his claims. Courts "do not sit as a 'super personnel department,' and must take care not to second-guess the employer's business judgment." *Ostrow v. GlobeCast Am. Inc.*, 489 F. App'x 433, 436 (11th Cir. 2012) (quotations and citation omitted). The court's assessment is not concerned with whether the defendant's decision was prudent or fair, it is only concerned with whether it was unlawfully discriminatory. *Alvarez*, 610 F.3d at 1266 ("[I]t is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive.") (*citing Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Further, Ealy's subjective belief that he must be a victim of discrimination is legally insufficient to raise a genuine issue of fact. *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) (plaintiff's "subjective conclusion . . . without supporting evidence, [is] insufficient to establish pretext"); *Gaston v. Home Depot USA, Inc.*, 129 F. Supp.2d 1355, 1368 (S.D. Fla. 2001) ("Plaintiff's mere belief, speculation, or conclusory accusation that he was subjected to discrimination will not create an inference of discrimination or satisfy his burden when responding to a properly supported motion for summary

judgment."). Accordingly, Ealy's race discrimination claim fails, and summary judgment is proper.

>  **ii.   Summary Judgment is also Proper on James' Race and Color Discrimination Claim (Count IV)**
>
>>  1.    <u>Like Ealy, James Cannot Establish a *Prima Facie* Case of Race and Color Discrimination</u>

James' race and color discrimination claim mirrors Ealy's: he alleges that he was assigned unfavorable tasks in the sun that his non-black co-workers were not required to complete; his non-black co-workers had access to air conditioning during working hours, breaks, and lunch, but he did not; and he was unlawfully terminated after being suspended without pay. (Am. Comp. [ECF. No. 22] at ¶ 147; Ex. 8, James Dep. 131:3-13.) James' claim fails at the initial stage because he cannot establish that Mr. Roebuck was treated better than he was in a similar situation and not subject to an adverse employment action.

James worked for the defendant for approximately five weeks. At some point during his first two weeks on the job, James participated in a tractor driving training with Ealy and Mr. Roebuck. Mr. Bearden was the instructor, and during the training, determined that James was the best driver of the three men. Accordingly, Mr. Bearden offered James the opportunity to drive the tractor at jobsites going forward. If James had accepted Mr. Bearden's offer, he would have worked primarily in air conditioning for the duration of his employment. However, James rejected the offer, notifying Mr. Bearden that he preferred to be outside instead of confined in the

tractor. (Ex. 2, Bearden Dep. 85:7-25.) Because Mr. Roebuck was the second-best driver during training, Mr. Bearden offered him this responsibility after James rejected it, and Mr. Roebuck accepted. Thereafter, James was assigned field work and trash pickup. However, air-conditioned trucks were parked at every jobsite, including the truck assigned to Ealy, with whom James was paired. James was allowed to sit in this truck during lunch or breaks throughout the day.

After the events on June 14, 2022, Ms. Wessel attempted to contact James in connection with her investigation. She also wanted to notify James that he was cleared to return to work. Ms. Wessel left three voicemails, but James did not return any of her calls. Moreover, James testified that on June 27, 2022, he was present and listened to a call on speaker phone between Ealy and Ms. Wessel about Ealy's job status. (Ex. 8, James Dep. 185:11-25, 186:1-20.) James did not ask about his own job status during this call or subsequently contact Ms. Wessel to inquire further about it. (Ex. 8, James Dep. 193:21-25, 194:1-15; Ex. 6, Declaration of Stacy Wessel ¶¶ 6, 7, 9.) After James did not return to work, the defendant administratively separated him on June 27, 2022, for voluntary job abandonment. (*Id.* at ¶ 9.) Race was not a factor in the defendant's decision to separate James. Because James cannot establish a *prime facie* case of race discrimination with comparator evidence or otherwise create an inference of discrimination, summary judgment is proper.

2.   <u>The Defendant Separated James for a Legitimate, Nondiscriminatory Reason and James Cannot Establish Pretext</u>

Even if James were able to establish a *prima facie* case of discrimination, which he cannot, the defendant is entitled to summary judgment because it has articulated a legitimate, nondiscriminatory reason for James' separation from the company – job abandonment. Like Ealy, James has only offered his own subjective conclusion that his race was the reason he was assigned unfavorable tasks in the sun, which is insufficient to raise a genuine issue of fact. *Carter*, 870 F.2d at 585. He otherwise has no evidence that this reason is false or was offered to cover up discriminatory animus. As to James' separation for job abandonment, he has testified that he listened to a call between Ealy and Ms. Wessel on June 27, 2022, and even spoke during that call. (Ex. 8, James Dep. 185:11-25, 186:1-20, 193:7-25, 194:1-15.) However, he did not ask Ms. Wessel about his job status during this call, make any effort to return her prior voicemails, attempt to contact her after this call ended, or return to work. (Ex. 8, James Dep. 193:7-25, 194:1-15; Ex. 6, Declaration of Stacy Wessel ¶¶ 6, 7, 9.) Accordingly, James' race and color discrimination claim fails, and summary judgment is proper.

WHEREFORE, the defendant, Webber Infrastructure Management, Inc. f/k/a Ferrovial Services Infrastructure, Inc., respectfully requests that this Court grant this partial motion for summary judgment against the plaintiffs and award any other relief this Court deems just and proper.

Date: October 23, 2024                Respectfully submitted,

                                      */s/ Kenneth A. Knox*
                                      Kenneth A. Knox
                                      Florida Bar No. 829455
                                      kknox@fisherphillips.com
                                      John Y. Doty
                                      Florida Bar No. 1030883
                                      jdoty@fisherphillips.com
                                      FISHER & PHILLIPS, LLP
                                      201 East Las Olas Boulevard, Suite 1700
                                      Fort Lauderdale, Florida 33301
                                      Telephone (954) 525-4800
                                      Facsimile (954) 525-8739
                                      *Attorneys for Defendant*

## **CERTIFICATE OF WORD COUNT**

I HEREBY CERTIFY on this **23rd day of October 2024**, that this document complies with word limits set forth in Rule 7.1(F) and Rule 56.1(B), N.D. Fla. Loc. R., and contains 5,034 words, which includes the headings and quotations, but does not include the case style, signature block or Certificate of Word Count and Certificate of Service.

                                      */s/ Kenneth A. Knox*
                                      Kenneth A. Knox

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on **October 23, 2024**, the foregoing document has been provided to all counsel of record or unrepresented parties on the service list below by the method indicated.

*/s/ Kenneth A. Knox*
Kenneth A. Knox

### <u>Service List</u>

Daniel J. Barroukh, Esq.
Derek Smith Law Group, PLLC
danielb@dereksmithlaw.com
520 Brickell Key Dr, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741

*Attorney for Plaintiffs*

*(Via CM/ECF)*