1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF FLORIDA
2          Case No. 4:24-cv-00029-RH-MAF

3

ERIC EALY and DARRELL JAMES,
4
                Plaintiffs,
5
vs.
6
WEBBER INFRASTRUCTURE MANAGEMENT,
7  INC. f/k/a FERROVIAL SERVICES
   INFRASTRUCTURE, INC.,
8
                Defendant.
9  _____/

10

11

12

13          REMOTE DEPOSITION OF
          MICHAEL STEPHEN BEARDEN
14
        Taken on Behalf of the Defendants
15
      DATE TAKEN:   September 17, 2024
16    TIME:         10:00 AM - 3:34 PM
      PLACE:        via Zoom
17

18        MICHELE ANZIVINO, Court Reporter

19

20

21

22

23

24

25              Exhibit 2

1   APPEARANCES:

2   On Behalf of the Plaintiffs:
    DEREK SMITH LAW GROUP, PLLC
3   BY:  DANIEL J. BARROUKH, ESQ.
    520 Brickell Key Drive, Suite O-301
4   Miami, Florida 33131
    danielb@dereksmithlaw.com
5

6   On Behalf of the Defendant:
    FISHER & PHILLIPS, LLP
7   BY:  JOHN DOTY, ESQ.
    201 East Las Olas Boulevard, Suite 1700
8   Fort Lauderdale, Florida 33301
    jdoty@fisherphillips.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2                      EXAMINATION

3   Witness Name                                    Page

4   MICHAEL STEPHEN BEARDEN

5       BY MR. BARROUKH ................................ 4

6
7                          EXHIBITS

8   Exhibit      Description                          Page

9   Exhibit 1    Road Maintenance Technican job       12
                 description
10
    Exhibit 2    List of names                        30
11
    Exhibit 3    Employee handbook acknowledgement form  44
12
    Exhibit 4    Email dated 5/12/22                  93
13
    Exhibit 5    Progressive discipline notice        107
14
    Exhibit 6    Video                                120
15
    Exhibit 7    Signed statement of Mr. Bearden      128
16
    Exhibit 8    Email dated 6/14/22                  150
17
    Exhibit 9    Typed statements, 5 pages            153
18
    Exhibit 10   Investigation report dated 6/24/22   173
19
                 20
21

22

23

24

25

 1    Thereupon,

 2                    MICHAEL STEPHEN BEARDEN,

 3    having been duly sworn or affirmed, was examined and

 4    testified as follows:

 5                    THE WITNESS:  Yes.

 6    DIRECT EXAMINATION BY MR. BARROUKH:

 7        Q.    All right.  Good morning, Mr. Bearden.  My

 8    name is Daniel Barroukh.  I represent the plaintiffs in

 9    this case.

10            Could you please state your full name for the

11    record?

12        A.    My full name is Michael Stephen Bearden.

13        Q.    All right.  And for today's deposition, how

14    would prefer I refer to you as?

15        A.    Stephen would be great.

16        Q.    Okay.  I'm going to call you Stephen.  If I

17    pronounce it wrong or call you a different name, I

18    don't mean any disrespect.  All right?

19            Okay.  So how many times, if ever, have you

20    given a deposition before?

21        A.    This is my first time.

22        Q.    All right.  So as you see, we're on Zoom.

23    There's going to be a few rules I'd like to lay out

24    that would hopefully allow this deposition to move a

25    little quicker, okay?  The first rule is as you can

1    see, there is a court reporter here with us today.  So

2    we cannot give inaudible answers, all right?  No head

3    nods or head shakes.  No mm-hmm.  I need you to say yes

4    or no.  Does that make sense?

5         A.    Yes.

6         Q.    Okay.  And again, probably the most important

7    rule is because we have the court reporter here today

8    she cannot take down both of your testimony at the same

9    time.  So I ask you that you allow me to ask you a full

10   question without a interruption even if you know the

11   answer to the question and I will give you the time,

12   all the time you need to answer that question.  Does

13   that make sense?

14        A.    Yes.

15        Q.    Okay.  And third rule is obviously your

16   attorney is present here today.  Now, if a question I

17   ask requires you to give an answer about what you and

18   your attorney spoke about, I don't want to hear it,

19   okay?  And I'm sure your attorney will jump in and tell

20   you not to answer that question.  All right?

21        A.    Yes.

22        Q.    And again, if any question of mine is

23   confusing or you need me to reword it feel free to ask

24   me.  Okay?

25        A.    Okay.

```
 1        Q.    The goal of this deposition is to get your

 2   best testimony, so if you do not understand a question

 3   it is not helpful if do not answer for clarification.

 4   All right?

 5        A.    Okay.

 6        Q.    Now, at any point in time today outside of

 7   when there's a question pending you're more than

 8   welcome to use the bathroom, take a break as many times

 9   as you need, all right?  I'm not holding you here or

10   keeping you here.  That's not my job is to take up your

11   whole day or prevent you from things like that, okay?

12        A.    Okay.

13        Q.    All right.  Now, is there anything that would

14   prevent you from testifying truthfully here today?

15        A.    No.

16        Q.    All right.  Is there anything that would

17   prevent you from thinking clearly today, medication or

18   otherwise?

19        A.    No.

20        Q.    Okay.  Where are you conducting this

21   deposition from?

22        A.    From my office in Madison, Florida.

23        Q.    Okay.  Is anybody else with you in the

24   office?

25        A.    No one's here in my office.
```

1    Q.    Okay.  Do you reside in Madison County,

2    Florida?

3    A.    Yes.

4    Q.    What's your address?

5    A.    Personal address or work address?

6    Q.    Personal address.

7    A.    It's 9467 Northwest Lovett Road, and that's

8    going to be in Greenville, Florida.

9    Q.    Okay.  And what is the zip code?

10    A.    32331.

11    Q.    All right.  Now, did you prepare for today's

12    deposition, Stephen?

13    A.    If you're meaning yes, I mean I took the

14    time, you know, from today just to be on the all.

15    Q.    Okay.  But outside of today or maybe earlier

16    this morning before the call, did you prepare for this

17    deposition in any way?

18    A.    Just like this morning like preparing like

19    documents?  No, I didn't.

20    Q.    So have you reviewed any documents for

21    today's deposition?

22    A.    Yesterday.

23    Q.    Okay.  And what documents did you look at?

24    A.    I spoke with the lawyer for about an hour.

25    Q.    Okay.  Yesterday did you look at any

1  documents related to this case?

2      A.      Yes, briefly.

3      Q.      Okay.  Do you know the names of those

4  documents?

5      A.      No.

6      Q.      Okay.  What did the documents show?

7      A.      It was just my testimony I guess, my written

8  document that I wrote.

9      Q.      Okay.  Do you know which -- what date the

10 testimony is from?

11     A.      Hold on.  I'm not sure what date it was on.

12     Q.      Okay.  That's fine.  And I'm simply asking

13 this because this has been an issue in prior

14 depositions.

15         Is there anything on your desk or around you

16 in your office right now, any documents you're looking

17 at relating to this case?

18     A.      No documents related to this case.

19     Q.      Okay.  And I'm going to ask you on the

20 record, I'm going to instruct you actually not to look

21 at any documentation outside of the documents I show

22 you.  All right?

23     A.      Okay.

24     Q.      Now, you said you spoke with your attorney

25 for an hour.  Was anybody else present at the meeting?

```
 1      A.      No.

 2      Q.      Okay.  Where was this meeting?

 3      A.      It was on Zoom.

 4      Q.      Okay.  It was about an hour, correct?

 5      A.      Yes.

 6      Q.      Okay.  And did you print out any documents or

 7  look at any documents during the meeting outside of the

 8  written testimony you spoke about?

 9      A.      No.

10      Q.      Okay.  All right.  And outside of your

11  meeting with your attorney, did you look over any

12  documents with any other members of the company?

13      A.      Did I look over any other documents with

14  anybody else?

15      Q.      Yes.  Any documents pertaining to this

16  lawsuit.

17      A.      I don't believe so.  I would say no.

18      Q.      And again, I'm not asking you to guess.  If

19  you don't know something that's fine.  I don't need you

20  to give me an answer.  If you don't know, that's an

21  acceptable answer.

22              All right.  Now, last question before we get

23  things moving a little bit more and again, we just have

24  to ask this.  Have you ever been arrested?

25      A.      Please explain arrested, like --
```

1      Q.     Well, do you know what being arrested is

2   like?

3      A.     Yes.  Arrested like when I was an adult,

4   teenager?

5      Q.     At any point in your life have you been

6   arrested?

7      A.     Yes.

8      Q.     How many.  How many times have you been

9   arrested?

10      A.     One time.

11      Q.     Okay.  When was that?

12      A.     When I was like 19 or -- 19 years old.  I

13   mean it was years ago.

14      Q.     Okay.  And what was the grounds for the

15   arrest?

16      A.     DUI.

17      Q.     Okay.  And you haven't had any other arrest

18   or run-in with the law since then; is that correct?

19      A.     No.

20      Q.     All right.  So whenever I refer to the

21   company throughout this deposition I'm referring to

22   Webber Infrastructure Management.  All right?

23         Now, if I refer to the company as Ferrovial

24   or Webber alone, all of that is referring to the

25   company, to the defendant in this case.  All right?

1    A.    Okay.

2    Q.    Now, how long have you been with the company?

3    A.    I started with the company in 2014, I left in

4    2018, and came back 2020 or 2021.

5    Q.    Okay.  I'm going to stick to the start date.

6    And again if I'm looking down I'm taking notes, all

7    right?  That's all I'm doing.

8            So in 2014 you started with Ferrovial.  Did

9    you start at the Madison location?

10    A.    Yes.

11    Q.    Okay.  What was your position for Ferrovial?

12    A.    I was an entry level technician.

13            MR. BARROUKH:  And I'm not sure whose

14    telephone that was.  I'm going to ask that all

15    devices be put on mute or silenced.

16            MR. DOTY:  It was me.  I'm having the same

17    problem with the audio popping in and out that I

18    had during Flowers, so I'll let you know if that is

19    an issue at any point of this.

20    BY MR. BARROUKH:

21    Q.    So again Stephen, you started in Madison

22    County as a maintenance technician in 2014; is that

23    correct?

24    A.    Yes.

25    Q.    I'm going to show you a document really

1    quickly that I'm marking as Exhibit 1.

2            (Exhibit No. 1 marked for identification.)

3    BY MR. BARROUKH:

4        Q.    Let me know when you can see it.

5        A.    I can see it.

6        Q.    I'll scroll through it so you can see the

7    same thing, but let me know if you need another minute

8    to review it.

9            Just those two pages.  Did you see that?

10       A.    Yeah.  I can see it, but I wasn't able to

11   read all of it.

12       Q.    That's fine.  If you need me to slow down so

13   can read all of it, let me know.  I'll give you all the

14   time you need, okay?

15       A.    Can you scroll to the top part?  I'm working

16   off an itty bitty laptop so everything is kind of

17   smaller.

18       Q.    Okay.  Would you like me to zoom in?

19       A.    It's good right there.  Just scroll down just

20   a little bit so I can read a little bit further.  Right

21   there is perfect.  Okay.

22       Q.    Now, do you know what this document is?

23       A.    I mean, it's a position summary.

24       Q.    Okay.  Have you ever seen this document

25   before?

1    A.    I mean I don't remember if I've seen this one

2    but, I mean, it's a possibility.

3    Q.    Okay.  Let me represent to you that Ferrovial

4    sent me this document, and you can see on the bottom

5    where it says Ferrovial-Ealy.  Do you see that?

6    A.    Yes.

7    Q.    That's just your law firm's numbering of this

8    document when they sent it to me.

9    A.    Okay.

10    Q.    Can you give me a brief description of what

11    this document is?

12    A.    It's a work detail on what to expect when

13    come on with the company.

14    Q.    Okay.  And up here it says "road maintenance

15    technician", correct?

16    A.    Yes.

17    Q.    Why are the words "road maintenance

18    technician" on this document?

19    A.    Because it's a road maintenance technician

20    document.

21    Q.    Okay.  So when it says "primary duties and

22    responsibilities", just to confirm, that applies to the

23    road maintenance technician position, correct?

24    A.    Yes.

25    Q.    Okay.  Now, when you started as a maintenance

1    technician, to your knowledge I know that was a decade

2    ago at this point, are these primary duties and

3    responsibilities similar or the same as they are today

4    for road maintenance technicians?

5        A.    I would say yes.

6        Q.    Okay.  And as you started in 2014 until

7    today, generally to your knowledge these duties and

8    responsibilities have not changed at any point; is that

9    correct?

10       A.    Yes.

11       Q.    So you started in 2014 in Madison County as a

12    maintenance tech.  So how long did you serve as a

13    maintenance technician?

14       A.    For two years.

15       Q.    Okay.  And then after two years were you

16    promoted?

17       A.    Yes.

18       Q.    Okay.  Now, before we get into that I want to

19    talk about your position.  What were your jobs as a

20    maintenance tech that you remember personally?

21       A.    I remember there was some hard work.  Weed

22    eating, shoveling dirt, picking up dead animals, I mean

23    erecting signs, cutting trees, picking up trash.

24       Q.    And did you work alongside any other

25    maintenance technicians at that time?

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 15 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    A.    Yes.

2    Q.    Okay.  And what kind of equipment were you

3  guys using?

4    A.    Side-by-side, ATVs, flat tip shovels, and

5  weed eaters.

6    Q.    You said flat tip shovels?

7    A.    Yes.  Easier to scrape dirt off of concrete

8  structures.

9    Q.    Okay.  So you were there for two years so

10 obviously you worked in the summer at some point in

11 Madison County, correct?

12   A.    Yes.

13   Q.    How was it working those summers in Madison?

14   A.    Very hot.

15   Q.    Very hot, yeah.  I was just there a couple

16 weeks ago actually.  Very hot up there.

17         Now, were any of the equipments or was any of

18 the equipment you just mentioned air conditioned?

19   A.    No.

20   Q.    None of it.  Okay.

21         Now, at any point were you assigned different

22 tasks from another maintenance technician during your

23 time there?

24   A.    Was I assigned tasks from another maintenance

25 technician?

```
 1        Q.     That's not what I asked.
 2               Were you assigned different tasks from the
 3   maintenance technicians who worked there?
 4        A.     Please repeat that one more time.
 5        Q.     Sure.
 6               When you were a maintenance tech, did you
 7   receive job assignments from your boss that were
 8   different from the other maintenance technicians?
 9        A.     That would -- yes.
10        Q.     Okay.  And why was that?
11        A.     Well with this contract, I mean, you know, if
12   someone is going out putting up brand new signs and it
13   only has one person needs to be done, you know, doing
14   that and so I'm putting up signs and another crew
15   member might be cutting trees or zero-turn lawn mower,
16   you know.  I mean there's so many different aspects of
17   this job.
18        Q.     Okay.  Would you say some of those aspects of
19   the job were more difficult than others?
20        A.     Yes.
21        Q.     So would you say that cutting a tree down was
22   more difficult than putting up a sign?
23        A.     I mean it's labor intensive, both of them.
24   It's just two different activities.  One is turning
25   wrenches.  The other one is using a chainsaw.
```

1    Q.    Okay.  Now, who assigned these tasks to the

2    maintenance technicians?

3    A.    That would be the supervisor.

4    Q.    Okay.  And we'll get to that.  But I want to

5    continue with your experience with the company.

6          So in 2016 you were promoted.  Up until your

7    promotion, so from 2014 to 2016, did you see any sort

8    of unequal treatment at the work place in Madison

9    County?

10   A.    I wouldn't call it unequal.  I mean some

11   activities was skills.  You know, like there was a

12   gentleman that could run a skid steer really good, and

13   I wasn't able to at that time.  And he was able to

14   drive a skid steer but I just didn't have the skills to

15   do so, and I understood that.

16   Q.    Fair enough.

17         So at any point from 2014 to 2016 did you see

18   any of your co-workers or did you yourself, you know,

19   report or complain about activity that was going on in

20   Madison County?

21   A.    Well if you say "complain", everybody is

22   going to complain about something when it's a 105

23   degrees outside.  So I mean I would say yes, I would

24   complain about that temperature but no, not in general.

25   I mean I knew the work detail.

1    Q.    Okay.  And just to make sure, there was no

2  complaints about harassment or retaliation, correct?

3    A.    No.

4    Q.    Now, to this same point there were no

5  complaints or reports to your knowledge of

6  discrimination from 2014 to 2016; is that correct?

7    A.    No.

8    Q.    Okay.  Let's get into 2016 when you became --

9  when you got the promotion, okay?  What were you

10  promoted to?

11    A.    I was promoted to crew leader.

12    Q.    And what did this promotion to crew lead

13  entail?  Job benefits, salary, things like that?

14    A.    I got a bump in pay and I was able to -- so

15  when the supervisor come to me that, you know, to tell

16  work detail I was able to let the guys below me know

17  what we're doing.  And I would work with them.  So it

18  wasn't like -- you know, you were still a technician

19  but you're the crew leader of the technicians.

20    Q.    I understand.

21        Is that similar to the foreman position

22  currently?

23    A.    No.

24    Q.    Okay.  What's the difference between a crew

25  lead and a foreman?

1    A.    Well, a foreman would be more of like a

2  supervisor.

3    Q.    Okay.

4    A.    So there's more paper detail.

5    Q.    Okay.  And when you say "more paper detail",

6  does that mean less labor-related work?

7    A.    Yes.  Less labor, more paperwork but still --

8    Q.    But the crew lead --

9    A.    I'm sorry.

10    Q.    No problem.

11        But the crew lead in 2016, that position you

12  worked as was still strictly labor intensive, however

13  you got to supervise the field work; is that fair to

14  say?

15    A.    Yes.

16    Q.    Okay.  And how many individuals did you

17  supervise as a crew lead in 2016?

18    A.    Two.

19    Q.    Okay.  Do you remember their names?

20    A.    Morgan, I can't remember his last name, and

21  D.W. Jarvis.

22    Q.    And how long were you a crew lead for for the

23  company?

24    A.    From that point I think it was maybe a year

25  or less.

1    Q.    Okay.  And as a crew lead, were you made

2  aware of any complaints or reports made against you?

3    A.    No.

4    Q.    Okay.  And still as a crew lead, did you hear

5  of any complaints or reports from Morgan or from D.W.

6  Jarvis who you were supervising?

7        MR. DOTY:  Objection to form.  Can you

8     clarify what you mean by complaints or reports?

9     Just be a little more specific with it?

10  BY MR. BARROUKH:

11    Q.    Well Stephen, if you understand, then you can

12  answer the question.

13        MR. DOTY:  Go ahead and answer.

14    A.    No.

15    Q.    Okay.  Now moving forward, you said you were

16  a crew lead for around a year.  What happened after

17  that?

18    A.    I got promoted to a supervisor/foreman role.

19    Q.    And what year was that?

20    A.    That had to be in the same 2016, maybe --

21  yeah.  2016/2017.  But I'm thinking it was more closer

22  to '16.

23    Q.    Okay.  And this foreman role, you described

24  it as less labor, more office work; is that correct?

25    A.    Yes.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 21 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    And that is less labor more office work

2    compared to the crew specifically, correct?

3    A.    Compared to the crew?

4    Q.    Crew lead.

5    A.    Yes.  More office, less work.

6    Q.    Okay.  Now, who did you supervise as the

7    foreman?

8    A.    I had the Madison project here, which was

9    three or four people.  And then I had also got the

10   Jefferson County project which had four people also.

11   Q.    Okay.  Who were the individuals from the

12   Madison office that you supervised?

13   A.    It would have to be Morgan, D.W. Jarvis, and

14   a gentleman named Clint and I believe his last name is

15   Minter.

16   Q.    How do you spell that for the court reporter?

17   A.    I would say M-i-n-t-e-r.

18   Q.    Okay.  And who was the last person?

19   A.    In the Madison project?  At that time I

20   don't -- I think they were -- we were hiring someone so

21   we had a vacant -- my position open.

22   Q.    And when you said "a vacant position", are

23   you referring to the crew lead that you were just

24   promoted from?

25   A.    Yes.

1    Q.    Okay.  Now, do you remember the individuals
2    at the Jefferson office?
3    A.    I had Willie Brewton.  He's still there.
4    That's the reason I remember him.  He's a supervisor
5    now.  And Roy, and I can't remember his last name.
6    He's retired.  Tyrone.  And I can't remember the other
7    gentleman's name.  He was there for a short time.
8    Q.    All right.  While you were supervising
9    Madison and Jefferson County as a foreman, where were
10   you located on a day-to-day basis?
11   A.    I had an office here in Madison and in
12   Jefferson County.
13   Q.    Okay.  And how many days each week would you
14   spend at Madison County versus Jefferson County?
15   A.    Jefferson County was a little more labor
16   intense.  There was an interstate project.  So I would
17   probably spend three days in Jefferson and two days in
18   Madison.
19   Q.    Okay.  And did that happen for the duration
20   of your time as more than?
21   A.    Yes.
22   Q.    When were you promoted from foreman or when
23   did your time as foreman come to an end?
24   A.    2018 when I left the company.
25   Q.    Now, from 2014 through 2018 when you left the

```
 1    company, did any of the individuals you supervised

 2    complain of harassment or retaliation?

 3         A.    No.

 4         Q.    Did any of the individuals you supervised

 5    from 2014 to 2018 complain of discrimination?

 6         A.    Not to my knowledge.

 7         Q.    Okay.  To your knowledge, did any of the

 8    individuals you've supervised from 2014 to 2018 file a

 9    lawsuit against the company?

10         A.    Not to my knowledge.

11         Q.    Okay.  And again, you were never involved in

12    a legal proceeding for any of the individuals you

13    supervised from 2014 to 2018; is that correct?

14         A.    That is correct.

15         Q.    Okay.  So why did you leave the company in

16    2018?

17         A.    I took a job offer with the State of Florida

18    as a correction facility maintenance superintendent.

19         Q.    Okay.  And before we get into that I just

20    want to go back into the individuals you supervised

21    briefly.  I want to clarify their ethnicity; is that

22    all right?  If you remember.  So if you can remember

23    their ethnicity, just tell me.  I'll go name by name.

24         A.    What was that word you said?

25         Q.    Ethnicity.
```

1      A.    Okay.

2      Q.    Their race, ethnicity.

3      A.    Okay.

4      Q.    Morgan.

5      A.    He was white.

6      Q.    D.W. Jarvis?

7      A.    D.W. Jarvis, he is -- what is South

8   American -- have his family is South American.

9      Q.    Would it be fair to say Hispanic to your

10   knowledge?

11     A.    Yes.

12     Q.    Okay.  Now Clint Minter?

13     A.    He would be white.

14     Q.    Willie Brewton?

15     A.    African American.

16     Q.    Roy?

17     A.    African American.

18     Q.    And Tyrone?

19     A.    African American.

20     Q.    Okay.  And to your knowledge, at the

21   Jefferson office where there were three African

22   Americans working there there were no complaints of

23   discrimination, is that correct, while you were the

24   supervisor?

25     A.    To my knowledge there were no complaints.

1   Q.    So you left in 2018 to work for the Florida

2   Department of Corrections as a superintendent?

3   A.    Yes.

4   Q.    Now, why did you leave?  What was the benefit

5   of going from a foreman with Ferrovial to a

6   superintendent for the Florida Department of

7   Corrections?

8   A.    At that time I was -- they were -- they were

9   luring me into that position with talks of like the

10  state retirement and the insurance program that they

11  have.

12  Q.    So it was more --

13  A.    Money, also.

14  Q.    Okay.  So it was monetary incentives and

15  retirement incentives, correct?

16  A.    Yes.

17  Q.    Okay.  And how long did you work for the

18  Florida Department of Corrections?

19  A.    Three years.

20  Q.    Okay.  So that would be 2018 to 2021; is that

21  correct?

22  A.    That sounds about right.

23  Q.    Now, what made you leave the Florida

24  Department of Corrections after three years?

25  A.    The prison is less -- it's less labor

```
 1   intensive work, but you're in a prison so every --
 2   everything that you have tool wise, you know, there's
 3   always -- I didn't really realize and think about it,
 4   you've got people in prison for murder and they are
 5   welling to grab tools that you have on your person
 6   and -- you know, so it's really -- it's hard you know?
 7   I mean it's kind of scary.  Very, you know, intense,
 8   demanding on -- you know, on that kind of stuff.
 9        Q.    Would you say it was emotionally taxing?
10        A.    Yes.
11        Q.    Okay.  Now, was this all of the inmates or
12   were some of the inmates more friendly?
13        A.    Some inmates were more friendly.
14        Q.    Okay.  Did you have any physical altercations
15   with an inmate at any point?
16        A.    I did not.
17        Q.    Okay.  But when you're referring to an inmate
18   trying to grab something on your person, that was a
19   one-sided interaction?
20        A.    It was one of my technicians there at the
21   prison, we had an inmate grab a screwdriver and try to
22   stab him with it.  And that's when I take a step back
23   a little and say maybe I need to get out of the prison
24   setting with tools and stuff.  So it wasn't like me as
25   a person, but it was one of my technicians.
```

1    Q.    I hear you.  That'sa hostile work environment

2    right there.

3          Now, is there any reason -- or describe your

4    separation of employment with the Florida Department of

5    Corrections.

6    A.    Like when I left and come back to Webber?

7    Q.    Yes.  Did you quit?

8    A.    Well, I put my two weeks in and they left a

9    open report so if I ever would like to come back I'm

10    more than welcome to.  But I don't think I would ever

11    want to.  But you never know.

12    Q.    That's what I was asking for.  You were never

13    suspended or terminated, correct?

14    A.    No.

15    Q.    Okay.  So when did you return, in around what

16    month to Webber in 2021?

17    A.    I believe it would be around April.

18    Q.    Around April of 2021?

19    A.    Yes.

20    Q.    Okay.  So you've worked for Webber from April

21    of 2021 through present day, correct?

22    A.    Yes.

23    Q.    And when they hired you, what was your

24    position?

25    A.    Superintendent.

1    Q.    Okay.  Could you describe the role of

2    superintendent, please?

3    A.    It's, you know, day-to-day activities, lots

4    of paperwork, and I like to work out in the field a

5    lot, so you know, I do make time to go out and run weed

6    eaters and pick up trash and do activities with the

7    employees.

8    Q.    Instead of being trapped in the office?

9    A.    Yes.  I've got lots of trapped in office time

10   with the prison, so I prefer not to if I can.

11   Q.    I hear you.  I hear you.  So as a

12   superintendent who your subordinates?

13   A.    Define subordinates, please.

14   Q.    Well what do you think subordinates means?

15   A.    I'm not sure.

16   Q.    Subordinate to me from, what I understand, is

17   an individual you supervisor who you give orders and

18   follows your orders.  Okay?

19   A.    So who do I supervise now?

20   Q.    As a superintendent, just the role, who is

21   everybody a superintendent supervises?

22   A.    So a superintendent usually has a supervisor,

23   a foreman up under him, and technicians or crew

24   leaders, you know, and then it kind of goes down to the

25   technician role.

1    Q.    Okay.  So you really worked at almost every

2    single level to this point for the company, tech, crew

3    lead, skipped the foreman aspect, and then supervisor,

4    correct?

5    A.    Yes.

6    Q.    Okay.  Now, you know, you've worked for the

7    company for six to seven years to this point, correct?

8    A.    Yes.

9    Q.    How many people, if you had to guess or to

10   your knowledge, have you worked with during that time

11   at Ferrovial?

12   A.    How many people?  I mean I'm not sure.

13   Q.    Okay.  How many people have you supervised

14   then during that time?

15   A.    Well, as people come in and they quit.  So I

16   mean if you had all of them together, you know, or at

17   one time?  Are you talking about like at one time at

18   this point?  Or just like as people leave and come

19   back?

20   Q.    Yeah.  And thank you.  I'm more than happy to

21   clarify.

22         During your entire tenure with Ferrovial, how

23   many individuals total have you supervised, whether

24   they left and came back or what they are still there

25   today?

1    A.    Roughly 20.

2    Q.    Okay.  Now I'm going to show another document

3  I'm marking as Plaintiff's Exhibit 2.  And to be clear,

4  the first document I showed is Plaintiff's Exhibit 1.

5        (Exhibit No. 2 marked for identification.)

6  BY MR. BARROUKH:

7    Q.    Let me know when you can see the document.

8    A.    Yes.

9    Q.    I'll scroll down so you can see this is the

10 complete page.  On the bottom again I'll represent this

11 document was Sent from my firm to your attorney's

12 office, okay?

13   A.    Okay.

14   Q.    Do you know what this document is?

15   A.    No.  I'm reading it, though.  Looks like

16 everybody that has worked in Madison office.

17   Q.    Okay.  And again, you did not work from 2018

18 to 2021, correct?

19   A.    Right.

20   Q.    So you don't have any knowledge about Robert

21 Cook's employment with Ferrovial; is that correct?

22   A.    I have no knowledge.  Heard the name.  No

23 knowledge.

24   Q.    Okay.  Now, the same question applies to the

25 next individuals I'm going to name.  All right?

1    A.    Okay.

2    Q.    Ezell Crumitie.

3         MR. DOTY:  I'm going to objection to

4    relevance as to the line of questioning with

5    Crumitie going forward.  Go ahead and answer,

6    Stephen.

7         MR. BARROUKH:  Relevance is not a proper

8    objection.

9         MR. DOTY:  Yes, it is.

10        MR. BARROUKH:  You can object to form.

11   Relevance is not an objection.  You cannot --

12   depositions are taken subject to objection in the

13   State of Florida and in Federal Court, so relevance

14   is not a proper objection.  You can object to form;

15   however, if it's a relevancy objection I'm going to

16   ask not to put that on the record.

17        MR. DOTY:  I'll object to the form then.

18        MR. BARROUKH:  What's the objection?

19        MR. DOTY:  I just don't like the question.  I

20   mean you're asking about someone who is not related

21   to the case in any way, shape, or form.

22        MR. BARROUKH:  Not liking the question is not

23   an objection under the Federal Rules.

24        MR. DOTY:  Go ahead and ask your question

25   about Crumitie then.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 32 of 219

Deposition of Michael Stephen Bearden                Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

```
 1              MR. BARROUKH:  All right.  Well I just want
 2        to make sure.  Relevance is not a valid objection
 3        and neither is I don't like this question.  So
 4        unless you have a form objection I'll ask you not
 5        to talk on the record.
 6   BY MR. BARROUKH:
 7        Q.    So are you aware of Mr. Crumitie?
 8        A.    Explain am I aware.  His name is on that
 9   list.
10        Q.    Yes, sir.
11              Do you have any personal knowledge, any
12   personal experience or information regarding to Ezell
13   Crumitie?
14        A.    Well, I mean I looked in a file and I
15   recognize that name from a file in the office.
16        Q.    What did the file say about Mr. Crumitie?
17        A.    Just his name.  I never looked into the
18   files.
19        Q.    Outside of the fact that you saw his name on
20   a file you don't have any other knowledge about Mr.
21   Crumitie; is that correct?
22        A.    I do.  I've heard some employees talk about
23   maybe that he was in a lawsuit, but other than that I
24   have any knowledge as to what it was about or who he
25   was or nothing.
```

1    Q.    Okay.  But -- so you were aware that

2  Mr. Crumitie filed a lawsuit or maybe filed a lawsuit?

3    A.    Yes.

4    Q.    Okay.  Did you ever ask about what he filed?

5    A.    No.

6    Q.    Okay.  And who told you or who mentioned his

7  name to you?

8    A.    Ken Gallagher I believe.  We had a work order

9  through that gentleman Crumitie over in Greenville, and

10  Ken said he used to work here.  And that's when I

11  looked at the file and his name was on file.

12    Q.    And who is Ken Gallagher?

13    A.    He's an employee that worked here and left

14  and come back.  Now he's back here.

15    Q.    Okay.  And Mr. Gallagher told you he worked

16  with Crumitie?

17    A.    I don't even believe he said he worked with

18  him.  He said he used to work here.  So I assume that

19  he worked with him.

20    Q.    And do you know that Mr. Crumitie's nickname

21  was Buddy?

22    A.    No, I did not know that.

23    Q.    Okay.  And again, I just want to understand

24  what you knew and what position you were in with

25  regards to these employees.  Okay?

1    Now was there any other employee outside of

2  Ken Gallagher who spoke to you about Crumitie or knew

3  anything related to Mr. Crumitie?

4    A.    No.

5    Q.    Okay.  Do you have any personal knowledge or

6  experience with Brianna Johnson?

7    A.    She was the project administrator that hired

8  me on.  Like, she did all the paperwork when I came

9  back.

10    Q.    Okay.  Does she still work there today?

11    A.    No.

12    Q.    When did Ms. Johnson leave?

13    A.    When I started, she left maybe a couple weeks

14  after I started.

15    Q.    Was she fired or do you know if she was fired

16  or suspended or if she just resigned?

17    A.    She resigned.  She found a replacement for

18  her before she left.

19    Q.    Okay.  I have a feeling we'll get to her

20  replacement.  But still, as my previous question was

21  standing do you have any personal knowledge or

22  experience of Donald Woolverton?

23    A.    No, I've never -- I don't believe so.

24    Q.    Okay.  What about John Peddie?

25    A.    I don't know that person either.

1    Q.    Okay.  What about Joseph Rye?

2    A.    I have heard the name.

3    Q.    Okay.  How did you hear the name?

4    A.    I believe that was -- we were doing a

5    driveway turning lane for Trulieve and the gentleman

6    that worked as security said that he worked here and

7    his name was Rye.

8    Q.    Okay.  When did Mr. Rye stop working for the

9    company?

10    A.    I don't know.  I mean I -- I seen his file.

11    After I talked with him I looked in there and I seen

12    his name so I mean -- but other than that I didn't look

13    in there to see when he worked or left or anything.

14    Q.    And now, this is the second time you

15    mentioned you checked the file after you hear a name.

16    Is there a file cabinet or is there a file on the

17    computer?

18    A.    There's a file cabinet, and it pops up and

19    you can kind of scroll through and it's got their names

20    on the top of the list on old employees and present

21    employees.

22    Q.    I got it.  So that's in the office right now

23    where you're taking this deposition?

24    A.    Yes.

25    Q.    Okay.  Now Mr. Juan Garcia, are you familiar

1  with him?

2      A.    Yes.

3      Q.    Okay.  And we'll get to that.  Now Angel

4  Rodriguez, are you familiar with him?

5      A.    No.

6      Q.    Okay.  What about James Linton?

7      A.    James Linton.  Yes.

8      Q.    Okay.  How do you know Mr. Linton?

9      A.    He was a technician here when I started back.

10     Q.    Okay.  Does Mr. Linton still work for the

11  company?

12     A.    No.

13     Q.    Why is Mr. Linton no longer with the company?

14     A.    I think he -- he left us and went to work for

15  the State of Florida Department of Transportation.

16     Q.    Okay.  Is that brings us to Shaunna Stoddard.

17  So by this time, this is 2021 now.

18         So you were here for all the remaining

19  employees, correct?

20     A.    Yes.

21     Q.    Now, outside of Mr. Crumitie who you said

22  there might have been legal action against the company,

23  do you know if any of these other individuals from 2018

24  to 2021 when you came back filed any legal action

25  against the company?

1    A.    2018?  Not to my knowledge.

2    Q.    Okay.  Now outside of these employees,

3 Shaunna Stoddard, Allen Roebuck, Benjamin Dietrich,

4 Krystal Trepal, Eric Darrell and Michael Dupree, who

5 still works for the company?

6    A.    Who still works for the company?

7    Q.    Yes.  First say who works for the company,

8 and then we can specify who works at the Madison

9 location.  Okay?

10    A.    Shaunna Stoddard, Krystal Trepal, and Michael

11 Dupree.

12    Q.    Now out of those three individuals, who works

13 at the Madison location?

14    A.    I don't believe Krystal works here at the

15 Madison location, but Shaunna and Michael.

16    Q.    Okay.  And was Krystal hired to start working

17 at the Madison location?

18    A.    I'm not sure on Krystal.  She was hired above

19 different persons because I think she started in as

20 like the Lake City or -- office, and she went to -- to

21 some kind of safety coordinator position.  But she

22 don't really come into this office.

23    Q.    Okay.

24    A.    I haven't seen her in a year or two.

25    Q.    Okay.  So is it fair to say you've seen her

1  in the Madison location less than five times?

2      A.    Yes.

3      Q.    What about less than three times?

4      A.    I really don't know.

5      Q.    Okay.

6      A.    I mean you're talking about over a three-year

7  span.

8      Q.    I hear you.  I'm just trying to get an

9  understand of how often she visited or interacted with

10  the employees at Madison, okay?

11          Now regarding -- you said Allen Roebuck is no

12  longer with the company; is that correct?

13      A.    That is correct.

14      Q.    Why is he not with the company anymore?

15      A.    He left to go take another job.

16      Q.    And did he say why he was leaving for this

17  other job?

18      A.    He didn't.  I think it was probably better

19  benefits, more pay.

20      Q.    Okay.  Did he make any complaints or reports

21  to you before he left and took this other job?

22      A.    He didn't make any complaints or reports

23  about leaving to take another job, no.

24      Q.    Okay.  Now Mr. Benjamin Dietrich as well, you

25  said he's no longer with the company.  What happened to

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1   Mr. Dietrich?

2       A.      He quit.

3       Q.      Do you know -- did he tell you why he quit?

4       A.      No.  I'm assuming that maybe he found

5   something else.  He gave me his letter of notification

6   and said that he was quitting that day.  And he didn't

7   really work very good for the short time he was here

8   so, I mean, it didn't really bother me too much.

9       Q.      But again, Mr. Dietrich never complained or

10  reported anything prior to leaving, correct?

11      A.      That is correct, he did not complain.

12      Q.      Okay.  Now you said Michael Dupree is still

13  employed, correct?

14      A.      Yeah.

15      Q.      Have there been -- since 2022 have there been

16  any other employees hired by the company in the

17  maintenance tech role?

18      A.      Since when?

19      Q.      After Michael Dupree was hired, have there

20  been any other maintenance techs who have come and gone

21  or who are still with the company?

22      A.      Yes.

23      Q.      Okay.  What are their names?

24      A.      You had Antonio McMullen, and I don't know

25  how to spell that.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 40 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    And Antonio, do you know around when his

2  original hire date was?

3    A.    It was after Michael Dupree, because Michael

4  Dupree is the gentleman that recommended him for the

5  job.

6    Q.    Okay.  And what is Antonio's ethnicity?

7    A.    It is African American.

8    Q.    And is Antonio still with the company?

9    A.    No, he has left.

10   Q.    And was he fired?

11   A.    No.

12   Q.    Did he quit?

13   A.    Yes.

14   Q.    How long was he employed before quit?

15   A.    I'm not sure.  I mean he was here for a good

16  while.  I mean six plus months.  But I don't know the

17  dates or even -- or if it was over a year.

18   Q.    Okay.  Do you know if Mr. McMullen made any

19  complaints or reports of discrimination, retaliation,

20  or harassment prior to leaving?

21   A.    No.

22   Q.    Did he make any of those reports to you?

23   A.    No, he made no reports.

24   Q.    You are saying he made no reports.  Are you

25  100 percent sure that he didn't report to anybody else,

1  whether it's HR or Mr. Flowers, about --

2      A.    Nobody come to me, so not to my knowledge

3  that he made any report.

4      Q.    Now, who else?  You said Antonio McMullen was

5  hired.  What other maintenance techs were hired?

6      A.    We had an Allen Endablo (phonetic) I believe.

7  I'm butchering his last name.

8      Q.    We'll all him Allen N, okay  Just by his last

9  name initial.  Is that all right?

10     A.    That's fine.

11     Q.    And what is ethnicity is Allen N?

12     A.    His family is from Mexico.

13     Q.    So you would say he's Hispanic; is that fair?

14     A.    Yes.

15     Q.    Now is Allen N. still with the company?

16     A.    Yes.

17     Q.    Are there any other maintenance techs?

18     A.    Yes.  We have another one recommended from

19  Michael Dupree that is -- he's been with us for a short

20  time.  Scott Chipley.

21     Q.    C-h-i-p-l-e-y?

22     A.    Sounds good to me.

23     Q.    What is Mr. Chipley's ethnicity?

24     A.    He is white.

25     Q.    Okay.  And is he still with the company?

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1      A.      Yes.

2      Q.      Okay.   Are there any other new maintenance

3  technicians?

4      A.      No.

5      Q.      Okay.   What about any new foremens with the

6  company?

7      A.      No new foremen.

8      Q.      And Juan Garcia is no longer with the

9  company, correct?

10      A.      That is correct.

11      Q.      Why did Juan leave?

12      A.      He resigned.

13      Q.      And why did he resigned if you know?

14      A.      I sent him -- he had a random drug test and

15  he resigned.

16      Q.      Okay.   To be clear, he did not take this drug

17  test before resigning.   He simply resigned upon you

18  telling him he had to take a drug test; is that

19  correct?

20      A.      That is correct.

21      Q.      Okay.   Was Mr. Garcia on drugs to your

22  knowledge?

23      A.      Not to my knowledge.

24      Q.      Okay.   Do you believe it's suspicious he

25  resigned after being told he had to complete a random

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 43 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    drug test?

2          MR. DOTY:  Objection.  Asking the witness to

3    speculate.  Go ahead, Stephen.

4          THE WITNESS:  Do I need to answer that?

5    Because I really don't --

6          MR. DOTY:  Yes, you've got to answer the

7    question.

8    A.    Okay.  What was the question again?

9    Q.    Sure.

10         The question was, do you believe it's

11   suspicious that he resigned following a random drug

12   test notification?

13   A.    I would say yes, that could be considered

14   suspicious.

15   Q.    Okay.  How many drug tests did Mr. Garcia --

16   how many drug tests was Mr. Garcia asked to complete to

17   your knowledge?

18   A.    I know that he had one right before that.

19   With Class A license you're required to do drug

20   screens.

21   Q.    Okay.  Had Mr. Garcia failed any prior drug

22   tests to your knowledge?

23   A.    Not to my knowledge.

24   Q.    Okay.  What about Mr. Roebuck?

25   A.    None to my knowledge.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 44 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1      Q.    And what about Mr. --

2            (Reporter clarification)

3            THE WITNESS:  Do you mind if I step to the

4      restroom real quick?

5            MR. BARROUKH:  Sure.  Let's take a

6      five-minute break and come back at 11:12.

7            (Brief recess taken.)

8  BY MR. BARROUKH:

9      Q.    Stephen, can you please describe the

10 company's policies with regards to anti-discrimination?

11     A.    What do you mean by like policies for

12 anti-discrimination?

13     Q.    All right.  Well, you understand the company

14 has policies, correct?

15     A.    Yes.

16     Q.    Okay.  Actually, let me show you a document.

17 This might be more helpful.

18           (Exhibit No. 3 marked for identification.)

19 BY MR. BARROUKH:

20     Q.    I'm showing you what I've marked as Exhibit

21 3.  Okay.  Now, I'm going to scroll through the

22 document just to show you that it's only this single

23 page.  And again, this document does not have a Bates

24 label but it was sent to me by your law firm.  Okay?

25     A.    Okay.

1    Q.    Do you know what this document is?  And I can

2  scroll through it.  Just take as much time as you need

3  to review the document.

4    A.    Employee handbook acknowledgement form.

5    Q.    Okay.  One moment.

6         And do you see at the bottom of the form it

7  says Stephen, correct?

8    A.    Yes.

9    Q.    And you see a signature on the document?

10    A.    Yes.

11    Q.    Is that your signature?

12    A.    It looks to be, yes, sir.

13    Q.    And position, do you know what this says?

14    A.    Abbreviation for superintendent.

15    Q.    And then the date 6/21/21.  Do you see that?

16    A.    Yes.  June.  I thought it was April.  So June

17  I started.

18    Q.    Okay.  So do you remember signing this

19  acknowledgement form?

20    A.    Honestly, I mean I would say I signed a lot

21  of papers, you know, when we started back, but I

22  remember he think everybody has to sign the handbook

23  acknowledgement forms and stuff.

24    Q.    Can you read this sentence starting from "I

25  have read here"?

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 46 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1        A.     "I have received and read a copy of the

2   Ferrovial Services U.S. Inc. Employee Handbook.  I

3   understand that the policies, rules and benefits

4   described in it are subject to change at the sole

5   discretion of the company at any time".

6        Q.     All right.  You can pause right there.

7               And now could you read this statement please

8   starting from "I understand"?

9        A.     "I understand that my signature below

10  indicates that I have read and understand the above

11  statements and that I have received a copy of the

12  Company's Employee handbook".

13       Q.     All right.  Now back to my previous question.

14              Can you please describe the company's

15  policies and procedures regarding anti-discrimination

16  policy?

17       A.     So if you're talking about anti-bullying and

18  discrimination policies, you know, there's zero

19  tolerance on that.  And if anybody would come to me or

20  if they -- I mean I have a wall in my office that's got

21  numbers of, you know, Russ Flowers or Stacy.  So if

22  anybody has any issue just even with me, I'm not the

23  end game here in Madison.  They -- they can easily go

24  beyond me very easily without me even knowing.

25       Q.     Okay.  How long has this wall of phone

1  numbers been up in your office?

2      A.    Well, it's been up there for a while because

3  I updated it and took Robert Cook off it and put my

4  name on there on one of the numbers if somebody would

5  like to call and talk.

6      Q.    Okay.  So this wall of phone numbers has been

7  there since you started working as a superintendent

8  again; is that correct?

9      A.    Yes.

10     Q.    Okay.  Now to your knowledge, what is the

11 company's anti-discrimination policy?

12     A.    I don't recall.

13     Q.    Do you know what discrimination is?

14     A.    Yes.

15     Q.    Okay.  What is your understanding of

16 discrimination?

17     A.    I mean if any discrimination, you know, comes

18 to me I mean it's -- it's zero tolerance, you know, and

19 I would assume that that's the company's, you know,

20 same thing.  I mean nobody wants to be bullied or

21 discriminated against.  You know, that's not just for

22 ethnic or if you're male or female or -- you know,

23 there's zero tolerance on that stuff.

24     Q.    I'm not asking about the tolerance of

25 discrimination or sex or race discrimination.  I'm

1    asking you, what do you understand discrimination to

2    mean?

3         A.    Getting less or more work than someone other

4    than that ethnic.  Somebody is put in a hardship

5    because of who they are.

6         Q.    Okay.  And to you, would discrimination

7    include being the target of a racial slur?

8         A.    Yes, that would be discrimination.  Racial

9    slurs.

10        Q.    Okay.  And would being called the N-word be

11   discrimination in your opinion?

12        A.    Yes.

13        Q.    Okay.  Now, how frequently are the company's

14   anti-discrimination policies told to you?

15        A.    Well I mean we have -- I have a wall of

16   papers right at my -- my desk right there to read any

17   of that kind of stuff.

18        Q.    Okay.  And what do the papers say?

19        A.    I couldn't tell you right this second without

20   reading them.

21        Q.    Okay.  Well, when was the last time you read

22   these papers do you think?

23        A.    I mean, I look at them every day but I

24   couldn't really tell you when was the last day that I

25   read through all the papers.

```
 1        Q.    Okay.  How many papers are they?

 2        A.    There's a wall of papers.  There's anti --

 3   you know, I mean there's everything that you could ever

 4   need, you know.  I mean all the way down to like if you

 5   get hurt at work, you know, there's a phone number on

 6   there that you can call and get, you know, a doctor on

 7   the phone, you know, to let them know that you got hurt

 8   or a cut or anything.  I mean so all the company

 9   policies.

10        Q.    And I understand they are on your wall so you

11   see them every day, but when was the last time you

12   really read through all of them?

13        A.    I don't recall.

14        Q.    Have you ever read through all of them, just

15   looked at the wall for some time and read through every

16   document?

17        A.    Yes.  I mean we update the wall once a year.

18        Q.    Okay.

19        A.    I mean make sure everything is up to date.

20        Q.    Okay.  And when you update the wall once a

21   year, to your understanding that's the company renewing

22   their policies every year; is that correct?

23        A.    I would believe so.  I mean, updated policies

24   and different standards as the company grows, you know,

25   and gets more work.
```

1    Q.    Okay.  And is there anything else the company

2    does to show you or explain their new annual policies?

3    A.    Now we go through Survey 123 that -- and they

4    send out like Toolbox Talks on all this that we go

5    through.

6    Q.    And what is -- you said Survey 123 and

7    Toolbox Talks; is that correct?

8    A.    Yes.

9    Q.    Okay.  And what are those?

10   A.    They're geared around safety of the company

11   and different new policies.  I mean there's just --

12   it's a really good tool to use so everybody knows

13   anything new that's coming around.  Or if anybody got,

14   you know, hurt from doing a certain job.  You know, so

15   it's an all around good tool.

16   Q.    I understand.  And outside of -- well, for

17   Survey 123 or Toolbox Talks, do you know if there are

18   any discrimination policies referenced.

19        MR. DOTY:  I want to pipe in briefly.  Maybe

20     we can work this out.  The form is vague with

21     discrimination.  Can we limit this to like

22     specifically unlawful discrimination and policies

23     in line with that?

24        MR. BARROUKH:  If he understands what I mean

25     by "discrimination", then can answer.  And I've

```
 1        also asked him to provide an explanation for

 2        discrimination, so I'm going based off his

 3        understanding so there's no confusion for the

 4        vagueness.

 5   BY MR. BARROUKH:

 6        Q.    Stephen, would you like to give a definition

 7   of discrimination that you understand at this point

 8   that's been different from what we've been using?

 9        A.    I mean no.  I think I explained what my

10   definition of that would be.

11        Q.    And --

12              MR. DOTY:  That's fine.  You can operate off

13        that definition.

14              MR. BARROUKH:  Okay.  Yeah, because I don't

15        want to give a definition that Stephen has never

16        heard before and ask him to answer questions based

17        off that.

18              MR. DOTY:  I understand.  He referenced

19        racial also, so I get it.  Go ahead.

20   BY MR. BARROUKH:

21        Q.    Well to that point, Stephen, to that point do

22   you know what race discrimination is?

23        A.    Yes.

24        Q.    What is race discrimination to your

25   understanding?
```

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 52 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    A.    You would give, you know, a harder time to

2    someone because of their race.

3    Q.    Okay.

4    A.    Or maybe make jokes or anything that was

5    associated with their race that would make someone feel

6    discomfort or pushed aside.

7    Q.    Okay.  And what type of jokes are you talking

8    about?

9    A.    Any kind of racial jokes that someone may

10   come up with.  I mean, I don't know.  I don't really

11   run down this racial stuff myself, so I could not tell

12   you.

13   Q.    Yeah.  And I'm not saying you do.  I just

14   want to make sure we are on the same page with the

15   definition of -- your definition of race

16   discrimination, okay?

17   A.    Okay.

18   Q.    And when you use the word "joke", could that

19   be a comment or, you know, a slur that someone makes?

20   A.    Yeah, it could -- yeah, I mean it would would

21   be some -- you know, to me that would be somebody

22   making fun or laughing at someone else's expense.

23   Q.    And why do you use the word "joke" rather

24   than, you know, a harmful comment or something like

25   that?  Why do you say "joke"?

1    A.    Because that's the definition that I've

2  always heard that, you know, racial jokes or whatever

3  the case may be.  I've heard that recently actually.

4    Q.    Recently from who?

5    A.    When all of this law stuff, you know, and all

6  that kind of stuff started up.

7    Q.    When all of this started up they told you no

8  more racial jokes at the office?

9    A.    No.  Just someone, you know, off the side was

10 saying that -- I heard it in the street like -- we're a

11 small community so --

12   Q.    Yes.

13   A.    -- so if you talk with, you know, anybody

14 that's worked here before you know a lot of people are

15 kin.  I mean we got, what 20,000 people in this whole

16 community?  So I've heard that -- going up to the local

17 store that we have been talked about from individuals

18 that I have allowed racial jokes in the office.  And

19 that's recently.  And that was from a third-party going

20 into a grocery store shopping.

21   Q.    I understand.  And you understand that a

22 federal court lawsuit is a public filing, correct?

23   A.    I guess so.  I do now, that is correct.

24   Q.    All right.  Well I can tell you that when you

25 file a lawsuit in court, especially in federal court,

1    it's -- all the documents accessible by the public,

2    especially the complaint which is what people refer to

3    as the lawsuit, you know, making all the claims and

4    things like that.  So that's how people can find out

5    about it or hear about it is through that filing.  Not

6    necessarily from solely word of mouth, you know, maybe

7    from one of the plaintiffs to another person.  Does

8    that make sense?

9        A.    Yes.

10       Q.    Now back to Survey 123 and Toolbox, was there

11   any mention of discrimination, racial discrimination

12   that you remember?

13       A.    No.

14       Q.    Okay.  Were there any other trainings or

15   annual trainings or anything at all that kept you up to

16   date on the company's discrimination policies?

17       A.    Not off the top of my head.  When we sign up

18   employees we go through this training system with them.

19   So I'm present, you know, with them through the

20   training and that -- and they go over discrimination

21   and everything.

22       Q.    And after those employees complete the

23   training system they fill out a form saying they

24   completed the training?

25       A.    Yes.

1    Q.    Do you have that form as well that you

2    completed the training?

3    A.    I have to look in my file.

4    Q.    Okay.  When was the last time you completed

5    that training?  Was it in 2014 when joined the company?

6    A.    I did all the new hire training in 2021 also.

7    Q.    Okay.  This was even though you were hired in

8    2018 you had to in 2021 complete this training again;

9    is that correct?

10    A.    Well, I left in '18 and then I came back in

11    2021.

12    Q.    Sorry.  Thank you.

13    So since 2021 have you completed any other

14    anti-discrimination review with the company?

15    A.    Not to my knowledge.

16    Q.    And do you know if -- well, scratch that.

17    Have you conducted any anti-discrimination

18    trainings for your staff members in Madison County?

19    A.    Just the new hire, you know, when it comes

20    through the new hire forms.

21    Q.    Okay.

22    A.    Here recently there's been a lot of turnover

23    in the past couple years.

24    Q.    I understand.  And I just want to go back and

25    share my screen.  I'm going to go back to Exhibit 2,

```
 1   what I showed you earlier, okay?

 2        A.    Okay.

 3        Q.    Really briefly.

 4              Now you can see the screen, correct?

 5        A.    Yes.

 6        Q.    Now you can see on the right-hand side it

 7   says Ethnicity Racial Cat 1.  Racial category 1,

 8   correct?

 9        A.    Yes.

10        Q.    You can see throughout all of these employees

11   there's four black or African American employees.  Do

12   you see that?

13        A.    Yes.

14        Q.    And that's throughout a nine or so year

15   period, right?

16        A.    Yes.

17        Q.    And as we discussed previously, my clients

18   down here, Mr. Ealy and Mr. James, are bringing this

19   current lawsuit alleging racial discrimination.  And as

20   well, Mr. Crumitie to your knowledge has also -- has

21   brought a legal claim for it.

22              Do you know if any of the other individuals

23   listed have brought a claim forth, a legal claim forth

24   against the company?

25        A.    Not to my knowledge.
```

1    Q.    Okay.  Do you know why there have only been

2    from 2013 all the way to 2022 or specifically September

3    5, 2013 to August 5, 2022 only four black or African

4    American employees hired by the company?

5    A.    I don't know.  I wouldn't -- I wasn't in the

6    process of hiring anybody during a lot of that

7    beginning time, so I don't know.

8    Q.    I understand.  I'm not saying you were

9    responsible for hiring.  I'm just wondering if you know

10   why there is a large disparity of hiring white versus

11   black or African American employees.  Do you see what

12   I'm saying?

13   A.    Right.  I mean unless, you know, people

14   putting in applications were only white.  I mean that's

15   a possibility.

16   Q.    Of course.

17   A.    I was just saying because when I was in

18   Jefferson County, when I had an opening all the

19   applicants were African American with no whites.  So I

20   mean that's a possibility on both sides.  Or Hispanic.

21   I mean, you never know who is going to put in an

22   application.

23   Q.    I understand.  And that does make sense to

24   me.  Thank you.

25        Me next question is do you know why from

1   again September 5, 2013 through August 5 of 2022 three

2   of the four black or African American employees brought

3   forth legal proceedings against the company?

4        A.    I have no clue.

5        Q.    Now were you, outside of the hiring training

6   given any other anti-discrimination, anti-retaliation

7   and anti-harassment training?  And if you don't know

8   what retaliation or harassment means, let me know and

9   we can figure those out.

10       A.    Yes, I know what all that is.  Like I said, I

11  don't remember, but we do have posters so I'm assuming

12  they come through Toolbox Talks.  But just sitting here

13  talking with you I couldn't really say that I do

14  remember.  So I don't remember or recall.

15       Q.    Okay.  So just to be clear, outside of the

16  Toolbox Talks posters that you see and the wall of

17  useful information, when was the last time you remember

18  you were trained on anti-retaliation,

19  anti-discrimination, and the anti-harassment

20  provisions?

21       A.    I do not remember.

22       Q.    Okay.  Have you ever been trained on those

23  outside of your new hire test or training?

24       A.    I can assume, but I don't remember that

25  either.

1    Q.    Okay.

2    A.    I apologize for that.

3    Q.    Don't apologize.  We are talking about a

4    large amount of time, many years.  So don't worry about

5    it.  And again, don't assume.  Whatever you can

6    remember.  If you don't know, like I said that's fine.

7          To your knowledge, who is responsible for

8    enforcing these anti-discrimination, anti-harassment,

9    and anti-retaliation policies for the company?

10   A.    I don't know who is responsible for that.  It

11   just -- it gets -- I don't know who makes policies.

12   Q.    Okay.  Well, do you know who makes sure the

13   employees abide by these policies?

14   A.    Well, everything is, you know don't -- I

15   believe everything kind of federally guidelined on how

16   all policies are written.

17   Q.    Okay.

18   A.    So I'm assuming that how the policies role

19   out, you know, if anybody breaks policies, you know,

20   you have -- I can give the number and the lady's last

21   name but it's stacy and it's right in our office right

22   there.  She's like over I guess in HR.

23   Q.    Okay.  Would you say that you're responsible

24   for enforcing these anti-discrimination,

25   anti-retaliation, and anti-harassment policies?

```
 1        A.    I just -- I make sure nothing like that
 2   happens.  And if it does, I go to the next step
 3   supervisor and the HR department.
 4        Q.    Okay.  So do you think it's fair to say you
 5   are responsible for the enforcement of those policies?
 6        A.    I would -- I would think so, yes.
 7        Q.    Okay.  Who else do you believe is responsible
 8   for the enforcing of those policies?
 9        A.    I believe anybody that's a citizen of the
10   United States should be, you know, part of that if you
11   really want to know.
12        Q.    Listen, I hear you and I'm with you on that.
13   I'm just talking about being able to enforce a company
14   policy you have to have a certain position with the
15   company, right?
16        A.    Yeah.  Well, I mean here you got supervisor.
17   They are enforcement.  And then the technicians, you
18   know, are known, you know, if they don't like anything,
19   you know, they have like this policy where you can say
20   something, won't nothing happen, you know.  So that's
21   why everybody --
22        Q.    I hear you.
23        A.    That's why if anybody feels in danger or
24   harassed against, I mean they can quietly -- so they
25   won't even be targeted for any of it, they can quietly
```

 1   make a phone call on their work time, their free time,

 2   away from anybody.  So there's always a number of

 3   somebody to reach.

 4       Q.    I hear you.  But as a tech, they don't have

 5   the same power as Mr. Flowers does where if he hears

 6   about a violation of policy he can suspend them, right?

 7   A tech can't see you in your office and stay you're

 8   violating policy, you've got to go home, correct?

 9       A.    Yeah, they can't do that.  But they do --

10   they do have training when they first -- it's called

11   like a stop work card.  So if they feel anything they

12   have the power to stop the work, they have the power to

13   walk off a job without getting fired or retaliated if

14   it's unfair unsafe environment.

15       Q.    Okay.  And the stop work card, do you know if

16   it's -- is it a physical card?  Sorry if that's a silly

17   question.  I'm just not familiar with this card.

18       A.    Yes.  It's a physical card that it's just --

19   it has the company policy on it and, you know, tells

20   the technicians they're entitled to stop work and...

21       Q.    Okay.  And basically the technician can read

22   the card, see if there's a violation of policy, and

23   make an individual decision of whether they can leave

24   or not; is that correct?

25       A.    That is correct, without retaliation against

 1    them.

 2         Q.    And would the individual have to notify

 3    anybody that they're stopping work?

 4         A.    Yes.  They would have to notify, you know,

 5    someone.  If it's a group of people there, you know,

 6    say if it was a -- if it was -- because it was a

 7    dangerous job or if they were out in the summer heat

 8    with no water or no close air conditioning that they

 9    can get to a cool place.  And they felt they were in

10    danger, then of course they would call the supervisor

11    and -- you know, or directly call me or call

12    Mr. Flowers or -- and they can -- you know, they can

13    call whoever they would like to and everybody would,

14    you know, make sure it was right.  Do you know what I

15    mean?

16         Q.    I understand.  So do you know if every tech

17    has this stop work card?

18         A.    They are issued it when they -- you know, I

19    mean everybody's got this stop work card.  And we have

20    the posters in there that, you know, I have everybody

21    take pictures of so that it's on their camera roll so

22    that if they don't have a card, you know, they've got

23    it on their pictures on their phone with the numbers

24    and stuff that they can call.  So if they feel anything

25    that they can call somebody or, you know, they can be

1   safe.

2        Q.    I hear you.  And when did the company stop

3   requiring this stop work card to be assigned to the

4   techs?

5        A.    I don't know if it's a company policy that is

6   they have to be assigned.  I mean, there's no papers

7   that we -- you know, I don't give somebody a card or

8   make them take a picture and sign their name on it or

9   anything.  So it's not like it's signed.  It's just a

10  tool that I like for everybody to have.

11       Q.    Okay.  And do you know if all of your

12  technicians were given a stop work card?

13       A.    Not all of them because we didn't have enough

14  to go around this time.  So I have everybody to take

15  pictures of our stop work policies and stuff and have

16  them on their phones.  And then a lot of times during

17  the toolbox talk I'll ask, you know, different

18  questions.  If you have an issue, you know, what number

19  to call.

20       Q.    I hear you.

21       A.    But first, you know, they'll get like a high

22  five because they can find it first.  So it kind of

23  gives people a --

24       Q.    I hear you.

25             Now, do you know if Eric Ealy and Darrell

 1    James were given this card?

 2        A.    Like I said, I don't know if they got a

 3    physical card or not, but I know that they took

 4    pictures if they did not.

 5        Q.    Okay.  And when you say they all have their

 6    phones, are those company phones?

 7        A.    Yes.

 8        Q.    And do you have any records of the company's

 9    phones, of the -- the text messages they send or the

10    calls incoming or outgoing?

11        A.    I have no record of any of that.

12        Q.    Okay.  Do you have the phones that were given

13    to Mr. Ealy and Mr. James?

14        A.    Yes.

15        Q.    Okay.  And have they been wiped at any point

16    since Mr. Ealy and James were let go?

17        A.    I believe when I got them -- well with every

18    foreman, you know, before I hand to it another

19    technician I go ahead and wipe it clear and give it to

20    a new technician.  But most of the time when I get, you

21    know, the phones back from technicians they're already

22    wiped clean.

23        Q.    Okay.  And you've had the same company phone

24    since you returned in 2021; is that correct?

25        A.    Yeah.  I've had the same company phone, yes.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 65 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1     Q.    Have you wiped your phone at any point since

2  returning in 2021?

3     A.    I've had the same number.  My phone, it went

4  down about I think seven or eight months ago and I had

5  to get a new phone.

6     Q.    Got it.  But it's the same number; is that

7  correct?

8     A.    It's the same number.

9     Q.    Okay.  And do you know to your knowledge if

10  Stacy Wessel or Russ Flowers phone number has changed

11  in the past three years?

12     A.    Not to my knowledge.

13     Q.    Okay.  And do you know if they use company

14  phones or personal cell phones?

15     A.    Should be company phones.

16     Q.    Okay.  Now, when the company we understand

17  that Ferrovial was taken over by Webber, correct?  And

18  I'm not going to ask you to define what take over means

19  because I'm sure it's much more complicated than a

20  simple word or two, right?  But Ferrovial is now

21  Webber, correct?

22     A.    That is correct.

23     Q.    Now, when Ferrovial became Webber was there

24  any additional training you had to complete with the

25  new company?

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 66 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    A.    I don't recall.  It's been about two years

2  now.

3    Q.    Do you remember whether you had anymore

4  training, whether it was in the field or regarding a

5  superintendent position or HR training, since Webber

6  took over?

7    A.    I have that had training, and I don't

8  remember the name of it.  It was like manager training.

9  You know, people skills, how to listen to people, what

10  to look for type stuff.  But I don't remember the name

11  of the training.

12    Q.    Okay.  When was the manager training?

13    A.    It was end of last year or beginning of this

14  year.

15    Q.    Okay.  Did you ever have a manager training

16  when, working for Ferrovial?

17    A.    I didn't have manager training, no.

18    Q.    Okay.  But you did supervise 20 plus people.

19  So you had some experience with supervision to that

20  point, correct?

21    A.    Right.  Well, not all at one time.  You know,

22  that was off and on.

23    Q.    I hear you.  I hear you.

24        Now, have you ever had to deal with an

25  employee bringing forth a complaint, a report of

1  discrimination, harassment or retaliation?

2       A.    Yes.

3       Q.    Okay.  How many times?

4       A.    One time.

5       Q.    Okay.  And is that one time with regards to

6  my clients?

7       A.    No.  It did not regard your clients at all.

8       Q.    Okay.  What is this -- well, who was the

9  subject of this complaint report or discrimination,

10 retaliation or harassment?

11      A.    It was a report of race.  It was when I

12 worked at the prison between two technicians.

13      Q.    Okay.  Now I'm specifically referring to

14 during your time at Madison County, Florida for

15 Ferrovial.

16      A.    Yeah, just -- I mean you said in my time so I

17 assumed like --

18      Q.    You're right.  You're right.

19            So with Ferrovial have there been any

20 complaints to you about race discrimination, harassment

21 or retaliation?

22      A.    No.

23      Q.    Okay.  There has not been one report of race

24 discrimination to you during your time with Ferrovial?

25      A.    From, you know, no.  But yes from this -- you

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 68 of 219

Deposition of Michael Stephen Bearden                 Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    know, obviously we are on this call now but --

2        Q.    Yeah.  Well, this call is included.  I'm

3    asking you about your entire time with them, not just

4    skipping out the period where my clients worked there.

5    Okay?

6        A.    Well they didn't let me know anything either.

7    So I mean that's what I'm saying.  No because nobody

8    has ever came up to me and said hey, I've been

9    discriminated against.

10       Q.    Okay.  And you know, we previously said

11   discrimination was -- you know, you gave me your

12   definition.  Do you remember that definition?

13       A.    We went over a lot of stuff.

14       Q.    Okay.

15       A.    I guess race, you know, from -- race.

16   Discrimination against race.

17       Q.    Okay.  Now you agree that jokes or slurs

18   against somebody because of their race was

19   discrimination; is that correct?

20       A.    That would be correct, yes, sir.

21       Q.    And you never received a complaint or report

22   of a slur or joke regarding someone's race during your

23   time with Ferrovial; is that correct?

24       A.    Yeah, that is correct.  I have not.

25       Q.    Okay.  And you have not had anything brought

1   up to you regarding race discrimination that you denied

2   ever happened, correct?

3       A.   I have never had anything brought up to me

4   that -- you know, that said I was having, you know,

5   discriminated against.

6       Q.   Okay.  Now, have you ever been a part of an

7   investigation regarding discrimination while working

8   for Ferrovial?

9       A.   No.

10      Q.   Have you ever been asked by HR if racism ever

11  occurred in the workplace?

12      A.   I believe this time, yes.  I believe someone

13  asked.  I mean I don't know if it was HR or if it was,

14  you know, talking about a lawsuit.  You know, I don't

15  recall who, when, or how.

16      Q.   And when you say "this time", what do you

17  mean?

18      A.   I mean we are on a call, you know, about --

19  it's obviously about racism so that's what I'm talking

20  about, this -- like right now present.

21      Q.   Okay.  And for this time.  And the reason --

22  I know what you're talking about, but this is for the

23  record.  You understand that this is all being typed up

24  and when we go back to it, when you say "this time"

25  it's not very clear.  So I just have to ask you to

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 70 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1  elaborate so we can make it very clear for the record.

2  Okay?

3      A.    Okay.

4      Q.    I know what you're saying and you're making

5  it clear for me, but sometimes I do that to keep the

6  record clear and clean.

7           So when you say "this time" talking about

8  this current lawsuit and that's what gave rise to this

9  lawsuit, what can you tell me about regarding a claim

10 of discrimination?

11     A.    Like I said, you go to the local store and I

12 run into someone and they -- you know, they mention

13 that our company is -- you know, allows discrimination

14 and stuff.  So I mean I've heard it recently a lot.

15     Q.    Okay.  But before we get to that, during your

16 employment with Ferrovial, again, you have not heard of

17 any race discrimination at the company; is that

18 correct?

19     A.    Yeah, I have not heard of any.

20     Q.    Okay.  If an employee said to you that

21 another employee made a joke or a statement about his

22 race, sitting here today would you think that is

23 discrimination?

24     A.    Yes.

25     Q.    Okay.  Now, when you were in the shopping

```
 1   center or grocery store and somebody said oh, I heard

 2   your company allows for discrimination, what was the

 3   context of that?  What happened after that, as well?

 4        A.    I just -- I let them know there's no

 5   discrimination that happens here at this company.

 6        Q.    Okay.

 7        A.    And then go about my business.

 8        Q.    I understand.  And how does it feel to you to

 9   hear somebody walking into a grocery store and making

10   that claim?

11        A.    It kind of hurts, you know, because we're,

12   like I said, we are a smaller community.  So I'm

13   related to a lot of people, you know, I have -- like my

14   brother in-law is an African American.  I've got, you

15   know, different families, you know, that I'm related to

16   that's all race --

17        Q.    I understand.

18        A.    So it's very hurtful, you know, when people

19   would say something like that, especially when you have

20   family that's not just white, you know.

21        Q.    I understand.  And I want to make it very

22   clear.  I'm not sure if you read the complaint or my

23   client's to this point, but there have been no

24   statements that you have made, any racially disparaging

25   comments to this point in time, okay?  I want to make
```

1  that very clear for you.  Nobody has said you used the

2  N-word or anything like that, okay?  I want to make

3  that clear.

4          Now moving forward -- because there was an

5  investigation in this case, correct?

6      A.    It's obvious.  Once everything happened I

7  turned it over to Stacy and Russ Flowers, and they -- I

8  don't know if it was Stacy or Russ but they did

9  investigations.

10     Q.    Now I just want to know from your

11 understanding, not specific to this case, what is the

12 general outlook of an investigation or a complaint with

13 Ferrovial?

14     A.    Well, if somebody comes to me obviously I get

15 Russ Flowers involved or Stacy involved.

16     Q.    Okay.

17     A.    I go to the next step because I want to make

18 sure that any allegations would not be pushed to the

19 side.

20     Q.    Okay.  And then what happened?

21     A.    And then they do their investigation.

22     Q.    Okay.  And what happens then?

23     A.    I don't know.

24     Q.    Okay.  Were you involved in their

25 investigation at any point?

1    A.    No.

2    Q.    Okay.  So is it fair to say that as far as

3  you're concerned, after you make that initial report to

4  Mr. Flowers or Ms. Wessel you have done everything you

5  needed to for the investigation?

6    A.    I ask them, you know, what to do.  I go from

7  step to step.  If they ask me to jump, I ask how high.

8  So if they ask me to send someone home or keep someone

9  here, I just do as they say.

10    Q.    So there's nothing in writing as to what you

11  need to do, but it's whatever your supervisor or

12  superior asks you to do you do; is that correct?

13    A.    I mean within federal guidelines, yes.

14    Q.    Of course.

15    A.    They are not going to ask me to run through a

16  fence or something, you know.  I've got to use my

17  common since on this stuff.

18    Q.    I hear you.  I hear you.

19          And when this investigation is over, do you

20  have any other involvement?

21    A.    No.  I mean but this was -- after this one I

22  had No involvement.

23    Q.    Okay.  Have you been involved in any other

24  investigations at all during your time with Ferrovial?

25    A.    No.

```
 1       Q.    Are you informed of the outcome of the

 2   investigation?

 3       A.    I'm not -- you know, nobody tells me

 4   the outcome of an investigation other than, you know,

 5   they can call me and say you've got a position open

 6   back up, you know, you can rehire.

 7       Q.    Would you ever be asked to give information

 8   regarding the investigation?

 9       A.    I believe so, because I would be investigated

10   on also.

11       Q.    Why would you be investigated on also if you

12   weren't involved in the investigation?

13       A.    Well, said that if I'm involved in doing an

14   investigation or I'm not.  So if somebody was doing an

15   investigation and then asked me questions about that

16   investigation on my behalf, you know, on my part,

17   that's two different activities.

18       Q.    Okay.  So just to clear it up, if you were

19   involved in a scenario then you would be asked

20   questions during an investigation.  But if you were not

21   involved in a scenario you would not be asked questions

22   during an investigation; is that correct?

23       A.    That is correct.

24       Q.    Okay.  Now, do you know if an employee can

25   have an attorney during any of these investigations or
```

```
 1    do you not know?

 2         A.     I have no clue.

 3         Q.     Okay.

 4         A.     I do not know.

 5         Q.     Okay.  And let's say at the end of the

 6    investigation the company decides to terminate an

 7    employee.  Are you involved in that process?

 8         A.     No.

 9         Q.     Okay.  Where does your involvement stop in

10    this process?

11         A.     When there's allegations and I turn it over

12    to Mr. Flowers or Stacy, you know, that's -- that's the

13    upper management so, you know, they take control.  So

14    my involvement in it would, you know, go no further.

15         Q.     Okay.  And are you ever trained on how to

16    file a complaint or report against the company?

17         A.     I think there's papers and stuff.  I mean I'm

18    not sure.  I assume there's stuff in there, you know,

19    but right off the top --

20         Q.     Again, I'm not asking you to assume.  I'm

21    asking you is there training on how to report or make a

22    complaint to the company?

23         A.     Through the company or like a lawsuit against

24    the company?

25         Q.     I'll ask the question one more time.
```

1    Do you know if there is any training given to

2  management or employees explaining how to make a report

3  or complaint to the company?

4    A.    Oh, yes.  Yes.

5    Q.    Okay.  And what is that?

6    A.    I mean during the -- the handbook that's

7  handed out, and then when we do the handbook training

8  when you're hired on that's got all that on there.

9    Q.    Okay.  And you said your wall was updated

10  every year.  Is there another training every year?

11    A.    Not to my knowledge.

12    Q.    Okay.  Do you teach any trainings every year?

13    A.    I do like new hire training.

14    Q.    Okay.

15    A.    So, you know, when we do a new hire.  And the

16  sheets that comes with like a new hire through the

17  company, we kind of go over the new hire forms with the

18  employees.  Mostly it's Shaunna, so HR would go through

19  the forms on the handbooks and everything.

20    Q.    Okay.  Outside of the new hire training, are

21  there any other trainings you give?

22    A.    Yeah.  I mean we do the Toolbox Talks and...

23    Q.    So you give the training on Toolbox Talks?

24    A.    Yeah.  We get email in on what to talk about,

25  like a printout guide and everything.

1    Q.    Okay.  And how do you -- walk me through the

2    training for Toolbox Talks.

3    A.    So I would get an email in and -- and it

4    would be either a training or a scenario, and then I

5    print it out and we would have a morning safety

6    meeting.  We talk every morning about the safety and

7    everything of each employee through the day, and then

8    we go over this handbook and we read it, and then they

9    have like a little signature thing on thereafter we

10   read it and sign it.  And I then take a picture and

11   send it into the -- on the Toolbox Talk on the Survey

12   123, and it goes to the coordinators or whoever above

13   me.

14   Q.    Okay.  And you did this every single day?

15   A.    Well, I mean we don't get them every -- we

16   get them like once a week.

17   Q.    Okay.

18   A.    But every morning I always talk with the

19   guys.

20   Q.    Okay.  What about any training for

21   anti-discrimination, anti-harassment and

22   anti-retaliation, was there a weekly training on that?

23   A.    There's no weekly training on it.

24   Q.    Was there monthly training on those topics?

25   A.    I don't remember that in particular topic

1  because we do so many trainings.  So it would be like a

2  broad spectrum of training.  So like -- you know, so if

3  one of them is relevant to you, would definitely have

4  the training for it.  Because each person relatively, I

5  can say that I'm a bucket truck driver and I'm up in

6  the air, so a training of safety harness would be more

7  so my cup of tea versus the guy below in the boat

8  trimming below the bridge deck.  He wouldn't need a

9  safety harness.  He would need a flotation device.  So

10  even though we get the same trainings, some help out

11  more than others.

12      Q.    I hear you.  And when I say "training" I'm

13  specifically referring to HR training, anti-harassment,

14  anti-discrimination or anti-retaliation training.  I'm

15  not talking about workplace safety in terms of physical

16  safety training.  Does that make sense?

17      A.    That makes sense.

18      Q.    Okay.  So sitting here today, when was the

19  last time you received training or you conducted a

20  training on anti-discrimination, anti-retaliation and

21  anti-harassment?

22      A.    I think it would be the new hire for the last

23  two guys that got hired.

24      Q.    Okay.

25      A.    I think Shaunna handled the training on them.

 1      Q.    Okay.  Outside of the new hire training, when

 2   was the last time you were trained on any

 3   anti-discrimination, anti-harassment and

 4   anti-retaliation policies?

 5      A.    I don't know.

 6            MR. DOTY:  I was going to chime in with

 7      objection as to asked and answered earlier during

 8      the line of questioning.  But I think he just said

 9      the same thing.

10            MR. BARROUKH:  Okay.  I believe he said I

11      don't know, and that's totally fine.

12            MR. DOTY:  Yeah.

13   BY MR. BARROUKH:

14      Q.    Are you aware of your rights as an employee

15   of Webber to file complaints against the company?

16      A.    I believe it's in the handbook, and I believe

17   we just read over it, so yes.

18      Q.    So sitting here today, could you explain

19   those rights to me?

20      A.    Not off the top of my head right now without

21   looking in the handbook.

22      Q.    Okay.

23      A.    But I mean it's pretty obvious.  It's within

24   the federal guidelines of no discrimination, zero

25   tolerance unless there's an agency that allows that.  I

 1   don't really know.

 2        Q.    I can assure you there is not.  There is not.

 3   You're correct about that.

 4             Now, have you ever been involved in an

 5   investigation at Ferrovial that resulted in a finding

 6   that discrimination occurred?

 7        A.    I don't recall any.

 8        Q.    Are you aware of any investigation that

 9   resulted in a finding of no discrimination occurring?

10        A.    I don't recall that either.

11        Q.    All right.  Now let's start off by talking

12   about -- actually give me a five-minute break.

13             (Brief recess taken.)

14   BY MR. BARROUKH:

15        Q.    All right, Stephen.

16             When was the first time you met Eric Ealy?

17        A.    I don't know the date, but it was here at the

18   office before work.

19        Q.    And what do you know about Mr. Ealy?

20        A.    He told me that he worked for a construction

21   company and he was looking for a new job and they

22   didn't know what they were doing.  And he was a loyal

23   employee.

24        Q.    Do you know if Mr. Ealy had any

25   certifications?

1      A.    I don't think he had a certification.  He

2  might have had a flag -- I think he had something to do

3  with flagging traffic.

4      Q.    Okay.  Do you know -- obviously there are

5  requirements to be a maintenance technician, correct?

6      A.    Yes.

7      Q.    Do you know if Mr. Ealy met those

8  requirements to your knowledge?

9      A.    No, he did not.

10      Q.    And what exact metric did he not meet?

11      A.    Well, I mean to be a full maintenance

12  technician you needed the advanced MOT certificate --

13      Q.    Okay.

14      A.    -- which they we hire people, you know, we

15  try to go ahead and kind of push that stuff through so

16  they can have the -- you know, the training that they

17  need to be a maintenance technician.

18      Q.    Okay.  Now did Mr. Ealy obtain his advanced

19  MOT certification while employed with Ferrovial?

20      A.    At the end he went to the class.  I'm not

21  sure if he got it or not.  So I don't remember.

22      Q.    Okay.  I'm representing to you that Mr. Ealy

23  did successfully complete the advance the MOT class in

24  Jacksonville at the training, okay?

25      A.    Okay.

1    Q.    Now, outside of the MOT advanced

2   certification which we can confidently say he has now,

3   is there anything else Mr. Ealy did not have to qualify

4   him as a maintenance technician?

5    A.    I believe no -- you know, I don't know.  I

6   don't know if it was him or someone else, you know,

7   that didn't have a GED.

8    Q.    Okay.  And to your knowledge sitting here

9   today, outside of all the claims of discrimination and

10  things like that, did Mr. Ealy ever fail to perform his

11  job duties adequately?

12   A.    Yes and no.

13   Q.    Okay.  Please explain.

14   A.    So you know why Mr. Ealy when he was first --

15  when I first hired him on, you know, he would take the

16  truck and go out.  And I think we were in the middle of

17  starting up mowing.  So, you know, that's a large

18  machine mowing, weed eating, trash pickup.  So I would

19  send him out and -- you know, and he would pick up

20  trash and -- for a full day.

21   Q.    Okay.

22   A.    So that's saying yes.  But, you know, after a

23  couple of months it was -- it was more of him going out

24  and picking up trash but then they wouldn't be on the

25  job site, you know.  So him coming to work, yes.

1    Q.    And when you say them not being on the job

2  site, what do you mean by that?

3    A.    Like the -- the technicians.

4    Q.    Okay.  And was it -- you said them, so I just

5  want to make it clear.  Is it specific technicians or

6  just all of the technicians?

7    A.    Well like there was -- well, like when he

8  first started it was Allen -- I think Allen Roebuck

9  or -- Allen Roebuck and I can't remember.  What is

10  Mr. Ealy's first name?

11    Q.    Mr. Ealy's first name is Eric.

12    A.    Eric Ealy.  He always told us to call him Bo

13  Ealy.

14    Q.    Yeah.

15    A.    So Eric Ealy, they would go out and work

16  together.  And there was a couple times where --

17    Q.    Are you sure -- sorry to cut you off, but are

18  you sure that Allen Roebuck wasn't referred to as Bo?

19    A.    Yes, he was also referred to as Bo.

20    Q.    So were both of them referred to as Bo?

21    A.    Yes, Bo Ealy and Bo Roebuck.

22    Q.    Okay.

23    A.    Both of them, their nicknames were Bo.

24    Q.    Okay.  Continue, please.

25    A.    That's why I always called one Bo Roebuck and

```
 1   Bo Ealy.

 2        Q.    Okay.

 3        A.    That's their preferred nickname they wanted

 4   us to call them.

 5        Q.    Okay.  So you were just describing how they

 6   would go off to work.

 7        A.    Yes.  They would go off to work.  And there

 8   was one time in particular where, you know, I was going

 9   to a job site and Mr. Ealy wasn't on the job site but

10   was -- you know, left.  So, you know, that was not a

11   good day, you know, to go and see employees that wasn't

12   on the job site.

13        Q.    Okay.  And when you say he wasn't on the job

14   site, do you know where he was?

15        A.    I don't know where he went, no, sir.

16        Q.    Could he have been at a different job site?

17        A.    No.  Because the one employee that was

18   working with him that day was left with no vehicle.  He

19   had been left on the job site.

20        Q.    Okay.  And outside of that one day during his

21   employment, is there anything else that says he did not

22   adequately perform the duties of his job?

23        A.    Not to my knowledge.

24        Q.    Okay.  Outside of that one day when he left

25   early, correct?
```

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 85 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    A.    Yes.

2    Q.    Okay.  Now regarding Mr. James, are you

3  familiar with Darrell James?

4    A.    Yes.

5    Q.    Okay.  How do you know Darrell James outside

6  of this lawsuit filing?

7    A.    I don't know him personally.  But outside

8  this, you know, he came on as a technician.  He had a

9  diesel certificate where he was -- he got a certified

10  diesel mechanic, and he was with us for a very short

11  period.  He was actually -- you know, when he first

12  came on through the, you know, first like two weeks he

13  seemed like was on top of his game.  You know, we had a

14  tractor training right here at the office and he --

15  even though he was like the brand new guy, and I

16  offered him to drive the tractor first because he

17  obviously new how to drive the tractor better than

18  Allen Roebuck or Mr. Ealy.

19    Q.    And what did he say when you offered him to

20  drive the tractor?

21    A.    He turned it down.

22    Q.    Why did he turn it down?

23    A.    He said he enjoyed out on the side of the

24  road, freedom, more so than being confined in that

25  tractor.

1    Q.    Okay.  And is any of that offer or the

2  rejection of that offer, is that in writing or it's all

3  verbal?

4    A.    It's just all verbal.

5    Q.    Okay.  Now you said Mr. James was good on the

6  tractor.  Was he qualified to be a maintenance

7  technician in your eyes?

8    A.    Not really.  I mean he's never done the

9  position before, and he still needed the MOT training.

10    Q.    Okay.  And outside of the MOT training, was

11  there anything that he was lacking based on the

12  requirements or qualifications to be a maintenance

13  technician?

14    A.    Just MOT and experience.

15    Q.    I can represent to you as well that at the

16  Jacksonville training he completed and received his MOT

17  certification.  Okay?

18    A.    Okay.

19    Q.    So now you're saying Mr. James just didn't

20  have the experience required to be a maintenance tech?

21    A.    That is correct.

22    Q.    Doesn't everybody have to start somewhere?

23    A.    Everybody has to start somewhere.  You start

24  at the bottom and work your way up.  That's what I did.

25    Q.    That's what most people do, as well.  I hear

1    you.

2          So was there anything in Mr. James's work

3    that indicated that he could not perform the job you

4    were asking him to or that he just did a bad job in

5    general?

6    A.    No, other than -- he did his job that I

7    assigned him, you know.  Now the mechanic skills wasn't

8    that good.  I asked him to change the oil in the

9    side-by-side, and he took the plug out and ran it with

10   no oil in it and blew it up.  So I assume that his

11   diesel license didn't go for gas engines.

12   Q.    I hear you.

13         But outside of that gas engine incident, was

14   there anything else that told you or showed you that he

15   was not able to do the job?

16   A.    Not at first.  But he wasn't here very long.

17   So I say "not at first".  He was only here a month, so

18   the first couple of weeks no, but the last two he

19   started being a little more defile (sic) on -- on what

20   was going on and everything.

21   Q.    What was the word you used there?

22   A.    Like so if I asked Juan to let the guys know

23   what they were going to do for today, you know, Juan

24   would come in and say that, you know, they just act

25   like he didn't say a word, and walked off and jumped in

1   the truck and drove off.

2       Q.    Okay.

3       A.    But they would call me immediately after that

4   ask what they wanted to be done -- wanted to do for the

5   day.  So I had to --  was Juan not telling them what to

6   do or were they just not listening to him because they

7   didn't like him or -- you know, I didn't know.

8       Q.    Okay.  Well, did you ask them why they were

9   going to you for instruction rather than Juan?

10          MR. BARROUKH:  And for the court reporter,

11      Juan is J-u-a-n and his full name is Juan Garcia,

12      G-a-r-c-i-a.

13  BY MR. BARROUKH:

14      Q.    You can answer the question.

15      A.    I didn't ask.  I just said yes, we're picking

16  up trash on XYZ roads.

17      Q.    Did you find it weird that they repeatedly

18  asked you when Mr. Garcia was in charge of assigning

19  them a task?

20      A.    Yes.  And that -- like I said, that was the

21  last couple weeks.  So, you know, I asked Juan, you

22  know, is he not demonstrating what he would like for

23  them to complete clearly, you know, enough.  Maybe they

24  misunderstood what he was saying or -- you never know

25  what, you know, somebody might be thinking.

1    Q.    I completely agree with you.

2         Well with that same respect, if you didn't

3    know what Mr. Ealy and Mr. James were thinking, why

4    didn't you ask them why they were going to you for

5    assignments and not to Juan?

6    A.    Well, I mean it just -- it happened so

7    quickly within that time frame.  I was assuming that --

8    because Mr. Juan Garcia was a new supervisor so I was

9    trying to train him to be more verbally clear in the

10   aspects of a job that he needed to be done.  So I was

11   more assuming that he wasn't being clear enough,

12   like --

13   Q.    Okay, so --

14   A.    -- hey, I need you to do this today.  Or

15   maybe it was more of if you don't mind, you know, can

16   you do this or if you would like to do something else

17   it's up to you.  I don't -- maybe it wasn't that clear.

18   Because the way they were presenting it to me was hey,

19   what are we doing today?  Even -- you know, so I was

20   more or less trying to train Juan in being a good

21   supervisor.

22   Q.    So is it fair to say that you assumed

23   Mr. Ealy and Mr. James asks for task assignments at the

24   beginning of the day was a result of Juan's poor

25   communication?  Is that fair to say?

```
1              MR. DOTY:  Objection.  You're
2        mischaracterizing his testimony.  But he can
3        answer.
4              MR. BARROUKH:  Well, I'm asking for his
5        clarification on this because I don't want to
6        mischaracterize it.
7              MR. DOTY:  Go ahead.
8        A.    So I guess what you're saying is I was
9   assuming.  So I mean -- and you don't want me to assume
10  here, so I understand.
11       Q.    So I'll ask it on a different series of
12  questions.
13             Were you concerned with Mr. Garcia's
14  communication skills when my clients were employed for
15  the company?
16       A.    Concerned in getting the point of what we're
17  doing throughout the day?
18       Q.    Yes.
19       A.    Yes, I was concerned that he -- his
20  communication skills wouldn't develop enough to get the
21  point of what activities we were doing for today.
22       Q.    Okay.  And were you worried about any other
23  aspects of his communication?
24       A.    No, no.  He just seemed a little more timid,
25  like maybe if somebody would over talk him that he
```

Deposition of Michael Stephen Bearden          Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1   might back down a little bit.

2       Q.     Okay.  Did you ever hear Mr. Garcia be -- or

3   let's scratch that question.

4              Did you ever see Mr. Garcia yell at my

5   clients ever?

6       A.     I've never seen him yell.  Now, the last day

7   that they were here there was a lot of yelling going

8   on.  So there could be a possibility on that day, but I

9   don't -- other than that, I have not heard him yelling

10  at any employees.

11      Q.     Okay.  Well solely on the day that my clients

12  were suspended, did Mr. Garcia yell at all?  Was there

13  shouting at all from Mr. Garcia?

14      A.     I don't recall if he was yelling.  I believe

15  Mr. Ealy was louder than Juan or Mr. James in talking

16  on that day.

17      Q.     Understood.

18      A.     And you know he was up in close proximity of

19  me.

20      Q.     I understand.

21             Now let's go back to earlier in my client's

22  employment, okay?

23      A.     Okay.

24      Q.     Now, during their time as maintenance

25  technicians, what type of assignments -- or first off

1   how were they assigned work, in pairs or by themselves

2   or in a group of all of the technicians together?

3       A.    It really depends on the activities.  But

4   like so right now like so if you got litter control, a

5   lot of times two employees would go together for litter

6   control.

7       Q.    Okay.

8       A.    So they would be paired up.  And it's mostly

9   the new employees that gets the litter control.  So the

10  two newest guys would be together and you would tell

11  them hey, today I need y'all to do XYZ, you know, what

12  roads, and that would be litter, weed control or et

13  cetera.

14      Q.    And when you say the two newest guys, you are

15  basically saying there was a system in place where the

16  newest people to join had to do certain tasks and

17  assignments; is that fair?

18      A.    That would be fair.

19      Q.    Okay.  Now, is that still an unspoken policy

20  at the company today?

21      A.    Yes.  I -- I give the guys especially during

22  mowing season.  So Allen and Scott, brand new, they're

23  working together and they're picking up litter

24  together.

25      Q.    Okay.  Now, when the employees are out in the

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 93 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

```
 1   field are they able to contact you or able to contact
 2   other employees for assistance or anything like that?
 3        A.    Yes.  Everybody's got cell phones.
 4              (Exhibit No. 4 marked for identification.)
 5   BY MR. BARROUKH:
 6        Q.    Now, I'm going to show you what I've marked
 7   as Plaintiff's Exhibit 4.  Let me know when you can see
 8   the document.
 9        A.    I can see it.
10        Q.    Now, this is the entire document.  On the
11   bottom you see that it's Ferrovial-Ealy-000637.  That
12   is, again, just showing that your attorneys have sent
13   that over to my office.  Okay?
14        A.    Okay.
15        Q.    All right.  Do you know what this is?
16        A.    That looks like a on call activity document.
17        Q.    Okay.  And what is that?
18        A.    So when you go on call or if you do like a
19   work activity on Survey 123, you put it in and you
20   submit it for -- you know, for your time to go in.
21        Q.    Okay.  And when say "time to go in", so let
22   me see if I can understand.  First and foremost, this
23   is an email, correct?
24        A.    Yes.
25        Q.    And this is an email from the ESRI team to
```

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

```
1    you, correct?

2         A.    Yes.

3         Q.    Okay.  Now based on your explanation, I'm

4    understanding that an on call activity email basically

5    says one of your techs is assigned to work in the

6    field, they're submitting that they're going to an

7    assignment, and basically it confirms with the ESRI

8    team and yourself that the tech is going to an

9    assignment; is that correct?

10        A.    It could be going to assignment, or if that's

11   an on call activity they could be going on call which

12   the company pays them an hour just to be on call --

13        Q.    Okay.

14        A.    -- just to hold the phone after hours, and

15   they submit it to get paid for that hour.

16        Q.    Okay.  That makes sense.

17              And is that voluntary, the additional hour

18   being on call?

19        A.    Well, everybody is on call so they do like a

20   rotation.  So there's, you know, four technicians, you

21   know, then that would be one technician on call once a

22   week and then they get seven hours just to hold the

23   phone.  Plus I give them an extra hour so if they need

24   to take like a Friday off they'll have a total of eight

25   hours so they don't have to use any sick days or
```

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 95 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1  anything.

2      Q.    But you said everybody is on call.  But you

3  also said if they wanted to do that extra hour they

4  could, correct?  So is this a voluntary or mandatory

5  hour of being on call?

6      A.    Well, that in particular would be probably a

7  mandatory on call.

8      Q.    Okay.  That's all I'm going to show.

9          Now, are you aware that sitting here today my

10  clients have brought forth a claim of discrimination,

11  retaliation and hostile work environment against the

12  company?

13      A.    Yes, I understand that.

14      Q.    Okay.  How did you become aware of that?

15      A.    Well, it was pretty obvious when all the

16  lawsuits and everything started coming into play.

17      Q.    Okay.  You say it's pretty obvious how it

18  came into play.

19          Well, how did you personally hear about it?

20      A.    It would be from lawyers, you know, needing

21  documents or not lawyers or anything but, you know,

22  upper management needing documents, you know from the

23  time of, you know, Mr. James or Ealy was here until

24  now.  You know, setting up a thing and I think the

25  website says their name, you know, Ealy/Ferrovial Zoom

1    deposition.

2        Q.    Okay.  So nobody ever specifically told you

3    that there was a lawsuit, but you've worked out that

4    there is a lawsuit, correct?

5        A.    Yes.  Well no, I'm sorry.  Michael Dupree

6    told me that they were suing us, but that's -- but I

7    didn't hear nothing from it until recently from -- you

8    know, from this.

9        Q.    Okay.  So when did Mr. Dupree tell you that

10   there was a lawsuit?

11       A.    He told me that they were suing the -- that

12   Darrell and Bo were suing the company several months

13   ago.  Maybe even a year ago.  But then I didn't hear

14   nothing else about it.  It was just hearsay from

15   Mr. Dupree.  But that's his family, they are all

16   cousins.

17       Q.    They are cousins?

18       A.    Yeah, they're first cousins.

19       Q.    Okay.  And what else did Michael say about

20   that?

21       A.    That was it.

22       Q.    He just said that there was a lawsuit being

23   filed, and that's all he said?

24       A.    Yeah, he said -- that's all he said, that his

25   cousins were trying to sue the company.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 97 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    Okay.  And did he say anything about their

2  lawsuit?

3    A.    No, he didn't really say anything about it.

4    Q.    He didn't say if he thought it was silly?  He

5  didn't say if he thought it was justified to you or

6  anything like that?

7    A.    I don't think he said anything about it.

8    Q.    Okay.  Now, let's take it a step at a time,

9  okay, with regards to this lawsuit.

10        Are you aware that my clients have alleged

11  Mr. Roebuck used severe racial language with my

12  clients?

13    A.    Have I heard?

14    Q.    Are you aware that that is in their

15  allegations?

16    A.    Yes, I have heard that now.

17    Q.    Okay.  And what are your thoughts on that?

18    A.    You know, my only thoughts -- I got two sides

19  to it.  If there was, I wish that somebody would have

20  come out and told me.  But on the other hand, if there

21  was I just -- like Mr. Roebuck got Mr. Dupree on after

22  they left.  So I just -- I wouldn't think that if he

23  was racist he wouldn't ask me to hire on an African

24  American again if that makes sense.

25    Q.    Sure.  I mean, have you ever heard

```
 1    Mr. Roebuck say anything racist before ever?

 2        A.    No, I haven't.

 3        Q.    Okay.  Did you ever hear Mr. Roebuck make a

 4    comment about mudfish before?

 5        A.    I have not heard any comment about a mudfish.

 6        Q.    Okay.  Have you ever heard Mr. Roebuck make a

 7    comment about boats and the affordability of boats

 8    before?

 9        A.    Please explain on that.

10        Q.    Sure.

11              My clients have both allege that had

12    Mr. Roebuck made a statement to them saying black

13    people don't have boats because they can't afford them.

14        A.    Yeah, I haven't heard that.

15        Q.    Okay.  And likewise, Mr. Roebuck told each of

16    my clients as per their allegations that he feeds black

17    people mudfish when he goes fishing because they're

18    bottom feeders.

19              Are you aware with that my clients have

20    alleged that?

21        A.    I haven't never heard that before.

22        Q.    Okay.  And are you aware that my clients have

23    each allege that had Mr. Roebuck has used the N-word

24    with each my clients?

25        A.    I haven't heard it.  And if I have heard it I
```

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 99 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

```
 1    would have went straight to Flowers and Ms. Stacy and
 2    got some people involved because I don't play, you
 3    know, racist stuff.
 4        Q.    Okay.  And are you aware that my clients each
 5    alleged that Mr. Roebuck and Mr. Garcia would call them
 6    "boy" at work?
 7        A.    I haven't heard them say that.
 8        Q.    Have you ever heard Mr. Roebuck or Mr. Garcia
 9    refer to another employee as "boy"?
10        A.    I haven't heard them, even each other or
11    anybody.  I haven't heard anybody state "boy".
12        Q.    Would you have filed a report if Mr. Garcia
13    called my clients "boy" while at work?
14        A.    I would have took it up with Mr. Flowers --
15        Q.    Okay.
16        A.    -- and just let him know what I heard and
17    what the next step should I do.  You know, would that
18    be a racist slur?  Because, you know, I don't know if
19    that would be a racist slur or not, but I'm more
20    careful than letting stuff go by.
21        Q.    And did my clients have the opportunity to
22    call you while they were at a job site and ask you to
23    come and give them help?
24        A.    Yes.  They could have called me.  Anybody
25    could call me.
```

1    Q.    Okay.  And at any point when my clients were

2    working at a job site, did they ever call you over for

3    help and make a report about discrimination?

4    A.    No discrimination.  I'm sure they -- you

5    know, everybody calls and asks me for some help.  I'm

6    not opposed to going out and helping anybody pick up

7    trash or weed eat.  But nobody has ever told me about

8    any kind of discrimination.

9    Q.    Okay.  To the same effect, did anybody during

10   your tenure supervising my clients tell you that my

11   clients were aggressive or conducting unlawful

12   behavior?

13   A.    Aggressive, yes.

14   Q.    Okay.  And does that apply to Mr. James and

15   Mr. Ealy?

16   A.    It was more Mr. Ealy than Mr. James.

17   Q.    Okay.  How many times was Mr. James reported

18   for aggression?

19   A.    Mr. James for aggression?  Well, Juan told

20   me.  I asked Juan to tell everybody we needed to work

21   overtime.  And he told me that Mr. James wasn't about

22   it.  And then I called him and he was like no, I ain't

23   doing it.  You know, I'm not about all this.  But other

24   than that, not really on his part.  Now, right there at

25   the last like two weeks of their employment --

1    Q.    Well, really quickly.  Sorry to interrupt,

2    but I just want to touch on that briefly.

3          You said you called Mr. James on the phone to

4    ask him to do overtime?

5    A.    Yes.

6    Q.    Okay.  Now, when you say that is an example

7    of aggressive behavior, this was -- there was no

8    physical involvement whatsoever, correct?

9    A.    No physical involvement.

10   Q.    So did you sense aggression over the phone?

11   A.    Just, you know, when you talk to somebody --

12   like I mean I'm sure you have a boss.  You know, if

13   your boss says I need on this deposition and you're

14   going to be on here for an extra two hours today, and

15   you get on the phone and you're like I ain't about

16   that, I aint doing it and hand up on him and walk off,

17   I mean is that aggression or not?

18   Q.    Well, let me ask you this.

19          Did you feel threatened by Mr. James's

20   actions on that call?

21   A.    No, I didn't feel threatened.

22   Q.    Do you know how the company defines

23   addressing?

24   A.    I'm not sure how they define aggression.

25   Like if somebody asked you to do a job while you're

 1  getting paid, and you tell them how it is, I

 2  mean that's kind of -- there's different aggression

 3  styles and types in my opinion.

 4       Q.    That's fair.  I can agree with that for sure.

 5             Now, outside of the series of events that

 6  resulted in my clients's suspension on June 14, outside

 7  of that day was Mr. James reported to be aggressive

 8  ever?  Again outside of what you just discussed and

 9  June 14th.

10       A.    I don't recall.

11       Q.    Okay.  Now what about Mr. Ealy, how many

12  times to your knowledge has he shown aggressive

13  behavior or has he been aggressive?

14       A.    Mr. Ealy, if he believed in something, if he

15  was right he would let you know real quick.  I would

16  say short-tempered.

17       Q.    Okay.  Short-tempered.

18             Now, do you remember any times Mr. Ealy was

19  short-tempered or aggressive?

20       A.    There was a couple of times towards me in

21  particular at, you know, in -- and it kind of caught me

22  off guard, but I'm an easy going person.  I'm six foot

23  two, 250 pounds but I'm just like -- I'm easy going.

24  So when somebody shows me aggression it kind of catches

25  me off guard a lot of times, and I can kind of step

Deposition of Michael Stephen Bearden                  Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    back and kind of diffuse the situation.  And I'm really

2    -- I'm a nice guy so, you know, I can diffuse it and

3    kind of let it go like hey, you know, is that person

4    having a bad day at home and is just bringing it to

5    work?  You know, will this keep going on?  You know, so

6    I mean I think -- you know, jumping back in someone's

7    face when they're -- gotten, you know, verbally

8    tempered, you know is a bad situation.  It just -- it

9    makes it a higher stress level.

10        Q.    Now, were there mechanisms with the company

11   for you to report employees's aggression or short

12   tempers or anything like that, any instances of

13   aggression?

14        A.    Well, I mean there's several things I could

15   have -- I mean obviously I could have wrote him up

16   right then and there, or I could have called

17   Mr. Flowers or Stacy and just let them know hey, I've

18   got an employee that's being verbally aggressive, you

19   know.  Or I could have done what I chose to do and let

20   it go in hopes of it was just, you know, a family --

21   something going on with the family or see what's going

22   on more in the future.

23        Q.    Okay.  Now did any -- again, this is prior to

24   June 14th, prior to the suspension of my clients, did

25   any of your employees report Mr. Ealy's aggression to

1  you?  Because I think we discussed they all could have

2  gone to you at any point.  So did they --

3      A.    The only person -- you know, Juan would say,

4  you know, that they were being aggressive towards him.

5      Q.    Okay.

6      A.    And that's what he would say.  He'd come up

7  and say I need you to do something.  They would, you

8  know, back talk him, you know, to the point of he

9  didn't want to even talk to them anymore.  So he was

10  kind of I would say -- what's the terminology?  Was it

11  like a gunshot terminology where you didn't want to

12  walk up to them to even conversate with them anymore.

13      Q.    Okay.  Now, did Mr. Garcia make any of those

14  complaints in writing?

15      A.    No.

16      Q.    Could he have made those complaints in

17  writing to you?

18      A.    He could have, yes.

19      Q.    And again, you could have written Mr. Ealy up

20  or any employee up for aggression; is that?

21      A.    That's correct.

22      Q.    And you also could have called Mr. Flowers or

23  Ms. Wessel if an employee was being aggressive to make

24  a report; is that correct?

25      A.    That is correct.

1    Q.    Okay.  Now, I understand that you've been

2    nothing but polite on this call, and I appreciate that,

3    and I can see very clearly that you are a nice person.

4    But after the first or second time that you witnessed

5    Mr. Ealy's aggression, why didn't you report it or why

6    didn't you take a formal action with the company about

7    it?

8    A.    You know, I should have.  I really should

9    have.  But I didn't want to -- I wanted to help

10   Mr. Ealy out because, you know, when he was telling me

11   his wife didn't work, he had a bunch of kids, this was

12   his work, you know, so I was hoping to win him over

13   with love versus keep writing someone up, you know, and

14   make him go downhill in a -- you know, in a job

15   situation.

16   Q.    I understand that.  I do understand that.

17         Now, since all of these instances have

18   transpired with the lawsuit and everything like that,

19   do you think you've changed your behavior or policy

20   personally with regards to if you hear an employee is

21   aggressive, this time moving forward you're going to

22   make a report or comment on it?

23   A.    I'm still going to be a little reserved, but

24   if somebody is aggressive towards me or -- that

25   scenario, I have a new supervisor I was trying to

 1  train.  So, you know, I've been in that new supervisor

 2  position.  Nobody wants to listen to you very good

 3  because they don't respect your role yet because you

 4  haven't really showed what you're capability is.

 5          But going back to all the events from what

 6  happened I would say yes, if -- you know, if somebody

 7  come up in my office and hit another tone with me I

 8  would get Stacy involved ASAP --

 9      Q.    Okay.

10      A.    -- at this point because this is my job and

11  my career for my family, also.  And I don't want no --

12  you know, no more work, you know, temperament than we

13  already have.  I mean, it's a high stress job already.

14  You're on the side of the roads.  People, you know,

15  throwing bottles at you every once in a while.  You

16  know, it happens.  I mean, you see people get in

17  wrecks.  I mean there's a lot of aspects of this job.

18      Q.    I understand.

19      A.    But it goes -- and it -- I guess I live, you

20  know, as calm as I am I do kind of like the

21  ever-changing environment.  And that's why I'm also a

22  volunteer fire department, you know, guy.  So, you

23  know, I like helping people.  I mean, I like doing this

24  kind of stuff.

25      Q.    I hear you.  I hear you.  Well thank you for

 1    your service.  All right.

 2            Now, did you ever discipline Mr. James prior

 3    to June 14 for performance issue?

 4        A.    I don't believe so, and I don't remember if I

 5    did.

 6        Q.    Okay.  Do you remember disciplining Mr. Ealy

 7    prior to June 14th ever?

 8        A.    I think I had to write him up for a seatbelt.

 9        Q.    Okay.

10        A.    And I did talk to him a couple times in the

11    office about, you know, we come in, we do a job, you

12    know, we stay on the job and, you know, we go home

13    safe, you know.

14        Q.    Definitely.  Definitely.

15            So I'm showing you what I've marked as

16    Plaintiff's Exhibit 5.

17            (Exhibit No. 5 marked for identification.)

18    BY MR. BARROUKH:

19        Q.    Let me know when you can see the document.

20        A.    I can see it.

21        Q.    Do you know what this is?

22        A.    That's a write-up form.

23        Q.    That's correct.  So I'll scroll through this

24    just to show you there are only two pages.  Again, they

25    are Bates labeled by the defendant meaning your

1    attorneys produced these documents to me, okay?

2              Now, you're correct.  This document is the

3    seatbelt disciplining that you issued for Mr. Ealy,

4    okay?  Do you understand that?

5         A.    Yes.

6         Q.    Okay.  Do you see where it says "supervisor"

7    and it says "Stephen Bearden"?

8         A.    Yes.

9         Q.    And "employee name" it says "Eric Ealy"?

10        A.    That is correct.

11        Q.    All right.  Now at the bottom on the second

12   page it says "employee" with a signature and a date, as

13   well as "manager" with a signature and a date.  Do you

14   see that?

15        A.    Yes.

16        Q.    Is this your signature where it's next to

17   manager?

18        A.    Yes.

19        Q.    Signature.  And do you know who signed on

20   this line?

21        A.    That would be Eric Ealy.

22        Q.    Now this document says "type of warning" and

23   you selected "written warning", correct?

24        A.    Yes.

25        Q.    Then it says "type of offense", and it says

1   "safety violation and violation of company policy".  Do

2   you see that?

3       A.    Yes.

4       Q.    Now, for the details it says the policy

5   was -- policy and procedure that had been violated was

6   a seatbelt unbuckled infraction.  Do you see that?

7       A.    Yes.

8       Q.    And there's two of them.  One at 6:50 and one

9   at 7:00 a.m.

10      A.    That is correct.

11      Q.    All right.  Now is this the only progressive

12  discipline notice you issued to Mr. Ealy while he was

13  employed?

14      A.    Yes.

15      Q.    All right.  And in the details segment of

16  this document it lets you provide a description of

17  infraction, a plan for improvement, consequences of

18  further infractions, and employee comments.  Do you see

19  that?

20      A.    Yes.

21      Q.    In any of these boxes could you have provided

22  more detail about Ealy's behavior or anymore

23  information about the situation on May 5, 2022?

24      A.    On that in particular with the seatbelt,

25  company policy, you know, that after multiple

1    infractions of seatbelt they wanted us to write them

2    up.  So it was more get me get them, get it wrote up,

3    put it in, get everybody back to work.

4         Q.    Okay.  But --

5         A.    So this was not how he was acting paper.  It

6    was a seatbelt.

7         Q.    Okay.  But were you -- two questions.

8              First, were you being prevented from writing

9    how he was acting on this document?  You know, I

10   understand it's not necessarily what the document is

11   for, but could you have if you wanted to?

12        A.    Employee comments?  I mean plan for

13   improvement?  I don't see -- if I took out the time and

14   put another paper.  This is employee stated that

15   seatbelt was buckled, and I just -- it was kind of a

16   pre-written out document.  I went out there.  He was

17   pretty upset about it.  So I just said you can put this

18   down here if you believe that this is what you done,

19   but this is GPS, and they kind of don't lie but -- and

20   can you please sign it, I'll sign it, and let's go on

21   with our day.

22        Q.    Okay.

23        A.    You know.

24        Q.    All right.  Did you feel Mr. Ealy was being

25   aggressive during this inaction?

1    A.    He was being pretty aggressive there.  He

2  kept coming up to me and saying I'm not signing this.

3  I was like please sign it because if you don't sign it,

4  you know, then I'll have to get more people involved.

5  And I was like just sign it, you know, state that you

6  felt your seatbelt was buckled, and let's go on and

7  finish our day out.

8    Q.    I understand.  And did you write this or did

9  Mr. Ealy write this?  Because it says employee stated,

10 not --

11   A.    I think I wrote that on the side of the road

12 on the truck hood.

13   Q.    Okay.  Now, again I want you to just try

14 answering this simply.

15         Was anybody preventing you from commenting on

16 Mr. Ealy's behavior that day, on this day?

17   A.    Was there anybody preventing me?

18   Q.    Sure.  If you wanted to write on here Eric

19 Ealy was being aggressive just in that box, could you

20 have done that?

21   A.    I guess I could have.

22   Q.    Okay.

23   A.    But that was more in the employee comment

24 section.

25   Q.    I agree.  And I see what you're saying, but

1    --

2         A.    It don't include like how was his feelings

3    about it.  He just got wrote up.  I mean, it don't

4    really specify on the paper.

5         Q.    I understand.

6              Now, was there another document you could

7    have submitted that spoke about his behavior or his

8    conduct on that May 5, 2022 action?

9         A.    Yes.  I could have come back to the office

10   and printed out the progressive discipline notice and

11   told him it was whatever, you know, I wanted to put on

12   there really.

13        Q.    But you didn't?

14        A.    But I didn't.

15        Q.    Okay.  Is there any other progressive

16   discipline notice you assigned to Mr. Ealy during his

17   tenure with the defendant?

18        A.    No, I don't believe so.

19        Q.    Okay.

20              MR. DOTY:  I don't want to cut off your

21        question, and I don't know what line you're going

22        with, but I think now or some period close to now

23        would be a good time for that 20-minute lunch

24        break, especially if we're going to go for a few

25        more hours.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 113 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

```
 1              MR. BARROUKH:  Okay.

 2              MR. DOTY:  Maybe the court reporter has

 3         something to say to that, too.

 4              MR. BARROUKH:  All right.  Off the record.

 5              (Luncheon recess taken.)

 6    BY MR. BARROUKH:

 7         Q.    Okay.  Now Mr. Bearden, you mentioned outside

 8    of the seatbelt discipline that there are no other

 9    written reports of discipline or policy violations of

10    my clients; is that correct?

11         A.    That's correct --

12         Q.    Now outside of June 14 -- before we get

13    there, did you notice any buildup of employee tension

14    or any hostility between the employees you supervised

15    leading up to June 14?

16         A.    I don't know.

17         Q.    Okay.  Was anything reported to you, whether

18    verbal or in writing, by any of your employees that

19    Juan was acting in a certain way that was improper?

20         A.    Yes.  Juan -- Juan was the only one that

21    mentioned anything that we had an employee acting

22    improper.

23         Q.    Okay.  And which employee did Juan say was

24    acting improper?

25         A.    He said that it was Mr. Ealy.
```

1    Q.    Okay.  And why -- how did he say Mr. Ealy was

2    acting improper?  Was it the -- just if you could

3    answer that.

4    A.    Just going back to the morning, you know,

5    just him telling him what to do.  And he would say they

6    would roll their eyes and walk off, act like he didn't

7    even exist.

8    Q.    Okay.  Did he tell you why he thought that

9    was happening or did you just assume it was a lack of

10   respect for whatever reason?

11   A.    I just assumed it was not really a lack of

12   respect, he was a new supervisor and maybe he just --

13   you know, not getting the communication together.

14   Q.    Okay.  And again, you never approached Eric

15   or Darrell was to why they were acting in the way that

16   Juan was reporting?

17   A.    No.

18   Q.    Now moving up to June 14, because it seems

19   that up to June 14, that the only complaint Juan or you

20   received about any employee was Eric Ealy ignores me at

21   times.  That doesn't seem like that's a very

22   contentious or hostile workplace.  Correct me if I'm

23   wrong.

24   A.    Yes.

25   Q.    Okay.  So can you walk me through your

1  involvement on June 14?  Were you at the Madison

2  location?

3      A.    What was the June 14, was that the day they

4  were sent -- I say "they" as Darrell and Mr. Ealy was

5  sent home?

6      Q.    Yes, yes.  That is the day they were sent

7  home.

8            Do you remember on June 14 my clients were

9  suspended?

10      A.    Yes, I remember most of it.

11      Q.    Okay.  Now, could you walk me through what

12  happened on June 14 from your perspective?

13      A.    So that morning I asked Juan, because I was

14  going through more training with him being more verbal

15  and like demonstrating how he wanted to let people know

16  what he needed to do during the next project or, you

17  know, job.  So I asked Juan to go ahead and let the --

18  let Mr. Ealy and James know that they needed to pick up

19  trash.  And I don't remember the areas.  And then let

20  Mr. Roebuck know that I needed him to do herbicide on

21  the side-by-side that day and to bring it around to the

22  side of the shop.

23            And that's where I went out and Mr. Roebuck

24  was outside doing the herbicide stuff with me, and I

25  was standing on the side of the building when Juan went

1   up to Mr. Ealy and Mr. James up in the front side yard

2   where the vehicles were and -- to let them know what

3   was going on, and I was on the side in the back of my

4   truck doing some herbicide calculations on my known.

5       Q.    Okay.

6       A.    And that's where Juan comes from the front of

7   the building and walked over to me and he looked at me,

8   you know, scared.  Like you could tell something was

9   going on.  And he said Steve, I can't do this job no

10  more.  He said I can't deal with it.  I can't deal with

11  the lack of respect that I keep getting every day.  I

12  just can't do it no more.

13          And that's when I heard Mr. Ealy, he was -- I

14  can't remember what he was saying, but you could tell

15  by the sound of somebody's voice when they're angry and

16  they're yelling, you know.  And you come out the back

17  of the shop.  I guess he thought Juan went around to

18  the office and he come around where I was at, and the

19  two technicians came into the shop, which they found

20  there was nobody in our office area and went to the

21  back of the shop and out the back door.  And that's

22  where, you know, they come out angry.

23      Q.    Okay.  And then what happens?

24      A.    I mean when I looked up I seen how Mr. Ealy

25  look looked, and I thought that he was out to attack

1  Juan Garcia.  Like that's my look.  He was out to

2  attack.  So I immediately pulled out my phone and was

3  like I need to hit record because nobody is going to

4  know that this workplace violence took place --

5       Q.    Okay.

6       A.    -- without a video.  But it never did.  You

7  know, there was no physical attack or nothing.

8       Q.    Okay.

9       A.    It was more verbal, and it died down pretty

10  quick.  And that's when I was like okay, so everything

11  lined up with what Juan was telling me this whole time,

12  and that's when I got Russ and Stacy involved at that

13  point.

14       Q.    Okay.  And what happened after?

15       A.    I think it was Mr. Flowers told me -- well I

16  told Juan just to go in my office, cool down.  And I

17  asked the two technicians are you all calmed down?

18  Pull the truck around back.  And that's when I called

19  Mr. Flowers.  And I'm not sure -- I can't remember if I

20  was with Darrell and Ealy or with Garcia or maybe

21  nobody when I talked to Flowers and he told me to -- to

22  go ahead send the two technicians home pending

23  investigation.  And that's what I let them know, you

24  know, that someone will be in contact.

25       Q.    Okay.  What happened after?

1    A.    They went home.  And I think Juan stayed for

2    the -- and I can't remember, but Juan stayed for the

3    remainder of the day.  But he might have been shook up

4    and I might have sent him home, too.  He can't remember

5    on that.

6    Q.    Okay.  Now obviously there's a lot to unpack

7    there, right?

8          So my first question is, was there any

9    physical violence on June 14 between my clients and

10   employees of the company?

11   A.    Physical?

12   Q.    Yes, sir.

13   A.    I did not see anybody touch anybody else.

14   Q.    Okay.  Now when you went to call Mr. Flowers,

15   was anybody attacked, either my clients or the

16   employees of the defendant, when you went to call

17   Mr. Flowers to your knowledge?

18   A.    Not to my knowledge.  Nobody was with talked.

19   Q.    Did anybody report being physically harmed at

20   any point that day on June 14, 2022?

21   A.    No.

22   Q.    Okay.  Now when you sent my clients home, did

23   they comply with your order or instruction?

24   A.    Yes.

25   Q.    And did my clients explain to you their

 1    perspective of what happened that day?

 2        A.    They did not say anything other than what I

 3    seen.

 4        Q.    Now to be clear, Mr. Garcia walked up to you

 5    first and prefaced my clients as they don't listen to

 6    me, they act unprofessionally.  Is that fair or is that

 7    incorrect?

 8        A.    Yes, that would fair.

 9        Q.    Now you didn't see what started this verbal

10    altercation; is that correct?

11        A.    That is correct.

12        Q.    So Mr. Garcia could have said a number of

13    things to my clients including racist remarks or

14    derogatory remarks or disturbing remarks in general

15    that led them to become vocal; is that fair?

16            MR. DOTY:  Objection.  There's speculation

17        there.

18    BY MR. BARROUKH:

19        Q.    You can answer.

20        A.    Well, assuming anybody can say anything.

21        Q.    I hear you.  Now to the -- to the specific

22    question though, because you were not there for the

23    initial conversation between my clients and Mr. Garcia,

24    Mr. Garcia again could have said something racist or

25    derogatory causing my clients to become upset.  Is that

```
 1   a possibility?

 2        A.    There's always that possibility.  It would be

 3   out of character --

 4        Q.    Okay.

 5        A.    -- I would think.  Because I didn't see that

 6   there was any kind ever racism going on.

 7        Q.    Well, you had never seen or heard of

 8   Mr. James becoming aggressive to this point, had you?

 9   You just testified that there was nothing in writing

10   and no reports of Mr. James being hostile or

11   aggressive; is that correct?

12        A.    Mr. James, yeah, that's correct.

13        Q.    Okay.  So it would also then be likewise out

14   of character for Mr. James to become aggressive out of

15   nowhere; is that fair?

16        A.    That is fair.

17        Q.    Okay.  Now, I'm going you what I've marked as

18   Exhibit 6.  And bear with me.  Last time I showed this

19   the audio did not work.

20            (Exhibit No. 6 marked for identification.)

21   BY MR. BARROUKH:

22        Q.    Well, let me ask you this.  You took a video

23   while the incident was ongoing, correct?

24        A.    Yes.

25        Q.    And only took one video; is that correct?
```

```
 1          A.     Yes.

 2          Q.     Okay.  Now what I've marked as Exhibit 6 is

 3   now being shown on the screen.  Do you see that?

 4          A.     Yes.

 5          Q.     Okay.  I'm going to try my best to play this

 6   for you.  Can you hear the volume?

 7          A.     No volume.

 8                 (Video played)

 9   BY MR. BARROUKH:

10          Q.     And you heard Mr. Ealy refer to you as

11   "Mr. Steve" right there?  Let me go back.  Can you hear

12   that?  He calls you "Mr. Steve"?

13          A.     Mm-hmm.

14          Q.     Did Mr. Ealy typically refer to you as

15   Mr. Steve?

16          A.     I don't recall.

17          Q.     Okay.  Well to confirm, you know, I can play

18   you the whole video, but from what you've seen so far

19   is this the recording you took on June 14, 2022?

20          A.     Yes.

21          Q.     Okay.  Now you did hear he called you

22   "Mr. Steve", correct?

23          A.     It sounded like, yes, sir.

24          Q.     Okay.  Typically if an employee calls you

25   Mr. Steve or Mr. Bearden, would you take that as a sign
```

 1    of respect?

 2         A.    No.   I mean I guess some people would, but at

 3    the prison that's how everybody talked so...

 4         Q.    So you're saying the inmates weren't being

 5    respectful when they called you Mr. Steve?

 6         A.    No.   They would call you Mr. Bearden, your

 7    last name.

 8         Q.    Let me ask you this.   Do you feel

 9    disrespected by being referred to as "Mr. Steve"?

10         A.    No.

11         Q.    Okay.   Do you think there's other things

12    Mr. Ealy you could have said to make you feel

13    disrespected?

14         A.    Yes.

15         Q.    Now, let's continue the video.

16              (Video played)

17    BY MR. BARROUKH:

18         Q.    And you heard right there Mr. James says "we

19    don't want to argue" this morning?   Did you hear that?

20    I can replay it for you.

21         A.    It sounded like he said that, yes.

22         Q.    Right.   He says we do not want to argue.

23              Now, I'm going to continue playing the video.

24              (Video played)

25    BY MR. BARROUKH:

1    Q.    Do you know who the individual in the back is

2    right there?

3    A.    Yes.  That is, what's his -- Roebuck.

4    Q.    That's Mr. Allen Roebuck?

5    A.    Yes.

6    Q.    All right.  Now just to confirm, it looks

7    like they're coming -- my clients are coming from

8    around the corner over there.  Is that fair to say or

9    is that incorrect?

10    A.    That's incorrect.  They come from where

11    Mr. Roebuck was standing.

12    Q.    Okay.  So they came from over here, around

13    this corner?

14    A.    Yeah, that -- no, that door.  They come out

15    the door.

16    Q.    They come out of the door.  Okay.

17          And you previously testified that Mr. Roebuck

18    was helping you on herbicide, correct?

19    A.    Yeah.  We was getting the herbicide

20    side-by-side going.

21    Q.    Okay.  So Mr. Roebuck was not inside either.

22    It was just Mr. Garcia and my two clients, correct?

23    A.    Well, they were outside around the other side

24    of the building in the front.

25    Q.    Okay.

1    A.    They wasn't inside at all.

2    Q.    Okay.  But they were alone, just Mr. Garcia,

3  Mr. Roebuck and Mr. James?

4    A.    Yeah.

5    Q.    Excuse me.  Mr. Garcia, Mr. Ealy and

6  Mr. James?

7    A.    That is correct.  They would be by

8  theirselfs.

9    Q.    Okay.  Now I'm going to continue the video

10  for you, okay?

11        (Video played)

12  BY MR. BARROUKH:

13    Q.    And do you hear that when Mr. Ealy says "I'm

14  not your child"?

15    A.    Mm-hmm.

16    Q.    Okay.  And do you hear one more time.  "I'm

17  not your child".  Do you hear that?

18    A.    Yes.

19    Q.    Now you're aware that Mr. Ealy and Mr. James

20  both allege that Mr. Garcia continuously called them

21  "boy" and referred to them as boys, correct?  I

22  previously told you that's what they alleged.

23    A.    Yes.  That's what you said, yes.

24    Q.    Do you they that telling Mr. Garcia I'm not

25  your child is because Mr. Garcia kept calling them boy?

1    A.    I didn't hear him say that they were boy or

2  other.

3    Q.    But why do you believe that they were saying

4  "I'm not your child, I'm not your child"?  It's very

5  clear he says it on two separate occasions, right?

6    A.    Right, I --

7          MR. DOTY:  Objection to form.  You're again

8      asking him to speculate given that he said, you

9      know, he never heard it.  But you can answer,

10      Stephen.

11  BY MR. BARROUKH:

12    Q.    I want to make it clear that I'm not asking

13  you about whether or not he called them boy. You're

14  standing right there recording the video and he says

15  "I'm not your child, I'm not your child" to Mr. Garcia.

16          When you were there, why do believe Mr. Ealy

17  was saying I'm not your child?

18    A.    Well I would think that because Mr. Garcia

19  was telling them what to do for today.  So, you know,

20  them indicating they're not a child meaning that they

21  don't need somebody telling them what to do.

22    Q.    Okay.  Did Mr. Ealy ever tell you that he was

23  not your child?

24    A.    I heard him -- he said -- no, he never told

25  me he was a child but, you know, he told me he wasn't a

1  child.  He eats hot food.  So, I mean, he's used to

2  term before.  Or I'm not a boy, I eat hot food or

3  something like that.

4      Q.    Okay.  But when you assigned -- because you

5  stated they would call you and you would provide the

6  job assignments sometimes.

7         When you provided them job assignments, did

8  they tell you "I'm not your child"?

9      A.    No.

10      Q.    But for some reason when Mr. Garcia is

11  assigning them job assignments you believe then they

12  responded "I'm not your child"?

13      A.    Yes, they said that.  I didn't realize or

14  didn't even think about it, how they, know, said that.

15      Q.    Okay.  Let's continue the video.

16       (Video played)

17  BY MR. BARROUKH:

18      Q.    And you hear that, "I'm not the only one

19  that's saying nothing"?  I can repeat that if I didn't

20  get that 100 percent correct.

21       (Video played)

22  BY MR. BARROUKH:

23      Q.    Do you hear that?

24      A.    "I'm not the only one that's saying nothing"?

25      Q.    Yeah.  What do you interpret that to mean?

```
 1      A.    That maybe that he's indicating that you --
 2  you know, if it's speculating Mr. James saying
 3  something to you or maybe Juan Garcia saying something.
 4      Q.    Okay.
 5      A.    So he's not the only one.  There's obvious
 6  two other people there.
 7      Q.    Okay.  And did you -- we're almost done.
 8            (Video played)
 9  BY MR. BARROUKH:
10      Q.    Do you hear that or no?
11      A.    I can hear it, but I can't make out what he's
12  saying.
13      Q.    I'll play it one more time.  I think I can
14  make it out.
15            (Video played)
16  BY MR. BARROUKH:
17      Q.    I heard that to say something along the lines
18  of I don't know why I'm going to work when nobody else
19  is doing anything.  And if you have a different take on
20  it, please let me know.  And I can rewind it.
21      A.    I can go with that because I can't understand
22  -- I cant' hear -- it's just one solid tone.  I can't
23  hear what he was saying.
24      Q.    Now, why do you think Mr. Ealy or James would
25  be saying nobody here does anything basically?  I'm the
```

1   only one at work doing anything?  Why do you think they

2   would say that?

3        A.    Not sure.  I mean, we got a small team here.

4   I mean if one person don't do a job it really, really

5   hurts us.  I mean, there's only five of us in Madison

6   that runs the county project.

7        Q.    I saw your office.  I know.

8              Did Mr. Ealy or Mr. James ever mention to you

9   that they do more work than Mr. Roebuck or Mr. Garcia?

10       A.    No, they've never mention that they do more

11  work.

12       Q.    Okay.  All right.  I'm going to stop sharing

13  this for now.

14             Let me show you what I'm marking as

15  Plaintiff's Exhibit 7.

16             (Exhibit No. 7 marked for identification.)

17  BY MR. BARROUKH:

18       Q.    Do you know what this document is?

19       A.    Stephen Bearden.  Looks like a statement.

20       Q.    Okay.  This is the entire document.  And

21  again, you can see down here that your attorney's

22  office sent this over to me.  All right?

23       A.    Okay.

24       Q.    Would you like a minute to review this

25  document?

1    A.    Okay.  I kind of briefly read over it.  It's

2  been -- I kind of remember a lot of it but, you know,

3  it's been -- 2022.

4    Q.    I hear you.  And do you see the name at the

5  top, Stephen Bearden?  That's your name, correct?

6    A.    Yes.

7    Q.    And is this your signature down at the

8  bottom?

9    A.    Yes.

10    Q.    And the date June 14, 2022; do you see that?

11    A.    Yes.

12    Q.    Is this your statement of facts of what

13  happened on June 14, 2022?

14    A.    I believe -- I believe so.

15    Q.    Okay.  Now, could you read from "Eric was

16  loud"?

17    A.     "Eric was loud and aggressively walking

18  towards Juan Garcia with looks of intention to attack".

19    Q.    All right.  Stop right there, please.

20         Now again, you testified that anything really

21  could have been said between Eric and Juan while you

22  were present, correct?

23    A.    Yes.

24    Q.    Okay.  Now, when you say "looks of intention

25  to attack", what do you mean by that?

```
 1       A.    You know, I mean if I'm -- if he's walking
 2   with his fist balled up, you know, loudly talking, I
 3   mean you could hear how loud he was, I mean that's --
 4   and he was walking fast towards Juan which when I
 5   pulled the video you could see that he was already made
 6   it past me, you know, going towards Juan.  So that's --
 7   I mean the whole video I thought that he was literally
 8   about to attack Juan for whatever reason and I wanted
 9   to document.  Not that it was anything else but other
10   than him being aggressive.
11       Q.    I understand.  Now in the video we don't hear
12   anything from you.  We don't hear anything from you at
13   all, correct?
14       A.    That is correct.
15       Q.    And we also don't hear you say I'm filming
16   you or making it known that you're recording my
17   clients, correct?
18       A.    Yeah, that is correct.
19       Q.    Okay.  Now did you tell them when you grabbed
20   your phone and started recording -- did you tell them
21   I'm recording you, you're on camera or did you make it
22   known to them that you were being recorded?
23       A.    I mean I pulled the phone out and recorded
24   it.  I mean that's -- I don't know if that's obvious or
25   not.
```

1    Q.    Okay.  Did you ask them for their consent to

2    being recorded prior to recording them?

3    A.    What was that?

4    Q.    Did you ask my clients for their consent to

5    be recorded prior to recording them?

6    A.    I -- no.

7    Q.    Okay.  Now on the video, so just a step back.

8    You mentioned had their hands were balled up in fists

9    or at least Mr. Ealy's was.

10          Was Mr. James's hands ever balled up in a

11   fist at any point that day from what you saw?

12   A.    I didn't see.  He was just right behind

13   Mr. Ealy.  I thought he might be egging him on or

14   something.

15   Q.    Okay.  And did you see Mr. James engage in

16   any aggressive behavior?

17   A.    Other than the video?

18   Q.    Well, did you see any aggressive behavior

19   from Mr. James in the video?

20   A.    No.  Just talking.

21   Q.    Okay.  So was there any aggressive behavior

22   from Mr. James on the day in question from what you

23   saw?

24   A.    No.

25   Q.    Okay.  Now with Mr. Ealy, in the video I

1  didn't see his fist balled at any point.  I'm more than

2  happy to go back, but did you see his fists balled in

3  the video at any point?

4      A.    I can't recall seeing it in the video.

5      Q.    Okay.  Let me pull this video up and we can

6  go frame by frame if we need to.

7          MR. DOTY:  I don't think he needs to see the

8      video again.  He testified already to what he

9      observed with Ealy's fist balled up coming out of

10     the room.  It's not on video.  He just said on

11     video he --

12         MR. BARROUKH:  Stop testifying for the

13     client.  The client just stated that he doesn't

14     recall if his fist is balled or not.  He just

15     stated he does not recall.  I have the video.  I'm

16     giving him the opportunity to watch the whole video

17     before he says he doesn't recall so he can make

18     an -- answer the statement after viewing it or

19     while viewing it.

20  BY MR. BARROUKH:

21     Q.    Is that fair to you, Mr. Bearden, or would

22  you like to alter your testimony?

23         MR. DOTY:  Stephen, if you want to see the

24     video again that's fine.  But what I heard you

25     saying a few seconds ago was, you know, in the

1    video you did not observe him with his fists balled

2    up.  I may not have heard you saidYou know but I

3    don't remember.  Let's -- why don't we take a look

4    at the video again for purposes of clarity.

5         MR. BARROUKH:  Off the record.  Actually, on

6    the record.  Could the court reporter please read

7    back the question before Stephen says I don't

8    recall?

9         (Thereupon, a portion of the record was read

10   by the reporter.)

11 BY MR. BARROUKH:

12   Q.    Now Mr. Bearden I'm happy to go back to the

13 video to help refresh your recollection of whether his

14 fists were balled or not.  Would you like me to do that

15 or are you prepared to testify based on what I just

16 showed you already?

17   A.    That's fine.  You can go in the video.  I

18 don't recall seeing his fists being balled in the

19 video.

20   Q.    Okay.  Like I said, I'm more than happy to

21 show you the whole video.  I have no problem with that.

22 I'll play the video.  And I'm more than happy to stop

23 it as many times as you need.

24        (Video played)

25 BY MR. BARROUKH:

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 134 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    Mr. Bearden after watching that video again,

2    did you see Mr. Ealy's fists balled up at any point?

3    A.    No.

4    Q.    And again, that is the only recorded footage

5    of the series of events that unfolded on June 14 that

6    led to my client's suspension, correct?

7    A.    Yes.

8    Q.    Okay.  Now back to your statement which is,

9    again, Plaintiff's Exhibit 7.  You could you read from

10    I called Russ.

11    A.    "I called Russ Flowers and then sent Eric and

12    Darrell home with pay for a calm down".

13    Q.    Okay.  Now you said sent them home with pay.

14         Did you have the authority to send my clients

15    home with pay?

16    A.    No.

17    Q.    So how did you send them home with pay?

18    A.    I don't recall.

19    Q.    Okay.  And again, just trying to understand

20    because this is -- this is from the day in question.

21    This is almost as fresh outside of the videos as we

22    have this information.  So --

23    A.    Yes.

24    Q.    So do you recall my clients being paid for

25    when they were sent home?

1    A.    I don't know if they got paid for that day or

2    not.

3    Q.    Okay.  Based on your statement, I called Russ

4    Flowers and then sent Eric and Darrell home with pay

5    for a calm down, do you believe that my clients should

6    have received payment based on you sending them home

7    with pay?

8    A.    I mean if I sent them home, you know, for

9    that day, you know, they should have got paid for that

10   day, yes.

11   Q.    Now --

12   A.    Did they not get paid or do you know?

13   Q.    TBD on that one.  We'll see.  We'll see.

14         Now, you say "this has been escalating for

15   the past 30 days with Eric's refusal to drive the

16   company truck to training".  Do you see that?

17   A.    Yes.

18   Q.    Is that documented in a formal complaint or

19   in writing at any point outside of this statement?

20   A.    It's not documented.  He just -- he didn't --

21   he refused to drive the truck and he drove his own

22   vehicle.

23   Q.    Did he tell you why he refused to drive the

24   company truck?

25   A.    He told me that he was going to take his

1    family with him which, you know, I strongly encouraged

2    him not to bring his family to the company training.

3         Q.    Did it violate company policy for him to

4    bring his family to the training to your knowledge?

5         A.    Not to my knowledge.

6         Q.    Okay.  Now, do you know if Mr. Ealy used this

7    training trip as a vacation for his family?  Did you

8    ask him?

9         A.    I didn't.  I don't know if it was a vacation.

10        Q.    Okay.  Because he did report to all days of

11   training and all mandatory hours of the training.  But

12   you don't know if his family was taking any vacation

13   time or relaxing on that trip, do you?

14        A.    I don't know.

15        Q.    So Mr. Ealy, if his family was going to be

16   taking a small vacation, rightfully would have wanted

17   space for them to drive them to Jacksonville; is that

18   fair?

19        A.    Yes.

20        Q.    Okay.  Now again, that sentence continues by

21   saying "this has been escalating for the past 30 days

22   with the refusal to drive the company truck to

23   training, not working well with Allen Roebuck and

24   others".

25             Now, today during your deposition you

```
 1    testified that Mr. Ealy would sometimes not respond to

 2    Mr. Garcia and that Mr. Garcia was the only one that

 3    brought to your attention issues with Mr. Ealy's

 4    conduct; is that correct?

 5         A.    I believe so.

 6         Q.    So here when you said he's not working well

 7    with Allen Roebuck, why do you say that?

 8         A.    He left Allen Roebuck in the summer on the

 9    side of the road with no vehicle.

10         Q.    Okay.  Did you ask Allen Roebuck why he did

11    that?

12         A.    I asked Allen what happened during that day.

13    Allen said he ran to the bathroom, and he come back and

14    he was gone.  He just --

15         Q.    Okay.

16         A.    I mean that's pretty.

17               Can I take five minutes real quick?

18         Q.    Sure.  But this is an important line of

19    questioning, so I'll give you the phone call this time

20    but please keep the phone off for the remainder of the

21    deposition.  Okay?

22         A.    Okay.

23         Q.    We can take five minutes.

24         A.    All right.  Thank you.

25               (Brief recess taken.)
```

```
 1    BY MR. BARROUKH:
 2        Q.    All right.  Steve, I noticed you needed to
 3    take a call briefly.  Was that call relating to this
 4    case whatsoever?
 5        A.    I forgot to take my phone off, and that was
 6    DOT calling about a road being shut down on 90 and I
 7    was -- I panicked for a second.
 8        Q.    Okay.  I hear you.  No problem.  No problem.
 9              Now we were discussing your written report on
10    June 14, 2022, correct?
11        A.    Yes.
12        Q.    Now, why was Mr. Ealy not working well with
13    Allen Roebuck in particular?
14        A.    I don't remember all of the details on it.  I
15    mean I know that one incident and that -- you know, I
16    can go off that.
17        Q.    Now, did you ask Mr. Ealy why he left
18    Mr. Roebuck in the bathroom and took the truck?
19        A.    On that day I do -- I did ask.
20        Q.    And do you remember what he said?
21        A.    That was one of the incidents where he said
22    he wasn't a boy or he wasn't a child, and he eats hot
23    food and he was going home to eat.
24        Q.    That's where he said he was going home to
25    eat?
```

1    A.    Mm-hmm.

2    Q.    Why would he say he's not a boy, he's not a

3    child, and he eats hot food?

4    A.    I don't know.  I mean when we work out here

5    you're out on the field, and sometimes if you are close

6    to a service station, you know, you can grab something

7    from the service station, but it's kind of hard to --

8    to let people go home and eat food.  So I don't know,

9    I -- you know.

10    Q.    Do you think maybe there was a disagreement

11    between Allen Roebuck and Eric Ealy on that occasion?

12    A.    Nobody told me that there was a disagreement.

13    Q.    Okay.  Was there any other instances of

14    Mr. Ealy leaving Allen Roebuck or any other employee on

15    the road and taking the truck with him and driving off?

16    A.    I don't recall.

17    Q.    Okay.  Now, was there an investigation into

18    that or follow-ups into Allen Roebuck's being left on

19    the side of the road?

20    A.    No, other than when I got a hold of Mr. Ealy

21    and, you know, let him know that when we take lunch

22    breaks that it's hard, especially when two people are

23    sharing a truck, you just can't leave somebody and go

24    home.  You know, I mean it's 100 degrees outside.

25    Q.    But Mr. Ealy was not written up for violation

```
 1    of company policy for that incident, correct?

 2         A.    That is correct.

 3         Q.    Now let's continue.  Can you please read from

 4    "first time".

 5         A.    "First time he showed me aggression when I

 6    was confronted him for not being on the job site for an

 7    hour and a half".

 8         Q.    Do you know what this is referring to?

 9         A.    That would have to be the time that he left

10    Mr. Roebuck and went home and got food because he was

11    pretty upset.  I told him that his lunch time was over.

12    You know, when you get a 30-minute lunch break, if you

13    leave a job site and drive, you know, 45 minutes to

14    your house to get food and try to drive 45 minutes back

15    to the work, you know, that's way over 30 minutes.

16         Q.    Absolutely.

17         A.    Even if it was an hour, that's still over an

18    hour, I mean --

19         Q.    And did your employees get lunch break?

20         A.    Yeah.  Everybody gets lunch break.

21         Q.    Now again though -- so right here, first time

22    he showed me aggression.  This sentence as well as "not

23    working well with Allen Roebuck" relate to the same

24    incidents, correct?

25         A.    Yes, I believe so.
```

1    Q.    Again, there was no formal write-up or any

2  written memorialization of this incident, correct?

3    A.    Correct.

4    Q.    And you could have written up Mr. Ealy for

5  this incident, correct?

6    A.    Yes.

7    Q.    Okay.  But you decided not to?

8    A.    Right.

9    Q.    Now, on the second experience.  I'll read

10  this.

11          "Second experience with Eric showing

12  aggression was when I wrote him up for driving the

13  company vehicle without a seatbelt".

14          Now, we had already discussed when I showed

15  you the seatbelt discipline form, there was no mention

16  of any aggression or aggressive behavior on the form,

17  correct?  And I'm happy to show you the document again

18  if you'd like.

19    A.    Oh, I don't need to see the document.  Yes,

20  there was nothing else but the seatbelt brought up on

21  that form.

22    Q.    Okay.  And there was no other form brought up

23  or no other write-up regarding Mr. Ealy's behavior on

24  that day on May 5, 2022, correct?

25    A.    Far as I know, yes.

1    Q.    Okay.  Well I can represent to you that we

2    don't have any other documents from that day, and I

3    don't think your counsel is withholding any documents.

4    So I think that is the only one from May 5, 2022

5    regarding that seatbelt discipline.

6          Now when you say he was showing aggression,

7    why -- again, why do you mention it over a month later

8    for the first time to anybody?

9          MR. DOTY:  Objection to asked -- we covered

10         this earlier in the deposition, and he asked and

11         answered that question multiple times.

12         MR. BARROUKH:  No, this is a different

13         question.  This is a different question

14         specifically to this complaint he wrote on June 14.

15         MR. DOTY:  Fair enough.

16   BY MR. BARROUKH:

17   Q.    Why is this the first time, this June 14

18   write-up or statement the first time you bring up any

19   aggression from the May 5, 2022 situation?

20   A.    Can you please repeat the question?  My

21   internet connection fell for a second and everybody

22   froze up.

23   Q.    Okay.  My question is why is this statement,

24   the one I'm showing you right now, the first time you

25   mention Mr. Ealy's aggression on May 5 when you wrote

1  him up for driving the company vehicle without a

2  seatbelt?

3      A.    Why did I bring it up there?

4      Q.    Not why did you bring it up right there, but

5  why is that the first time you're mentioning it?

6      A.    I mean because when I was writing the

7  statement about -- so it was kind of a compiled

8  information sheet, you know, from what happened the day

9  that there was so much aggression going on.  It was

10  just like oh, this has been kind of -- it's happened

11  here and there and -- and now it's resolved into a

12  bigger thing than what it should have.  So it's kind of

13  a compiled thing of all the steps.

14      Q.    I agree, but that doesn't answer my question.

15          Why is this the first time you're bringing it

16  up?

17      A.    That's the first time I wrote it on the

18  paper.  Is that -- I'm not sure what you're asking.

19      Q.    I'll clarify.

20          From May 5 2022 from when you wrote him up

21  for driving the vehicle without a seatbelt, to June 14,

22  2022, that's a month and nine days approximately, why

23  after everything is this the first time you're

24  mentioning it?

25      A.    Well, because of all -- you know, what

1  happened.  You know, I know you didn't see what exactly

2  happened on the video.  You seen what conspired to me

3  pulling my phone out on the video, but it was a

4  recollection on all the stuff that's happened in the

5  past, you know, month to two months.

6      Q.    Okay.  So would -- do you believe you would

7  have reported this write-up of Mr. Ealy's aggression,

8  the write-up if the June 14 aggression never occurred?

9      A.    And then you're referring to the 14th of when

10 everything -- are you referring to the video of that

11 date?

12     Q.    Yep.

13     A.    Well, that video and that aggression caused

14 me to write everything that has happened that I can,

15 you know, remember.

16     Q.    I hear you.  I hear you.

17          So my question though, my question is had the

18 June 14th events not transpired, had there been no

19 aggression on June 14th, would you have ever mentioned

20 Eric Ealy's aggression on May 5 when you wrote him up?

21     A.    No.

22     Q.    Now, the third incident of Eric showing

23 aggression is when he had to go to the company

24 training.  Do you see that?

25     A.    Yes.

1    Q.    And we had already spoken about the company

2    training with regards to bringing his family, correct?

3    A.    Yes.

4    Q.    Now when it says here, and you're quoting --

5    quotes are used when you have a direct cite to

6    something, right?  You understand that, Stephen?

7    A.    It sounds good to me.

8    Q.    I know it's a lot, and we can take another

9    break if you need but I need you to stick with me for a

10   little bit.

11        When you used quotes here, because this is

12   your statement, that means you're citing something

13   directly, correct?

14   A.    Right.

15   Q.    Do you have a document or a recording with

16   Mr. Ealy using these exact words?

17   A.    No.

18   Q.    Okay.  So when you're quoting you're

19   paraphrasing; is that fair to say?

20   A.    Yes.

21   Q.    Okay.  Now, you say that while Eric was at

22   training Eric continually called demanding more money.

23   Do you see that?

24   A.    Yes.

25   Q.    Is there a record of these calls anywhere?

1    A.    I don't have access to the records on the

2    phone, so no.

3    Q.    Are there phone records available that can be

4    accessed to your knowledge?

5    A.    I don't know the steps, but I'm sure

6    Verizon -- you know, they're through Verizon so I'm

7    sure that they can possibly get it.  But it's been two

8    years, so I don't know how records hold up through

9    Verizon.

10    Q.    All right.  Well, maybe we'll find out.  But

11    either way.

12         Here your statement continues.  "I was also

13    notified that Eric and Darrell were unprofessional and

14    disruptive at the company training event by Ferrovial

15    safety headquarter employees".

16         Do you see that?

17    A.    Yes.

18    Q.    How were you notified?

19    A.    I was notified by phone verbally.

20    Q.    And --

21    A.    And I believe Mr. Flowers asked for them to

22    give it to us in writing, but nobody wouldn't ever

23    do -- you know, put it in writing of the it was always

24    verbal.

25    Q.    I agree.  Yeah, I have no written statements

 1    about it.  And I have the email from Mr. Flowers asking

 2    for anything about their conduct because he didn't have

 3    anything in writing either.  So I just wanted to

 4    confirm there was nothing in writing or a text message

 5    or anything like that or a voice mail that you have.

 6          Now again, over here you use quotations.

 7    Just to confirm, you do not have any document or

 8    recording that cites Darrell James saying this or that

 9    has Mr. Darrell James explicitly using these words,

10    correct?

11        A.    Yeah, I don't have any documents.

12        Q.    Okay.  So this sentence, "Darrell James said

13    his time cuts off at 3:30 and he is not working

14    overtime, that he is not all about that", that is

15    paraphrasing, correct?

16        A.    Yes.

17        Q.    Okay.  And then the rest of this statement

18    "Darrell made the statement that he works for no man",

19    do you have this in writing or do you have a recording

20    of this message at all?

21        A.    No.

22        Q.    Do you know what Darrell meant when he said,

23    I work for no man or that he works for no man?

24        A.    I mean.  I don't know.  I mean no man you

25    could -- you could refer that to anything.

1    Q.    Okay.  And when you say "I feel that I am

2   chasing Eric and Darrell around trying to deescalate

3   arguments and they are creating a hostile environment

4   for other employees", do you see that?

5    A.    Mm-hmm.

6    Q.    You say arguments plural.  What other

7   arguments has Darrell escalated outside of June 14?

8    A.    I don't know.

9    Q.    Do any pop into your head at this time

10  sitting here today?

11   A.    No, I have no documents or anything on it.

12   Q.    But even to your memory, you know, if Darrell

13  started fights or anything like that, can you remember

14  sitting here today any other arguments that Darrell

15  escalated during his time with Ferrovial?

16   A.    I don't know, I don't remember any of it.

17   Q.    All right.  Now you said "they are creating a

18  hostile environment for other employees".

19          Again, how was Darrell creating a hostile

20  environment for other employees?

21   A.    Well when they -- it was just -- you when

22  they come out of -- both of them.  It wasn't just Eric.

23   Q.    Okay.

24   A.    You know, if it was just Eric coming out, you

25  know, angry that would -- I would have just put Eric's

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 149 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    causing a hostile environment.  But it was Eric with

2    Darrell right behind him.  So that's why I put both of

3    them on there.

4        Q.    Okay.  So what exactly did Darrell do that

5    created a hostile environment for the other employees?

6        A.    He was just right behind Eric.  You know, I

7    he couldn't really hear what he was saying but you

8    could tell that he was, you know, angry, popping words

9    off that made -- and then I -- you know, I would assume

10   that it would be almost like encouraging, possibly

11   encouraging to Eric to get even angrier about

12   something.

13       Q.    Okay.  And I know we briefly talked about

14   Mr. James's lack of aggression.  Did you ever see

15   Mr. James angry?  And if you don't understand the

16   difference in the question let me know.

17       A.    Did I ever see him angry?

18       Q.    Yes.  Because you just stated that he was

19   angry, popping words behind Mr. James, encouraging him.

20   Was he ever angry before?  Did you ever see him angry

21   at work before?

22       A.    I mean I heard him angry on the phone.  Is

23   that considered the same thing?

24       Q.    Sure.  When was he angry on the phone?

25       A.    You know, when asked to work overtime, you

 1   know he -- that was -- that was -- I mean he didn't say

 2   all that politely, but I don't have documents or

 3   recordings how he was talking to me.

 4       Q.    Okay.  But outside of that, is there anything

 5   else you can think of where Darrell James created a

 6   hostile environment for other employees?

 7       A.    I don't recall.  I don't remember anything

 8   else.

 9       Q.    Okay.  But would it be fair to say that if

10   Mr. James walked up to another employee and punched him

11   in the face he would probably remember that; is that

12   fair?

13       A.    Yes.

14       Q.    But nothing like that ever happened with

15   Mr. James, correct?

16       A.    Correct.

17       Q.    And with Mr. Ealy as, you know, you perceived

18   his aggression there was nothing physical that Mr. Ealy

19   ever did in the workplace to put another employee in

20   danger; is that correct?

21       A.    That's correct.

22       Q.    Okay.  I'm going to stop sharing this.

23             (Exhibit No. 8 marked for identification.)

24   BY MR. BARROUKH:

25       Q.    Can you see this document that I've marked as

1    Exhibit 8?

2         A.    I can.

3         Q.    Do you know what this document is?

4         A.    Shaunna is the external sender.  Allen

5    Roebuck who --

6         Q.    And again, this is a one-page document

7    provided to me by your attorneys, okay?

8         A.    Okay.

9         Q.    And you can see there, the

10   Ferrovial-Ealy-000575.

11        Now this is an email from Shaunna Williams to

12   Shaunna Stoddard like you mentioned.  Why does it say

13   "Allen Roebuck" at the top?

14        A.    I don't know.

15        Q.    Do you know what this statement is?  How

16   about this.  Could you go ahead and read this for me

17   starting with "I was filling"?

18        A.    "I was filling up the coolers with water by

19   the garage when Eric Ely and Darrell James and Juan

20   walked to step in Bearden and I heard Eric yelling at

21   Juan.  He has experiences I have experienced the same

22   aggression from Eric and he has made me start looking

23   for another job because of the hostility at work work".

24        Q.    All right.

25        After reading that, do you know what this is

 1    or what this could be?

 2        A.    I mean it looks like something that Allen

 3    Roebuck was writing possibly.

 4        Q.    Okay.  Have you ever seen this before?

 5        A.    No, I haven't seen this.

 6        Q.    Okay.  Well, I'm going to represent to you

 7    that this was given to me as Mr. Roebuck's statement on

 8    the subject.  Okay?

 9        A.    Okay.

10        Q.    Now Mr. Roebuck, did he ever report any

11    hostility to you by Eric previously?

12        A.    No.

13        Q.    Did he ever report any aggression to you

14    previously to June 14 by Eric?

15        A.    I don't remember.

16        Q.    Okay.  Could Mr. Roebuck report hostility or

17    aggression to you if he wanted?

18        A.    Yes, he could have.

19        Q.    But from what you remember sitting here

20    today, you don't remember Mr. Roebuck ever complaining

21    about hostility or aggression by Mr. Ealy to you,

22    correct?

23        A.    Yeah, I don't remember if he did or didn't.

24        Q.    Okay.

25        A.    It looks like that was why he was looking for

 1    another job and left though.

 2        Q.    Okay.  But again, he says Darrell James's

 3    name here, but outside of that sentence he doesn't say

 4    anything about aggression or hostility from Darrell

 5    James, correct?

 6        A.    Yeah, he don't see it on there.

 7        Q.    Okay.  Now -- okay.  That's fine.

 8             I'm going to show you what I marked as

 9    Plaintiff's Exhibit 9.

10             (Exhibit No. 9 marked for identification.)

11    BY MR. BARROUKH:

12        Q.    I'm going to scroll through this document

13    because there five pages, and then we can go through

14    them, okay?

15        A.    Okay.

16        Q.    Briefly I just want to point out Shaunna

17    Stoddard's name, signature and date on the first page.

18    Again, each of these pages was provided to me by your

19    attorneys to me.  The second page, Juan Garcia's name,

20    date and signature.

21        A.    Okay.

22        Q.    The third page is Allen Roebuck's name, date

23    and signature.  The fourth page is your name.  And the

24    fifth page is a continued statement from you and

25    signature and date.  Do you see that?

1    A.    Mm-hmm.

2    Q.    Okay.  Now I'm going to start up here with

3  Ms. Shaunna Stoddard's statement.  This is the entire

4  statement you're seeing right now.

5    A.    Okay.

6    Q.    Would you like a minute to review it?

7    A.    Yes, please.

8    Q.    Let me know when you're ready.

9    A.    Okay.  I read it.

10    Q.    Now, did Ms. Stoddard work at the Madison

11  County location?

12    A.    Yes.  Her office is right by the front door.

13    Q.    And could Ms. Stoddard at any point when you

14  worked with her make a report or complaint to you if

15  she wanted?

16    A.    Yes, me or Mr. Flowers or Stacy.

17    Q.    Okay.  Now again, in this first sentence Ms.

18  Stoddard says she "heard Eric Ealy on numerous

19  occasions outside the office yelling and arguing with

20  Juan Garcia".  Do you see that?

21    A.    Yes.

22    Q.    Outside of this June 21 statement, did

23  Ms. Stoddard ever mention or report this arguing or

24  yelling to you?

25    A.    I don't recall.

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    Okay.  Do you know if there's a document she

2  may have sent to you regarding this yelling and arguing

3  she heard?

4    A.    I don't recall a document.

5    Q.    Okay.  Now, again when she says that "Eric

6  Ealy raised aggressive communication" with her, she

7  could have reported that aggressive communication if

8  she wanted; is that correct?

9    A.    She could have recorded it?

10    Q.    Reported.

11          Ms. Stoddard could have reported Eric Ealy's

12  aggressive communication if she wanted to, correct?

13    A.    Yes.

14    Q.    And again, up until this point there's no

15  written document regarding any April 27 communication

16  citing Mr. Ealy's aggressive behavior, correct?

17    A.    Yes.

18    Q.    Now, do you know why she never reported the

19  yelling and arguing or the aggressive communication to

20  you or to anybody else before June 21, 2022?

21    A.    I don't know.

22    Q.    Okay.  Was anybody stopping her from making

23  this report?

24    A.    No one was stopping her.

25    Q.    Okay.  Now, when she says "I have over heard

```
 1   him", assuming she means Eric.  She refers to Eric in

 2   the previous sentence so I'm going to assume she means

 3   Eric.  "I have heard Eric in the office telling Allen

 4   Roebuck that he didn't do any work".

 5           Do you see that?

 6       A.   Yes.

 7       Q.   "That Allen didn't work as hard as he did".

 8   Do you see that?

 9       A.   Yes.

10       Q.   "And was arguing with him about what they did

11   that day".

12           Do you see that?

13       A.   Yes.

14       Q.   Did Mr. Ealy ever report these things to you,

15   that Allen Roebuck didn't do any work or didn't work as

16   hard as Mr. Ealy and whether Mr. Ealy worked harder

17   than Allen in general?  Did he ever report that to you?

18       A.   I don't recall.

19       Q.   Okay.  And when Ms. Stoddard says this

20   behavior is unprofessional and need to be addressed, do

21   you see that?

22       A.   Yes.

23       Q.   Ms. Stoddard, it's correct that she could

24   have reported any and all of this behavior prior to

25   June 21; isn't that right?
```

1    A.    Yes.

2    Q.    Okay.  Now this is Juan Garcia's statement

3  and his signature.  I will scroll down as necessary,

4  okay?

5    A.    Okay.

6    Q.    Now, here you can see Juan Garcia states

7  "Darrell, cutting me off mid-sentence, said to me he

8  picked up five miles of trash and why did I only pick

9  up two miles of trash".  Do you see that?

10    A.    Yes.

11    Q.    Do you know if Darrell and Eric were being

12  assigned to pick up more trash than Mr. Garcia and

13  Mr. Roebuck?

14    A.    No.

15    Q.    Okay.  But you were in charge of assigning

16  the tasks; is that's correct?

17    A.    Well, I mean Darrell and Mr. Ealy was

18  assigned picking up trash, and I believe that Juan

19  Garcia was out trying to help them pick up trash.

20    Q.    Okay.  So all three of them were picking up

21  trash together; is that fair to say?

22    A.    That's what it seems to be, yes.

23    Q.    And did Darrell or Eric ever notify you that

24  they had to clean more than Mr. Garcia or pick up more

25  trash than Mr. Garcia?

1    A.    I don't recall.  I mean no, I don't recall.

2   It likes like Juan was helping them pick up an extra

3   two miles of trash if you read it that way.

4    Q.    Okay.  That is fair.  That is fair.

5          Now, here it says Eric and Darrell

6   immediately with aggressive behavior.  Do you see that?

7   Immediately respond.

8    A.    Yes.

9    Q.    What did they immediately respond to; do you

10  know?  Because here Darrell is talking, but then it's

11  saying an immediate response.  Do you know what Eric

12  and Darrell are immediately responding to?

13   A.    I don't know.

14   Q.    I don't know either, so you were there that

15  day.  That's why maybe you can provide some insight as

16  to that specifically.

17   A.    Well, it looks like this -- this was when

18  they were all by theirself.

19   Q.    Yeah.  Okay.  That's fair.

20         Now, again Mr. Garcia said "Eric saying fuck

21  you I ain't doing it, I ain't no fucking boy".

22         Again Mr. Ealy is using the word "boy", and

23  previously in the report he said I'm not your child.

24  Is it possible that Mr. Garcia was calling Eric and

25  Darrell "boy" when weren't there?

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 159 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    A.    I -- I'm -- I don't see it written anywhere.

2    Hold on.  I mean there's a possibility, but they didn't

3    write it down is what I'm saying.

4    Q.    I hear you.

5    A.    Yeah.  Okay.  I thought you said they wrote

6    it down.  I didn't read it.

7    Q.    No, just that -- the word "boy" is written

8    down in this statement.  And, you know, with -- in the

9    video Eric saying children multiple times, like we are

10   not children, in this statement he's quoting Eric

11   saying I'm not a boy, it's just weird to me.  Most

12   people don't -- don't say things like that.  However we

13   can continue.

14         Okay.  Now again, here "every time I tell

15   Eric and Darrell the work assignment, I get an attitude

16   and aggression from them".

17         Do you see that?

18   A.    Yes.

19   Q.    Every time.  He's saying every single day he

20   assigned them work or even multiple times a day when he

21   assigns them work he got aggression from Eric and

22   Darrell.

23         Was any of these instances, were any of these

24   instances of aggression reported to you?

25   A.    No.  I mean there was no documents that Juan

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 160 of 219

Deposition of Michael Stephen Bearden                          Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1   filled out over it.

2       Q.    Okay.  Now again, sitting here today these

3   are the only statements I have from Mr. Garcia

4   regarding Eric and Darrell's alleged aggression.

5           Are you aware of any other documents

6   Mr. Garcia submitted pertaining to Eric and Darrell's

7   aggression?

8       A.    I have no -- I don't have any recollection.

9       Q.    Okay.  Now again, you weren't stopping

10  Mr. Garcia from reporting any aggression to you, were

11  you?

12      A.    No.

13      Q.    Mr. Garcia had every chance to report this

14  aggression if he wanted to, correct?

15      A.    Yes.

16      Q.    But he chose not to until June 21, 2022,

17  correct?

18      A.    Yes.  This is the first time he wrote

19  anything down, yes.

20      Q.    Okay.  Now again, it's -- there are numerous

21  instances with Eric but again, Darrell is thrown in

22  there.  It's just surprising to me.

23          Does it surprise you that Darrell is included

24  when he brings up attitude and aggression?

25      A.    Did you ask me a question or have you --

1    Q.    Yeah.   I said does it surprise you that

2    Darrell is included in this report of aggression and

3    attitude from Mr. Garcia?

4    A.    Does it surprise me that his name is in

5    there?

6    Q.    Yeah.  What do you know about Darrell James

7    as a person being aggressive?

8    A.    Not much.  I mean he wasn't with us very

9    long.

10    Q.    Okay.  So moving on, I showed you Allen

11    Roebuck's statement on the 14th.  And now this is Allen

12    Roebuck's statement on June 21, 2022.  Okay?

13    A.    Okay.

14    Q.    Now again, this is the second report of

15    Mr. Roebuck and -- and the second report of two to my

16    knowledge.  The first one I previously showed you and

17    this is the second and last one.

18         Would you like a minute to read it?

19    A.    Yes, please.

20    Q.    Okay.

21    A.    Okay.

22    Q.    Okay.  Now what is this statement?

23    A.    It's Allen Roebuck stating what he has

24    witnessed from what's been going on to what happened

25    the day of the incident.

Deposition of Michael Stephen Bearden                     Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    Okay.  And again to be clear, this document

2    was reported a week later after his first complaint,

3    written complaint, correct.  And I can go back and show

4    you to confirm if you'd like.

5    A.    No, you don't have to.

6    Q.    Okay.  The answer is yes then?

7    A.    Yes.

8    Q.    Okay.  Now, why didn't Mr. Roebuck write

9    everything down on the June 14th, 2022 date?  Why did

10   he wait a week and then write one, two, three more

11   paragraphs and then submit it afterwards?

12   A.    Well I think that I have an opinion on it,

13   and the reason I mean I did one, too, was to get more

14   in detail while it was still fresh in my mind.

15   Q.    Okay.  Did anybody ask you to write these

16   statements?

17   A.    You know, I don't know if anybody asked us to

18   write them or not or if we just something that we

19   needed to do to keep it fresh in mind.

20   Q.    So to your knowledge you all -- you typed and

21   printed out extensively detailed statements, signed

22   them in pen, and dated them independently one another

23   and collectively scanned them as one PDF?  Is that your

24   testimony sitting here today?

25   A.    I believe that's what happened.

1    Q.    So there was no company involvement in

2    getting these statements prepared?

3    A.    I don't believe that the company helped us do

4    anything on the statements.

5    Q.    No?  Okay.  Well --

6    A.    I mean I don't recall.  I mean that's just --

7    I don't recall.  I don't remember.

8    Q.    Okay.  I mean you see where I'm coming from

9    in terms of statements were given on the 14th by

10   several individuals, and then new statements are

11   collectively reissued together in writing with more

12   detail, signed in pen, dated in pen.  It seems like

13   this was a collective effort.  Do you see that?

14   A.    Yes.

15   Q.    Okay.  Now, here again he says "I also

16   witnessed on several occasions Juan giving Eric Ealy

17   and Darrell James and myself work assignments and Eric

18   will argue and cuss at Juan".  Do you see this?

19   A.    Yes.

20   Q.    Mr. Roebuck never reported this arguing and

21   cussing at Juan, correct, prior to the June 14th and to

22   this statement?

23   A.    That is correct.

24   Q.    Okay.  Then again, he was not prohibited by

25   you or anybody else at the company from reporting

1   Mr. Ealy's arguing and cussing or any aggressive

2   behavior, correct?

3       A.    Correct.

4       Q.    All right.  Again, when this second paragraph

5   Mr. Roebuck states "fuck this, you do it, this is not

6   my job", and he quotes Mr. Ealy in saying that, he

7   never reported this, did he --

8       A.    I don't remember.

9       Q.    -- prior to June 21, 2022?

10      A.    That is correct.

11      Q.    And again, in this statement when he says "I

12  can't work with Eric because of the aggression" and

13  likewise he mentions aggression and Eric's hostility at

14  work, the June 14th statement and this statement are

15  the first ever reports made to you about this, correct?

16      A.    Correct.

17      Q.    All right.  Now here you notice in this

18  statement Mr. Roebuck leaves out Darrell James.  Do you

19  see that?  He says Eric, Eric, Eric, Eric, right?  And

20  then he says Darrell will agree with Eric's statements

21  but Eric argues and cusses, Eric was speed walking with

22  his fists balled up.  He doesn't -- Darrell walking

23  behind him.

24          He doesn't mention Darrell James being

25  aggressive, violent or hostile, correct?

1    A.    Correct.

2    Q.    And that's simply because Darrell James was

3  not aggressive, violent or hostile, correct?

4    A.    Can you repeat that?  I'm sorry, my screen

5  is --

6    Q.    Sure.

7        My question was Darrell James was not

8  aggressive, violent or hostile, correct?

9    A.    Yeah.  By reading this I would say correct.

10   Q.    And from your own personal knowledge Darrell

11 James was not aggressive, violent or hostile, correct?

12   A.    Yes.

13   Q.    Okay.  Now this, again you see it's your

14 name, your signature and the date here.  Did you sign

15 this statement?

16   A.    Yes.

17   Q.    Okay.  And you did make this statement.  Not

18 only you signed it but you wrote this whole thing,

19 correct?

20   A.    Is that my statement?  Then yes.

21   Q.    Okay.  Now let me zoom in.

22        Now this is basically, correct me if I'm

23 wrong, a summary of the last statement.  It's similar.

24 You talk about what happened around 7 a.m., that he

25 refused to drive the truck, not working with Roebuck

```
 1   and others.  That's the exact same statements.

 2           Is it fair to say this paragraph is

 3   essentially the first statement that I just read to you

 4   from you?

 5       A.    I believe so.

 6       Q.    Okay.  And again, you took a week and you

 7   stated again Eric and Darrell were sent home with pay.

 8   Do you see that?

 9       A.    Yes.

10       Q.    And this says actually you called Russ

11   Flowers and then you sent them home with pay.  Meaning

12   Mr. Flowers was spoken to before you sent these

13   individuals home with pay, correct?

14       A.    Yes.  After that incident I called Flowers,

15   Mr. Flowers, and I let him take the next part.

16       Q.    Okay.  Now we already discussed this session,

17   the not being on the job site for an hour and a half.

18   We already spoke about the seatbelt company truck

19   incident, and we already spoke about the third incident

20   of training, correct?

21       A.    Yes.

22       Q.    Now, could you please read this for me from

23   Eric?

24       A.     "Eric opened my office door walked in and

25   slammed the door behind him and said he ain't no
```

1    fucking child".  Keep going?

2        Q.    Ten.

3        A.    "And he was not driving the company truck to

4    the training event and he was not going to the training

5    without his family and I was required to give him gift

6    cards".

7        Q.    Okay.  I apologize.  We already covered this

8    statement as well, correct?

9        A.    Sounds like it, yes.

10        Q.    Okay.  We covered this.  All right.

11              Could you please read this?

12        A.    "After I sent Eric and Darrell home 6/14/22

13    Eric has called me every day even up to nine o'clock at

14    night arguing about his time and money and how I needed

15    to come to the office and take pictures of his time

16    sheets that he just refused to do".

17        Q.    Okay.  Now again, could you read "Darrell

18    called in sick"?

19        A.    "Darrell called in sick Wednesday and

20    Thursday.  I called him" --

21        Q.    All right.  Now, why would Darrell call in

22    sick if he was suspended?

23        A.    If I remember correctly, I think I called

24    Darrell back or tried to get him to come back into work

25    the next day, and he called in sick.  And then I --

```
 1    they told me --

 2        Q.    So you tried -- sorry.  Continue.

 3        A.    Let's see.  I --

 4        Q.    Can you please read this next sentence?

 5        A.    "I called him Friday not to come into work

 6    pending investigation".

 7        Q.    So it's your testimony today that he called

 8    in sick on Wednesday and Thursday despite you inviting

 9    him back?

10        A.    Mm-hmm.

11        Q.    And then on Friday you call him to tell him

12    he's not welcome to come back into work pending an

13    investigation?

14        A.    Yes.

15        Q.    That's correct?  So he was suspended on June

16    14, he was welcome back on June 15 and 16, and then on

17    June 17 he was suspended again?

18        A.    That seem -- well I was under the -- you

19    know, I know Eric was sent home and I thought Darrell

20    was sent home to cool down, too, but I thought he was

21    able to come back because I knew Eric was under

22    investigation.  I didn't realize that Darrell was under

23    investigation either.  Does that make sense?

24        Q.    Yeah, that makes sense.

25        A.    And that's --
```

1    Q.    So to your knowledge was --

2    A.    -- when I ended it off further up, and I

3 didn't ask if I could have Darrell come back or not

4 until that Friday when they told me that he was -- and

5 that's what I remember.  And it could be cloudy on

6 that, and that's why I was trying to make sure

7 everything was put in.

8    Q.    That's fine.  That's fine.

9    A.    But I don't have documents on that so --

10    Q.    Okay.  But now I'm just going to need to

11 clarify very briefly.

12        So on June 14 when you sent Mr. Ealy and

13 Mr. James home, who did you believe was suspended on

14 that day?

15    A.    I believe that Eric was suspended.

16    Q.    Eric, and only Eric was suspended on June 14

17 to your knowledge?

18    A.    Yes.  I was asked for both of them to send

19 both of them home.  But I was assuming that James was

20 able to come back.

21    Q.    And why did you make that assumption?

22    A.    Because Eric was the one that was coming out

23 being very aggressive --

24    Q.    Okay.

25    A.    -- with his fists looking like he was going

```
 1   to attack.  But Darrell was in the background but I --

 2        Q.    So because Darrell -- because Darrell was not

 3   aggressive you did not assume he was suspended; is that

 4   what you're telling me?

 5        A.    As aggressive.

 6        Q.    Okay.  Well -- okay.  That's fine.

 7             So you could you continue with "Darrell

 8   called me"?

 9        A.    "Darrell called me the morning of June 21,

10   2022 at 7:33 AM saying he is coming to the office to do

11   his time because I was going to cheat him".

12        Q.    Okay.  So were in constant -- well, I don't

13   want to say that.

14             However, you state "Eric has called me every

15   day".  And then again you say Darrell called me the

16   morning of June 21, 2022.  Do you see that?

17        A.    Mm-hmm.

18        Q.    What -- how frequent was your communication

19   with Eric and Darrell after they were suspended?

20        A.    Not very much.  It was -- Eric called me

21   wanting his time done, but they wasn't putting their

22   time on the sheet.  I was -- I was pretty much giving

23   them 40 hours a week because -- you know, because they

24   did come into work but they wouldn't write their time

25   down.
```

```
 1        Q.    Okay.

 2        A.    I probably shouldn't even, you know, paid

 3   them for it but -- you know, I was just to be nice and

 4   put them down for 40 hours even though they refused to

 5   do their time sheets.

 6        Q.    So their hours could have been more or less

 7   than 40 hours; is that what you're saying?  It could

 8   have less?  It could have been 25 hours and you'd still

 9   write 40?

10        A.    I mean it's a possibility, but I would say

11   that they -- the 40 hours is a good estimate.

12        Q.    Okay.  That's fair.

13              Now again, when Darrell calls you on June 21

14   saying he's coming into the office, did you tell

15   anybody that he said he was coming in or that he called

16   on June 21?

17        A.    I don't recall.

18        Q.    Okay.  And you said I told him that we could

19   talk about it on the phone or send me a text message,

20   that I couldn't have him at the office at the time.  Do

21   you see that?

22        A.    Yes.

23        Q.    Okay.  Did you and Darrell text at any point

24   following June 21?

25        A.    You know, I don't remember.
```

1    Q.    Okay.  That's fair.

2         But you obviously you had Mr. James's number,

3    and you were able to text him if you needed to,

4    correct?

5    A.    Yes.  I think that was on the company cell

6    phone.

7    Q.    Okay.  Now, in the next paragraph you say

8    after advising Darrell not to come into the office he

9    showed up to the office and tried to get into the Dodge

10   parked on the side of the building and tried to get

11   into the office but doors were locked.

12        Do you see that?

13   A.    Yes.

14   Q.    I did miss a couple of words, but you see

15   that's what I read?

16   A.    Yes.

17   Q.    Now, did you tell anybody that Darrell showed

18   up to the office trying to get into the building or

19   trying to get into the car?

20   A.    I believe I told Mr. Flowers.  I was pretty

21   -- letting them know exactly what was going on at this

22   point, letting him know everything.

23   Q.    Okay.

24   A.    Since he was the manager and I handed it up

25   to the upper person.  But I don't have documents.  It

1    was probably verbal.

2        Q.    I understand.  Now -- so Mr. Flowers knew

3    that Darrell James was trying to come back to work.

4    Whether to work or not to work, he was physically

5    appearing at the office and he was calling you,

6    correct?

7        A.    He was calling me about his time.

8        Q.    But my question, was Mr. Flowers was aware

9    that Darrell James had showed up and that Darrell James

10   had called you asking to return; isn't that correct?

11       A.    I don't remember, but I'm pretty sure I let

12   him know.  But I don't -- I don't remember if I said

13   anything or not.

14       Q.    Okay.  Okay.  And then again, this same exact

15   statement I feel that I'm chasing Eric and Darrell

16   around.  This is a copy and posted statement I believe.

17             Okay.  Mr. Bearden, give me a couple more

18   minutes.  I think I'm about done.

19             (Brief recess taken.)

20   BY MR. BARROUKH:

21       Q.    Now I have one more document I'm going to

22   show you today, Mr. Bearden, that I'm marking as

23   Plaintiff's Exhibit 10.

24             (Exhibit No. 10 marked for identification.)

25       A.    Okay.

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 174 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1    Q.    Do you see the document?

2    A.    Yes.

3    Q.    All right.  Do you know what this document

4    is?

5    A.    Investigation report.

6    Q.    Okay.  And let me show you that this is the

7    entire document, two pages.  And have you ever seen

8    this document before?

9    A.    If I have I don't remember.

10    Q.    Okay.  If you've never seen this document I

11    only have one question or one small line of

12    questioning.

13         Do you see it says "from:  Stacy Wessel"?

14    A.    Yes, to somebody King.

15    Q.    Yes.  Do you see that?

16    A.    Yes.

17    Q.    And you see it says "re: Eric Ealy Madison".

18         Do you see that?

19    A.    Yes.

20    Q.    Now, here in this section it says "the

21    investigation".  It says name, date/time of interview,

22    date/time of follow-up interview, and your name is

23    right here.  Do you see that?

24    A.    Yes.

25    Q.    This is June 21, 2022, correct?

 1      A.    Yes.

 2      Q.    And in fact if we go to this other report,

 3   again it's the same, June 21, 2022.  And I'm showing

 4   you Exhibit 9 one more time just to show you the date

 5   from all of these employee statements are the exact

 6   same as the date you had an interview with Ms. Wessel,

 7   correct?

 8      A.    Yes.

 9      Q.    Now Ms. Wessel's report is an investigation

10   report.  Do you see that?

11      A.    Mm-hmm.

12      Q.    Employee and witness interviews, you can see

13   that everybody's name is listed who was a witness.  And

14   that includes Russ Flowers, Stephen Bearden, Eric Ealy,

15   Juan Garcia, Allen Roebuck, and Shaunna Stoddard.  Do

16   you see that?

17      A.    Yes.

18      Q.    Do you believe anybody is missing from this

19   witness interview that should have been interviewed as

20   a witness?

21      A.    Let's see.  You got Russ, Steve, Eric, Juan,

22   Allen, Shaunna.  Where is Darrell?

23      Q.    That's my same question.  I don't know.

24   Darrell James prior to his termination and prior to

25   Mr. Ealy's termination was never spoken to by

1  Ms. Wessel.  And I want to make that abundantly clear.

2  That is Ms. Wessel's testimony, that she never spoke to

3  Darrell James from June 14 to June 27 before they were

4  terminated.  Do you understand?

5      A.    Yes.

6      Q.    Do you believe that Mr. James, before

7  terminating him, should have been spoken to and

8  interviewed just like Ms. Stoddard was, just like

9  Mr. Roebuck was, just like Mr. Garcia, Ealy, Flowers

10  and yourself were?

11      A.    Yes.  I mean I would agree.

12      Q.    All right.  Why do you think Mr. James should

13  have been interviewed?  And forgive me if that's a

14  silly question, but again for the record.

15      A.    Well his name was, you know, on the incident

16  of what happened that day, too.

17      Q.    Do you believe he should have been asked any

18  questions before they fired him?

19      A.    Yes.

20      Q.    And why do you say that?

21      A.    I mean everybody gets -- I mean if everybody

22  was asked questions I assume that -- that he should

23  have been asked a question, too.

24      Q.    Okay.  And again, from your report in Exhibit

25  9 you state that Mr. James showed up to work when you

1    told him not to show up and he called you on June 21.

2           Do you think Mr. James was ignoring you or

3    ignoring anybody from the company based on these

4    actions you signed happened?

5           A.    I don't know.  I mean I don't know --

6           Q.    Well, let me ask you this.  Let me ask you

7    this.

8           Was Mr. James ignoring you from June 14thto

9    June 27?

10          A.    Let's see.  He called me June 21.  He's

11   coming to the office to do his time.  So he called me

12   there on the 21st.

13          Q.    Okay.

14          A.    But, you know, I called him Friday.  So I

15   called him that day.

16          Q.    Okay.  And to be clear, you called him the

17   morning of the 21st at 7:33, and then you had an

18   interview with Ms. Wessel at 4:33 so, approximately --

19   I'm not great with numbers but I think that would be

20   nine and a half hours later, correct?

21          A.    Sounds right.

22          Q.    And do you remember telling Ms. Wessel if

23   Mr. James called you that morning?

24          A.    I don't recall.

25          Q.    Okay.  Well, if you were speaking about the

```
 1    incident could you have told Ms. Wessel that Darrell

 2    James called that morning?

 3              MR. DOTY:  Objection.  Asking him to

 4        speculate.

 5    BY MR. BARROUKH:

 6        Q.    You can answer.

 7        A.    I mean there's a possibility.  I mean that's

 8    in my statement, right?

 9        Q.    Mm-hmm.  I hear you.  Okay.

10              And the last thing is Ms. Wessel says "Please

11    note that during" employee -- that's what she told me

12    EE stood for.  "Please note that during EE interview

13    that he stated to every question I am not going to

14    agree or admit to anything.  During the interview, EE"

15    -- Eric -- "reported that Allen had asked him What do

16    you call a black man hung.  EE stated that he reported

17    this to Stephen Bearden."

18        Q.    Do you see that?

19        A.    Yes.

20        Q.    Okay.  Did Mr. Roebuck ever say or report

21    that Allen asked him "what do you report a black man

22    hung"?  Did he ever report that to you?

23        A.    Did Allen report that he said that?

24        Q.    I apologize.

25              Did Mr. Ealy ever report any racial
```

1  discrimination or any remarks about racist comments

2  from Mr. Roebuck to you?

3      A.    No.

4      Q.    Okay.

5      A.    He did not report anything like that.

6      Q.    Okay.  All right.  Well, that's going to be

7  it.  I have no further questions for you today.

8          MR. BARROUKH:  John?

9          MR. DOTY:  Yeah, I don't have anything.  I

10     don't know if you are ordering a copy of the

11     transcript, but we'll read in the event that

12     happens, have him sign it, and go from there.

13         MR. BARROUKH:  Okay.  Let's go ahead.  Can we

14     order a mini of this transcript, please?

15         (The deposition concluded at 3:34 P.M.)

16                 ---o0o---

17

18

19

20

21

22

23

24

25

 1                      ---o0o---

 2              WITNESS' SIGNATURE

 3          Please be advised I have read the foregoing

 4    deposition pages _____through _____,

 5    inclusive.  I hereby state there are:

 6

 7          (check one)

 8          _____ no corrections

 9          _____ corrections per attached

10

11

12    _____

13    MICHAEL STEPHEN BEARDEN

14

15                      ---o0o---

16

17

18

19

20

21

22

23

24

25

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 181 of 219

Deposition of Michael Stephen Bearden                    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

1                          ERRATA SHEET

2            DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES

3    IN RE:  Eric Ealy and Darrell James vs. Webber
     Infrastructure Management, Inc. f/k/a Ferrovial
4    Services Infrastructure, Inc.
     DEPONENT:  MICHAEL STEPHEN BEARDEN
5    DATE TAKEN:  September 17, 2024

6    PAGE   LINE   CORRECTION & REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21

22           Under penalties of perjury, I declare that I have
             read the foregoing document and that the facts
             stated are true.

23

24   _____
     DATE                    MICHAEL STEPHEN BEARDEN
25

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA               )

 4    COUNTY OF BROWARD              )

 5            I, Michele Anzivino, Court Reporter, do
      hereby certify that I was authorized to and did
 6    stenographically report the deposition of MICHAEL
      STEPHEN BEARDEN, that a review of the transcript was
 7    requested; and that the foregoing transcript, pages 1
      through 182, is a true and correct record of my
 8    stenographic notes.

 9

10            I FURTHER CERTIFY that I am not a relative,
      employee, or attorney, or counsel of any of the
      parties, nor am I a relative or employee of any of the
11    parties' attorney or counsel connected with the action,
      nor am I financially interested in the action.

12

13            DATED this 30th day of September, 2024.

14

15

16

17

18

19
              _Michele Anzivino_____
20            MICHELE ANZIVINO, Court Reporter
              Notary Public – State of Florida
21            My Commission Expires: 03/19/2027
              My Commission No.: HH-375658

22

23

24

25
```

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 183 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

### WORD INDEX

**< 0 >**
**03/19/2027**  182:*21*

**< 1 >**
**1**  3:*9*  12:*1, 2*  30:*4*
56:*7*  182:7
**10**  3:*9*  173:*23, 24*
**10:00**  1:*16*
**100**  40:*25*  126:*20*
139:*24*
**105**  17:22
**107**  3:*9*
**11:12**  44:*6*
**12**  3:*9*
**120**  3:*9*
**123**  50:*3, 6, 17*  54:*10*
77:*12*  93:*19*
**128**  3:*9*
**14**  102:*6*  107:*3*
113:*12, 15*  114:*18, 19*
115:*1, 3, 8, 12*  118:*9,
20*  121:*19*  129:*10, 13*
134:*5*  138:*10*  142:*14,
17*  143:*21*  144:*8*
148:*7*  152:*14*  168:*16*
169:*12, 16*  176:*3*
**14th**  102:*9*  103:*24*
107:*7*  144:*9, 18, 19*
161:*11*  162:*9*  163:*9,
21*  164:*14*
**14thto**  177:*8*
**15**  168:*16*
**150**  3:*9*
**153**  3:*9*
**16**  20:22  168:*16*
**17**  1:*13*  168:*17*
181:*5*
**1700**  2:*7*
**173**  3:*9*
**18**  55:*10*
**182**  182:7
**19**  10:*12*

**< 2 >**
**2**  3:*9*  30:*3, 5*  55:*25*
**20**  3:*9*  30:*1*  66:*18*
**20,000**  53:*15*

**201**  2:*7*
**2013**  57:*2, 3*  58:*1*
**2014**  11:*3, 8, 22*  14:*6,
11*  17:*7, 17*  18:*6*
22:*25*  23:*5, 8, 13*
55:*5*
**2016**  17:*6, 7, 17*  18:*6,
8*  19:*11, 17*  20:*20*
**2016/2017**  20:*21*
**2018**  11:*4*  22:*24, 25*
23:*5, 8, 13, 16*  25:*1,
20*  30:*17*  36:*23*  37:*1*
55:*8*
**2020**  11:*4*
**2021**  11:*4*  25:*20*
27:*16, 18, 21*  30:*18*
36:*17, 24*  55:*6, 8, 11,
13*  64:*24*  65:*2*
**2022**  39:*15*  57:*2, 3*
58:*1*  109:*23*  112:*8*
118:*20*  121:*19*  129:*3,
10, 13*  138:*10*  141:*24*
142:*4, 19*  143:*20, 22*
155:*20*  160:*16*
161:*12*  162:*9*  164:*9*
170:*10, 16*  174:*25*
175:*3*
**2024**  1:*13*  181:*5*
182:*13*
**20-minute**  112:*23*
**21**  154:*22*  155:*20*
156:*25*  160:*16*
161:*12*  164:*9*  170:*9,
16*  171:*13, 16, 24*
174:*25*  175:*3*  177:*1,
10*
**21st**  177:*12, 17*
**25**  171:*8*
**250**  102:*23*
**27**  155:*15*  176:*3*
177:*9*

**< 3 >**
**3**  3:*9*  44:*18, 21*
**3:30**  147:*13*
**3:34**  1:*16*  179:*15*
**30**  3:*9*  135:*15*
136:*21*  140:*15*
**30-minute**  140:*12*

**30th**  182:*13*
**32331**  7:*10*
**33131**  2:*4*
**33301**  2:*8*

**< 4 >**
**4**  3:*5, 9*  93:*4, 7*
**4:24-cv-00029-RH-
MAF**  1:*2*
**4:33**  177:*18*
**40**  170:*23*  171:*4, 7, 9,
11*
**44**  3:*9*
**45**  140:*13, 14*

**< 5 >**
**5**  3:*9*  57:*3*  58:*1*
107:*16, 17*  109:*23*
112:*8*  141:*24*  142:*4,
19, 25*  143:*20*  144:*20*
**5/12/22**  3:*9*
**520**  2:*3*

**< 6 >**
**6**  3:*9*  120:*18, 20*
121:*2*
**6/14/22**  3:*9*  167:*12*
**6/21/21**  45:*15*
**6/24/22**  3:*9*
**6:50**  109:*8*

**< 7 >**
**7**  3:*9*  128:*15, 16*
134:*9*  165:*24*
**7:00**  109:*9*
**7:33**  170:*10*  177:*17*

**< 8 >**
**8**  3:*9*  150:*23*  151:*1*

**< 9 >**
**9**  3:*9*  153:*9, 10*
175:*4*  176:*25*
**90**  138:*6*
**93**  3:*9*
**9467**  7:*7*

**< A >**
**a.m**  109:*9*  165:*24*

**Abbreviation**  45:*14*
**abide**  59:*13*
**able**  12:*10*  17:*13*
18:*14, 16*  60:*13*
87:*15*  93:*1*  168:*21*
169:*20*  172:*3*
**Absolutely**  140:*16*
**abundantly**  176:*1*
**acceptable**  9:*21*
**access**  146:*1*
**accessed**  146:*4*
**accessible**  54:*1*
**acknowledgement**
3:*9*  45:*4, 19, 23*
**act**  87:*24*  114:*6*
119:*6*
**acting**  110:*5, 9*
113:*19, 21, 24*  114:*2,
15*
**action**  36:*22, 24*
105:*6*  112:*8*  182:*11*
**actions**  101:*20*  177:*4*
**activities**  16:*2*
17:*11*  28:*3, 6*  74:*17*
90:*21*  92:*3*
**activity**  17:*19*  93:*16,
19*  94:*4, 11*
**additional**  65:*24*
94:*17*
**address**  7:*4, 5, 6*
**addressed**  156:*20*
**addressing**  101:*23*
**adequately**  82:*11*
84:22
**administrator**  34:*7*
**admit**  178:*14*
**adult**  10:*3*
**advance**  81:*23*
**advanced**  81:*12, 18*
82:*1*
**advised**  180:*3*
**advising**  172:*8*
**affirmed**  4:*3*
**afford**  98:*13*
**affordability**  98:*7*
**African**  24:*15, 17, 19,
21*  40:*7*  56:*11*  57:*3,
11, 19*  58:*2*  71:*14*
97:*23*
**agency**  79:*25*

Case 4:24-cv-00029-RH-MAF Document 35-2 Filed 10/23/24 Page 184 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

**aggression** 100:*18, 19*
101:*10, 17, 24* 102:*2,*
*24* 103:*11, 13, 25*
104:*20* 105:*5* 140:*5,*
*22* 141:*12, 16* 142:*6,*
*19, 25* 143:*9* 144:*7, 8,*
*13, 19, 20, 23* 149:*14*
150:*18* 151:*22*
152:*13, 17, 21* 153:*4*
159:*16, 21, 24* 160:*4,*
*7, 10, 14, 24* 161:*2*
164:*12, 13*
**aggressive** 100:*11, 13*
101:*7* 102:*7, 12, 13,*
*19* 103:*18* 104:*4, 23*
105:*21, 24* 110:*25*
111:*1, 19* 120:*8, 11,*
*14* 130:*10* 131:*16, 18,*
*21* 141:*16* 155:*6, 7,*
*12, 16, 19* 158:*6*
161:*7* 164:*1, 25*
165:*3, 8, 11* 169:*23*
170:*3, 5*
**aggressively** 129:*17*
**ago** 10:*13* 14:*2*
15:*16* 65:*4* 96:*13*
132:*25*
**agree** 68:*17* 89:*1*
102:*4* 111:*25* 143:*14*
146:*25* 164:*20*
176:*11* 178:*14*
**ahead** 20:*13* 31:*5, 24*
43:*3* 51:*19* 64:*19*
81:*15* 90:*7* 115:*17*
117:*22* 151:*16*
179:*13*
**aint** 101:*16*
**ain't** 100:*22* 101:*15*
158:*21* 166:*25*
**air** 15:*18* 62:*8* 78:*6*
**allegations** 72:*18*
75:*11* 97:*15* 98:*16*
**allege** 98:*11, 23*
124:*20*
**alleged** 97:*10* 98:*20*
99:*5* 124:*22* 160:*4*
**alleging** 56:*19*
**Allen** 37:*3* 38:*11*
41:*6, 8, 11, 15* 83:*8, 9,*
*18* 85:*18* 92:*22*

123:*4* 136:*23* 137:*7,*
*8, 10, 12, 13* 138:*13*
139:*11, 14, 18* 140:*23*
151:*4, 13* 152:*2*
153:*22* 156:*3, 7, 15,*
*17* 161:*10, 11, 23*
175:*15, 22* 178:*15, 21,*
*23*
**allow** 4:*24* 5:*9*
**allowed** 53:*18*
**allows** 70:*13* 71:*2*
79:*25*
**alongside** 14:*24*
**alter** 132:*22*
**altercation** 119:*10*
**altercations** 26:*14*
**American** 24:*8, 15,*
*17, 19* 40:*7* 56:*11*
57:*4, 11, 19* 58:*2*
71:*14* 97:*24*
**Americans** 24:*22*
**amount** 59:*4*
**Angel** 36:*3*
**angrier** 149:*11*
**angry** 116:*15, 22*
148:*25* 149:*8, 15, 17,*
*19, 20, 22, 24*
**animals** 14:*22*
**annual** 50:*2* 54:*15*
**answer** 5:*11, 12, 17,*
*20* 6:*3* 9:*20, 21*
20:*12, 13* 31:*5* 43:*4,*
*6* 50:*25* 51:*16* 88:*14*
90:*3* 114:*3* 119:*19*
125:*9* 132:*18* 143:*14*
162:*6* 178:*6*
**answered** 79:*7*
142:*11*
**answering** 111:*14*
**answers** 5:*2*
**anti** 49:*2*
**anti-bullying** 46:*17*
**anti-discrimination**
44:*10, 12* 46:*15*
47:*11* 48:*14* 55:*14,*
*17* 58:*6, 19* 59:*8, 24*
77:*21* 78:*14, 20* 79:*3*
**anti-harassment** 58:*7,*
*19* 59:*8, 25* 77:*21*
78:*13, 21* 79:*3*

**anti-retaliation** 58:*6,*
*18* 59:*9, 25* 77:*22*
78:*14, 20* 79:*4*
**Antonio** 39:*24* 40:*1,*
*8* 41:*4*
**Antonio's** 40:*6*
**anybody** 6:*23* 8:*25*
9:*14* 40:*25* 46:*19, 22*
50:*13* 53:*13* 57:*6*
59:*19* 60:*9, 23* 61:*2*
62:*3* 99:*11, 24* 100:*6,*
*9* 111:*15, 17* 118:*13,*
*15, 19* 119:*20* 142:*8*
155:*20, 22* 162:*15, 17*
163:*25* 171:*15*
172:*17* 175:*18* 177:*3*
**anymore** 38:*14* 66:*3*
104:*9, 12* 109:*22*
**ANZIVINO** 1:*18*
182:*5, 20*
**apologize** 59:*2, 3*
167:*7* 178:*24*
**APPEARANCES** 2:*1*
**appearing** 173:*5*
**applicants** 57:*19*
**application** 57:*22*
**applications** 57:*14*
**applies** 13:*22* 30:*24*
**apply** 100:*14*
**appreciate** 105:*2*
**approached** 114:*14*
**approximately**
143:*22* 177:*18*
**April** 27:*17, 18, 20*
45:*16* 155:*15*
**area** 116:*20*
**areas** 115:*19*
**argue** 122:*19, 22*
163:*18*
**argues** 164:*21*
**arguing** 154:*19, 23*
155:*2, 19* 156:*10*
163:*20* 164:*1* 167:*14*
**arguments** 148:*3, 6, 7,*
*14*
**arrest** 10:*15, 17*
**arrested** 9:*24, 25*
10:*1, 3, 6, 9*
**ASAP** 106:*8*
**aside** 52:*6*

**asked** 16:*1* 43:*16*
51:*1* 69:*10, 13* 74:*7,*
*15, 19, 21* 79:*7* 87:*8,*
*22* 88:*18, 21* 100:*20*
101:*25* 115:*13, 17*
117:*17* 137:*12* 142:*9,*
*10* 146:*21* 149:*25*
162:*17* 169:*18*
176:*17, 22, 23* 178:*15,*
*21*
**asking** 8:*12* 9:*18*
27:*12* 31:*20* 43:*2*
47:*24* 48:*1* 68:*3*
75:*20, 21* 87:*4* 90:*4*
125:*8, 12* 143:*18*
147:*1* 173:*10* 178:*3*
**asks** 73:*12* 89:*23*
100:*5*
**aspect** 29:*3*
**aspects** 16:*16, 18*
89:*10* 90:*23* 106:*17*
**assigned** 15:*21, 24*
16:*2* 17:*1* 63:*3, 6*
87:*7* 92:*1* 94:*5*
112:*16* 126:*4* 157:*12,*
*18* 159:*20*
**assigning** 88:*18*
126:*11* 157:*15*
**assignment** 94:*7, 9,*
*10* 159:*15*
**assignments** 16:*7*
89:*5, 23* 91:*25* 92:*17*
126:*6, 7, 11* 163:*17*
**assigns** 159:*21*
**assistance** 93:*2*
**associated** 52:*5*
**assume** 33:*18* 47:*19*
58:*24* 59:*5* 75:*18, 20*
87:*10* 90:*9* 114:*9*
149:*9* 156:*2* 170:*3*
176:*22*
**assumed** 67:*17*
89:*22* 114:*11*
**assuming** 39:*4* 58:*11*
59:*18* 89:*7, 11* 90:*9*
119:*20* 156:*1* 169:*19*
**assumption** 169:*21*
**assure** 80:*2*
**attached** 180:*9*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 185 of 219
Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

**attack** 116:*25* 117:*2,
7* 129:*18, 25* 130:*8*
170:*1*
**attacked** 118:*15*
**attention** 137:*3*
**attitude** 159:*15*
160:*24* 161:*3*
**attorney** 5:*16, 18, 19*
8:*24* 9:*11* 74:*25*
182:*10, 11*
**attorneys** 93:*12*
108:*1* 151:*7* 153:*19*
**attorney's** 30:*11*
128:*21*
**ATVs** 15:*4*
**audio** 11:*17* 120:*19*
**August** 57:*3* 58:*1*
**authority** 134:*14*
**authorized** 182:*5*
**available** 146:*3*
**aware** 20:*2* 32:*7, 8*
33:*1* 79:*14* 80:*8*
95:*9, 14* 97:*10, 14*
98:*19, 22* 99:*4*
124:*19* 160:*5* 173:*8*

< B >
**back** 11:*4* 23:*20*
26:*22* 27:*6, 9* 29:*19,
24* 33:*14* 34:*9* 36:*9,
24* 44:*6* 45:*21* 46:*13*
54:*10* 55:*10, 24, 25*
64:*21* 69:*24* 74:*6*
91:*1, 21* 103:*1, 6*
104:*8* 106:*5* 110:*3*
112:*9* 114:*4* 116:*3,
16, 21* 117:*18* 121:*11*
123:*1* 131:*7* 132:*2*
133:*7, 12* 134:*8*
137:*13* 140:*14* 162:*3*
167:*24* 168:*9, 12, 16,
21* 169:*3, 20* 173:*3*
**background** 170:*1*
**bad** 87:*4* 103:*4, 8*
**balled** 130:*2* 131:*8,
10* 132:*1, 2, 9, 14*
133:*1, 14, 18* 134:*2*
164:*22*
**BARROUKH** 2:*3*
3:*5* 4:*6, 8* 11:*13, 20*

12:*3* 20:*10* 30:*6*
31:*7, 10, 18, 22* 32:*1,
6* 44:*5, 8, 19* 50:*24*
51:*5, 14, 20* 79:*10, 13*
80:*14* 88:*10, 13* 90:*4*
93:*5* 107:*18* 113:*1, 4,
6* 119:*18* 120:*21*
121:*9* 122:*17, 25*
124:*12* 125:*11*
126:*17, 22* 127:*9, 16*
128:*17* 132:*12, 20*
133:*5, 11, 25* 138:*1*
142:*12, 16* 150:*24*
153:*11* 173:*20* 178:*5*
179:*8, 13*
**based** 51:*2, 16* 86:*11*
94:*3* 133:*15* 135:*3, 6*
177:*3*
**basically** 61:*21*
92:*15* 94:*4, 7* 127:*25*
165:*22*
**basis** 22:*10*
**Bates** 44:*23* 107:*25*
**bathroom** 6:*8*
137:*13* 138:*18*
**bear** 120:*18*
**BEARDEN** 1:*13* 3:*4,
9* 4:*2, 7, 12* 108:*7*
113:*7* 121:*25* 122:*6*
128:*19* 129:*5* 132:*21*
133:*12* 134:*1* 151:*20*
173:*17, 22* 175:*14*
178:*17* 180:*13* 181:*4,
24* 182:*6*
**becoming** 120:*8*
**beginning** 57:*7*
66:*13* 89:*24*
**Behalf** 1:*13* 2:*2, 6*
74:*16*
**behavior** 100:*12*
101:*7* 102:*13* 105:*19*
109:*22* 111:*16* 112:*7*
131:*16, 18, 21* 141:*16,
23* 155:*16* 156:*20, 24*
158:*6* 164:*2*
**believe** 9:*17* 21:*14*
27:*17* 33:*8, 17* 34:*23*
35:*4* 37:*14* 41:*6*
42:*24* 43:*10* 49:*23*
59:*15* 60:*7, 9* 64:*17*

69:*12* 74:*9* 79:*10, 16*
82:*5* 91:*14* 107:*4*
110:*18* 112:*18* 125:*3,
16* 126:*11* 129:*14*
135:*5* 137:*5* 140:*25*
144:*6* 146:*21* 157:*18*
162:*25* 163:*3* 166:*5*
169:*13, 15* 172:*20*
173:*16* 175:*18* 176:*6,
17*
**believed** 102:*14*
**benefit** 25:*4*
**benefits** 18:*13* 38:*19*
46:*3*
**Benjamin** 37:*3* 38:*24*
**best** 6:*2* 121:*5*
**better** 38:*18* 85:*17*
**beyond** 46:*24*
**bigger** 143:*12*
**bit** 9:*23* 12:*20* 91:*1*
145:*10*
**bitty** 12:*16*
**black** 56:*11* 57:*3, 11*
58:*2* 98:*12, 16*
178:*16, 21*
**blew** 87:*10*
**Bo** 83:*12, 18, 19, 20,
21, 23, 25* 84:*1* 96:*12*
**boat** 78:*7*
**boats** 98:*7, 13*
**boss** 16:*7* 101:*12, 13*
**bother** 39:*8*
**bottles** 106:*15*
**bottom** 13:*4* 30:*10*
45:*6* 86:*24* 93:*11*
98:*18* 108:*11* 129:*8*
**Boulevard** 2:*7*
**box** 111:*19*
**boxes** 109:*21*
**boy** 99:*6, 9, 11, 13*
124:*21, 25* 125:*1, 13*
126:*2* 138:*22* 139:*2*
158:*21, 22, 25* 159:*7,
11*
**boys** 124:*21*
**brand** 16:*12* 85:*15*
92:*22*
**break** 6:*8* 44:*6*
80:*12* 112:*24* 140:*12,

19, 20* 145:*9*
**breaks** 59:*19* 139:*22*
**Brewton** 22:*3* 24:*14*
**Brianna** 34:*6*
**Brickell** 2:*3*
**bridge** 78:*8*
**brief** 13:*10* 44:*7*
80:*13* 137:*25* 173:*19*
**briefly** 8:*2* 23:*21*
50:*19* 56:*3* 101:*2*
129:*1* 138:*3* 149:*13*
153:*16* 169:*11*
**bring** 115:*21* 136:*2,
4* 142:*18* 143:*3, 4*
**bringing** 56:*18*
66:*25* 103:*4* 143:*15*
145:*2*
**brings** 36:*16* 160:*24*
**broad** 78:*2*
**brother** 71:*14*
**brought** 56:*21, 23*
58:*2* 68:*25* 69:*3*
95:*10* 137:*3* 141:*20,
22*
**BROWARD** 182:*4*
**bucket** 78:*5*
**buckled** 110:*15*
111:*6*
**Buddy** 33:*21*
**building** 115:*25*
116:*7* 123:*24* 172:*10,
18*
**buildup** 113:*13*
**bullied** 47:*20*
**bump** 18:*14*
**bunch** 105:*11*
**business** 71:*7*
**butchering** 41:*7*

< C >
**cabinet** 35:*16, 18*
**calculations** 116:*4*
**call** 4:*16, 17* 7:*16*
17:*10* 47:*5* 49:*6*
61:*1* 62:*10, 11, 13, 24,
25* 63:*19* 68:*1, 2*
69:*18* 74:*5* 83:*12*
84:*4* 88:*3* 93:*16, 18*
94:*4, 11, 12, 18, 19, 21*
95:*2, 5, 7* 99:*5, 22, 25*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 186 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

100:2  101:20  105:2
118:14, 16  122:6
126:5  137:19  138:3
167:21  168:11
178:16
**called**  48:10  61:10
83:25  99:13, 24
100:22  101:3  103:16
104:22  117:18
121:21  122:5  124:20
125:13  134:10, 11
135:3  145:22  166:10,
14  167:13, 18, 19, 20,
23, 25  168:5, 7  170:8,
9, 14, 15, 20  171:15
173:10  177:1, 10, 11,
14, 15, 16, 23  178:2
**calling**  124:25  138:6
158:24  173:5, 7
**calls**  64:10  100:5
121:12, 24  145:25
171:13
**calm**  106:20  134:12
135:5
**calmed**  117:17
**camera**  62:21  130:21
**cant**  127:22
**capability**  106:4
**car**  172:19
**card**  61:11, 15, 16, 17,
18, 22  62:17, 19, 22
63:3, 7, 12  64:1, 3
**cards**  167:6
**career**  106:11
**careful**  99:20
**Case**  1:2  4:9  8:1, 17,
18  10:25  31:21  53:3
72:5, 11  138:4
**Cat**  56:7
**catches**  102:24
**category**  56:7
**caught**  102:21
**caused**  144:13
**causing**  119:25  149:1
**cell**  65:14  93:3
172:5
**center**  71:1
**certain**  50:14  60:14
92:16  113:19

**certificate**  81:12
85:9  182:1
**certification**  81:1, 19
82:2  86:17
**certifications**  80:25
**certified**  85:9
**certify**  182:5, 8
**cetera**  92:13
**chainsaw**  16:25
**chance**  160:13
**change**  46:4  87:8
**changed**  14:8  65:10
105:19
**CHANGES**  181:2
**character**  120:3, 14
**charge**  88:18  157:15
**chasing**  148:2  173:15
**cheat**  170:11
**check**  180:7
**checked**  35:15
**child**  124:14, 17, 25
125:4, 15, 17, 20, 23,
25  126:1, 8, 12
138:22  139:3  158:23
167:1
**children**  159:9, 10
**chime**  79:6
**Chipley**  41:20
**C-h-i-p-l-e-y**  41:21
**Chipley's**  41:23
**chose**  103:19  160:16
**cite**  145:5
**cites**  147:8
**citing**  145:12  155:16
**citizen**  60:9
**City**  37:20
**claim**  56:21, 23  70:9
71:10  95:10
**claims**  54:3  82:9
**clarification**  6:3
44:2  90:5
**clarify**  20:8  23:21
29:21  143:19  169:11
**clarity**  133:4
**Class**  43:19  81:20, 23
**clean**  64:22  70:6
157:24
**clear**  30:3  42:16
58:15  64:19  69:25
70:1, 5, 6  71:22  72:1,

3  74:18  83:5  89:9,
11, 17  119:4  125:5,
12  162:1  176:1
177:16
**clearly**  6:17  88:23
105:3
**client**  132:13
**clients**  56:17  67:6, 7
68:4  90:14  91:5, 11
95:10  97:10, 12
98:11, 16, 19, 22, 24
99:4, 13, 21  100:1, 10,
11  103:24  113:10
115:8  118:9, 15, 22,
25  119:5, 13, 23, 25
123:7, 22  130:17
131:4  134:14, 24
135:5
**client's**  71:23  91:21
134:6
**clients's**  102:6
**Clint**  21:14  24:12
**close**  62:8  91:18
112:22  139:5
**closer**  20:21
**cloudy**  169:5
**clue**  58:4  75:2
**code**  7:9
**collective**  163:13
**collectively**  162:23
163:11
**come**  13:13  18:15
22:23  27:6, 9  29:15,
18  33:14  37:22
39:20  41:2  44:6
46:19  52:10  58:12
87:24  97:20  99:23
104:6  106:7  107:11
112:9  116:16, 18, 22
123:10, 14, 16  137:13
148:22  167:15, 24
168:5, 12, 21  169:3,
20  170:24  172:8
173:3
**comes**  47:17  55:19
72:14  76:16  116:6
**coming**  50:13  82:25
95:16  111:2  123:7
132:9  148:24  163:8

169:22  170:10
171:14, 15  177:11
**comment**  52:19, 24
98:4, 5, 7  105:22
111:23
**commenting**  111:15
**comments**  71:25
109:18  110:12  179:1
**Commission**  182:21
**common**  73:17
**communication**  89:25
90:14, 20, 23  114:13
155:6, 7, 12, 15, 19
170:18
**community**  53:11, 16
71:12
**company**  9:12  10:21,
23, 25  11:2, 3  13:13
17:5  19:23  22:24
23:1, 9, 15  29:2, 7
35:9  36:11, 13, 22, 25
37:5, 6, 7  38:12, 14,
25  39:16, 21  40:8
41:15, 25  42:6, 9
44:13  46:5  49:8, 21,
24  50:1, 10  55:5, 14
56:24  57:4  58:3
59:9  60:13, 15  61:19
63:2, 5  64:6, 23, 25
65:13, 15, 16, 25
70:13, 17  71:2, 5
75:6, 16, 22, 23, 24
76:3, 17  79:15  80:21
90:15  92:20  94:12
95:12  96:12, 25
101:22  103:10  105:6
109:1, 25  118:10
135:16, 24  136:2, 3,
22  140:1  141:13
143:1  144:23  145:1
146:14  163:1, 3, 25
166:18  167:3  172:5
177:3
**company's**  44:10
46:12, 14  47:11, 19
48:13  54:16  64:8
**compared**  21:2, 3
**compiled**  143:7, 13
**complain**  17:19, 21,

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 187 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

22, 24  23:2, 5  39:11
**complained**  39:9
**complaining**  152:20
**complaint**  54:2
66:25  67:9  68:21
71:22  72:12  75:16,
22  76:3  114:19
135:18  142:14
154:14  162:2, 3
**complaints**  18:2, 5
20:2, 5, 8  24:22, 25
38:20, 22  40:19
67:20  79:15  104:14,
16
**complete**  30:10
42:25  43:16  54:22
55:8  65:24  81:23
88:23
**completed**  54:24
55:2, 4, 13  86:16
**completely**  89:1
**complicated**  65:19
**comply**  118:23
**computer**  35:17
**concerned**  73:3
90:13, 16, 19
**concluded**  179:15
**concrete**  15:7
**conditioned**  15:18
**conditioning**  62:8
**conduct**  112:8  137:4
147:2
**conducted**  55:17
78:19
**conducting**  6:20
100:11
**confidently**  82:2
**confined**  85:24
**confirm**  13:22
121:17  123:6  147:4,
7  162:4
**confirms**  94:7
**confronted**  140:6
**confusing**  5:23
**confusion**  51:3
**connected**  182:11
**connection**  142:21
**consent**  131:1, 4
**consequences**  109:17

**considered**  43:13
149:23
**conspired**  144:2
**constant**  170:12
**construction**  80:20
**contact**  93:1  117:24
**contentious**  114:22
**context**  71:3
**continually**  145:22
**continue**  17:5  83:24
122:15, 23  124:9
126:15  140:3  159:13
168:2  170:7
**continued**  153:24
**continues**  136:20
146:12
**continuously**  124:20
**contract**  16:11
**control**  75:13  92:4, 6,
9, 12
**conversate**  104:12
**conversation**  119:23
**Cook**  47:3
**Cook's**  30:21
**cool**  62:9  117:16
168:20
**coolers**  151:18
**coordinator**  37:21
**coordinators**  77:12
**copy**  46:1, 11  173:16
179:10
**corner**  123:8, 13
**correct**  9:4  10:18
11:23  13:15, 23  14:9
15:11  18:2, 6  20:24
21:2  23:13, 14  24:23
25:15, 21  27:13, 21
29:4, 7  30:18, 21
32:21  36:19  38:12,
13  39:10, 11, 13  42:9,
10, 19, 20  44:14  45:7
47:8  49:22  50:7
53:22, 23  55:9  56:4,
8  61:8, 24, 25  64:24
65:7, 17, 21, 22  66:20
68:19, 20, 23, 24  69:2
70:18  72:5  73:12
74:22, 23  80:3  81:5
84:25  86:21  93:23
94:1, 9  95:4  96:4

101:8  104:21, 24, 25
107:23  108:2, 10, 23
109:10  113:10, 11
114:22  119:10, 11
120:11, 12, 23, 25
121:22  123:18, 22
124:7, 21  126:20
129:5, 22  130:13, 14,
17, 18  134:6  137:4
138:10  140:1, 2, 24
141:2, 3, 5, 17, 24
145:2, 13  147:10, 15
150:15, 16, 20, 21
152:22  153:5  155:8,
12, 16  156:23  157:16
160:14, 17  162:3
163:21, 23  164:2, 3,
10, 15, 16, 25  165:1, 3,
8, 9, 11, 19, 22  166:13,
20  167:8  168:15
172:4  173:6, 10
174:25  175:7  177:20
182:7
**correction**  23:18
181:6
**Corrections**  25:2, 7,
18, 24  27:5  180:8, 9
**correctly**  167:23
**counsel**  142:3
182:10, 11
**County**  7:1  11:22
14:11  15:11  17:9, 20
21:10  22:9, 12, 14, 15
55:18  57:18  67:14
128:6  154:11  182:4
**couple**  15:15  34:13
55:23  82:23  83:16
87:18  88:21  102:20
107:10  172:14
173:17
**course**  57:16  62:10
73:14
**COURT**  1:1, 18  5:1,
7  21:16  31:13  53:22,
25  88:10  113:2
133:6  182:5, 20
**cousins**  96:16, 17, 18,
25
**covered**  142:9  167:7,

10
**co-workers**  17:18
**created**  149:5  150:5
**creating**  148:3, 17, 19
**crew**  16:14  18:11, 12,
19, 24  19:8, 11, 17, 22
20:1, 4, 16  21:2, 3, 4,
23  28:23  29:2
**Crumitie**  31:2, 5, 25
32:7, 13, 16, 21  33:2,
9, 16  34:2, 3  36:21
56:20
**Crumitie's**  33:20
**cup**  78:7
**current**  56:19  70:8
**currently**  18:22
**cuss**  163:18
**cusses**  164:21
**cussing**  163:21  164:1
**cut**  49:8  83:17
112:20
**cuts**  147:13
**cutting**  14:23  16:15,
21  157:7

< D >
**D.W**  19:21  20:5
21:13  24:6, 7
**danger**  60:23  62:10
150:20
**dangerous**  62:7
**DANIEL**  2:3  4:8
**danielb@dereksmithla
w.com**  2:4
**DARRELL**  1:2  37:4
63:25  85:3, 5  96:12
114:15  115:4  117:20
134:12  135:4  146:13
147:8, 9, 12, 18, 22
148:2, 7, 12, 14, 19
149:2, 4  150:5
151:19  153:2, 4
157:7, 11, 17, 23
158:5, 10, 12, 25
159:15, 22  160:21, 23
161:2, 6  163:17
164:18, 20, 22, 24
165:2, 7, 10  166:7
167:12, 17, 19, 21, 24
168:19, 22  169:3

170:*1*, 2, 7, 9, 15, 19
171:*13*, 23   172:*8*, *17*
173:*3*, 9, 15   175:22,
*24*   176:*3*   178:*1*
181:*3*
**Darrell's**   160:*4*, 6
**DATE**   1:*13*   8:*9*, *11*
11:5   40:2   45:*15*
49:*19*   54:*16*   80:*17*
108:*12*, 13   129:*10*
144:*11*   153:*17*, 20, 22,
25   162:9   165:*14*
175:*4*, 6   181:5, *24*
**date/time**   174:*21*, 22
**dated**   3:9   162:22
163:*12*   182:*13*
**dates**   40:*17*
**day**   6:*11*   27:*21*   39:6
48:*23*, *24*   49:*11*   77:7,
*14*   82:20   84:*11*, *18*,
20, *24*   88:5   89:*24*
90:*17*   91:6, 8, *11*, *16*
102:7   103:4   110:*21*
111:7, *16*   115:*3*, 6, *21*
116:*11*   118:*3*, *20*
119:*1*   131:*11*, 22
134:*20*   135:*1*, 9, *10*
137:*12*   138:*19*
141:*24*   142:2   143:8
156:*11*   158:*15*
159:*19*, *20*   161:*25*
167:*13*, *25*   169:*14*
170:*15*   176:*16*
177:*15*   182:*13*
**days**   22:*13*, *17*   94:*25*
135:*15*   136:*10*, *21*
143:22
**day-to-day**   22:*10*
28:*3*
**dead**   14:22
**deal**   66:*24*   116:*10*
**decade**   14:*1*
**decided**   141:7
**decides**   75:6
**decision**   61:*23*
**deck**   78:8
**declare**   181:*20*
**deescalate**   148:2

**Defendant**   1:7   2:6
10:*25*   107:*25*   112:*17*
118:*16*
**Defendants**   1:*13*
**defile**   87:*19*
**Define**   28:*13*   65:*18*
101:*24*
**defines**   101:22
**definitely**   78:*3*
107:*14*
**definition**   51:6, *10*, *13*,
*15*   52:*15*   53:*1*   68:*12*
**degrees**   17:*23*   139:*24*
**demanding**   26:8
145:22
**demonstrating**   88:22
115:*15*
**denied**   69:*1*
**Department**   25:2, 6,
*18*, *24*   27:4   36:*15*
60:*3*   106:22
**depends**   92:*3*
**DEPONENT**   181:*4*
**DEPOSITION**   1:*13*
4:*13*, *20*, *24*   6:*1*, *21*
7:*12*, *17*, *21*   10:*21*
35:*23*   96:*1*   101:*13*
136:*25*   137:*21*
142:*10*   179:*15*   180:*4*
182:*6*
**depositions**   8:*14*
31:*12*
**DEREK**   2:2
**derogatory**   119:*14*, 25
**describe**   27:*3*   28:*1*
44:9   46:*14*
**described**   20:*23*   46:4
**describing**   84:5
**Description**   3:*8*, 9
13:*10*   109:*16*
**desk**   8:*15*   48:*16*
**despite**   168:8
**detail**   13:*12*   17:*25*
18:*16*   19:*4*, 5   109:*22*
162:*14*   163:*12*
**detailed**   162:*21*
**details**   109:*4*, *15*
138:*14*
**develop**   90:*20*

**device**   78:*9*
**devices**   11:*15*
**died**   117:9
**diesel**   85:*9*, *10*   87:*11*
**Dietrich**   37:*3*   38:*24*
39:*1*, 9
**difference**   18:*24*
149:*16*
**different**   4:*17*   15:*21*
16:2, 8, *16*, *24*   37:*19*
49:*24*   50:*11*   51:8
63:*17*   71:*15*   74:*17*
84:*16*   90:*11*   102:2
127:*19*   142:*12*, *13*
**difficult**   16:*19*, 22
**diffuse**   103:*1*, 2
**DIRECT**   4:6   145:5
**directly**   62:*11*   145:*13*
**dirt**   14:22   15:7
**disagreement**   139:*10*,
12
**discipline**   3:9   107:2
109:*12*   112:*10*, 16
113:8, 9   141:*15*
142:5
**disciplining**   107:6
108:*3*
**discomfort**   52:6
**discretion**   46:5
**discriminated**   47:*21*
68:9   69:5
**discrimination**   18:6
23:5   24:*23*   40:*19*
46:*18*   47:*13*, 16, 17,
25   48:*1*, 6, 8, 11
50:*18*, 21, 22, 25   51:2,
7, 22, 24   52:*16*   54:*11*,
*16*, 20   56:*19*   67:*1*, 9,
20, *24*   68:*11*, 16, 19
69:*1*, 7   70:*10*, *13*, 17,
23   71:2, 5   79:24
80:6, 9   82:9   95:*10*
100:*3*, 4, 8   179:*1*
**discussed**   56:*17*
102:8   104:*1*   141:*14*
166:*16*
**discussing**   138:9
**disparaging**   71:*24*
**disparity**   57:*10*

**disrespect**   4:*18*
**disrespected**   122:9, *13*
**disruptive**   146:*14*
**DISTRICT**   1:*1*
**disturbing**   119:*14*
**doctor**   49:6
**document**   8:8   11:*25*
12:22, *24*   13:*4*, 8, *11*,
*18*, *20*   30:2, 4, 7, *11*,
*14*   44:*16*, 22, 23   45:*1*,
*3*, 9   49:*16*   93:8, *10*,
16   107:*19*   108:2, 22
109:*16*   110:9, *10*, 16
112:6   128:*18*, 20, 25
130:9   141:*17*, 19
145:*15*   147:7   150:*25*
151:*3*, 6   153:*12*
155:*1*, 4, *15*   162:*1*
173:*21*   174:*1*, 3, 7, 8,
10   181:22
**documentation**   8:*21*
**documented**   135:*18*,
20
**documents**   7:*19*, *20*,
23   8:*1*, 4, 6, 16, 18, 21
9:6, 7, 12, 13, 15   54:*1*
95:*21*, 22   108:*1*
142:2, *3*   147:*11*
148:*11*   150:2   159:*25*
160:5   169:9   172:*25*
**Dodge**   172:9
**doing**   11:7   16:*13*
18:*17*   35:4   50:*14*
74:*13*, 14   80:22
89:*19*   90:*17*, 21
100:*23*   101:*16*
106:*23*   115:*24*   116:4
127:*19*   128:*1*   158:*21*
**Donald**   34:22
**door**   116:*21*   123:*14*,
15, 16   154:*12*   166:*24*,
25
**doors**   172:*11*
**DOT**   138:6
**DOTY**   2:7   11:*16*
20:7, *13*   31:*3*, 9, *17*,
*19*, *24*   43:2, 6   50:*19*
51:*12*, *18*   79:6, *12*
90:*1*, 7   112:*20*   113:2
119:*16*   125:7   132:7,

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 189 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

*23* 142:*9*, *15* 178:*3*
179:*9*
**downhill** 105:*14*
**Drive** 2:*3* 17:*14*
85:*16*, *17*, *20* 135:*15*,
*21*, *23* 136:*17*, *22*
140:*13*, *14* 165:*25*
**driver** 78:*5*
**driveway** 35:*5*
**driving** 139:*15*
141:*12* 143:*1*, *21*
167:*3*
**drove** 88:*1* 135:*21*
**drug** 42:*14*, *16*, *18*
43:*1*, *11*, *15*, *16*, *19*, *21*
**drugs** 42:*21*
**DUI** 10:*16*
**duly** 4:*3*
**Dupree** 37:*4*, *11*
39:*12*, *19* 40:*3*, *4*
41:*19* 96:*5*, *9*, *15*
97:*21*
**duration** 22:*19*
**duties** 13:*21* 14:2, 7
82:*11* 84:22

< E >
**EALY** 1:2 56:*18*
63:*25* 64:*13*, *16*
80:*16*, *19*, *24* 81:7, *18*,
*22* 82:*3*, *10*, *14* 83:*12*,
*13*, *15*, *21* 84:*1*, *9*
85:*18* 89:*3*, *23* 91:*15*
95:*23* 100:*15*, *16*
102:*11*, *14*, *18* 104:*19*
105:*10* 107:6 108:*3*,
*9*, *21* 109:*12* 110:*24*
111:*9*, *19* 112:*16*
113:*25* 114:*1*, *20*
115:*4*, *18* 116:*1*, *13*,
*24* 117:*20* 121:*10*, *14*
122:*12* 124:*5*, *13*, *19*
125:*16*, *22* 127:*24*
128:*8* 131:*13*, *25*
136:*6*, *15* 137:*1*
138:*12*, *17* 139:*11*, *14*,
*20*, *25* 141:*4* 145:*16*
150:*17*, *18* 152:*21*
154:*18* 155:6 156:*14*,
*16* 157:*17* 158:22

163:*16* 164:6 169:*12*
174:*17* 175:*14* 176:*9*
178:*25* 181:*3*
**Ealy/Ferrovial** 95:*25*
**Ealy's** 83:*10*, *11*
103:*25* 105:5 109:*22*
111:*16* 131:9 132:*9*
134:2 137:*3* 141:*23*
142:*25* 144:7, *20*
155:*11*, *16* 164:*1*
175:*25*
**earlier** 7:*15* 56:*1*
79:7 91:*21* 142:*10*
**early** 84:*25*
**Easier** 15:7
**easily** 46:*23*, *24*
**East** 2:7
**easy** 102:*22*, *23*
**eat** 100:7 126:2
138:*23*, *25* 139:*8*
**eaters** 15:5 28:6
**eating** 14:22 82:*18*
**eats** 126:*1* 138:22
139:*3*
**EE** 178:*12*, *14*, *16*
**effect** 100:*9*
**effort** 163:*13*
**egging** 131:*13*
**eight** 65:4 94:*24*
**either** 34:*25* 58:*25*
68:6 77:4 80:*10*
118:*15* 123:*21*
146:*11* 147:*3* 158:*14*
168:*23*
**elaborate** 70:*1*
**else's** 52:22
**Ely** 151:*19*
**Email** 3:9 76:*24*
77:*3* 93:*23*, *25* 94:*4*
147:*1* 151:*11*
**emotionally** 26:*9*
**employed** 39:*13*
40:*14* 81:*19* 90:*14*
109:*13*
**Employee** 3:9 33:*13*
34:*1* 45:4 46:2, *12*
66:*25* 70:*20*, *21*
74:*24* 75:7 77:7
79:*14* 80:*23* 84:*17*
99:9 103:*18* 104:*20*,

*23* 105:*20* 108:*9*, *12*
109:*18* 110:*12*, *14*
111:*9*, *23* 113:*13*, *21*,
*23* 114:*20* 121:*24*
139:*14* 150:*10*, *19*
175:5, *12* 178:*11*
182:*10*
**employees** 28:7
32:22 33:*25* 35:*20*,
*21* 36:*19* 37:2 38:*10*
39:*16* 54:*18*, *22*
56:*10*, *11* 57:4, *11*
58:2 59:*13* 76:2, *18*
84:*11* 91:*10* 92:5, *9*,
*25* 93:2 103:*25*
113:*14*, *18* 118:*10*, *16*
140:*19* 146:*15* 148:*4*,
*18*, *20* 149:*5* 150:*6*
**employees's** 103:*11*
**employment** 27:*4*
30:*21* 70:*16* 84:*21*
91:22 100:*25*
**encouraged** 136:*1*
**encouraging** 149:*10*,
*11*, *19*
**Endablo** 41:*6*
**ended** 169:*2*
**enforce** 60:*13*
**enforcement** 60:5, *17*
**enforcing** 59:*8*, *24*
60:*8*
**engage** 131:*15*
**engine** 87:*13*
**engines** 87:*11*
**enjoyed** 85:*23*
**entail** 18:*13*
**ENTER** 181:*2*
**entire** 29:22 68:*3*
93:*10* 128:*20* 154:*3*
174:*7*
**entitled** 61:*20*
**entry** 11:*12*
**environment** 27:*1*
61:*14* 95:*11* 106:*21*
148:*3*, *18*, *20* 149:*1*, *5*
150:*6*
**equipment** 15:2, *18*
**equipments** 15:*17*
**erecting** 14:*23*

**ERIC** 1:2 37:*4*
63:*25* 80:*16* 83:*11*,
*12*, *15* 108:*9*, *21*
111:*18* 114:*14*, *20*
129:*15*, *17*, *21* 134:*11*
135:*4* 139:*11* 141:*11*
144:*20*, *22* 145:*21*, *22*
146:*13* 148:2, *22*, *24*
149:*1*, *6*, *11* 151:*19*,
*20*, *22* 152:*11*, *14*
154:*18* 155:5, *11*
156:*1*, *3* 157:*11*, *23*
158:5, *11*, *20*, *24*
159:*9*, *10*, *15*, *21*
160:*4*, *6*, *21* 163:*16*,
*17* 164:*12*, *19*, *21*
166:*7*, *23*, *24* 167:*12*,
*13* 168:*19*, *21* 169:*15*,
*16*, *22* 170:*14*, *19*, *20*
173:*15* 174:*17*
175:*14*, *21* 178:*15*
181:*3*
**Eric's** 135:*15* 148:*25*
164:*13*, *20*
**ERRATA** 181:*1*
**escalated** 148:*7*, *15*
**escalating** 135:*14*
136:*21*
**especially** 53:*25*
54:2 71:*19* 92:*21*
112:*24* 139:22
**ESQ** 2:*3*, 7
**ESRI** 93:*25* 94:7
**essentially** 166:*3*
**estimate** 171:*11*
**et** 92:*12*
**ethnic** 47:22 48:*4*
**ethnicity** 23:*21*, *23*,
*25* 24:2 40:6 41:*11*,
*23* 56:7
**event** 146:*14* 167:*4*
179:*11*
**events** 102:5 106:5
134:5 144:*18*
**ever-changing** 106:*21*
**everybody** 17:*21*
28:*21* 30:*16* 45:22
50:*12* 60:*21* 62:*13*,
*20* 63:*10*, *14* 86:22,
*23* 94:*19* 95:2 100:5,

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 190 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

20  110:3  122:3
140:20  142:21
176:21
**everybody's**  62:19
93:3  175:13
**exact**  81:10  145:16
166:1  173:14  175:5
**exactly**  144:1  149:4
172:21
**EXAMINATION**  3:2
4:6
**examined**  4:3
**example**  101:6
**Excuse**  124:5
**Exhibit**  3:8, 9  12:1,
2  30:3, 4, 5  44:18, 20
55:25  93:4, 7  107:16,
17  120:18, 20  121:2
128:15, 16  134:9
150:23  151:1  153:9,
10  173:23, 24  175:4
176:24
**EXHIBITS**  3:7
**exist**  114:7
**expect**  13:12
**expense**  52:22
**experience**  17:5
32:12  34:6, 22  66:19
86:14, 20  141:9, 11
**experienced**  151:21
**experiences**  151:21
**Expires**  182:21
**explain**  9:25  32:8
50:2  79:18  82:13
98:9  118:25
**explained**  51:9
**explaining**  76:2
**explanation**  51:1
94:3
**explicitly**  147:9
**extensively**  162:21
**external**  151:4
**extra**  94:23  95:3
101:14  158:2
**eyes**  86:7  114:6
**Ezell**  31:2  32:12

**< F >**
**f/k/a**  1:7  181:3

**face**  103:7  150:11
**facility**  23:18
**fact**  32:19  175:2
**facts**  129:12  181:22
**fail**  82:10
**failed**  43:21
**Fair**  17:16  19:13
24:9  37:25  41:13
60:4  73:2  89:22, 25
92:17, 18  102:4
119:6, 8, 15  120:15,
16  123:8  132:21
136:18  142:15
145:19  150:9, 12
157:21  158:4, 19
166:2  171:12  172:1
**familiar**  35:25  36:4
61:17  85:3
**families**  71:15
**family**  24:8  41:12
71:20  96:15  103:20,
21  106:11  136:1, 2, 4,
7, 12, 15  145:2  167:5
**far**  73:2  121:18
141:25
**fast**  130:4
**Federal**  31:13, 23
53:22, 25  73:13
79:24
**federally**  59:15
**feeders**  98:18
**feeds**  98:16
**feel**  5:23  52:5  61:11
62:24  71:8  101:19,
21  110:24  122:8, 12
148:1  173:15
**feeling**  34:19
**feelings**  112:2
**feels**  60:23
**fell**  142:21
**felt**  62:9  111:6
**female**  47:22
**fence**  73:16
**FERROVIAL**  1:7
10:23  11:8, 11  13:3
25:5  29:11, 22  30:21
46:2  65:17, 20, 23
66:16  67:15, 19, 24
68:23  69:8  70:16
72:13  73:24  80:5

81:19  146:14  148:15
181:3
**Ferroval-Ealy**  13:5
**Ferroval-Ealy-000575**
151:10
**Ferroval-Ealy-000637**
93:11
**field**  19:13  28:4
66:4  93:1  94:6
139:5
**fifth**  153:24
**fights**  148:13
**figure**  58:9
**file**  23:8  32:14, 15,
16, 20  33:11  35:10,
15, 16, 18  53:25  55:3
75:16  79:15
**filed**  33:2, 4  36:24
96:23  99:12
**files**  32:18
**filing**  53:22  54:5
85:6
**fill**  54:23
**filled**  160:1
**filling**  151:17, 18
**filming**  130:15
**financially**  182:11
**find**  54:4  63:22
88:17  146:10
**finding**  80:5, 9
**fine**  8:12  9:19
12:12  41:10  51:12
59:6  79:11  132:24
133:17  153:7  169:8
170:6
**finish**  111:7
**fire**  106:22
**fired**  34:15  40:10
61:13  176:18
**firm**  30:11  44:24
**firm's**  13:7
**first**  4:21, 25  30:4
37:7  61:10  63:21, 22
80:16  82:14, 15  83:8,
10, 11  85:11, 12, 16
87:16, 17, 18  91:25
93:22  96:18  105:4
110:8  118:8  119:5
140:4, 5, 21  142:8, 17,
18, 24  143:5, 15, 17,

23  153:17  154:17
160:18  161:16  162:2
164:15  166:3
**FISHER**  2:6
**fishing**  98:17
**fist**  130:2  131:11
132:1, 9, 14
**fists**  131:8  132:2
133:1, 14, 18  134:2
164:22  169:25
**five**  38:1  63:22
128:5  137:17, 23
153:13  157:8
**five-minute**  44:6
80:12
**flag**  81:2
**flagging**  81:3
**flat**  15:4, 6
**FLORIDA**  1:1  2:4,
8  6:22  7:2, 8  23:17
25:1, 6, 18, 23  27:4
31:13  36:15  67:14
182:3, 20
**flotation**  78:9
**Flowers**  11:18  41:1
46:21  61:5  62:12
65:10  72:17, 15  73:4
75:12  99:1, 14
103:17  104:22
117:15, 19, 21  118:14,
17  134:11  135:4
146:21  147:1  154:16
166:11, 12, 14, 15
172:20  173:2, 8
175:14  176:9
**following**  43:11
171:24
**follows**  4:4  28:18
**follow-up**  174:22
**follow-ups**  139:18
**food**  126:1, 2  138:23
139:3, 8  140:10, 14
**foot**  102:22
**footage**  134:4
**foregoing**  180:3
181:22  182:7
**foreman**  18:21, 25
19:1  20:23  21:7
22:9, 22, 23  25:5

Case 4:24-cv-00029-RH-MAF Document 35-2 Filed 10/23/24 Page 191 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

28:*23* 29:*3* 64:*18*
**foremen** 42:*7*
**foremens** 42:*5*
**foremost** 93:*22*
**forgive** 176:*13*
**forgot** 138:*5*
**form** 3:*9* 20:*7*
31:*10, 14, 17, 21* 32:*4*
45:*4, 6, 19* 50:*20*
54:*23* 55:*1* 107:*22*
125:*7* 141:*15, 16, 21,*
*22*
**formal** 105:*6* 135:*18*
141:*1*
**forms** 45:*23* 55:*20*
76:*17, 19*
**Fort** 2:*8*
**forth** 56:*23* 58:*3*
66:*25* 95:*10*
**forward** 20:*15* 31:*5*
72:*4* 105:*21*
**found** 34:*17* 39:*4*
116:*19*
**four** 21:*9, 10* 56:*11*
57:*3* 58:*2* 94:*20*
**fourth** 153:*23*
**frame** 89:*7* 132:*6*
**free** 5:*23* 61:*1*
**freedom** 85:*24*
**frequent** 170:*18*
**frequently** 48:*13*
**fresh** 134:*21* 162:*14,*
*19*
**Friday** 94:*24* 168:*5,*
*11* 169:*4* 177:*14*
**friendly** 26:*12, 13*
**front** 116:*1, 6*
123:*24* 154:*12*
**froze** 142:*22*
**fuck** 158:*20* 164:*5*
**fucking** 158:*21* 167:*1*
**full** 4:*10, 12* 5:*9*
81:*11* 82:*20* 88:*11*
**fun** 52:*22*
**further** 12:*20* 75:*14*
109:*18* 169:*2* 179:*7*
182:*8*
**future** 103:*22*

< G >

**Gallagher** 33:*8, 12,*
*15* 34:*2*
**game** 46:*23* 85:*13*
**garage** 151:*19*
**Garcia** 35:*25* 42:*8,*
*21* 43:*15, 16, 21*
88:*11, 18* 89:*8* 91:*2,*
*4, 12, 13* 99:*5, 8, 12*
104:*13* 117:*1, 20*
119:*4, 12, 23, 24*
123:*22* 124:*2, 5, 20,*
*24, 25* 125:*15, 18*
126:*10* 127:*3* 128:*9*
129:*18* 137:*2* 154:*20*
157:*6, 12, 19, 24, 25*
158:*20, 24* 160:*3, 6,*
*10, 13* 161:*3* 175:*15*
176:*9*
**G-a-r-c-i-a** 88:*12*
**Garcia's** 90:*13*
153:*19* 157:*2*
**gas** 87:*11, 13*
**geared** 50:*10*
**GED** 82:*7*
**general** 17:*24* 72:*12*
87:*5* 119:*14* 156:*17*
**generally** 14:*7*
**gentleman** 17:*12*
21:*14* 33:*9* 35:*5*
40:*4*
**gentleman's** 22:*7*
**Getting** 48:*3* 61:*13*
90:*16* 102:*1* 114:*13*
116:*11* 123:*19* 163:*2*
**gift** 167:*5*
**give** 5:*2, 11, 17* 9:*20*
12:*13* 13:*10* 28:*17*
51:*6, 15* 52:*1* 59:*20*
63:*7* 64:*19* 74:*7*
76:*21, 23* 80:*12*
92:*21* 94:*23* 99:*23*
137:*19* 146:*22* 167:*5*
173:*17*
**given** 4:*20* 58:*6*
63:*12* 64:*1, 12* 76:*1*
125:*8* 152:*7* 163:*9*
**gives** 63:*23*
**giving** 132:*16*
163:*16* 170:*22*

**Go** 20:*13* 23:*20, 23*
28:*5* 31:*5, 24* 38:*15*
43:*3* 46:*23* 50:*3, 4*
51:*19* 54:*18, 20*
55:*24, 25* 60:*2* 61:*8*
63:*14* 64:*16, 19*
69:*24* 70:*11* 71:*7*
72:*17* 73:*6* 75:*14*
76:*17, 18* 77:*8* 81:*15*
82:*16* 83:*15* 84:*6, 7,*
*11* 87:*11* 90:*7* 91:*21*
92:*5* 93:*18, 20, 21*
99:*20* 103:*3, 20*
105:*14* 107:*12*
110:*20* 111:*6* 112:*24*
115:*17* 117:*16, 22*
121:*11* 127:*21* 132:*2,*
*6* 133:*12, 17* 138:*16*
139:*8, 23* 144:*23*
151:*16* 153:*13* 162:*3*
175:*2* 179:*12, 13*
**goal** 6:*1*
**goes** 28:*24* 77:*12*
98:*17* 106:*19*
**going** 4:*16, 23* 7:*8*
8:*19, 20* 11:*5, 14, 25*
16:*12* 17:*19, 22* 25:*5*
30:*2, 25* 31:*3, 5, 15*
44:*21* 51:*2* 53:*16, 19*
55:*25* 57:*21* 65:*18*
73:*15* 79:*6* 82:*23*
84:*8* 87:*20, 23* 88:*9*
89:*4* 91:*7* 93:*6* 94:*6,*
*8, 10, 11* 95:*8* 100:*6*
101:*14* 102:*22, 23*
103:*5, 21* 105:*21, 23*
106:*5* 112:*21, 24*
114:*4* 115:*14* 116:*3,*
*9* 117:*3* 120:*6, 17*
121:*5* 122:*23* 123:*20*
124:*9* 127:*18* 128:*12*
130:*6* 135:*25* 136:*15*
138:*23, 24* 143:*9*
150:*22* 152:*6* 153:*8,*
*12* 154:*2* 156:*2*
161:*24* 167:*1, 4*
169:*10, 25* 170:*11*
172:*21* 173:*21*
178:*13* 179:*6*

**Good** 4:*7* 12:*19*
17:*12* 39:*7* 40:*15*
41:*22* 50:*12, 15*
84:*11* 86:*5* 87:*8*
89:*20* 106:*2* 112:*23*
145:*7* 171:*11*
**gotten** 103:*7*
**GPS** 110:*19*
**grab** 26:*5, 18, 21*
139:*6*
**grabbed** 130:*19*
**great** 4:*15* 177:*19*
**Greenville** 7:*8* 33:*9*
**grocery** 53:*20* 71:*1, 9*
**grounds** 10:*14*
**GROUP** 2:*2* 62:*5*
92:*2*
**grows** 49:*24*
**guard** 102:*22, 25*
**guess** 8:*7* 9:*18* 29:*9*
53:*23* 59:*22* 68:*15*
90:*8* 106:*19* 111:*21*
116:*17* 122:*2*
**guide** 76:*25*
**guidelined** 59:*15*
**guidelines** 73:*13*
79:*24*
**gunshot** 104:*11*
**guy** 78:*7* 85:*15*
103:*2* 106:*22*
**guys** 15:*3* 18:*16*
77:*19* 78:*23* 87:*22*
92:*10, 14, 21*

< H >

**half** 140:*7* 166:*17*
177:*20*
**hand** 64:*18* 97:*20*
101:*16*
**handbook** 3:*9* 45:*4,*
*22* 46:*2, 12* 76:*6, 7*
77:*8* 79:*16, 21*
**handbooks** 76:*19*
**handed** 76:*7* 172:*24*
**handled** 78:*25*
**hands** 131:*8, 10*
**happen** 22:*19* 60:*20*
**happened** 20:*16*
38:*25* 69:*2* 71:*3*
72:*6, 20* 89:*6* 106:*6*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 192 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

115:*12*  117:*14*, *25*
119:*1*  129:*13*  137:*12*
143:*8*, *10*  144:*1*, *2*, *4*,
*14*  150:*14*  161:*24*
162:*25*  165:*24*
176:*16*  177:*4*
**happening** 114:*9*
**happens** 60:*2*  71:*5*
72:*22*  106:*16*  116:*23*
179:*12*
**happy** 29:*20*  132:*2*
133:*12*, *20*, *22*  141:*17*
**harassed** 60:*24*
**harassment** 18:*2*
23:*2*  40:*20*  58:*8*
67:*1*, *10*, *20*
**hard** 14:*21*  26:*6*
139:*7*, *22*  156:*7*, *16*
**harder** 52:*1*  156:*16*
**hardship** 48:*4*
**harmed** 118:*19*
**harmful** 52:*24*
**harness** 78:*6*, *9*
**head** 5:*2*, *3*  54:*17*
79:*20*  148:*9*
**headquarter** 146:*15*
**hear** 5:*18*  20:*4*  27:*1*
28:*11*  35:*3*, *15*  38:*8*
54:*5*  60:*12*, *22*  61:*4*
63:*2*, *20*, *24*  66:*23*
71:*9*  73:*18*  78:*12*
86:*25*  87:*12*  91:*2*
95:*19*  96:*7*, *13*  98:*3*
105:*20*  106:*25*
119:*21*  121:*6*, *11*, *21*
122:*19*  124:*13*, *16*, *17*
125:*1*  126:*18*, *23*
127:*10*, *11*, *22*, *23*
129:*4*  130:*3*, *11*, *12*,
*15*  138:*8*  144:*16*
149:*7*  159:*4*  178:*9*
**Heard** 30:*22*  32:*22*
35:*2*  51:*16*  53:*2*, *3*,
*10*, *16*  70:*14*, *16*, *19*
71:*1*  91:*9*  97:*13*, *16*,
*25*  98:*5*, *6*, *14*, *21*, *25*
99:*7*, *8*, *10*, *11*, *16*
116:*13*  120:*7*  121:*10*
122:*18*  125:*9*, *24*
127:*17*  132:*24*  133:*2*

149:*22*  151:*20*
154:*18*  155:*3*, *25*
156:*3*
**hears** 61:*5*
**hearsay** 96:*14*
**heat** 62:*7*
**He'd** 104:*6*
**help** 78:*10*  99:*23*
100:*3*, *5*  105:*9*
133:*13*  157:*19*
**helped** 163:*3*
**helpful** 6:*3*  44:*17*
**helping** 100:*6*
106:*23*  123:*18*  158:*2*
**herbicide** 115:*20*, *24*
116:*4*  123:*18*, *19*
**hey** 68:*8*  89:*14*, *18*
92:*11*  103:*3*, *17*
**HH-375658** 182:*21*
**high** 63:*21*  73:*7*
106:*13*
**higher** 103:*9*
**hire** 40:*2*  55:*6*, *19*,
*20*  58:*23*  76:*13*, *15*,
*16*, *17*, *20*  78:*22*  79:*1*
81:*14*  97:*23*
**hired** 27:*23*  34:*7*
37:*16*, *18*  39:*16*, *19*
41:*5*  55:*7*  57:*4*  76:*8*
78:*23*  82:*15*
**hiring** 21:*20*  57:*6*, *9*,
*10*  58:*5*
**Hispanic** 24:*9*  41:*13*
57:*20*
**hit** 106:*7*  117:*3*
**Hold** 8:*11*  94:*14*, *22*
139:*20*  146:*8*  159:*2*
**holding** 6:*9*
**home** 61:*8*  73:*8*
103:*4*  107:*12*  115:*5*,
*7*  117:*22*  118:*1*, *4*, *22*
134:*12*, *13*, *15*, *17*, *25*
135:*4*, *6*, *8*  138:*23*, *24*
139:*8*, *24*  140:*10*
166:*7*, *11*, *13*  167:*12*
168:*19*, *20*  169:*13*, *19*
**Honestly** 45:*20*
**hood** 111:*12*
**hopefully** 4:*24*

**hopes** 103:*20*
**hoping** 105:*12*
**hostile** 27:*1*  95:*11*
114:*22*  120:*10*  148:*3*,
*18*, *19*  149:*1*, *5*  150:*6*
164:*25*  165:*3*, *8*, *11*
**hostility** 113:*14*
151:*23*  152:*11*, *16*, *21*
153:*4*  164:*13*
**hot** 15:*14*, *15*, *16*
126:*1*, *2*  138:*22*
139:*3*
**hour** 7:*24*  8:*25*  9:*4*
94:*12*, *15*, *17*, *23*  95:*3*,
*5*  140:*7*, *17*, *18*
166:*17*
**hours** 94:*14*, *22*, *25*
101:*14*  112:*25*
136:*11*  170:*23*  171:*4*,
*6*, *7*, *8*, *11*  177:*20*
**house** 140:*14*
**HR** 41:*1*  59:*22*  60:*3*
66:*5*  69:*10*, *13*  76:*18*
78:*13*
**hung** 178:*16*, *22*
**hurt** 49:*5*, *7*  50:*14*
**hurtful** 71:*18*
**hurts** 71:*11*  128:*5*

**< I >**
**identification** 12:*2*
30:*5*  44:*18*  93:*4*
107:*17*  120:*20*
128:*16*  150:*23*
153:*10*  173:*24*
**ignores** 114:*20*
**ignoring** 177:*2*, *3*, *8*
**immediate** 158:*11*
**immediately** 88:*3*
117:*2*  158:*6*, *7*, *9*, *12*
**important** 5:*6*  137:*18*
**improper** 113:*19*, *22*,
*24*  114:*2*
**improvement** 109:*17*
110:*13*
**inaction** 110:*25*
**inaudible** 5:*2*
**incentives** 25:*14*, *15*
**incident** 87:*13*
120:*23*  138:*15*  140:*1*

141:*2*, *5*  144:*22*
161:*25*  166:*14*, *19*
176:*15*  178:*1*
**incidents** 138:*21*
140:*24*
**include** 48:*7*  112:*2*
**included** 68:*2*
160:*23*  161:*2*
**includes** 175:*14*
**including** 119:*13*
**inclusive** 180:*5*
**incoming** 64:*10*
**incorrect** 119:*7*
123:*9*, *10*
**independently** 162:*22*
**INDEX** 3:*1*
**indicated** 87:*3*
**indicates** 46:*10*
**indicating** 125:*20*
127:*1*
**individual** 28:*17*
61:*23*  62:*2*  123:*1*
**individuals** 19:*16*
21:*11*  22:*1*  23:*1*, *4*, *8*,
*12*, *20*  29:*23*  30:*25*
36:*23*  37:*12*  53:*17*
56:*22*  163:*10*  166:*13*
**information** 32:*12*
58:*17*  74:*7*  109:*23*
134:*22*  143:*8*
**informed** 74:*1*
**infraction** 109:*6*, *17*
**infractions** 109:*18*
110:*1*
**INFRASTRUCTURE**
1:*2*, *7*  10:*22*  181:*3*, *4*
**initial** 41:*9*  73:*3*
119:*23*
**in-law** 71:*14*
**inmate** 26:*15*, *17*, *21*
**inmates** 26:*11*, *12*, *13*
122:*4*
**inside** 123:*21*  124:*1*
**insight** 158:*15*
**instances** 103:*22*
105:*17*  139:*13*
159:*23*, *24*  160:*21*
**instruct** 8:*20*
**instruction** 88:*9*

118:23
**insurance** 25:10
**intense** 22:16 26:7
**intensive** 16:23
19:12 26:1
**intention** 129:18, 24
**interacted** 38:9
**interaction** 26:19
**interested** 182:11
**internet** 142:21
**interpret** 126:25
**interrupt** 101:1
**interruption** 5:10
**interstate** 22:16
**interview** 174:21, 22
175:6, 19 177:18
178:12, 14
**interviewed** 175:19
176:8, 13
**interviews** 175:12
**investigated** 74:9, 11
**Investigation** 3:9
69:7 72:5, 12, 21, 25
73:5, 19 74:2, 4, 8, 12,
14, 15, 16, 20, 22 75:6
80:5, 8 117:23
139:17 168:6, 13, 22,
23 174:5, 21 175:9
**investigations** 72:9
73:24 74:25
**inviting** 168:8
**involved** 23:11
72:15, 24 73:23
74:12, 13, 19, 21 75:7
80:4 99:2 106:8
111:4 117:12
**involvement** 73:20,
22 75:9, 14 101:8, 9
115:1 163:1
**issue** 8:13 11:19
46:22 63:18 107:3
**issued** 62:18 108:3
109:12
**issues** 137:3
**itty** 12:16

**< J >**
**Jacksonville** 81:24
86:16 136:17

**JAMES** 1:2 36:6, 7
56:18 64:1, 13, 16
85:2, 3, 5 86:5, 19
89:3, 23 91:15 95:23
100:14, 16, 17, 19, 21
101:3 102:7 107:2
115:18 116:1 120:8,
10, 12, 14 122:18
124:3, 6, 19 127:2, 24
128:8 131:15, 19, 22
147:8, 9, 12 149:15,
19 150:5, 10, 15
151:19 153:5 161:6
163:17 164:18, 24
165:2, 7, 11 169:13,
19 173:3, 9 175:24
176:3, 6, 12, 25 177:2,
8, 23 178:2 181:3
**James's** 87:2 101:19
131:10 149:14 153:2
172:2
**Jarvis** 19:21 20:6
21:13 24:6, 7
**jdoty@fisherphillips.c
om** 2:8
**Jefferson** 21:10 22:2,
9, 12, 14, 15, 17 24:21
57:18
**job** 3:9 6:10 16:7,
17, 19 18:13 23:17
38:15, 17, 21, 23 40:5
50:14 61:13 62:7
80:21 82:11, 25 83:1
84:9, 12, 13, 16, 19, 22
87:3, 4, 6, 15 89:10
99:22 100:2 101:25
105:14 106:10, 13, 17
107:11, 12 115:17
116:9 126:6, 7, 11
128:4 140:6, 13
151:23 153:1 164:6
166:17
**jobs** 14:19
**JOHN** 2:7 34:24
179:8
**Johnson** 34:6, 12
**join** 92:16
**joined** 55:5
**joke** 52:18, 23, 25
68:22 70:21

**jokes** 52:4, 7, 9 53:2,
8, 18 68:17
**Joseph** 35:1
**Juan** 35:25 42:8, 11
87:22, 23 88:5, 9, 11,
21 89:5, 8, 20 91:15
100:19, 20 104:3
113:19, 20, 23 114:16,
19 115:13, 17, 25
116:6, 17 117:1, 11,
16 118:1, 2 127:3
129:18, 21 130:4, 6, 8
151:19, 21 153:19
154:20 157:2, 6, 18
158:2 159:25 163:16,
18, 21 175:15, 21
**J-u-a-n** 88:11
**Juan's** 89:24
**jump** 5:19 73:7
**jumped** 87:25
**jumping** 103:6
**June** 45:16 102:6, 9
103:24 107:3, 7
113:12, 15 114:18, 19
115:1, 3, 8, 12 118:9,
20 121:19 129:10, 13
134:5 138:10 142:14,
17 143:21 144:8, 18,
19 148:7 152:14
154:22 155:20
156:25 160:16
161:12 162:9 163:21
164:9, 14 168:15, 16,
17 169:12, 16 170:9,
16 171:13, 16, 24
174:25 175:3 176:3
177:1, 8, 9, 10
**justified** 97:5

**< K >**
**keep** 70:5 73:8
103:5 105:13 116:11
137:20 162:19 167:1
**keeping** 6:10
**Ken** 33:8, 10, 12 34:2
**kept** 54:15 111:2
124:25
**Key** 2:3
**kids** 105:11
**kin** 53:15

**kind** 12:16 15:2
26:7, 8 28:24 35:19
37:21 48:17 52:9
53:6 59:15 63:22
71:11 76:17 81:15
100:8 102:2, 21, 24,
25 103:1, 3 104:10
106:20, 24 110:15, 19
120:6 129:1, 2 139:7
143:7, 10, 12
**King** 174:14
**knew** 17:25 33:24
34:2 168:21 173:2
**know** 5:10 7:14 8:3,
9 9:19, 20 10:1
11:18 12:4, 7, 13, 22
14:1 16:11, 13, 16
17:11, 18 18:15, 16,
18 26:2, 6, 7, 8 27:11
28:3, 5, 24 29:6, 16
30:7, 14 33:20, 22
34:15, 25 35:10 36:8,
23 38:4 39:3, 24
40:1, 16, 18 42:13
43:18 45:1, 13, 21
46:18, 21 47:13, 17,
18, 19, 21, 22 49:3, 4,
5, 6, 7, 24 50:14, 17
51:22 52:1, 10, 19, 21,
24 53:2, 5, 9, 13, 14
54:3, 6, 19 55:16, 19
56:22 57:1, 5, 7, 9, 13,
21, 25 58:7, 8, 10
59:6, 10, 11, 12, 14, 19
60:10, 11, 18, 19, 20
61:15, 19 62:4, 5, 11,
12, 14, 16, 18, 20, 22,
25 63:5, 7, 11, 17, 18,
21, 25 64:2, 3, 18, 21
65:9, 13 66:9, 21
67:25 68:1, 6, 10, 11,
15 69:4, 13, 14, 18, 22
70:4, 12, 13 71:4, 11,
13, 15, 18, 20 72:8, 10,
23 73:6, 16 74:3, 4, 6,
16, 24 75:1, 4, 12, 13,
14, 18 76:1, 15 78:2
79:5, 11 80:1, 17, 19,
22, 24 81:4, 7, 14, 16
82:5, 6, 14, 15, 17, 19,

22, 25   84:8, 10, 11, 14,
15   85:5, 7, 8, 11, 12,
13   87:7, 22, 23, 24
88:7, 21, 22, 23, 24, 25
89:3, 15, 19   91:18
92:11   93:7, 15, 20
94:20, 21   95:20, 21,
22, 23, 24, 25   96:8
97:18   99:3, 16, 17, 18
100:5, 23   101:11, 12,
22   102:15, 21   103:2,
3, 5, 6, 7, 8, 17, 19, 20
104:3, 4, 8   105:8, 10,
12, 13, 14   106:1, 6, 12,
14, 16, 20, 22, 23
107:11, 12, 13, 19, 21
108:19   109:25   110:9,
23   111:4, 5   112:11,
21   113:16   114:4, 13
115:15, 17, 18, 20
116:2, 8, 16, 22   117:4,
7, 23, 24   121:17
123:1   125:9, 19, 25
126:14   127:2, 18, 20
128:7, 18   129:2
130:1, 2, 6, 24   132:25
133:2   135:1, 8, 9, 12
136:1, 6, 9, 12, 14
138:15   139:4, 6, 8, 9,
21, 24   140:8, 12, 13,
15   141:25   143:8, 25
144:1, 5, 15   145:8
146:5, 6, 8, 23   147:22,
24   148:8, 12, 16, 24,
25   149:6, 8, 9, 13, 16,
25   150:1, 17   151:3,
14, 15, 25   154:8
155:1, 18, 21   157:11
158:10, 11, 13, 14
159:8   161:6   162:17
168:19   170:23   171:2,
3, 25   172:21, 22
173:12   174:3   175:23
176:15   177:5, 14
179:10
**knowing**   46:24
**knowledge**   14:1, 7
18:5   23:6, 7, 10
24:10, 20, 25   29:10
30:20, 22, 23   32:11,

20, 24   34:5, 21   37:1
41:2   42:22, 23   43:17,
22, 23, 25   47:10
55:15   56:20, 25   59:7
65:9, 12   76:11   81:8
82:8   84:23   102:12
118:17, 18   136:4, 5
146:4   161:16   162:20
165:10   169:1, 17
**known**   60:18   116:4
130:16, 22
**knows**   50:12
**Krystal**   37:4, 10, 14,
16, 18

**< L >**
**label**   44:24
**labeled**   107:25
**labor**   16:23   19:7, 12
20:24   21:1   22:15
25:25
**labor-related**   19:6
**lack**   114:9, 11
116:11   149:14
**lacking**   86:11
**lady's**   59:20
**Lake**   37:20
**lane**   35:5
**language**   97:11
**laptop**   12:16
**large**   57:10   59:4
82:17
**Las**   2:7
**Lauderdale**   2:8
**laughing**   52:22
**LAW**   2:2   10:18
13:7   44:24   53:5
**lawn**   16:15
**lawsuit**   9:16   23:9
32:23   33:2   53:22, 25
54:3   56:19   69:14
70:8, 9   75:23   85:6
96:3, 4, 10, 22   97:2, 9
105:18
**lawsuits**   95:16
**lawyer**   7:24
**lawyers**   95:20, 21
**lay**   4:23

**lead**   18:12, 25   19:8,
11, 17, 22   20:1, 4, 16
21:4, 23   29:3
**leader**   18:11, 19
**leaders**   28:24
**leading**   113:15
**leave**   23:15   25:4, 23
29:18   34:12   42:11
61:23   139:23   140:13
**leaves**   164:18
**leaving**   38:16, 23
39:10   40:20   139:14
**led**   119:15   134:6
**left**   11:3   22:24, 25
25:1   27:6, 8   29:24
33:13   34:13, 18
35:13   36:14   38:15,
21   40:9   55:10   84:10,
18, 19, 24   97:22
137:8   138:17   139:18
140:9   153:1
**legal**   23:12   36:22, 24
56:21, 23   58:3
**lets**   109:16
**letter**   39:5
**letting**   99:20   172:21,
22
**level**   11:12   29:2
103:9
**license**   43:19   87:11
**lie**   110:19
**life**   10:5
**likes**   158:2
**likewise**   98:15
120:13   164:13
**liking**   31:22
**limit**   50:21
**line**   31:4   50:23   79:8
108:20   112:21
137:18   174:11   181:6
**lined**   117:11
**lines**   127:17
**Linton**   36:6, 7, 8, 10,
13
**List**   3:9   32:9   35:20
**listed**   56:23   175:13
**Listen**   60:12   66:9
106:2   119:5
**listening**   88:6

**literally**   130:7
**litter**   92:4, 5, 9, 12, 23
**little**   4:25   9:23
12:20   20:9   22:15
26:23   77:9   87:19
90:24   91:1   105:23
145:10
**live**   106:19
**LLP**   2:6
**local**   53:16   70:11
**located**   22:10
**location**   11:9   37:9,
13, 15, 17   38:1   115:2
154:11
**locked**   172:11
**long**   11:2   14:12
19:22   25:17   40:14
46:25   87:16   161:9
**longer**   36:13   38:12,
25   42:8
**look**   7:23, 25   8:20
9:7, 11, 13   35:12
48:23   55:3   66:10
116:25   117:1   133:3
**looked**   32:14, 17
33:11   35:11   49:15
116:7, 24, 25
**looking**   8:16   11:6
79:21   80:21   151:22
152:25   169:25
**Looks**   30:15   45:12
93:16   123:6   128:19
129:18, 24   152:2, 25
158:17
**lot**   28:5   45:20
53:14   55:22   57:6
63:16   68:13   70:14
71:13   91:7   92:5
102:25   106:17   118:6
129:2   145:8
**lots**   28:3, 9
**loud**   129:16, 17
130:3
**louder**   91:15
**loudly**   130:2
**love**   105:13
**Lovett**   7:7
**loyal**   80:22
**lunch**   112:23   139:21

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 195 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

140:*11, 12, 19, 20*
**Luncheon** 113:*5*
**luring** 25:*9*

**< M >**
**machine** 82:*18*
**Madison** 6:*22* 7:*1*
 11:*9, 21* 14:*11* 15:*11, 13* 17:*8, 20* 21:*8, 12, 19* 22:*9, 11, 14, 18* 30:*16* 37:*8, 13, 15, 17* 38:*1, 10* 46:*23* 55:*18* 67:*14* 115:*1* 128:*5* 154:*10* 174:*17*
**mail** 147:*5*
**Maintenance** 3:*9* 11:*22* 13:*14, 17, 19, 23, 25* 14:*4, 12, 13, 20, 25* 15:*22, 24* 16:*3, 6, 8* 17:*2* 23:*18* 39:*17, 20* 41:*5, 17* 42:*2* 81:*5, 11, 17* 82:*4* 86:*6, 12, 20* 91:*24*
**making** 52:*22* 54:*3* 70:*4* 71:*9* 130:*16* 155:*22*
**male** 47:*22*
**man** 147:*18, 23, 24* 178:*16, 21*
**MANAGEMENT** 1:*2* 10:*22* 75:*13* 76:*2* 95:*22* 181:*3*
**manager** 66:*8, 12, 15, 17* 108:*13, 17* 172:*24*
**mandatory** 95:*4, 7* 136:*11*
**marked** 12:*2* 30:*5* 44:*18, 20* 93:*4, 6* 107:*15, 17* 120:*17, 20* 121:*2* 128:*16* 150:*23, 25* 153:*8, 10* 173:*24*
**marking** 12:*1* 30:*3* 128:*14* 173:*22*
**McMullen** 39:*24* 40:*18* 41:*4*
**mean** 4:*18* 7:*13* 10:*13* 12:*23* 13:*1, 2* 14:*22* 16:*11, 16, 23* 17:*10, 23, 25* 19:*6* 20:*8* 26:*7* 29:*12, 16*

31:*20* 32:*14* 35:*10, 12* 38:*6* 39:*8* 40:*15, 16* 44:*11* 45:*20* 46:*20* 47:*17, 18, 20* 48:*2, 15, 23* 49:*3, 4, 8, 17, 19, 23* 50:*11, 24* 51:*9* 52:*10, 20* 53:*15* 57:*13, 14, 20, 21* 60:*16, 24* 62:*15, 19* 63:*6* 67:*16* 68:*7* 69:*13, 17, 18* 70:*14* 73:*13, 21* 75:*17* 76:*6, 22* 77:*15* 79:*23* 81:*11* 83:*2* 86:*8* 89:*6* 90:*9* 97:*25* 101:*12, 17* 102:*2* 103:*6, 14, 15* 106:*13, 16, 17, 23* 110:*12* 112:*3* 116:*24* 122:*2* 126:*1, 25* 128:*3, 4, 5* 129:*25* 130:*1, 3, 7, 23, 24* 135:*8* 137:*16* 138:*15* 139:*4, 24* 140:*18* 143:*6* 147:*24* 149:*22* 150:*1* 152:*2* 157:*17* 158:*1* 159:*2, 25* 161:*8* 162:*13* 163:*6, 8* 171:*10* 176:*11, 21* 177:*5* 178:*7*
**meaning** 7:*13* 107:*25* 125:*20* 166:*11*
**means** 28:*14* 58:*8* 65:*18* 145:*12* 156:*1, 2*
**meant** 147:*22*
**mechanic** 85:*10* 87:*7*
**mechanisms** 103:*10*
**medication** 6:*17*
**meet** 81:*10*
**meeting** 8:*25* 9:*2, 7, 11* 77:*6*
**member** 16:*15*
**members** 9:*12* 55:*18*
**memorialization** 141:*2*
**memory** 148:*12*
**mention** 54:*11* 70:*12* 128:*8, 10* 141:*15*

142:*7, 25* 154:*23* 164:*24*
**mentioned** 15:*18* 33:*6* 35:*15* 113:*7, 21* 131:*8* 144:*19* 151:*12*
**mentioning** 143:*5, 24*
**mentions** 164:*13*
**message** 147:*4, 20* 171:*19*
**messages** 64:*9*
**met** 80:*16* 81:*7*
**metric** 81:*10*
**Mexico** 41:*12*
**Miami** 2:*4*
**MICHAEL** 1:*13* 3:*4* 4:*2, 12* 37:*4, 10, 15* 39:*12, 19* 40:*3* 41:*19* 96:*5, 19* 180:*13* 181:*4, 24* 182:*6*
**MICHELE** 1:*18* 182:*5, 20*
**middle** 82:*16*
**mid-sentence** 157:*7*
**miles** 157:*8, 9* 158:*3*
**mind** 44:*3* 89:*15* 162:*14, 19*
**mine** 5:*22*
**mini** 179:*14*
**Minter** 21:*15* 24:*12*
**M-i-n-t-e-r** 21:*17*
**minute** 12:*7* 128:*24* 154:*6* 161:*18*
**minutes** 137:*17, 23* 140:*13, 14, 15* 173:*18*
**mischaracterize** 90:*6*
**mischaracterizing** 90:*2*
**missing** 175:*18*
**misunderstood** 88:*24*
**mm-hmm** 5:*3* 121:*13* 124:*15* 139:*1* 148:*5* 154:*1* 168:*10* 170:*17* 175:*11* 178:*9*
**moment** 45:*5*
**monetary** 25:*14*
**Money** 25:*13* 145:*22* 167:*14*
**month** 27:*16* 87:*17* 142:*7* 143:*22* 144:*5*
**monthly** 77:*24*

**months** 40:*16* 65:*4* 82:*23* 96:*12* 144:*5*
**Morgan** 19:*20* 20:*5* 21:*13* 24:*4*
**morning** 4:*7* 7:*16, 18* 77:*5, 6, 18* 114:*4* 115:*13* 122:*19* 170:*9, 16* 177:*17, 23* 178:*2*
**MOT** 81:*12, 19, 23* 82:*1* 86:*9, 10, 14, 16*
**mouth** 54:*6*
**move** 4:*24*
**moving** 9:*23* 20:*15* 72:*4* 105:*21* 114:*18* 161:*10*
**mower** 16:*15*
**mowing** 82:*17, 18* 92:*22*
**mudfish** 98:*4, 5, 17*
**multiple** 109:*25* 142:*11* 159:*9, 20*
**murder** 26:*4*
**mute** 11:*15*

**< N >**
**Name** 3:*3* 4:*8, 10, 12, 17* 19:*20* 21:*14* 22:*5, 7* 23:*23* 30:*22, 25* 32:*8, 15, 17, 19* 33:*7, 11* 35:*2, 3, 7, 12, 15* 41:*7, 9* 47:*4* 59:*21* 63:*8* 66:*8, 10* 83:*10, 11* 88:*11* 95:*25* 108:*9* 122:*7* 129:*4, 5* 153:*3, 17, 19, 22, 23* 161:*4* 165:*14* 174:*21, 22* 175:*13* 176:*15*
**named** 21:*14*
**names** 3:*9* 8:*3* 19:*19* 35:*19* 39:*23*
**necessarily** 54:*6* 110:*10*
**necessary** 157:*3*
**need** 5:*3, 12, 23* 6:*9* 9:*19* 12:*7, 12, 14* 26:*23* 43:*4* 45:*2* 49:*4* 73:*11* 78:*8, 9* 81:*17* 89:*14* 92:*11* 94:*23* 101:*13* 104:*7* 117:*3* 125:*21* 132:*6*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 196 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

133:*23*  141:*19*  145:*9*
156:*20*  169:*10*
**needed**  73:*5*  81:*12*
86:*9*  89:*10*  100:*20*
115:*16, 18, 20*  138:*2*
162:*19*  167:*14*  172:*3*
**needing**  95:*20, 22*
**needs**  16:*13*  132:*7*
**neither**  32:*3*
**never**  23:*11*  27:*11,
12*  32:*17*  34:*23*  39:*9*
51:*15*  57:*21*  68:*21*
69:*3*  86:*8*  88:*24*
91:*6*  98:*21*  114:*14*
117:*6*  120:*7*  125:*9,
24*  128:*10*  144:*8*
155:*18*  163:*20*  164:*7*
174:*10*  175:*25*  176:*2*
**new**  16:*12*  42:2, *5, 7*
50:*2, 11, 13*  55:*6, 19,
20*  58:*23*  64:*20*  65:*5,
25*  76:*13, 15, 16, 17,
20*  78:*22*  79:*1*  80:*21*
85:*15, 17*  89:*8*  92:*9,
22*  105:*25*  106:*1*
114:*12*  163:*10*
**newest**  92:*10, 14, 16*
**nice**  103:*2*  105:*3*
171:*3*
**nickname**  33:*20*  84:*3*
**nicknames**  83:*23*
**night**  167:*14*
**nine**  56:*14*  143:*22*
167:*13*  177:*20*
**nods**  5:*3*
**NORTHERN**  1:*1*
**Northwest**  7:*7*
**Notary**  182:*20*
**note**  178:*11, 12*
**notes**  11:*6*  182:*8*
**notice**  3:*9*  109:*12*
112:*10, 16*  113:*13*
164:*17*
**noticed**  138:*2*
**notification**  39:*5*
43:*12*
**notified**  146:*13, 18, 19*
**notify**  62:*2, 4*  157:*23*

**number**  49:*5*  59:*20*
61:*2*  63:*18*  65:*3, 6, 8,
10*  119:*12*  172:*2*
**numbering**  13:*7*
**numbers**  46:*21*  47:*1,
4, 6*  62:*23*  177:*19*
**numerous**  154:*18*
160:*20*
**N-word**  48:*10*  72:*2*
98:*23*

**< O >**
**o0o**  179:*16*  180:*1, 15*
**O-301**  2:*3*
**object**  31:*10, 14, 17*
**Objection**  20:*7*  31:*3,
8, 11, 12, 14, 15, 18, 23*
32:*2, 4*  43:*2*  79:*7*
90:*1*  119:*16*  125:*7*
142:*9*  178:*3*
**observe**  133:*1*
**observed**  132:*9*
**obtain**  81:*18*
**obvious**  72:*6*  79:*23*
95:*15, 17*  127:*5*
130:*24*
**obviously**  5:*15*  15:*10*
68:*1*  69:*19*  72:*14*
81:*4*  85:*17*  103:*15*
118:*6*  172:*2*
**occasion**  139:*11*
**occasions**  125:*5*
154:*19*  163:*16*
**occurred**  69:*11*  80:*6*
144:*8*
**occurring**  80:*9*
**o'clock**  167:*13*
**offense**  108:*25*
**offer**  23:*17*  86:*1, 2*
**offered**  85:*16, 19*
**office**  6:*22, 24, 25*
8:*16*  20:*24*  21:*1, 5,
12*  22:*2, 11*  24:*21*
28:*8, 9*  30:*12, 16*
32:*15*  35:*22*  37:*20,
22*  46:*20*  47:*1*  53:*8,
18*  59:*21*  61:*7*  80:*18*
85:*14*  93:*13*  106:*7*
107:*11*  112:*9*  116:*18,
20*  117:*16*  128:*7, 22*

154:*12, 19*  156:*3*
166:*24*  167:*15*
170:*10*  171:*14, 20*
172:*8, 9, 11, 18*  173:*5*
177:*11*
**oh**  71:*1*  76:*4*  141:*19*
143:*10*
**oil**  87:*8, 10*
**Okay**  4:*16, 19, 25*
5:*6, 15, 19, 24, 25*  6:*5,
11, 12, 20, 23*  7:*1, 9,
15, 23, 25*  8:*3, 6, 9, 12,
19, 23*  9:*2, 4, 6, 10*
10:*11, 14, 17*  11:*1, 5,
11*  12:*14, 18, 21, 24*
13:*3, 9, 14, 21, 25*
14:*6, 15, 18*  15:*2, 9,
20*  16:*10, 18*  17:*1, 4*
18:*1, 8, 9, 24*  19:*3, 5,
16, 19*  20:*1, 4, 15, 23*
21:*6, 11, 18*  22:*1, 13,
19*  23:*7, 11, 15, 19*
24:*1, 3, 12, 20*  25:*14,
17, 20*  26:*11, 14, 17*
27:*15, 20*  28:*1, 18*
29:*1, 6, 13*  30:*2, 12,
13, 17, 24*  31:*1*  33:*1,
4, 6, 15, 23, 25*  34:*5,
10, 19, 24*  35:*1, 3, 8,
25*  36:*3, 6, 8, 10, 16*
37:*2, 9, 16, 23, 25*
38:*5, 10, 20, 24*  39:*12,
23*  40:*6, 18*  41:*8, 25*
42:*2, 5, 16, 21, 24*
43:*8, 15, 21, 24*  44:*16,
21, 24, 25*  45:*5, 18*
46:*25*  47:*6, 10, 15*
48:*6, 10, 13, 18, 21*
49:*1, 18, 20*  50:*1, 9*
51:*14*  52:*3, 7, 16, 17*
54:*14*  55:*4, 7, 21*
56:*1, 2*  57:*1*  58:*15,
22*  59:*1, 12, 17, 23*
60:*4, 7*  61:*15, 21*
63:*11*  64:*5, 12, 15, 23*
65:*9, 13, 16*  66:*12, 15,
18*  67:*3, 5, 8, 13, 23*
68:*5, 10, 14, 17, 25*
69:*6, 21*  70:*2, 3, 15,
20, 25*  71:*6, 25*  72:*2,

16, 20, 22, 24*  73:*2, 23*
74:*18, 24*  75:*3, 5, 9,
15*  76:*5, 9, 12, 14, 20*
77:*1, 14, 17, 20*  78:*18,
24*  79:*1, 10, 22*  81:*4,
13, 18, 22, 24, 25*  82:*8,
13, 21*  83:*4, 22, 24*
84:*2, 5, 13, 20, 24*
85:*2, 5*  86:*1, 5, 10, 17,
18*  88:*2, 8*  89:*13*
90:*22*  91:*2, 11, 22, 23*
92:*7, 19, 25*  93:*13, 14,
17, 21*  94:*3, 13, 16*
95:*8, 14, 17*  96:*2, 9,
19*  97:*1, 8, 9, 17*  98:*3,
6, 15, 22*  99:*4, 15*
100:*1, 9, 14, 17*  101:*6*
102:*11, 17*  103:*23*
104:*5, 13*  105:*1*
106:*9*  107:*6, 9*  108:*1,
4, 6*  110:*4, 7, 22*
111:*13, 22*  112:*15, 19*
113:*1, 7, 17, 23*  114:*1,
8, 14, 25*  115:*11*
116:*5, 23*  117:*5, 8, 10,
14, 25*  118:*6, 14, 22*
120:*4, 13, 17*  121:*2, 5,
17, 21, 24*  122:*11*
123:*12, 16, 21, 25*
124:*2, 9, 10, 16*
125:*22*  126:*4, 15*
127:*4, 7*  128:*12, 20,
23*  129:*1, 15, 24*
130:*19*  131:*1, 7, 15,
21, 25*  132:*5*  133:*20*
134:*8, 13, 19*  135:*3*
136:*6, 10, 20*  137:*10,
15, 21, 22*  138:*8*
139:*13, 17*  141:*7, 22*
142:*1, 23*  144:*6*
145:*18, 21*  147:*12, 17*
148:*1, 23*  149:*4, 13*
150:*4, 9, 22*  151:*7, 8*
152:*4, 6, 8, 9, 16, 24*
153:*2, 7, 14, 15, 21*
154:*2, 5, 9, 17*  155:*1,
5, 22, 25*  156:*19*
157:*2, 4, 5, 15, 20*
158:*4, 19*  159:*5, 14*
160:*2, 9, 20*  161:*10,*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 197 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

*12, 13, 20, 21, 22*
162:*1, 6, 8, 15* 163:*5,*
*8, 15, 24* 165:*13, 17,*
*21* 166:*6, 16* 167:*7,*
*10, 17* 169:*10, 24*
170:*6, 12* 171:*1, 12,*
*18, 23* 172:*1, 7, 23*
173:*14, 17, 25* 174:*6,*
*10* 176:*24* 177:*13, 16,*
*25* 178:*9, 20* 179:*4, 6,*
*13*
**Olas** 2:*7*
**old** 10:*12* 35:*20*
**once** 49:*17, 20* 72:*6*
77:*16* 94:*21* 106:*15*
**one-page** 151:*6*
**one's** 6:*25*
**one-sided** 26:*19*
**ongoing** 120:*23*
**open** 21:*21* 27:*9*
74:*5*
**opened** 166:*24*
**opening** 57:*18*
**operate** 51:*12*
**opinion** 48:*11* 102:*3*
162:*12*
**opportunity** 99:*21*
132:*16*
**opposed** 100:*6*
**order** 33:*8* 118:*23*
179:*14*
**ordering** 179:*10*
**orders** 28:*17, 18*
**original** 40:*2*
**outcome** 74:*1, 4*
**outgoing** 64:*10*
**outlook** 72:*12*
**outside** 6:*6* 7:*15*
8:*21* 9:*7, 10* 17:*23*
32:*19* 34:*1* 36:*21*
37:*2* 50:*16* 58:*5, 15,*
*23* 76:*20* 79:*1* 82:*1,*
*9* 84:*20, 24* 85:*5, 7*
86:*10* 87:*13* 102:*5, 6,*
*8* 113:*7, 12* 115:*24*
123:*23* 134:*21*
135:*19* 139:*24* 148:*7*
150:*4* 153:*3* 154:*19,*
*22*

**overtime** 100:*21*
101:*4* 147:*14* 149:*25*

**< P >**
**P.M** 179:*15*
**Page** 3:*3, 8* 30:*10*
44:*23* 52:*14* 108:*12*
153:*17, 19, 22, 23, 24*
181:*6*
**pages** 3:*9* 12:*9*
107:*24* 153:*13, 18*
174:*7* 180:*4* 182:*7*
**paid** 94:*15* 102:*1*
134:*24* 135:*1, 9, 12*
171:*2*
**paired** 92:*8*
**pairs** 92:*1*
**panicked** 138:*7*
**paper** 19:*4, 5* 110:*5,*
*14* 112:*4* 143:*18*
**papers** 45:*21* 48:*16,*
*18, 22, 25* 49:*1, 2*
63:*6* 75:*17*
**paperwork** 19:*7*
28:*4* 34:*8*
**paragraph** 164:*4*
166:*2* 172:*7*
**paragraphs** 162:*11*
**paraphrasing** 145:*19*
147:*15*
**parked** 172:*10*
**part** 12:*15* 60:*10*
69:*6* 74:*16* 100:*24*
166:*15*
**particular** 77:*25*
84:*8* 95:*6* 102:*21*
109:*24* 138:*13*
**parties** 182:*10, 11*
**pause** 46:*6*
**pay** 18:*14* 38:*19*
134:*12, 13, 15, 17*
135:*4, 7* 166:*7, 11, 13*
**payment** 135:*6*
**pays** 94:*12*
**PDF** 162:*23*
**Peddie** 34:*24*
**pen** 162:*22* 163:*12*
**penalties** 181:*20*
**pending** 6:*7* 117:*22*
168:*6, 12*

**people** 21:*9, 10* 26:*4*
29:*9, 12, 13, 15, 18*
53:*14, 15* 54:*2, 4*
57:*13* 62:*5* 63:*23*
66:*9, 18* 71:*13, 18*
81:*14* 86:*25* 92:*16*
98:*13, 17* 99:*2*
106:*14, 16, 23* 111:*4*
115:*15* 122:*2* 127:*6*
139:*8, 22* 159:*12*
**perceived** 150:*17*
**percent** 40:*25* 126:*20*
**perfect** 12:*21*
**perform** 82:*10* 84:*22*
87:*3*
**performance** 107:*3*
**period** 56:*15* 68:*4*
85:*11* 112:*22*
**perjury** 181:*20*
**person** 16:*13* 21:*18*
26:*5, 18, 25* 34:*25*
54:*7* 78:*4* 102:*22*
103:*3* 104:*3* 105:*3*
128:*4* 161:*7* 172:*25*
**Personal** 7:*5, 6*
32:*11, 12* 34:*5, 21*
65:*14* 165:*10*
**personally** 14:*20*
85:*7* 95:*19* 105:*20*
**persons** 37:*19*
**perspective** 115:*12*
119:*1*
**pertaining** 9:*15*
160:*6*
**PHILLIPS** 2:*6*
**phone** 46:*25* 47:*6*
49:*5, 7* 61:*1* 62:*23*
64:*23, 25* 65:*1, 3, 5,*
*10* 94:*14, 23* 101:*3,*
*10, 15* 117:*2* 130:*20,*
*23* 137:*19, 20* 138:*5*
144:*3* 146:*2, 3, 19*
149:*22, 24* 171:*19*
172:*6*
**phones** 63:*16* 64:*6, 9,*
*12, 21* 65:*14, 15* 93:*3*
**phonetic** 41:*6*
**physical** 26:*14* 61:*16,*
*18* 64:*3* 78:*15* 101:*8,*

*9* 117:*7* 118:*9, 11*
150:*18*
**physically** 118:*19*
173:*4*
**pick** 28:*6* 82:*19*
100:*6* 115:*18* 157:*8,*
*12, 19, 24* 158:*2*
**picked** 157:*8*
**picking** 14:*22, 23*
82:*24* 88:*15* 92:*23*
157:*18, 20*
**pickup** 82:*18*
**picture** 63:*8* 77:*10*
**pictures** 62:*21, 23*
63:*15* 64:*4* 167:*15*
**pipe** 50:*19*
**PLACE** 1:*16* 17:*8*
62:*9* 92:*15* 117:*4*
**Plaintiffs** 1:*2* 2:*2*
4:*8* 54:*7*
**Plaintiff's** 30:*3, 4*
93:*7* 107:*16* 128:*15*
134:*9* 153:*9* 173:*23*
**plan** 109:*17* 110:*12*
**play** 95:*16, 18* 99:*2*
121:*5, 17* 127:*13*
133:*22*
**played** 121:*8* 122:*16,*
*24* 124:*11* 126:*16, 21*
127:*8, 15* 133:*24*
**playing** 122:*23*
**please** 4:*10* 9:*25*
16:*4* 28:*2, 13* 44:*9*
46:*7, 14* 82:*13* 83:*24*
98:*9* 110:*20* 111:*3*
127:*20* 129:*19* 133:*6*
137:*20* 140:*3* 142:*20*
154:*7* 161:*19* 166:*22*
167:*11* 168:*4* 178:*10,*
*12* 179:*14* 180:*3*
**PLLC** 2:*2*
**plug** 87:*9*
**plural** 148:*6*
**plus** 40:*16* 66:*18*
94:*23*
**PM** 1:*16*
**point** 6:*6* 10:*5*
11:*19* 14:*2, 8* 15:*10,*
*21* 17:*17* 18:*4* 19:*24*
26:*15* 29:*2, 7, 18*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 198 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

51:7, *21*  64:*15*  65:*1*
66:*20*  71:*23, 25*
72:*25*  90:*16, 21*
100:*1*  104:2, *8*
106:*10*  117:*13*
118:*20*  120:8  131:*11*
132:*1, 3*  134:2
135:*19*  153:*16*
154:*13*  155:*14*
171:*23*  172:22

**policies**  44:*10, 11, 14*
46:*3, 15, 18*  48:*14*
49:9, *22, 23*  50:2, *11,
18, 22*  54:*16*  59:9, *11,
13, 16, 18, 19, 25*  60:5,
8  63:*15*  79:4

**policy**  46:*16*  47:*11*
60:*14, 19*  61:6, *8, 19,
22*  63:5  92:*19*
105:*19*  109:*1, 4, 5, 25*
113:9  136:3  140:*1*

**polite**  105:2

**politely**  150:2

**poor**  89:*24*

**pop**  148:9

**popping**  11:*17*  149:8,
*19*

**pops**  35:*18*

**portion**  133:9

**position**  11:*11*  12:*23*
13:*23*  14:*19*  18:*21*
19:*11*  21:*21, 22*  25:9
27:*24*  33:*24*  37:*21*
45:*13*  60:*14*  66:5
74:5  86:9  106:2

**possibility**  13:2
57:*15, 20*  91:8  120:*1,
2*  159:2  171:*10*
178:7

**possible**  158:*24*

**possibly**  146:7
149:*10*  152:3

**posted**  173:*16*

**posters**  58:*11, 16*
62:*20*

**pounds**  102:*23*

**power**  61:5, *12*

**prefaced**  119:5

**prefer**  4:*14*  28:*10*

**preferred**  84:*3*

**prepare**  7:*11, 16*

**prepared**  133:*15*
163:2

**preparing**  7:*18*

**present**  5:*16*  8:*25*
27:*21*  35:20  54:*19*
69:*20*  129:22

**presenting**  89:*18*

**pretty**  79:*23*  95:*15,
17*  110:*17*  111:*1*
117:9  137:*16*  140:*11*
170:22  172:*20*
173:*11*

**prevent**  6:*11, 14, 17*

**prevented**  110:8

**preventing**  111:*15, 17*

**previous**  34:*20*
46:*13*  156:2

**previously**  56:*17*
68:*10*  123:*17*  124:22
152:*11, 14*  158:*23*
161:*16*

**pre-written**  110:*16*

**primary**  13:*21*  14:2

**print**  9:6  77:5

**printed**  112:*10*
162:*21*

**printout**  76:*25*

**prior**  8:*13*  39:*10*
40:20  43:*21*  103:*23,
24*  107:2, *7*  131:2, *5*
156:*24*  163:*21*  164:9
175:*24*

**prison**  25:*25*  26:*1, 4,
21, 23*  28:*10*  67:*12*
122:*3*

**probably**  5:6  22:*17*
38:*18*  95:6  150:*11*
171:2  173:*1*

**problem**  11:*17*
19:*10*  133:*21*  138:8

**procedure**  109:5

**procedures**  46:*15*

**proceeding**  23:*12*

**proceedings**  58:*3*

**process**  57:6  75:7, *10*

**produced**  108:*1*

**program**  25:*10*

**Progressive**  3:9
109:*11*  112:*10, 15*

**prohibited**  163:*24*

**project**  21:*8, 10, 19*
22:*16*  34:7  115:*16*
128:*6*

**promoted**  14:*16*
17:6  18:*10, 11*  20:*18*
21:*24*  22:22

**promotion**  17:7  18:9,
*12*

**pronounce**  4:*17*

**proper**  31:7, *14*

**provide**  51:*1*  109:*16*
126:5  158:*15*

**provided**  109:*21*
126:7  151:7  153:*18*

**provisions**  58:*20*

**proximity**  91:*18*

**public**  53:22  54:*1*
182:*20*

**Pull**  117:*18*  132:5

**pulled**  117:2  130:*5,
23*

**pulling**  144:*3*

**punched**  150:*10*

**purposes**  133:*4*

**push**  81:*15*

**pushed**  52:6  72:*18*

**put**  11:*15*  27:8
31:*16*  47:*3*  48:4
57:*21*  93:*19*  110:*3,
14, 17*  112:*11*  146:*23*
148:*25*  149:2  150:*19*
169:7  171:*4*

**putting**  16:*12, 14, 22*
57:*14*  170:*21*

**< Q >**

**qualifications**  86:*12*

**qualified**  86:6

**qualify**  82:*3*

**question**  5:*10, 11, 12,
16, 20, 22*  6:2, 7  9:22
20:*12*  30:*24*  31:*19,
22, 24*  32:*3*  34:*20*
43:7, *8, 10*  46:*13*
57:*25*  61:*17*  75:*25*
88:*14*  91:*3*  112:*21*
118:8  119:22  131:22

**Progressive** (continued right column)

133:7  134:*20*  142:*11,
13, 20, 23*  143:*14*
144:*17*  149:*16*
160:*25*  165:7  173:8
174:*11*  175:*23*
176:*14, 23*  178:*13*

**questioning**  31:*4*
79:8  137:*19*  174:*12*

**questions**  51:*16*
63:*18*  74:*15, 20, 21*
90:*12*  110:7  176:*18,
22*  179:7

**quick**  44:*4*  102:*15*
117:*10*  137:*17*

**quicker**  4:*25*

**quickly**  12:*1*  89:7
101:*1*

**quietly**  60:*24, 25*

**quit**  27:7  29:*15*
39:2, *3*  40:*12, 14*

**quitting**  39:6

**quotations**  147:*6*

**quotes**  145:5, *11*
164:*6*

**quoting**  145:*4, 18*
159:*10*

**< R >**

**race**  24:2  47:*25*
51:*22, 24*  52:2, *5, 15*
67:*11, 20, 23*  68:*15,
16, 18, 22*  69:*1*  70:*17,
22*  71:*16*

**racial**  48:*7, 8*  51:*19*
52:9, *11*  53:2, *8, 18*
54:*11*  56:7, *19*  97:*11*
178:*25*

**racially**  71:*24*

**racism**  69:*10, 19*
120:*6*

**racist**  97:*23*  98:*1*
99:*3, 18, 19*  119:*13,
24*  179:*1*

**raised**  155:*6*

**ran**  87:9  137:*13*

**random**  42:*14, 25*
43:*11*

**reach**  61:*3*

**read**  12:*11, 13, 20*
45:*24, 25*  46:*1, 7, 10*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 199 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

48:*16*, *21*, *25*  49:*12*,
*14*, *15*  61:*21*  71:*22*
77:*8*, *10*  79:*17*  129:*1*,
*15*  133:*6*, *9*  134:*9*
140:*3*  141:*9*  151:*16*
154:*9*  158:*3*  159:*6*
161:*18*  166:*3*, *22*
167:*11*, *17*  168:*4*
172:*15*  179:*11*  180:*3*
181:*22*
**reading**  30:*15*  48:*20*
151:*25*  165:*9*
**ready**  154:*8*
**real**  44:*4*  102:*15*
137:*17*
**realize**  26:*3*  126:*13*
168:*22*
**really**  11:*25*  17:*12*
26:*3*, *6*  29:*1*  37:*22*
38:*4*  39:*7*, *8*  43:*5*
48:*24*  49:*12*  50:*12*
52:*10*  56:*3*  58:*13*
60:*11*  80:*1*  86:*8*
92:*3*  97:*3*  100:*24*
101:*1*  103:*1*  105:*8*
106:*4*  112:*4*, *12*
114:*11*  128:*4*  129:*20*
149:*7*
**reason**  22:*4*  27:*3*
69:*21*  114:*10*  126:*10*
130:*8*  162:*13*  181:*6*
**recall**  47:*12*  49:*13*
58:*14*  66:*1*  69:*15*
80:*7*, *10*  91:*14*
102:*10*  121:*16*  132:*4*,
*14*, *15*, *17*  133:*8*, *18*
134:*18*, *24*  139:*16*
150:*7*  154:*25*  155:*4*
156:*18*  158:*1*  163:*6*,
*7*  171:*17*  177:*24*
**receive**  16:*7*
**received**  46:*1*, *11*
68:*21*  78:*19*  86:*16*
114:*20*  135:*6*
**recess**  44:*7*  80:*13*
113:*5*  137:*25*  173:*19*
**recognize**  32:*15*
**recollection**  133:*13*
144:*4*  160:*8*

**recommended**  40:*4*
41:*18*
**record**  4:*11*  8:*20*
31:*16*  32:*5*  64:*11*
69:*23*  70:*1*, *6*  113:*4*
117:*3*  133:*5*, *6*, *9*
145:*25*  176:*14*  182:*7*
**recorded**  130:*22*, *23*
131:*2*, *5*  134:*4*  155:*9*
**recording**  121:*19*
125:*14*  130:*16*, *20*, *21*
131:*2*, *5*  145:*15*
147:*8*, *19*
**recordings**  150:*3*
**records**  64:*8*  146:*1*,
*3*, *8*
**refer**  4:*14*  10:*20*, *23*
54:*2*  99:*9*  121:*10*, *14*
147:*25*
**referenced**  50:*18*
51:*18*
**referred**  83:*18*, *19*, *20*
122:*9*  124:*21*
**referring**  10:*21*, *24*
21:*23*  26:*17*  67:*13*
78:*13*  140:*8*  144:*9*,
*10*
**refers**  156:*1*
**refresh**  133:*13*
**refusal**  135:*15*
136:*22*
**refused**  135:*21*, *23*
165:*25*  167:*16*  171:*4*
**regard**  67:*7*
**regarding**  32:*12*
38:*11*  46:*15*  66:*4*
68:*22*  69:*1*, *7*  70:*9*
74:*8*  85:*2*  141:*23*
142:*5*  155:*2*, *15*
160:*4*
**regards**  33:*25*  44:*10*
67:*5*  97:*9*  105:*20*
145:*2*
**rehire**  74:*6*
**reissued**  163:*11*
**rejection**  86:*2*
**relate**  140:*23*
**related**  8:*1*, *18*  31:*20*
34:*3*  71:*13*, *15*

**relating**  8:*17*  138:*3*
**relative**  182:*8*, *10*
**relatively**  78:*4*
**relaxing**  136:*13*
**relevance**  31:*4*, *7*, *11*,
*13*  32:*2*
**relevancy**  31:*15*
**relevant**  78:*3*
**remainder**  118:*3*
137:*20*
**remaining**  36:*18*
**remarks**  119:*13*, *14*
179:*1*
**remember**  13:*1*
14:*20*, *21*  19:*19*, *20*
22:*1*, *4*, *5*, *6*  23:*22*
45:*18*, *22*  54:*12*
58:*11*, *14*, *17*, *21*, *24*
59:*6*  66:*3*, *8*, *10*
68:*12*  77:*25*  81:*21*
83:*9*  102:*18*  107:*4*, *6*
115:*8*, *10*, *19*  116:*14*
117:*19*  118:*2*, *4*
129:*2*  133:*3*  138:*14*,
*20*  144:*15*  148:*13*, *16*
150:*7*, *11*  152:*15*, *19*,
*20*, *23*  163:*7*  164:*8*
167:*23*  169:*5*  171:*25*
173:*11*, *12*  174:*9*
177:*22*
**REMOTE**  1:*13*
**renewing**  49:*21*
**repeat**  16:*4*  126:*19*
142:*20*  165:*4*
**repeatedly**  88:*17*
**replacement**  34:*17*, *20*
**replay**  122:*20*
**report**  3:*9*  17:*19*
27:*9*  40:*25*  41:*3*
66:*25*  67:*9*, *11*, *23*
68:*21*  73:*3*  75:*16*, *21*
76:*2*  99:*12*  100:*3*
103:*11*, *25*  104:*24*
105:*5*, *22*  118:*19*
136:*10*  138:*9*  152:*10*,
*13*, *16*  154:*14*, *23*
155:*23*  156:*14*, *17*
158:*23*  160:*13*  161:*2*,
*14*, *15*  174:*5*  175:*2*, *9*,
*10*  176:*24*  178:*20*, *21*,

*22*, *23*, *25*  179:*5*
182:*6*
**reported**  39:*10*
100:*17*  102:*7*  113:*17*
144:*7*  155:*7*, *10*, *11*,
*18*  156:*24*  159:*24*
162:*2*  163:*20*  164:*7*
178:*15*, *16*
**Reporter**  1:*18*  5:*1*, *7*
21:*16*  44:*2*  88:*10*
113:*2*  133:*6*, *10*
182:*1*, *5*, *20*
**reporting**  114:*16*
160:*10*  163:*25*
**reports**  18:*5*  20:*2*, *5*,
*8*  38:*20*, *22*  40:*19*, *22*,
*23*, *24*  113:*9*  120:*10*
164:*15*
**represent**  4:*8*  13:*3*
30:*10*  86:*15*  142:*1*
152:*6*
**representing**  81:*22*
**requested**  182:*7*
**required**  43:*19*
86:*20*  167:*5*
**requirements**  81:*5*, *8*
86:*12*
**requires**  5:*17*
**requiring**  63:*3*
**reserved**  105:*23*
**reside**  7:*1*
**resigned**  34:*16*, *17*
42:*12*, *13*, *15*, *17*, *25*
43:*11*
**resigning**  42:*17*
**resolved**  143:*11*
**respect**  89:*2*  106:*3*
114:*10*, *12*  116:*11*
122:*1*
**respectful**  122:*5*
**respond**  137:*1*  158:*7*,
*9*
**responded**  126:*12*
**responding**  158:*12*
**response**  158:*11*
**responsibilities**  13:*22*
14:*3*, *8*
**responsible**  57:*9*
59:*7*, *10*, *23*  60:*5*, *7*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 200 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

rest 147:17
restroom 44:4
result 89:24
resulted 80:5, 9
102:6
retaliated 61:13
retaliation 18:2 23:2
40:19 58:8 61:25
67:1, 10, 21 95:11
retired 22:6
retirement 25:10, 15
return 27:15 173:10
returned 64:24
returning 65:2
review 12:8 45:3
55:14 128:24 154:6
182:6
reviewed 7:20
rewind 127:20
reword 5:23
right 4:7, 13, 18, 22
5:2, 20 6:4, 9, 13, 16
7:11 8:16, 22 9:10,
22 10:20, 22, 25 11:7
12:19, 20 22:8 23:22
25:22 27:2 30:19, 25
32:1 35:22 41:9
43:18 44:13 46:6, 13
48:16, 19 53:24
56:15 57:13 59:21
60:15 61:6 62:14
65:20 66:21 67:18
69:20 75:19 79:20
80:11, 15 85:14 92:4
93:15 100:24 102:15
103:16 107:1 108:11
109:11, 15 110:24
113:4 118:7 121:11
122:18, 22 123:2, 6
125:5, 6, 14 128:12,
22 129:19 131:12
137:24 138:2 140:21
141:8 142:24 143:4
145:6, 14 146:10
148:17 149:2, 6
151:24 154:4, 12
156:25 164:4, 17, 19
167:10, 21 174:3, 23
176:12 177:21 178:8

179:6
rightfully 136:16
right-hand 56:6
rights 79:14, 19
rise 70:8
Road 3:9 7:7 13:14,
17, 19, 23 14:4 85:24
111:11 137:9 138:6
139:15, 19
roads 88:16 92:12
106:14
Robert 30:20 47:3
Rodriguez 36:4
Roebuck 37:3 38:11
43:24 83:8, 9, 18, 21,
25 85:18 97:11, 21
98:1, 3, 6, 12, 15, 23
99:5, 8 115:20, 23
123:3, 4, 11, 17, 21
124:3 128:9 136:23
137:7, 8, 10 138:13,
18 139:11, 14 140:10,
23 151:5, 13 152:3,
10, 16, 20 156:4, 15
157:13 161:15, 23
162:8 163:20 164:5,
18 165:25 175:15
176:9 178:20 179:2
Roebuck's 139:18
152:7 153:22 161:11,
12
role 20:18, 23 28:1,
20, 25 39:17 59:18
106:3
roll 62:21 114:6
room 132:10
rotation 94:20
Roughly 30:1
Roy 22:5 24:16
rule 4:25 5:7, 15
rules 4:23 31:23
46:3
run 17:12 28:5
52:11 70:12 73:15
run-in 10:18
runs 128:6
Russ 46:21 65:10
72:7, 8, 15 117:12
134:10, 11 135:3

166:10 175:14, 21
Rye 35:1, 7, 8

< S >
safe 63:1 107:13
safety 37:21 50:10
77:5, 6 78:6, 9, 15, 16
109:1 146:15
saidYou 133:2
salary 18:13
saw 32:19 128:7
131:11, 23
saying 40:24 52:13
53:10 54:23 57:8, 12,
17 68:7 70:4 82:22
86:19 88:24 90:8
92:15 98:12 111:2,
25 116:14 122:4
125:3, 17 126:19, 24
127:2, 3, 12, 23, 25
132:25 136:21 147:8
149:7 158:11, 20
159:3, 9, 11, 19 164:6
170:10 171:7, 14
says 13:5, 14, 21
45:7, 13 56:7 84:21
94:5 95:25 101:13
108:6, 7, 9, 12, 22, 25
109:4 111:9 122:18,
22 124:13 125:5, 14
132:17 133:7 145:4
153:2 154:18 155:5,
25 156:19 158:5
163:15 164:11, 19, 20
166:10 174:13, 17, 20,
21 178:10
scanned 162:23
scared 116:8
scary 26:7
scenario 74:19, 21
77:4 105:25
Scott 41:20 92:22
scrape 15:7
scratch 55:16 91:3
screen 55:25 56:4
121:3 165:4
screens 43:20
screwdriver 26:21
scroll 12:6, 15, 19
30:9 35:19 44:21

45:2 107:23 153:12
157:3
season 92:22
seatbelt 107:8 108:3
109:6, 24 110:1, 6, 15
111:6 113:8 141:13,
15, 20 142:5 143:2,
21 166:18
second 35:14 48:19
105:4 108:11 138:7
141:9, 11 142:21
153:19 161:14, 15, 17
164:4
seconds 132:25
section 111:24
174:20
security 35:6
see 4:22 5:1 12:4, 5,
6, 9, 10 13:4, 5 17:7,
17 30:7, 9 35:13
45:6, 9, 15 49:11
56:4, 6, 10, 12 57:11
58:16 61:7, 22 84:11
91:4 93:7, 9, 11, 22
103:21 105:3 106:16
107:19, 20 108:6, 14
109:2, 6, 18 110:13
111:25 118:13 119:9
120:5 121:3 128:21
129:4, 10 130:5
131:12, 15, 18 132:1,
2, 7, 23 134:2 135:13,
16 141:19 144:1, 24
145:23 146:16 148:4
149:14, 17, 20 150:25
151:9 153:6, 25
154:20 156:5, 8, 12,
21 157:6, 9 158:6
159:1, 17 163:8, 13,
18 164:19 165:13
166:8 168:3 170:16
171:21 172:12, 14
174:1, 13, 15, 17, 18,
23 175:10, 12, 16, 21
177:10 178:18
seeing 132:4 133:18
154:4
seen 12:24 13:1
35:10, 11 37:24, 25
91:6 116:24 119:3

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 201 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

120:7  121:*18*  144:2
152:*4, 5*  174:7, *10*
**segment**  109:*15*
**selected**  108:*23*
**send**  50:*4*  64:*9*  73:*8*
77:*11*  82:*19*  117:22
134:*14, 17*  169:*18*
171:*19*
**sender**  151:*4*
**sending**  135:6
**sense**  5:*4, 13*  54:8
57:*23*  78:*16, 17*
94:*16*  97:*24*  101:*10*
168:*23, 24*
**sent**  13:*4, 8*  30:*11*
42:*14*  44:24  93:*12*
115:*4, 5, 6*  118:*4, 22*
128:22  134:*11, 13, 25*
135:*4, 8*  155:2  166:7,
*11, 12*  167:*12*  168:*19,
20*  169:*12*
**sentence**  45:*24*
136:*20*  140:22
147:*12*  153:*3*  154:*17*
156:2  168:*4*
**separate**  125:5
**separation**  27:*4*
**September**  1:*13*  57:2
58:*1*  181:5  182:*13*
**series**  90:*11*  102:5
134:5
**serve**  14:*12*
**service**  107:*1*  139:*6,
7*
**SERVICES**  1:7  46:2
181:*4*
**session**  166:*16*
**setting**  26:*24*  95:*24*
**seven**  29:7  65:*4*
94:22
**severe**  97:*11*
**sex**  47:*25*
**shakes**  5:*3*
**shape**  31:*21*
**share**  55:25
**sharing**  128:*12*
139:*23*  150:22
**Shaunna**  36:*16*  37:*3,
10, 15*  76:*18*  78:25

151:*4, 11, 12*  153:*16*
154:*3*  175:*15, 22*
**sheet**  143:*8*  170:22
181:*1*
**sheets**  76:*16*  167:*16*
171:5
**shook**  118:*3*
**shop**  115:22  116:*17,
19, 21*
**shopping**  53:*20*
70:25
**short**  22:7  39:7
41:*19*  85:*10*  103:*11*
**short-tempered**
102:*16, 17, 19*
**shouting**  91:*13*
**shoveling**  14:22
**shovels**  15:*4, 6*
**show**  8:*6, 21*  11:25
30:2  44:*16, 22*  50:2
93:6  95:8  107:*24*
128:*14*  133:*21*
141:*17*  153:*8*  162:*3*
173:22  174:*6*  175:*4*
177:*1*
**showed**  30:*4*  56:*1*
87:*14*  106:*4*  120:*18*
133:*16*  140:5, 22
141:*14*  161:*10, 16*
172:9, *17*  173:9
176:25
**showing**  44:*20*  93:*12*
107:*15*  141:*11*  142:6,
*24*  144:22  175:*3*
**shown**  102:*12*  121:*3*
**shows**  102:*24*
**shut**  138:*6*
**sic**  87:*19*
**sick**  94:*25*  167:*18,
19, 22, 25*  168:*8*
**side**  53:9  56:6
72:*19*  85:*23*  106:*14*
111:*11*  115:22, *25*
116:*1, 3*  123:*23*
137:9  139:*19*  172:*10*
**Side-by-side**  15:*4*
87:9  115:*21*  123:*20*
**sides**  57:*20*  97:*18*
**sign**  16:22  45:22
54:*17*  63:8  77:*10*

110:*20*  111:*3, 5*
121:25  165:*14*
179:*12*
**signature**  45:9, *11*
46:9  77:9  108:*12, 13,
16, 19*  129:7  153:*17,
20, 23, 25*  157:*3*
165:*14*  180:2
**Signed**  3:9  45:*20*
63:9  108:*19*  162:*21*
163:*12*  165:*18*  177:*4*
**signing**  45:*18*  111:2
**signs**  14:*23*  16:*12, 14*
**silenced**  11:*15*
**silly**  61:*16*  97:*4*
176:*14*
**similar**  14:*3*  18:*21*
165:*23*
**simple**  65:*20*
**simply**  8:*12*  42:*17*
111:*14*  165:2
**single**  29:2  44:22
77:*14*  159:*19*
**sir**  32:*10*  45:*12*
68:*20*  84:*15*  118:*12*
121:*23*
**site**  82:*25*  83:2  84:9,
*12, 14, 16, 19*  99:22
100:2  140:*6, 13*
166:*17*
**sitting**  58:*12*  70:22
78:*18*  79:*18*  82:8
95:9  148:*10, 14*
152:*19*  160:2  162:*24*
**situation**  103:*1, 8*
105:*15*  109:*23*
142:*19*
**six**  29:7  40:*16*
102:22
**skid**  17:*12, 14*
**skills**  17:*11, 14*  66:9
87:7  90:*14, 20*
**skipped**  29:*3*
**skipping**  68:*4*
**slammed**  166:25
**slow**  12:*12*
**slur**  48:7  52:*19*
68:22  99:*18, 19*
**slurs**  48:9  68:*17*

**small**  53:*11*  128:*3*
136:*16*  174:*11*
**smaller**  12:*17*  71:*12*
**SMITH**  2:2
**sole**  46:*4*
**solely**  54:6  91:*11*
**solid**  127:22
**somebody**  47:*4*  48:*4*
52:*21*  61:*3*  62:25
63:*7*  68:*18*  71:*1, 9*
72:*14*  74:*14*  88:25
90:*25*  97:*19*  101:*11,
25*  102:*24*  105:*24*
106:*6*  125:*21*  139:*23*
174:*14*
**somebody's**  116:*15*
**someone's**  68:22
103:*6*
**sorry**  19:9  55:*12*
61:*16*  83:*17*  96:5
101:*1*  165:*4*  168:2
**sort**  17:7
**sound**  116:*15*
**sounded**  121:*23*
122:*21*
**sounds**  25:22  41:22
145:7  167:9  177:*21*
**South**  24:7, *8*
**space**  136:*17*
**span**  38:7
**speaking**  177:25
**specific**  20:9  72:*11*
83:*5*  119:*21*
**specifically**  21:2
50:22  57:2  67:*13*
78:*13*  96:2  142:*14*
158:*16*
**specify**  37:8  112:*4*
**spectrum**  78:2
**speculate**  43:*3*  125:8
178:*4*
**speculating**  127:2
**speculation**  119:*16*
**speed**  164:*21*
**spell**  21:*16*  39:25
**spend**  22:*14, 17*
**spoke**  5:*18*  7:*24*
8:*24*  9:8  34:2  112:7
166:*18, 19*  176:2

**spoken** 145:*1* 166:*12*
175:*25* 176:7
**stab** 26:22
**Stacy** 46:*21* 59:*21*
65:*10* 72:7, *8*, *15*
75:*12* 99:*1* 103:*17*
106:*8* 117:*12* 154:*16*
174:*13*
**staff** 55:*18*
**standards** 49:*24*
**standing** 34:*21*
115:*25* 123:*11*
125:*14*
**start** 11:5, *9* 37:*16*
80:*11* 86:22, *23*
151:22 154:2
**started** 11:*3*, *8*, *21*
13:*25* 14:6, *11* 34:*13*,
*14* 36:9 37:*19* 45:*17*,
*21* 47:7 53:6, *7* 83:*8*
87:*19* 95:*16* 119:9
130:*20* 148:*13*
**starting** 45:*24* 46:*8*
82:*17* 151:*17*
**state** 4:*10* 23:*17*
25:*10* 31:*13* 36:*15*
99:*11* 111:5 170:*14*
176:*25* 180:5 182:*3*,
*20*
**stated** 110:*14* 111:9
126:5 132:*13*, *15*
149:*18* 166:7 178:*13*,
*16* 181:22
**statement** 3:9 46:7
70:*21* 98:*12* 128:*19*
129:*12* 132:*18* 134:8
135:*3*, *19* 142:*18*, *23*
143:7 145:*12* 146:*12*
147:*17*, *18* 151:*15*
152:7 153:*24* 154:*3*,
*4*, *22* 157:2 159:*8*, *10*
161:*11*, *12*, *22* 163:22
164:*11*, *14*, *18* 165:*15*,
*17*, *20*, *23* 166:*3*
167:*8* 173:*15*, *16*
178:*8*
**statements** 3:9 46:*11*
71:24 146:*25* 160:*3*
162:*16*, *21* 163:2, *4*, *9*,

*10* 164:*20* 166:*1*
175:*5*
**STATES** 1:*1* 60:*10*
157:*6* 164:*5*
**stating** 161:*23*
**station** 139:6, 7
**stay** 61:7 107:*12*
**stayed** 118:*1*, 2
**steer** 17:*12*, *14*
**stenographic** 182:*8*
**stenographically**
182:6
**step** 26:22 44:*3*
60:2 72:*17* 73:7
97:*8* 99:*17* 102:25
131:7 151:*20*
**STEPHEN** 1:*13* 3:4
4:2, *12*, *15*, *16* 7:*12*
11:*21* 20:*11* 31:6
43:*3* 44:9 45:7 51:6,
*15*, *21* 80:*15* 108:7
125:*10* 128:*19* 129:5
132:*23* 133:7 145:6
175:*14* 178:*17*
180:*13* 181:4, *24*
182:6
**steps** 143:*13* 146:5
**Steve** 116:9 121:*11*,
*12*, *15*, 22, *25* 122:5, 9
138:2 175:*21*
**stick** 11:5 145:9
**Stoddard** 36:*16* 37:*3*,
*10* 151:*12* 154:*10*, *13*,
*18*, *23* 155:*11* 156:*19*,
*23* 175:*15* 176:8
**Stoddard's** 153:*17*
154:*3*
**stood** 178:*12*
**stop** 35:8 61:*11*, *12*,
*15*, *20* 62:*17*, *19* 63:2,
*3*, *12*, *15* 75:9 128:*12*
129:*19* 132:*12*
133:22 150:22
**stopping** 62:*3*
155:22, *24* 160:9
**store** 53:*17*, *20* 70:*11*
71:*1*, 9
**straight** 99:*1*
**street** 53:*10*

**stress** 103:9 106:*13*
**strictly** 19:*12*
**strongly** 136:*1*
**structures** 15:8
**stuff** 26:*8*, *24* 45:*23*
47:*23* 48:*17* 52:*11*
53:*5*, *6* 62:*24* 63:*15*
66:*10* 68:*13* 70:*14*
73:*17* 75:*17*, *18*
81:*15* 99:*3*, *20*
106:*24* 115:*24* 144:*4*
**styles** 102:*3*
**subject** 31:*12* 46:*4*
67:9 152:*8*
**submit** 93:*20* 94:*15*
162:*11*
**submitted** 112:7
160:6
**submitting** 94:6
**Subordinate** 28:*16*
**subordinates** 28:*12*,
*13*, *14*
**successfully** 81:*23*
**sue** 96:25
**suing** 96:*6*, *11*, *12*
**Suite** 2:*3*, 7
**summary** 12:*23*
165:*23*
**summer** 15:*10* 62:7
137:8
**summers** 15:*13*
**superintendent** 23:*18*
25:*2*, *6* 27:*25* 28:*2*,
*12*, *20*, *21*, *22* 45:*14*
47:7 66:5
**superior** 73:*12*
**supervise** 19:*13*, *17*
21:6 28:*19* 66:*18*
**supervised** 21:*12*
23:*1*, *4*, *8*, *13*, *20*
29:*13*, *23* 113:*14*
**supervises** 28:*21*
**supervising** 20:6
22:8 100:*10*
**supervision** 66:*19*
**supervisor** 17:*3*
18:*15* 19:2 22:*4*
24:*24* 28:*17*, *22* 29:*3*
60:*3*, *16* 62:*10* 73:*11*

89:*8*, *21* 105:*25*
106:*1* 108:*6* 114:*12*
**supervisor/foreman**
20:*18*
**sure** 5:*19* 8:*11*
11:*13* 16:5 18:*1*
28:*15* 29:*12* 32:2
37:*18* 40:*15*, *25* 43:*9*
44:5 49:*19* 52:*14*
59:*12* 60:*1* 62:*14*
65:*19* 71:22 72:*18*
75:*18* 81:*21* 83:*17*,
*18* 97:*25* 98:*10*
100:*4* 101:*12*, *24*
102:*4* 111:*18* 117:*19*
128:*3* 137:*18* 143:*18*
146:*5*, *7* 149:*24*
165:6 169:6 173:*11*
**surprise** 160:*23*
161:*1*, *4*
**surprising** 160:22
**Survey** 50:*3*, *6*, *17*
54:*10* 77:*11* 93:*19*
**suspend** 61:6
**suspended** 27:*13*
34:*16* 91:*12* 115:9
167:22 168:*15*, *17*
169:*13*, *15*, *16* 170:*3*,
*19*
**suspension** 102:6
103:*24* 134:6
**suspicious** 42:*24*
43:*11*, *14*
**sworn** 4:*3*
**system** 54:*18*, *23*
92:*15*

**< T >**
**take** 5:*8* 6:*8*, *10*
26:22 38:*15*, *23*
42:*16*, *18* 44:5 45:2
62:*21* 63:*8*, *14* 65:*18*
75:*13* 77:*10* 82:*15*
94:*24* 97:*8* 105:6
121:*25* 127:*19* 133:*3*
135:*25* 137:*17*, *23*
138:*3*, *5* 139:*21*
145:*8* 166:*15* 167:*15*
**Taken** 1:*13* 31:*12*
44:7 65:*17* 80:*13*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 203 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

113:5  137:25  173:19
181:5

**talk**  14:19  32:5, 22
47:5  53:13  63:17
76:24  77:6, 11, 18
90:25  101:11  104:8,
9  107:10  165:24
171:19

**talked**  35:11  53:17
117:21  118:18  122:3
149:13

**talking**  29:17  38:6
46:17  52:7  58:13
59:3  60:13  69:14, 19,
22  70:7  78:15  80:11
91:15  130:2  131:20
150:3  158:10

**talks**  25:9  50:4, 7, 17
58:12, 16  76:22, 23
77:2

**target**  48:7

**targeted**  60:25

**task**  88:19  89:23

**tasks**  15:22, 24  16:2
17:1  92:16  157:16

**taxing**  26:9

**TBD**  135:13

**tea**  78:7

**teach**  76:12

**team**  93:25  94:8
128:3

**tech**  14:12, 20  16:6
29:2  39:17  61:4, 7
62:16  86:20  94:8

**Technican**  3:9

**technician**  11:12, 22
13:15, 18, 19, 23  14:1,
13  15:22, 25  18:18
28:25  36:9  61:21
64:19, 20  81:5, 12, 17
82:4  85:8  86:7, 13
94:21

**technicians**  14:4, 25
16:3, 8  17:2  18:19
26:20, 25  28:23  42:3
60:17  61:20  63:12
64:21  67:12  83:3, 5,
6  91:25  92:2  94:20
116:19  117:17, 22

**techs**  39:20  41:5, 17
63:4  94:5

**teenager**  10:4

**telephone**  11:14

**tell**  5:19  18:15
23:23  39:3  48:19, 24
52:11  53:24  70:9
92:10  96:9  100:10,
20  102:1  114:8
116:8, 14  125:22
126:8  130:19, 20
135:23  149:8  159:14
168:11  171:14
172:17

**telling**  42:18  88:5
105:10  114:5  117:11
124:24  125:19, 21
156:3  170:4  177:22

**tells**  61:19  74:3

**temperament**  106:12

**temperature**  17:24

**tempered**  103:8

**tempers**  103:12

**Ten**  167:2

**tension**  113:13

**tenure**  29:22  100:10
112:17

**term**  126:2

**terminate**  75:6

**terminated**  27:13
176:4

**terminating**  176:7

**termination**  175:24,
25

**terminology**  104:10,
11

**terms**  78:15  163:9

**test**  42:14, 17, 18
43:1, 12  58:23

**testified**  4:4  120:9
123:17  129:20  132:8
137:1

**testify**  133:15

**testifying**  6:14
132:12

**testimony**  5:8  6:2
8:7, 10  9:8  90:2
132:22  162:24  168:7
176:2

**tests**  43:15, 16, 22

**text**  64:9  147:4
171:19, 23  172:3

**thank**  29:20  55:12
57:24  106:25  137:24

**That'sa**  27:1

**theirself**  158:18

**theirselfs**  124:8

**thing**  12:7  47:20
77:9  79:9  95:24
143:12, 13  149:23
165:18  178:10

**things**  6:11  9:23
18:13  54:4  82:10
103:14  119:13
122:11  156:14
159:12

**think**  19:24  21:20
26:3  27:10  28:14
36:14  37:19  38:18
45:22  48:22  51:9
60:4, 6  65:4  70:22
75:17  78:22, 25  79:8
81:1, 2  82:16  83:8
95:24  97:7, 22  103:6
104:1  105:19  107:8
111:11  112:22
117:15  118:1  120:5
122:11  125:18
126:14  127:13, 24
128:1  132:7  139:10
142:3, 4  150:5
162:12  167:23  172:5
173:18  176:12  177:2,
19

**thinking**  6:17  20:21
88:25  89:3

**third**  5:15  144:22
153:22  166:19

**third-party**  53:19

**thought**  45:16  97:4,
5  114:8  116:17, 25
130:7  131:13  159:5
168:19, 20

**thoughts**  97:17, 18

**threatened**  101:19, 21

**three**  21:9  22:17
24:21  25:19, 24
37:12  38:3  58:1
65:11  157:20  162:10

**three-year**  38:6

**throwing**  106:15

**thrown**  160:21

**Thursday**  167:20
168:8

**TIME**  1:16  4:21
5:9, 11, 12  6:6  7:14
10:10  12:14  14:25
15:23  16:4  17:13
21:19  22:7, 20, 23
25:8  28:5, 9  29:10,
14, 17  35:14  36:17
39:7  41:20  45:2
46:5  48:21  49:11, 15
52:1  55:4  57:7
58:17  59:4  61:1
63:14  64:20  66:21
67:4, 5, 14, 16, 24
68:3, 23  69:12, 16, 21,
24  70:7  71:25  73:24
75:25  78:19  79:2
80:16  84:8  89:7
91:24  93:20, 21
95:23  97:8  105:4, 21
110:13  112:23
117:11  120:18
124:16  127:13
136:13  137:19  140:4,
5, 9, 11, 21  142:8, 17,
18, 24  143:5, 15, 17,
23  147:13  148:9, 15
159:14, 19  160:18
167:14, 15  170:11, 21,
22, 24  171:5, 20
173:7  175:4  177:11

**times**  4:19  6:8  10:8
38:1, 3  63:16  67:3
83:16  92:5  100:17
102:12, 18, 20, 25
107:10  114:21
133:23  142:11  159:9,
20

**timid**  90:24

**tip**  15:4, 6

**today**  5:1, 7, 16  6:6,
14, 17  7:14, 15  14:3,
7  29:25  34:10  70:22
78:18  79:18  82:9
87:23  89:14, 19
90:21  92:11, 20  95:9

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 204 of 219

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

101:*14*  125:*19*
136:*25*  148:*10*, *14*
152:*20*  160:2  162:*24*
168:7  173:*22*  179:7
**today's**  4:*13*  7:*11*, *21*
**told**  33:6, *15*  42:*25*
48:*14*  53:7  80:*20*
83:*12*  87:*14*  96:2, *6*,
*11*  97:*20*  98:*15*
100:7, *19*, *21*  112:*11*
117:*15*, *16*, *21*  124:22
125:*24*, *25*  135:*25*
139:*12*  140:*11*  168:*1*
169:*4*  171:*18*  172:*20*
177:*1*  178:*1*, *11*
**tolerance**  46:*19*
47:*18*, *23*, *24*  79:*25*
**tone**  106:7  127:*22*
**tool**  26:2  50:*12*, *15*
63:*10*
**Toolbox**  50:*4*, *7*, *17*
54:*10*  58:*12*, *16*
63:*17*  76:22, *23*  77:2,
*11*
**tools**  26:5, *24*
**top**  12:*15*  35:*20*
54:*17*  75:*19*  79:*20*
85:*13*  129:5  151:*13*
**topic**  77:*25*
**topics**  77:*24*
**total**  29:*23*  94:*24*
**totally**  79:*11*
**touch**  101:2  118:*13*
**tractor**  85:*14*, *16*, *17*,
*20*, *25*  86:6
**traffic**  81:*3*
**train**  89:9, *20*  106:*1*
**trained**  58:*18*, 22
75:*15*  79:2
**training**  54:*18*, *20*, *23*,
*24*  55:2, *5*, *6*, *8*  58:5,
*7*, *23*  61:*10*  65:*24*
66:*4*, *5*, *7*, *8*, *11*, *12*, *15*,
*17*  75:*21*  76:*1*, *7*, *10*,
*13*, *20*, *23*  77:2, *4*, *20*,
*22*, *23*, *24*  78:2, *4*, *6*,
*12*, *13*, *14*, *16*, *19*, *20*,
*25*  79:*1*  81:*16*, *24*
85:*14*  86:9, *10*, *16*
115:*14*  135:*16*  136:2,

*4*, *7*, *11*, *23*  144:*24*
145:2, *22*  146:*14*
166:*20*  167:*4*
**trainings**  54:*14*, *15*
55:*18*  76:*12*, *21*  78:*1*,
*10*
**transcript**  179:*11*, *14*
181:2  182:6, *7*
**transpired**  105:*18*
144:*18*
**Transportation**  36:*15*
**trapped**  28:8, *9*
**trash**  14:*23*  28:6
82:*18*, *20*, *24*  88:*16*
100:7  115:*19*  157:8,
*9*, *12*, *18*, *19*, *21*, *25*
158:*3*
**treatment**  17:8
**tree**  16:*21*
**trees**  14:*23*  16:*15*
**Trepal**  37:*4*, *10*
**tried**  167:*24*  168:2
172:9, *10*
**trimming**  78:8
**trip**  136:7, *13*
**truck**  78:5  82:*16*
88:*1*  111:*12*  116:*4*
117:*18*  135:*16*, *21*, *24*
136:22  138:*18*
139:*15*, *23*  165:*25*
166:*18*  167:*3*
**true**  181:22  182:7
**Trulieve**  35:*5*
**truthfully**  6:*14*
**try**  26:*21*  81:*15*
111:*13*  121:5  140:*14*
**trying**  26:*18*  38:8
89:9, *20*  96:*25*
105:*25*  134:*19*  148:2
157:*19*  169:6  172:*18*,
*19*  173:*3*
**turn**  75:*11*  85:22
**turned**  72:7  85:*21*
**turning**  16:*24*  35:*5*
**turnover**  55:22
**two**  12:9  14:*14*, *15*
15:9  16:*24*  19:*18*
22:*17*  27:8  37:*24*
65:*20*  66:*1*  67:*12*
74:*17*  78:*23*  85:*12*

87:*18*  92:5, *10*, *14*
97:*18*  100:*25*  101:*14*
102:*23*  107:*24*  109:8
110:7  116:*19*  117:*17*,
*22*  123:22  125:5
127:6  139:22  144:5
146:7  157:9  158:*3*
161:*15*  162:*10*  174:7
**type**  52:7  66:*10*
91:*25*  108:*22*, *25*
**Typed**  3:*9*  69:*23*
162:*20*
**types**  102:*3*
**typically**  121:*14*, *24*
**Tyrone**  22:6  24:*18*

**< U >**
**U.S.**  46:2
**unbuckled**  109:6
**understand**  6:2
18:*20*  20:*11*  28:*16*
33:*23*  38:9  44:*13*
46:*3*, 8, 9, *10*  48:*1*
49:*10*  50:*16*  51:7, *18*
53:*21*  55:*24*  57:8, *23*
62:*16*  65:*16*  69:*23*
71:8, *17*, *21*  90:*10*
91:*20*  93:22  95:*13*
105:*1*, *16*  106:*18*
108:*4*  110:*10*  111:8
112:5  127:*21*  130:*11*
134:*19*  145:6  149:*15*
173:2  176:*4*
**understanding**  47:*15*
49:*21*  51:*3*, *25*  72:*11*
94:*4*
**understands**  50:*24*
**understood**  17:*15*
91:*17*
**unequal**  17:8, *10*
**unfair**  61:*14*
**unfolded**  134:*5*
**UNITED**  1:*1*  60:*10*
**unlawful**  50:22
100:*11*
**unpack**  118:6
**unprofessional**
146:*13*  156:*20*
**unprofessionally**

119:6
**unsafe**  61:*14*
**unspoken**  92:*19*
**update**  49:*17*, *20*
**updated**  47:*3*  49:*23*
76:9
**upper**  75:*13*  95:22
172:*25*
**upset**  110:*17*  119:*25*
140:*11*
**use**  6:8  50:*12*  52:*18*,
*23*  65:*13*  73:*16*
94:*25*  147:6
**useful**  58:*17*
**usually**  28:22

**< V >**
**vacant**  21:*21*, 22
**vacation**  136:7, *9*, *12*,
*16*
**vague**  50:*20*
**vagueness**  51:*4*
**valid**  32:2
**vehicle**  84:*18*  135:22
137:*9*  141:*13*  143:*1*,
*21*
**vehicles**  116:2
**verbal**  86:*3*, *4*
113:*18*  115:*14*  117:9
119:9  146:*24*  173:*1*
**verbally**  89:9  103:7,
*18*  146:*19*
**Verizon**  146:6, *9*
**versus**  22:*14*  57:*10*
78:7  105:*13*
**Video**  3:*9*  117:6
120:22, *25*  121:8, *18*
122:*15*, *16*, *23*, *24*
124:9, *11*  125:*14*
126:*15*, *16*, *21*  127:8,
*15*  130:5, *7*, *11*  131:7,
*17*, *19*, *25*  132:*3*, *4*, *5*,
*8*, *10*, *11*, *15*, *16*, *24*
133:*1*, *4*, *13*, *17*, *19*, *21*,
*22*, *24*  134:*1*  144:2, *3*,
*10*, *13*  159:9
**videos**  134:*21*
**viewing**  132:*18*, *19*
**violate**  136:*3*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 205 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

violated 109:5
violating 61:8
violation 61:6, 22
  109:1 139:25
violations 113:9
violence 117:4 118:9
violent 164:25 165:3,
  8, 11
visited 38:9
vocal 119:15
voice 116:15 147:5
volume 121:6, 7
voluntary 94:17 95:4
volunteer 106:22
vs 1:2 181:3

< W >
wait 162:10
walk 61:13 77:1
  101:16 104:12 114:6,
  25 115:11
walked 87:25 116:7
  119:4 150:10 151:20
  166:24
walking 71:9 129:17
  130:1, 4 164:21, 22
wall 46:20, 25 47:6
  48:15 49:2, 10, 15, 17,
  20 58:16 76:9
want 5:18 14:18
  17:4 23:20, 21 27:11
  32:1 33:23 50:19
  51:15 52:14 55:24
  60:11 71:21, 25 72:2,
  10, 17 83:5 90:5, 9
  101:2 104:9, 11
  105:9 106:11 111:13
  112:20 122:19, 22
  125:12 132:23
  153:16 170:13 176:1
wanted 84:3 88:4
  95:3 105:9 110:1, 11
  111:18 112:11
  115:15 130:8 136:16
  147:3 152:17 154:15
  155:8, 12 160:14
wanting 170:21
wants 47:20 106:2
warning 108:22, 23

watch 132:16
watching 134:1
water 62:8 151:18
way 7:17 31:21
  49:4 57:2 86:24
  89:18 113:19 114:15
  140:15 146:11 158:3
WEBBER 1:2 10:22,
  24 27:6, 16, 20 65:17,
  21, 23 66:5 79:15
  181:3
website 95:25
Wednesday 167:19
  168:8
Weed 14:21 15:5
  28:5 82:18 92:12
  100:7
week 22:13 77:16
  94:22 162:2, 10
  166:6 170:23
weekly 77:22, 23
weeks 15:16 27:8
  34:13 85:12 87:18
  88:21 100:25
weird 88:17 159:11
welcome 6:8 27:10
  168:12, 16
Well 10:1 16:11
  17:21 19:1 20:11
  27:8 28:14 29:15
  32:1, 14 38:24 44:13
  47:2 48:15, 21 50:16
  51:21 53:24 55:1, 10,
  16 56:20 59:12, 14
  60:16 64:17 66:21
  67:8 68:2, 6 71:3
  72:14 74:13 77:15
  81:11 83:7 86:15, 25
  88:8 89:2, 6 90:4
  91:11 94:19 95:6, 15,
  19 96:5 100:19
  101:1, 18 103:14
  106:25 108:13
  117:15 119:20 120:7,
  22 121:17 123:23
  125:18 131:18
  136:23 137:6 138:12
  140:22, 23 142:1
  143:25 144:13
  146:10 148:21 152:6

157:17 158:17
  162:12 163:5 167:8
  168:18 170:6, 12
  176:15 177:6, 25
  179:6
welling 26:5
went 36:14 37:20
  65:3 68:13 81:20
  84:15 99:1 110:16
  115:23, 25 116:17, 20
  118:1, 14, 16 140:10
we're 4:22 18:17
  53:10 71:11 88:15
  90:16 112:24 127:7
Wessel 65:10 73:4
  104:23 174:13 175:6
  176:1 177:18, 22
  178:1, 10
Wessel's 175:9 176:2
we've 51:8
whatsoever 101:8
  138:4
white 24:5, 13 41:24
  57:10, 14 71:20
whites 57:19
wife 105:11
Williams 151:11
Willie 22:3 24:14
win 105:12
wipe 64:19
wiped 64:15, 22 65:1
wise 26:2
wish 97:19
withholding 142:3
Witness 3:3 4:5
  43:2, 4 44:3 175:12,
  13, 19, 20 180:2
witnessed 105:4
  161:24 163:16
wondering 57:9
Woolverton 34:22
word 23:24 52:18,
  23 54:6 65:20 87:21,
  25 158:22 159:7
words 13:17 145:16
  147:9 149:8, 19
  172:14
work 7:5 13:12
  14:21, 24 17:8, 25
  18:16, 17 19:6, 13

20:24 21:1, 5 25:1,
  17 26:1 27:1 28:4
  30:17 33:8, 10, 18
  34:10 36:10, 14 39:7
  48:3 49:5, 25 50:20
  61:1, 11, 12, 15, 20
  62:3, 17, 19 63:3, 12,
  15 80:18 82:25
  83:15 84:6, 7 86:24
  87:2 92:1 93:19
  94:5 95:11 99:6, 13
  100:20 103:5 105:11,
  12 106:12 110:3
  120:19 127:18 128:1,
  9, 11 139:4 140:15
  147:23 149:21, 25
  151:23 154:10 156:4,
  7, 15 159:15, 20, 21
  163:17 164:12, 14
  167:24 168:5, 12
  170:24 173:3, 4
  176:25
worked 15:10 16:3
  19:12 27:20 29:1, 6,
  10 30:16 33:13, 15,
  17, 19 35:6, 13 53:14
  67:12 68:4 80:20
  96:3 154:14 156:16
working 12:15 15:13
  24:22 35:8 37:16
  47:7 66:16 69:7
  84:18 92:23 100:2
  136:23 137:6 138:12
  140:23 147:13
  165:25
workplace 69:11
  78:15 114:22 117:4
  150:19
works 37:5, 6, 7, 8, 12,
  14 147:18, 23
worried 90:22
worry 59:4
wrecks 106:17
wrenches 16:25
write 107:8 110:1
  111:8, 9, 18 144:14
  159:3 162:8, 10, 15,
  18 170:24 171:9
  181:2

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

**write-up** 107:*22*
141:*1, 23* 142:*18*
144:*7, 8*
**writing** 73:*10* 86:2
104:*14, 17* 105:*13*
110:*8* 113:*18* 120:9
135:*19* 143:6 146:*22,*
*23* 147:*3, 4, 19* 152:*3*
163:*11*
**written** 8:7 9:*8*
59:*16* 104:*19* 108:*23*
113:9 138:9 139:*25*
141:2, *4* 146:*25*
155:*15* 159:*1, 7*
162:*3*
**wrong** 4:*17* 114:*23*
165:*23*
**wrote** 8:*8* 103:*15*
110:*2* 111:*11* 112:*3*
141:*12* 142:*14, 25*
143:*17, 20* 144:*20*
159:5 160:*18* 165:*18*

**< X >**
**XYZ** 88:*16* 92:*11*

**< Y >**
**y'all** 92:*11*
**yard** 116:*1*
**Yeah** 12:*10* 15:*15*
20:*21* 29:*20* 39:*14*
51:*14* 52:*13, 20*
60:*16* 61:9 64:*25*
67:*16* 68:2, *24* 70:*19*
76:22, *24* 79:*12*
83:*14* 96:*18, 24*
98:*14* 120:*12* 123:*14,*
*19* 124:*4* 126:*25*
130:*18* 140:*20*
146:*25* 147:*11*
152:*23* 153:6 158:*19*
159:5 161:*1, 6* 165:9
168:*24* 179:9
**year** 19:*24* 20:*16, 19*
37:*24* 40:*17* 49:*17,*
*21, 22* 56:*14* 66:*13,*
*14* 76:*10, 12* 96:*13*
**years** 10:*12, 13*
14:*14, 15* 15:9 25:*19,*

*24* 29:7 55:*23* 59:*4*
65:*11* 66:*1* 146:*8*
**yell** 91:*4, 6, 12*
**yelling** 91:*7, 9, 14*
116:*16* 151:*20*
154:*19, 24* 155:2, *19*
**Yep** 144:*12*
**Yesterday** 7:*22, 25*

**< Z >**
**zero** 46:*18* 47:*18, 23*
79:*24*
**zero-turn** 16:*15*
**zip** 7:9
**Zoom** 1:*16* 4:*22* 9:*3*
12:*18* 95:*25* 165:*21*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 207 of 219

Deposition of Michael Stephen Bearden    Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

## WORD LIST

**< 0 >**
**03/19/2027** *(1)*

**< 1 >**
**1** *(7)*
**10** *(3)*
**10:00** *(1)*
**100** *(3)*
**105** *(1)*
**107** *(1)*
**11:12** *(1)*
**12** *(1)*
**120** *(1)*
**123** *(6)*
**128** *(1)*
**14** *(27)*
**14th** *(11)*
**14thto** *(1)*
**15** *(1)*
**150** *(1)*
**153** *(1)*
**16** *(2)*
**17** *(3)*
**1700** *(1)*
**173** *(1)*
**18** *(1)*
**182** *(1)*
**19** *(2)*

**< 2 >**
**2** *(4)*
**20** *(3)*
**20,000** *(1)*
**201** *(1)*
**2013** *(3)*
**2014** *(13)*
**2016** *(8)*
**2016/2017** *(1)*
**2018** *(13)*
**2020** *(1)*
**2021** *(14)*
**2022** *(26)*
**2024** *(3)*
**20-minute** *(1)*
**21** *(15)*
**21st** *(2)*
**25** *(1)*

**250** *(1)*
**27** *(3)*

**< 3 >**
**3** *(3)*
**3:30** *(1)*
**3:34** *(2)*
**30** *(4)*
**30-minute** *(1)*
**30th** *(1)*
**32331** *(1)*
**33131** *(1)*
**33301** *(1)*

**< 4 >**
**4** *(4)*
**4:24-cv-00029-RH-MAF** *(1)*
**4:33** *(1)*
**40** *(5)*
**44** *(1)*
**45** *(2)*

**< 5 >**
**5** *(16)*
**5/12/22** *(1)*
**520** *(1)*

**< 6 >**
**6** *(4)*
**6/14/22** *(2)*
**6/21/21** *(1)*
**6/24/22** *(1)*
**6:50** *(1)*

**< 7 >**
**7** *(5)*
**7:00** *(1)*
**7:33** *(2)*

**< 8 >**
**8** *(3)*

**< 9 >**
**9** *(5)*
**90** *(1)*
**93** *(1)*
**9467** *(1)*

**< A >**
**a.m** *(2)*
**Abbreviation** *(1)*
**abide** *(1)*
**able** *(12)*
**Absolutely** *(1)*
**abundantly** *(1)*
**acceptable** *(1)*
**access** *(1)*
**accessed** *(1)*
**accessible** *(1)*
**acknowledgement** *(4)*
**act** *(3)*
**acting** *(7)*
**action** *(6)*
**actions** *(2)*
**activities** *(7)*
**activity** *(5)*
**additional** *(2)*
**address** *(4)*
**addressed** *(1)*
**addressing** *(1)*
**adequately** *(2)*
**administrator** *(1)*
**admit** *(1)*
**adult** *(1)*
**advance** *(1)*
**advanced** *(3)*
**advised** *(1)*
**advising** *(1)*
**affirmed** *(1)*
**afford** *(1)*
**affordability** *(1)*
**African** *(12)*
**agency** *(1)*
**aggression** *(44)*
**aggressive** *(38)*
**aggressively** *(1)*
**ago** *(7)*
**agree** *(9)*
**ahead** *(12)*
**aint** *(1)*
**ain't** *(5)*
**air** *(3)*
**allegations** *(4)*
**allege** *(3)*
**alleged** *(5)*
**alleging** *(1)*
**Allen** *(40)*

**allow** *(2)*
**allowed** *(1)*
**allows** *(3)*
**alongside** *(1)*
**alter** *(1)*
**altercation** *(1)*
**altercations** *(1)*
**American** *(13)*
**Americans** *(1)*
**amount** *(1)*
**Angel** *(1)*
**angrier** *(1)*
**angry** *(11)*
**animals** *(1)*
**annual** *(2)*
**answer** *(23)*
**answered** *(2)*
**answering** *(1)*
**answers** *(1)*
**anti** *(1)*
**anti-bullying** *(1)*
**anti-discrimination** *(15)*
**anti-harassment** *(8)*
**anti-retaliation** *(8)*
**Antonio** *(4)*
**Antonio's** *(1)*
**anybody** *(36)*
**anymore** *(5)*
**ANZIVINO** *(3)*
**apologize** *(4)*
**APPEARANCES** *(1)*
**appearing** *(1)*
**applicants** *(1)*
**application** *(1)*
**applications** *(1)*
**applies** *(2)*
**apply** *(1)*
**appreciate** *(1)*
**approached** *(1)*
**approximately** *(2)*
**April** *(5)*
**area** *(1)*
**areas** *(1)*
**argue** *(3)*
**argues** *(1)*
**arguing** *(8)*
**arguments** *(4)*
**arrest** *(2)*

**arrested** *(6)*
**ASAP** *(1)*
**aside** *(1)*
**asked** *(31)*
**asking** *(18)*
**asks** *(3)*
**aspect** *(1)*
**aspects** *(5)*
**assigned** *(14)*
**assigning** *(3)*
**assignment** *(4)*
**assignments** *(9)*
**assigns** *(1)*
**assistance** *(1)*
**associated** *(1)*
**assume** *(13)*
**assumed** *(3)*
**assuming** *(9)*
**assumption** *(1)*
**assure** *(1)*
**attached** *(1)*
**attack** *(7)*
**attacked** *(1)*
**attention** *(1)*
**attitude** *(3)*
**attorney** *(8)*
**attorneys** *(4)*
**attorney's** *(2)*
**ATVs** *(1)*
**audio** *(2)*
**August** *(2)*
**authority** *(1)*
**authorized** *(1)*
**available** *(1)*
**aware** *(16)*

**< B >**
**back** *(55)*
**background** *(1)*
**bad** *(3)*
**balled** *(12)*
**BARROUKH** *(59)*
**based** *(8)*
**basically** *(6)*
**basis** *(1)*
**Bates** *(2)*
**bathroom** *(3)*
**bear** *(1)*
**BEARDEN** *(24)*

**becoming** *(1)*
**beginning** *(3)*
**Behalf** *(4)*
**behavior** *(17)*
**believe** *(48)*
**believed** *(1)*
**benefit** *(1)*
**benefits** *(3)*
**Benjamin** *(2)*
**best** *(2)*
**better** *(2)*
**beyond** *(1)*
**bigger** *(1)*
**bit** *(5)*
**bitty** *(1)*
**black** *(8)*
**blew** *(1)*
**Bo** *(10)*
**boat** *(1)*
**boats** *(3)*
**boss** *(3)*
**bother** *(1)*
**bottles** *(1)*
**bottom** *(8)*
**Boulevard** *(1)*
**box** *(1)*
**boxes** *(1)*
**boy** *(16)*
**boys** *(1)*
**brand** *(3)*
**break** *(8)*
**breaks** *(2)*
**Brewton** *(2)*
**Brianna** *(1)*
**Brickell** *(1)*
**bridge** *(1)*
**brief** *(5)*
**briefly** *(10)*
**bring** *(6)*
**bringing** *(5)*
**brings** *(2)*
**broad** *(1)*
**brother** *(1)*
**brought** *(9)*
**BROWARD** *(1)*
**bucket** *(1)*
**buckled** *(2)*
**Buddy** *(1)*
**building** *(5)*

**buildup** *(1)*
**bullied** *(1)*
**bump** *(1)*
**bunch** *(1)*
**business** *(1)*
**butchering** *(1)*

**< C >**
**cabinet** *(2)*
**calculations** *(1)*
**call** *(49)*
**called** *(43)*
**calling** *(5)*
**calls** *(6)*
**calm** *(3)*
**calmed** *(1)*
**camera** *(2)*
**cant** *(1)*
**capability** *(1)*
**car** *(1)*
**card** *(14)*
**cards** *(1)*
**career** *(1)*
**careful** *(1)*
**Case** *(11)*
**Cat** *(1)*
**catches** *(1)*
**category** *(1)*
**caught** *(1)*
**caused** *(1)*
**causing** *(2)*
**cell** *(3)*
**center** *(1)*
**certain** *(4)*
**certificate** *(3)*
**certification** *(4)*
**certifications** *(1)*
**certified** *(1)*
**certify** *(2)*
**cetera** *(1)*
**chainsaw** *(1)*
**chance** *(1)*
**change** *(2)*
**changed** *(3)*
**CHANGES** *(1)*
**character** *(2)*
**charge** *(2)*
**chasing** *(2)*
**cheat** *(1)*

**check** *(1)*
**checked** *(1)*
**child** *(18)*
**children** *(2)*
**chime** *(1)*
**Chipley** *(1)*
**C-h-i-p-l-e-y** *(1)*
**Chipley's** *(1)*
**chose** *(2)*
**cite** *(1)*
**cites** *(1)*
**citing** *(2)*
**citizen** *(1)*
**City** *(1)*
**claim** *(6)*
**claims** *(2)*
**clarification** *(3)*
**clarify** *(5)*
**clarity** *(1)*
**Class** *(3)*
**clean** *(3)*
**clear** *(22)*
**clearly** *(3)*
**client** *(2)*
**clients** *(39)*
**client's** *(3)*
**clients's** *(1)*
**Clint** *(2)*
**close** *(4)*
**closer** *(1)*
**cloudy** *(1)*
**clue** *(2)*
**code** *(1)*
**collective** *(1)*
**collectively** *(2)*
**come** *(40)*
**comes** *(5)*
**coming** *(14)*
**comment** *(7)*
**commenting** *(1)*
**comments** *(4)*
**Commission** *(2)*
**common** *(1)*
**communication** *(11)*
**community** *(3)*
**company** *(101)*
**company's** *(8)*
**compared** *(2)*
**compiled** *(2)*

complain  (7)
complained  (1)
complaining  (1)
complaint  (15)
complaints  (14)
complete  (8)
completed  (5)
completely  (1)
complicated  (1)
comply  (1)
computer  (1)
concerned  (4)
concluded  (1)
concrete  (1)
conditioned  (1)
conditioning  (1)
conduct  (3)
conducted  (2)
conducting  (2)
confidently  (1)
confined  (1)
confirm  (6)
confirms  (1)
confronted  (1)
confusing  (1)
confusion  (1)
connected  (1)
connection  (1)
consent  (2)
consequences  (1)
considered  (2)
conspired  (1)
constant  (1)
construction  (1)
contact  (3)
contentious  (1)
context  (1)
continually  (1)
continue  (10)
continued  (1)
continues  (2)
continuously  (1)
contract  (1)
control  (5)
conversate  (1)
conversation  (1)
Cook  (1)
Cook's  (1)
cool  (3)

coolers  (1)
coordinator  (1)
coordinators  (1)
copy  (4)
corner  (2)
correct  (156)
correction  (2)
Corrections  (7)
correctly  (1)
counsel  (3)
County  (18)
couple  (11)
course  (3)
COURT  (14)
cousins  (4)
covered  (3)
co-workers  (1)
created  (2)
creating  (3)
crew  (18)
Crumitie  (14)
Crumitie's  (1)
cup  (1)
current  (2)
currently  (1)
cuss  (1)
cusses  (1)
cussing  (2)
cut  (3)
cuts  (1)
cutting  (4)

< D >
D.W  (5)
danger  (3)
dangerous  (1)
DANIEL  (2)
danielb@dereksmithlaw.com  (1)
DARRELL  (79)
Darrell's  (2)
DATE  (23)
date/time  (2)
dated  (6)
dates  (1)
day  (56)
days  (8)
day-to-day  (2)
dead  (1)

deal  (3)
decade  (1)
decided  (1)
decides  (1)
decision  (1)
deck  (1)
declare  (1)
deescalate  (1)
Defendant  (6)
Defendants  (1)
defile  (1)
Define  (3)
defines  (1)
definitely  (3)
definition  (9)
degrees  (2)
demanding  (2)
demonstrating  (2)
denied  (1)
Department  (8)
depends  (1)
DEPONENT  (1)
DEPOSITION  (19)
depositions  (2)
DEREK  (1)
derogatory  (2)
describe  (4)
described  (2)
describing  (1)
Description  (4)
desk  (2)
despite  (1)
detail  (8)
detailed  (1)
details  (3)
develop  (1)
device  (1)
devices  (1)
died  (1)
diesel  (3)
Dietrich  (4)
difference  (2)
different  (19)
difficult  (2)
diffuse  (2)
DIRECT  (2)
directly  (2)
dirt  (2)
disagreement  (2)

discipline  (9)
disciplining  (2)
discomfort  (1)
discretion  (1)
discriminated  (3)
discrimination  (52)
discussed  (5)
discussing  (1)
disparaging  (1)
disparity  (1)
disrespect  (1)
disrespected  (2)
disruptive  (1)
DISTRICT  (2)
disturbing  (1)
doctor  (1)
document  (55)
documentation  (1)
documented  (2)
documents  (27)
Dodge  (1)
doing  (19)
Donald  (1)
door  (7)
doors  (1)
DOT  (1)
DOTY  (28)
downhill  (1)
Drive  (13)
driver  (1)
driveway  (1)
driving  (5)
drove  (2)
drug  (9)
drugs  (1)
DUI  (1)
duly  (1)
Dupree  (11)
duration  (1)
duties  (5)

< E >
EALY  (91)
Ealy/Ferrovial  (1)
Ealy's  (18)
earlier  (5)
early  (1)
Easier  (1)
easily  (2)

East *(1)*
easy *(2)*
eat *(5)*
eaters *(2)*
eating *(2)*
eats *(3)*
EE *(4)*
effect *(1)*
effort *(1)*
egging *(1)*
eight *(2)*
either *(11)*
elaborate *(1)*
else's *(1)*
Ely *(1)*
Email *(9)*
emotionally *(1)*
employed *(5)*
Employee *(40)*
employees *(37)*
employees's *(1)*
employment *(6)*
encouraged *(1)*
encouraging *(3)*
Endablo *(1)*
ended *(1)*
enforce *(1)*
enforcement *(2)*
enforcing *(3)*
engage *(1)*
engine *(1)*
engines *(1)*
enjoyed *(1)*
entail *(1)*
ENTER *(1)*
entire *(6)*
entitled *(1)*
entry *(1)*
environment *(10)*
equipment *(2)*
equipments *(1)*
erecting *(1)*
ERIC *(84)*
Eric's *(4)*
ERRATA *(1)*
escalated *(2)*
escalating *(2)*
especially *(6)*
ESQ *(2)*

ESRI *(2)*
essentially *(1)*
estimate *(1)*
et *(1)*
ethnic *(2)*
ethnicity *(8)*
event *(3)*
events *(4)*
ever-changing *(1)*
everybody *(22)*
everybody's *(3)*
exact *(5)*
exactly *(3)*
EXAMINATION *(2)*
examined *(1)*
example *(1)*
Excuse *(1)*
Exhibit *(37)*
EXHIBITS *(1)*
exist *(1)*
expect *(1)*
expense *(1)*
experience *(9)*
experienced *(1)*
experiences *(1)*
Expires *(1)*
explain *(7)*
explained *(1)*
explaining *(1)*
explanation *(2)*
explicitly *(1)*
extensively *(1)*
external *(1)*
extra *(4)*
eyes *(2)*
Ezell *(2)*

< F >
f/k/a *(2)*
face *(2)*
facility *(1)*
fact *(2)*
facts *(2)*
fail *(1)*
failed *(1)*
Fair *(31)*
familiar *(4)*
families *(1)*
family *(15)*

far *(3)*
fast *(1)*
Federal *(6)*
federally *(1)*
feeders *(1)*
feeds *(1)*
feel *(12)*
feeling *(1)*
feelings *(1)*
feels *(1)*
fell *(1)*
felt *(2)*
female *(1)*
fence *(1)*
FERROVIAL *(27)*
Ferrovial-Ealy *(1)*
Ferrovial-Ealy-000575 *(1)*
Ferrovial-Ealy-000637 *(1)*
field *(6)*
fifth *(1)*
fights *(1)*
figure *(1)*
file *(16)*
filed *(6)*
files *(1)*
filing *(3)*
fill *(1)*
filled *(1)*
filling *(2)*
filming *(1)*
financially *(1)*
find *(4)*
finding *(2)*
fine *(13)*
finish *(1)*
fire *(1)*
fired *(5)*
firm *(2)*
firm's *(1)*
first *(44)*
FISHER *(1)*
fishing *(1)*
fist *(5)*
fists *(8)*
five *(7)*
five-minute *(2)*
flag *(1)*

flagging *(1)*
flat *(2)*
FLORIDA *(17)*
flotation *(1)*
Flowers *(33)*
following *(3)*
follows *(2)*
follow-up *(1)*
follow-ups *(1)*
food *(7)*
foot *(1)*
footage *(1)*
foregoing *(3)*
foreman *(12)*
foremen *(1)*
foremens *(1)*
foremost *(1)*
forgive *(1)*
forgot *(1)*
form *(19)*
formal *(3)*
forms *(4)*
Fort *(1)*
forth *(5)*
forward *(4)*
found *(3)*
four *(6)*
fourth *(1)*
frame *(3)*
free *(2)*
freedom *(1)*
frequent *(1)*
frequently *(1)*
fresh *(3)*
Friday *(5)*
friendly *(2)*
front *(4)*
froze *(1)*
fuck *(2)*
fucking *(2)*
full *(6)*
fun *(1)*
further *(6)*
future *(1)*

< G >
Gallagher *(4)*
game *(2)*
garage *(1)*

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 211 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

Garcia (52)
G-a-r-c-i-a (1)
Garcia's (3)
gas (2)
geared (1)
GED (1)
general (5)
generally (1)
gentleman (5)
gentleman's (1)
Getting (8)
gift (1)
give (24)
given (9)
gives (1)
giving (3)
Go (70)
goal (1)
goes (4)
going (86)
Good (16)
gotten (1)
GPS (1)
grab (4)
grabbed (1)
great (2)
Greenville (2)
grocery (3)
grounds (1)
GROUP (3)
grows (1)
guard (2)
guess (11)
guide (1)
guidelined (1)
guidelines (2)
gunshot (1)
guy (4)
guys (8)

< H >
half (3)
hand (3)
handbook (10)
handbooks (1)
handed (2)
handled (1)
hands (2)
happen (2)

happened (26)
happening (1)
happens (6)
happy (6)
harassed (1)
harassment (7)
hard (6)
harder (2)
hardship (1)
harmed (1)
harmful (1)
harness (2)
head (5)
headquarter (1)
hear (57)
Heard (42)
hears (1)
hearsay (1)
heat (1)
He'd (1)
help (7)
helped (1)
helpful (2)
helping (4)
herbicide (5)
hey (6)
HH-375658 (1)
high (3)
higher (1)
hire (14)
hired (13)
hiring (5)
Hispanic (3)
hit (2)
Hold (6)
holding (1)
home (31)
Honestly (1)
hood (1)
hopefully (1)
hopes (1)
hoping (1)
hostile (14)
hostility (7)
hot (7)
hour (13)
hours (13)
house (1)
HR (8)

hung (2)
hurt (3)
hurtful (1)
hurts (2)

< I >
identification (10)
ignores (1)
ignoring (3)
immediate (1)
immediately (6)
important (2)
improper (4)
improvement (2)
inaction (1)
inaudible (1)
incentives (2)
incident (13)
incidents (2)
include (2)
included (3)
includes (1)
including (1)
inclusive (1)
incoming (1)
incorrect (3)
independently (1)
INDEX (1)
indicated (1)
indicates (1)
indicating (2)
individual (4)
individuals (16)
information (6)
informed (1)
infraction (2)
infractions (2)
INFRASTRUCTURE (5)
initial (3)
in-law (1)
inmate (3)
inmates (4)
inside (2)
insight (1)
instances (6)
instruct (1)
instruction (2)
insurance (1)

intense (2)
intensive (3)
intention (2)
interacted (1)
interaction (1)
interested (1)
internet (1)
interpret (1)
interrupt (1)
interruption (1)
interstate (1)
interview (7)
interviewed (3)
interviews (1)
investigated (2)
Investigation (29)
investigations (3)
inviting (1)
involved (15)
involvement (8)
issue (5)
issued (3)
issues (1)
itty (1)

< J >
Jacksonville (3)
JAMES (72)
James's (6)
Jarvis (5)
jdoty@fisherphillips.c
om (1)
Jefferson (9)
job (52)
jobs (1)
JOHN (3)
Johnson (2)
join (1)
joined (1)
joke (5)
jokes (7)
Joseph (1)
Juan (53)
J-u-a-n (1)
Juan's (1)
jump (2)
jumped (1)
jumping (1)
June (57)

**justified** *(1)*

**< K >**
**keep** *(8)*
**keeping** *(1)*
**Ken** *(4)*
**kept** *(3)*
**Key** *(1)*
**kids** *(1)*
**kin** *(1)*
**kind** *(34)*
**King** *(1)*
**knew** *(5)*
**know** *(411)*
**knowing** *(1)*
**knowledge** *(48)*
**known** *(4)*
**knows** *(1)*
**Krystal** *(5)*

**< L >**
**label** *(1)*
**labeled** *(1)*
**labor** *(7)*
**labor-related** *(1)*
**lack** *(4)*
**lacking** *(1)*
**lady's** *(1)*
**Lake** *(1)*
**lane** *(1)*
**language** *(1)*
**laptop** *(1)*
**large** *(3)*
**Las** *(1)*
**Lauderdale** *(1)*
**laughing** *(1)*
**LAW** *(5)*
**lawn** *(1)*
**lawsuit** *(21)*
**lawsuits** *(1)*
**lawyer** *(1)*
**lawyers** *(2)*
**lay** *(1)*
**lead** *(12)*
**leader** *(2)*
**leaders** *(1)*
**leading** *(1)*
**leave** *(9)*
**leaves** *(1)*

**leaving** *(5)*
**led** *(2)*
**left** *(26)*
**legal** *(6)*
**lets** *(1)*
**letter** *(1)*
**letting** *(3)*
**level** *(3)*
**license** *(2)*
**lie** *(1)*
**life** *(1)*
**likes** *(1)*
**likewise** *(3)*
**liking** *(1)*
**limit** *(1)*
**line** *(8)*
**lined** *(1)*
**lines** *(1)*
**Linton** *(5)*
**List** *(3)*
**listed** *(2)*
**Listen** *(4)*
**listening** *(1)*
**literally** *(1)*
**litter** *(5)*
**little** *(13)*
**live** *(1)*
**LLP** *(1)*
**local** *(2)*
**located** *(1)*
**location** *(8)*
**locked** *(1)*
**long** *(8)*
**longer** *(4)*
**look** *(13)*
**looked** *(8)*
**looking** *(7)*
**Looks** *(10)*
**lot** *(16)*
**lots** *(2)*
**loud** *(3)*
**louder** *(1)*
**loudly** *(1)*
**love** *(1)*
**Lovett** *(1)*
**loyal** *(1)*
**lunch** *(6)*
**Luncheon** *(1)*
**luring** *(1)*

**< M >**
**machine** *(1)*
**Madison** *(30)*
**mail** *(1)*
**Maintenance** *(32)*
**making** *(6)*
**male** *(1)*
**man** *(6)*
**MANAGEMENT** *(6)*
**manager** *(7)*
**mandatory** *(3)*
**marked** *(17)*
**marking** *(4)*
**McMullen** *(3)*
**mean** *(129)*
**meaning** *(4)*
**means** *(6)*
**meant** *(1)*
**mechanic** *(2)*
**mechanisms** *(1)*
**medication** *(1)*
**meet** *(1)*
**meeting** *(5)*
**member** *(1)*
**members** *(2)*
**memorialization** *(1)*
**memory** *(1)*
**mention** *(9)*
**mentioned** *(8)*
**mentioning** *(2)*
**mentions** *(1)*
**message** *(3)*
**messages** *(1)*
**met** *(2)*
**metric** *(1)*
**Mexico** *(1)*
**Miami** *(1)*
**MICHAEL** *(18)*
**MICHELE** *(3)*
**middle** *(1)*
**mid-sentence** *(1)*
**miles** *(3)*
**mind** *(4)*
**mine** *(1)*
**mini** *(1)*
**Minter** *(2)*
**M-i-n-t-e-r** *(1)*
**minute** *(4)*

**minutes** *(6)*
**mischaracterize** *(1)*
**mischaracterizing** *(1)*
**missing** *(1)*
**misunderstood** *(1)*
**mm-hmm** *(10)*
**moment** *(1)*
**monetary** *(1)*
**Money** *(3)*
**month** *(5)*
**monthly** *(1)*
**months** *(5)*
**Morgan** *(4)*
**morning** *(14)*
**MOT** *(8)*
**mouth** *(1)*
**move** *(1)*
**moving** *(6)*
**mower** *(1)*
**mowing** *(3)*
**mudfish** *(3)*
**multiple** *(4)*
**murder** *(1)*
**mute** *(1)*

**< N >**
**Name** *(50)*
**named** *(1)*
**names** *(5)*
**necessarily** *(2)*
**necessary** *(1)*
**need** *(30)*
**needed** *(12)*
**needing** *(2)*
**needs** *(2)*
**neither** *(1)*
**never** *(27)*
**new** *(31)*
**newest** *(3)*
**nice** *(3)*
**nickname** *(2)*
**nicknames** *(1)*
**night** *(1)*
**nine** *(4)*
**nods** *(1)*
**NORTHERN** *(1)*
**Northwest** *(1)*
**Notary** *(1)*
**note** *(2)*

notes *(2)*
notice *(6)*
noticed *(1)*
notification *(2)*
notified *(3)*
notify *(3)*
number *(10)*
numbering *(1)*
numbers *(6)*
numerous *(2)*
N-word *(3)*

**< O >**
o0o *(3)*
O-301 *(1)*
object *(3)*
Objection *(18)*
observe *(1)*
observed *(1)*
obtain *(1)*
obvious *(6)*
obviously *(10)*
occasion *(1)*
occasions *(3)*
occurred *(3)*
occurring *(1)*
o'clock *(1)*
offense *(1)*
offer *(3)*
offered *(2)*
office *(50)*
oh *(4)*
oil *(2)*
Okay *(491)*
Olas *(1)*
old *(2)*
once *(6)*
one-page *(1)*
one's *(1)*
one-sided *(1)*
ongoing *(1)*
open *(3)*
opened *(1)*
opening *(1)*
operate *(1)*
opinion *(3)*
opportunity *(2)*
opposed *(1)*
order *(3)*

ordering *(1)*
orders *(2)*
original *(1)*
outcome *(2)*
outgoing *(1)*
outlook *(1)*
outside *(39)*
overtime *(4)*

**< P >**
P.M *(1)*
Page *(12)*
pages *(8)*
paid *(7)*
paired *(1)*
pairs *(1)*
panicked *(1)*
paper *(6)*
papers *(9)*
paperwork *(3)*
paragraph *(3)*
paragraphs *(1)*
paraphrasing *(2)*
parked *(1)*
part *(6)*
particular *(6)*
parties *(2)*
pause *(1)*
pay *(11)*
payment *(1)*
pays *(1)*
PDF *(1)*
Peddie *(1)*
pen *(3)*
penalties *(1)*
pending *(4)*
people *(36)*
perceived *(1)*
percent *(2)*
perfect *(1)*
perform *(3)*
performance *(1)*
period *(4)*
perjury *(1)*
person *(15)*
Personal *(8)*
personally *(4)*
persons *(1)*
perspective *(2)*

pertaining *(2)*
PHILLIPS *(1)*
phone *(31)*
phones *(10)*
phonetic *(1)*
physical *(11)*
physically *(2)*
pick *(9)*
picked *(1)*
picking *(7)*
pickup *(1)*
picture *(2)*
pictures *(5)*
pipe *(1)*
PLACE *(5)*
Plaintiffs *(4)*
Plaintiff's *(8)*
plan *(2)*
play *(7)*
played *(9)*
playing *(1)*
please *(28)*
PLLC *(1)*
plug *(1)*
plural *(1)*
plus *(3)*
PM *(1)*
point *(42)*
policies *(26)*
policy *(18)*
polite *(1)*
politely *(1)*
poor *(1)*
pop *(1)*
popping *(3)*
pops *(1)*
portion *(1)*
position *(18)*
possibility *(9)*
possible *(1)*
possibly *(3)*
posted *(1)*
posters *(3)*
pounds *(1)*
power *(3)*
prefaced *(1)*
prefer *(2)*
preferred *(1)*
prepare *(2)*

prepared *(2)*
preparing *(1)*
present *(7)*
presenting *(1)*
pretty *(11)*
prevent *(3)*
prevented *(1)*
preventing *(2)*
previous *(3)*
previously *(8)*
pre-written *(1)*
primary *(2)*
print *(2)*
printed *(2)*
printout *(1)*
prior *(15)*
prison *(8)*
probably *(7)*
problem *(5)*
procedure *(1)*
procedures *(1)*
proceeding *(1)*
proceedings *(1)*
process *(3)*
produced *(1)*
program *(1)*
Progressive *(4)*
prohibited *(1)*
project *(7)*
promoted *(7)*
promotion *(3)*
pronounce *(1)*
proper *(2)*
provide *(4)*
provided *(4)*
provisions *(1)*
proximity *(1)*
public *(3)*
Pull *(2)*
pulled *(3)*
pulling *(1)*
punched *(1)*
purposes *(1)*
push *(1)*
pushed *(2)*
put *(17)*
putting *(5)*

**< Q >**

Case 4:24-cv-00029-RH-MAF    Document 35-2    Filed 10/23/24    Page 214 of 219
Deposition of Michael Stephen Bearden
Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

qualifications *(1)*
qualified *(1)*
qualify *(1)*
question *(48)*
questioning *(4)*
questions *(10)*
quick *(4)*
quicker *(1)*
quickly *(3)*
quietly *(2)*
quit *(6)*
quitting *(1)*
quotations *(1)*
quotes *(3)*
quoting *(3)*

**< R >**
race *(19)*
racial *(14)*
racially *(1)*
racism *(3)*
racist *(8)*
raised *(1)*
ran *(2)*
random *(3)*
reach *(1)*
read *(40)*
reading *(4)*
ready *(1)*
real *(3)*
realize *(3)*
really *(33)*
reason *(8)*
recall *(29)*
receive *(1)*
received *(7)*
recess *(5)*
recognize *(1)*
recollection *(3)*
recommended *(2)*
record *(16)*
recorded *(6)*
recording *(10)*
recordings *(1)*
records *(4)*
refer *(8)*
referenced *(2)*
referred *(5)*
referring *(9)*

refers *(1)*
refresh *(1)*
refusal *(2)*
refused *(5)*
regard *(1)*
regarding *(15)*
regards *(6)*
rehire *(1)*
reissued *(1)*
rejection *(1)*
relate *(1)*
related *(6)*
relating *(2)*
relative *(2)*
relatively *(1)*
relaxing *(1)*
relevance *(5)*
relevancy *(1)*
relevant *(1)*
remainder *(2)*
remaining *(1)*
remarks *(4)*
remember *(60)*
REMOTE *(1)*
renewing *(1)*
repeat *(4)*
repeatedly *(1)*
replacement *(2)*
replay *(1)*
report *(49)*
reported *(16)*
Reporter *(12)*
reporting *(3)*
reports *(13)*
represent *(6)*
representing *(1)*
requested *(1)*
required *(3)*
requirements *(3)*
requires *(1)*
requiring *(1)*
reserved *(1)*
reside *(1)*
resigned *(8)*
resigning *(1)*
resolved *(1)*
respect *(6)*
respectful *(1)*
respond *(3)*

responded *(1)*
responding *(1)*
response *(1)*
responsibilities *(3)*
responsible *(6)*
rest *(1)*
restroom *(1)*
result *(1)*
resulted *(3)*
retaliated *(1)*
retaliation *(9)*
retired *(1)*
retirement *(2)*
return *(1)*
returned *(1)*
returning *(1)*
review *(6)*
reviewed *(1)*
rewind *(1)*
reword *(1)*
right *(108)*
rightfully *(1)*
right-hand *(1)*
rights *(2)*
rise *(1)*
Road *(13)*
roads *(3)*
Robert *(2)*
Rodriguez *(1)*
Roebuck *(58)*
Roebuck's *(5)*
role *(8)*
roll *(2)*
room *(1)*
rotation *(1)*
Roughly *(1)*
Roy *(2)*
rule *(3)*
rules *(3)*
run *(5)*
run-in *(1)*
runs *(1)*
Russ *(12)*
Rye *(3)*

**< S >**
safe *(2)*
safety *(10)*
saidYou *(1)*

salary *(1)*
saw *(4)*
saying *(42)*
says *(43)*
scanned *(1)*
scared *(1)*
scary *(1)*
scenario *(4)*
Scott *(2)*
scrape *(1)*
scratch *(2)*
screen *(4)*
screens *(1)*
screwdriver *(1)*
scroll *(10)*
season *(1)*
seatbelt *(16)*
second *(13)*
seconds *(1)*
section *(2)*
security *(1)*
see *(109)*
seeing *(3)*
seen *(16)*
segment *(1)*
selected *(1)*
send *(10)*
sender *(1)*
sending *(1)*
sense *(11)*
sent *(25)*
sentence *(8)*
separate *(1)*
separation *(1)*
September *(5)*
series *(3)*
serve *(1)*
service *(3)*
SERVICES *(3)*
session *(1)*
setting *(2)*
seven *(3)*
severe *(1)*
sex *(1)*
shakes *(1)*
shape *(1)*
share *(1)*
sharing *(3)*
Shaunna *(13)*

sheet *(3)*
sheets *(3)*
shook *(1)*
shop *(4)*
shopping *(2)*
short *(5)*
short-tempered *(3)*
shouting *(1)*
shoveling *(1)*
shovels *(2)*
show *(19)*
showed *(15)*
showing *(8)*
shown *(2)*
shows *(1)*
shut *(1)*
sic *(1)*
sick *(6)*
side *(14)*
Side-by-side *(4)*
sides *(2)*
sign *(13)*
signature *(16)*
Signed *(8)*
signing *(2)*
signs *(3)*
silenced *(1)*
silly *(3)*
similar *(3)*
simple *(1)*
simply *(4)*
single *(4)*
sir *(6)*
site *(13)*
sitting *(11)*
situation *(5)*
six *(3)*
skid *(2)*
skills *(6)*
skipped *(1)*
skipping *(1)*
slammed *(1)*
slow *(1)*
slur *(5)*
slurs *(2)*
small *(4)*
smaller *(2)*
SMITH *(1)*
sole *(1)*

solely *(2)*
solid *(1)*
somebody *(22)*
somebody's *(1)*
someone's *(2)*
sorry *(8)*
sort *(1)*
sound *(1)*
sounded *(2)*
sounds *(5)*
South *(2)*
space *(1)*
span *(1)*
speaking *(1)*
specific *(4)*
specifically *(8)*
specify *(2)*
spectrum *(1)*
speculate *(3)*
speculating *(1)*
speculation *(1)*
speed *(1)*
spell *(2)*
spend *(2)*
spoke *(9)*
spoken *(4)*
stab *(1)*
Stacy *(13)*
staff *(1)*
standards *(1)*
standing *(4)*
start *(9)*
started *(21)*
starting *(4)*
state *(12)*
stated *(10)*
statement *(43)*
statements *(14)*
STATES *(4)*
stating *(1)*
station *(2)*
stay *(2)*
stayed *(2)*
steer *(2)*
stenographic *(1)*
stenographically *(1)*
step *(11)*
STEPHEN *(30)*
steps *(2)*

Steve *(10)*
stick *(2)*
Stoddard *(13)*
Stoddard's *(2)*
stood *(1)*
stop *(17)*
stopping *(4)*
store *(5)*
straight *(1)*
street *(1)*
stress *(2)*
strictly *(1)*
strongly *(1)*
structures *(1)*
stuff *(22)*
styles *(1)*
subject *(4)*
submit *(1)*
submitted *(2)*
submitting *(1)*
Subordinate *(1)*
subordinates *(3)*
successfully *(1)*
sue *(1)*
suing *(3)*
Suite *(2)*
summary *(2)*
summer *(3)*
summers *(1)*
superintendent *(12)*
superior *(1)*
supervise *(5)*
supervised *(9)*
supervises *(1)*
supervising *(3)*
supervision *(1)*
supervisor *(18)*
supervisor/foreman *(1)*
sure *(42)*
surprise *(3)*
surprising *(1)*
Survey *(6)*
suspend *(1)*
suspended *(12)*
suspension *(3)*
suspicious *(3)*
sworn *(1)*
system *(3)*

**< T >**
take *(32)*
Taken *(10)*
talk *(17)*
talked *(6)*
talking *(18)*
talks *(9)*
target *(1)*
targeted *(1)*
task *(2)*
tasks *(6)*
taxing *(1)*
TBD *(1)*
tea *(1)*
teach *(1)*
team *(3)*
tech *(10)*
Technican *(1)*
technician *(24)*
technicians *(24)*
techs *(5)*
teenager *(1)*
telephone *(1)*
tell *(27)*
telling *(11)*
tells *(2)*
temperament *(1)*
temperature *(1)*
tempered *(1)*
tempers *(1)*
Ten *(1)*
tension *(1)*
tenure *(3)*
term *(1)*
terminate *(1)*
terminated *(2)*
terminating *(1)*
termination *(2)*
terminology *(2)*
terms *(2)*
test *(6)*
testified *(6)*
testify *(1)*
testifying *(2)*
testimony *(10)*
tests *(3)*
text *(5)*
thank *(5)*

Deposition of Michael Stephen Bearden

Eric Ealy and Darrell James v. Webber Infrastructure Management, Inc.

That'sa *(1)*
theirself *(1)*
theirselfs *(1)*
thing *(10)*
things *(10)*
think *(53)*
thinking *(4)*
third *(4)*
third-party *(1)*
thought *(11)*
thoughts *(2)*
threatened *(2)*
three *(11)*
three-year *(1)*
throwing *(1)*
thrown *(1)*
Thursday *(2)*
TIME *(108)*
times *(20)*
timid *(1)*
tip *(2)*
today *(34)*
today's *(3)*
told *(33)*
tolerance *(5)*
tone *(2)*
tool *(4)*
Toolbox *(11)*
tools *(2)*
top *(8)*
topic *(1)*
topics *(1)*
total *(2)*
totally *(1)*
touch *(2)*
tractor *(6)*
traffic *(1)*
train *(3)*
trained *(4)*
training *(66)*
trainings *(7)*
transcript *(5)*
transpired *(2)*
Transportation *(1)*
trapped *(2)*
trash *(16)*
treatment *(1)*
tree *(1)*
trees *(2)*

Trepal *(2)*
tried *(4)*
trimming *(1)*
trip *(2)*
truck *(16)*
true *(2)*
Trulieve *(1)*
truthfully *(1)*
try *(5)*
trying *(13)*
turn *(2)*
turned *(2)*
turning *(2)*
turnover *(1)*
two *(40)*
type *(5)*
Typed *(3)*
types *(1)*
typically *(2)*
Tyrone *(2)*

< U >
U.S *(1)*
unbuckled *(1)*
understand *(46)*
understanding *(6)*
understands *(1)*
understood *(2)*
unequal *(2)*
unfair *(1)*
unfolded *(1)*
UNITED *(2)*
unlawful *(2)*
unpack *(1)*
unprofessional *(2)*
unprofessionally *(1)*
unsafe *(1)*
unspoken *(1)*
update *(2)*
updated *(3)*
upper *(3)*
upset *(3)*
use *(8)*
useful *(1)*
usually *(1)*

< V >
vacant *(2)*
vacation *(4)*

vague *(1)*
vagueness *(1)*
valid *(1)*
vehicle *(6)*
vehicles *(1)*
verbal *(8)*
verbally *(4)*
Verizon *(3)*
versus *(4)*
Video *(48)*
videos *(1)*
viewing *(2)*
violate *(1)*
violated *(1)*
violating *(1)*
violation *(5)*
violations *(1)*
violence *(2)*
violent *(4)*
visited *(1)*
vocal *(1)*
voice *(2)*
volume *(2)*
voluntary *(2)*
volunteer *(1)*
vs *(2)*

< W >
wait *(1)*
walk *(7)*
walked *(6)*
walking *(6)*
wall *(11)*
want *(35)*
wanted *(18)*
wanting *(1)*
wants *(2)*
warning *(2)*
watch *(1)*
watching *(1)*
water *(2)*
way *(11)*
WEBBER *(12)*
website *(1)*
Wednesday *(2)*
Weed *(6)*
week *(7)*
weekly *(2)*
weeks *(7)*

weird *(2)*
welcome *(4)*
Well *(86)*
welling *(1)*
went *(16)*
we're *(8)*
Wessel *(10)*
Wessel's *(2)*
we've *(1)*
whatsoever *(2)*
white *(6)*
whites *(1)*
wife *(1)*
Williams *(1)*
Willie *(2)*
win *(1)*
wipe *(1)*
wiped *(3)*
wise *(1)*
wish *(1)*
withholding *(1)*
Witness *(10)*
witnessed *(1)*
wondering *(1)*
Woolverton *(1)*
word *(9)*
words *(6)*
work *(91)*
worked *(22)*
working *(17)*
workplace *(5)*
works *(8)*
worried *(1)*
worry *(1)*
wrecks *(1)*
wrenches *(1)*
write *(14)*
write-up *(6)*
writing *(17)*
written *(15)*
wrong *(3)*
wrote *(14)*

< X >
XYZ *(2)*

< Y >
y'all *(1)*
yard *(1)*

**Yeah**  *(41)*
**year**  *(15)*
**years**  *(13)*
**yell**  *(3)*
**yelling**  *(9)*
**Yep**  *(1)*
**Yesterday**  *(2)*

**< Z >**
**zero**  *(4)*
**zero-turn**  *(1)*
**zip**  *(1)*
**Zoom**  *(6)*

1                          ---o0o---

2                     WITNESS' SIGNATURE

3          Please be advised I have read the foregoing

4     deposition pages 1_____through 182_____,

5     inclusive.  I hereby state there are:

6

7          (check one)

8          X_____ no corrections

9          _____ corrections per attached

10

11

12     _Stephen Bearden_____

13     MICHAEL STEPHEN BEARDEN

14

15                         ---o0o---

16

17

18

19

20

21

22

23

24

25

```
 1                      ERRATA SHEET

 2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

 3   IN RE:  Eric Ealy and Darrell James vs. Webber
     Infrastructure Management, Inc. f/k/a Ferrovial
 4   Services Infrastructure, Inc.
     DEPONENT:  MICHAEL STEPHEN BEARDEN
 5   DATE TAKEN:  September 17, 2024

 6   PAGE  LINE  CORRECTION & REASON

 7   N/A_____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21
             Under penalties of perjury, I declare that I have
22       read the foregoing document and that the facts
         stated are true.
23

24   10-11-2024            Stephen Bearden
     DATE                  MICHAEL STEPHEN BEARDEN
25
```